WILLIAM L. OSTERHOUDT (SBN 043021)
DOLORES T. OSTERHOUDT (SBN 215537)
Law Offices of William Osterhoudt
135 Belvedere Street
San Francisco, California 94117
Telephone (415) 664-4600
Facsimile (415) 664-4691
Email: osterhoudt@aol.com

Attorneys for Defendant,
SAMUEL COHEN

IN THE UNITED STATE DISTRICT COURT,

FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>        vs.<br><br>SAMUEL COHEN,<br><br>                    Defendant. | **Case No. CR-10-0547**<br><br>**DEFENDANT SAMUEL COHEN'S NOTICE OF MOTION AND MOTION TO VACATE DETENTION ORDER AND TO ADMIT THE DEFENDANT TO BAIL ON REASONABLE CONDITIONS**<br><br>Date:  October 19, 2010<br>Time:  10:00 a.m.<br>Place:  Honorable Susan Illston |

**PLEASE TAKE NOTICE** that on October 19, 2010, at 10:00 am, or as soon thereafter as the matter may be heard in the courtroom of the Honorable Susan Illston, defendant Samuel ("Mouli") Cohen, by and through his counsel of record, will and hereby does move this Court to vacate the detention order entered by Magistrate Nagle on August 12, 2010, in the Central District of California, and for an Order admitting Mr. Cohen to pretrial release on reasonable conditions.

This motion is based on the instant notice, the attached memorandum of points and authorities in support of this motion, all applicable Constitutional, statutory and case authority, and such other evidence and arguments as may be presented to the Court at the hearing on this motion.

Dated:  October 6, 2010                              Respectfully submitted,


                                                      s/   William L. Osterhoudt
                                                     WILLIAM OSTERHOUDT,
                                                     Counsel for Samuel Cohen

*Samuel Cohen's Notice of Motion and Motion to Vacate the Detention Order, and Admit the Defendant to Bail on Reasonable Conditions; United States v. Cohen., Case No. 10-0547 SI*

# TABLE OF CONTENTS

**Page**

Memorandum of Points and Authorities………………………………………….   1

I.      Introduction………………………………………………………………   1

II.     Background of the Present Charges…………………………………....   1

III.    Mr. Cohen's Personal History and Character…………………………….   5

IV.     Mouli Cohen's Professional Background…………………………………   8

V.      The Bail Reform Act Supports Mr. Cohen's Pretrial Release on
        Reasonable Conditions…………………………………………………….   12

        A.  The Government's Showing Before the Magistrate Was Deeply
            Flawed and Did Not Support Pretrial Detention………………………   12

        B.  The Magistrate's Finding that Mouli Cohen Presents a  Risk of
            Flight and Danger to the Community, and that No Conditions of
            Reason Can Mitigate this Danger, Was Not Supported by Even
            a Preponderance of the Evidence……………………………………..   18

        C.  The Bail Reform Act Factors Favor the Defendant's Release………..   21

VI.     Proposal for Release on Reasonable Conditions………………………….   22

Conclusion…………………………………………………………………………   23

Proof of Service

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  Introduction

On July 15, 2010, the grand jury returned an Indictment charging Samuel Cohen with nineteen counts of wire fraud in violation of 18 USC § 1343, and thirteen counts of engaging in monetary transactions with criminally derived property, in violation of 18 USC § 1957.  These allegations grew out of investments made by various persons in shares of Ecast, a business founded by Mr. Cohen and others, which provides internet enabled music, games and information to bars and restaurants nationwide.  Beginning in September 2002, Mr. Cohen is alleged to have made false or misleading representations to investors regarding a planned acquisition of Ecast by Microsoft Corporation, an acquisition which would have boosted the value of Ecast stock, but which never took place.  Having lost money on these investments, investors filed civil lawsuits in San Francisco Superior Court against Mr. Cohen and others in 2009, claiming that they were defrauded.  The charges in the Indictment mirror the allegations made in the civil suit.  These charges do not appear to be well-founded and, in any event, Mr. Cohen is clearly entitled to pretrial release on conditions sufficient to reasonably assure his appearance when required.

### II.  Background of the Present Charges

The present prosecution grew out of the civil actions filed against Mr. Cohen and others in San Francisco Superior Court beginning in 2009.  In addition to claiming that Mr. Cohen defrauded the purchasers of Ecast shares by falsely representing that Microsoft would acquire the company,  plaintiffs in the civil actions alleged that Mr. Cohen obtained $22 million from the same investors by falsely telling them that regulatory approval of the Microsoft-Ecast deal in the United States and Europe required these expenditures.  Mr. Cohen denies these allegations and the evidence belies them.  The acquisition by civil plaintiffs, including Hari Dillon, of Ecast stock

from Mr. Cohen took place through legitimate transactions in which Dillon executed two comprehensive declarations, one on behalf of the Dillon Group and the other on behalf of the Glover Group, absolving Mr. Cohen of any misrepresentations and completely contradicting his later claims. These declarations were attached to defendant's opposition to detention in the Court below, and are similarly attached as Exhibit "B" to this motion. Representative is Dillon's declaration executed May 2, 2004, in which he declared, under penalty of perjury, that:

> In connection with Dilon's purchase of Ecast stock, Cohen never promised or represented to me that Dilon would receive any guaranteed profit or return in connection with Ecast stock that would make Dilon wealthy. Cohen did not make to me any predictions about the future price of Ecast stock, and he never stated or represented that the stock would have any particular value at any time.
>
> . . .
>
> Cohen never represented that Ecast was about to be acquired or would be acquired within any specific period of time or was imminently going to do an initial public offering.
>
> I understood at all times that Dilon's investment in Ecast involved substantial risks.

See Exhibit B, page 1. The purchasers (Messrs. Dillon and Glover and the investor groups they represented) also entered into a release agreement releasing Mr. Cohen from any and all potential claims pertaining to the Ecast stock purchase. These releases are attached to this motion as Exhibit "C." The releases are exhaustive and detailed and contradict the assertions made against Mr. Cohen in the civil complaints, and now in the Indictment.

Of even greater importance, the $22 million dollars allegedly extracted from the Dillon and Glover partnerships over a period of six years to facilitate regulatory approval of the supposed Microsoft purchase of Ecast, were actually used by the complainants for an entirely different purpose. These funds were used to purchase (through convertible note purchase agreements) an equity position in ProCinea, a thoroughly legitimate and highly promising corporation founded in part by Mr. Cohen, which developed sophisticated software to forecast box office returns for

motion pictures.  The security agreements and note purchase agreements through which these investments were effected contained no mention whatsoever of Ecast or Microsoft, and they appear to be straight forward investments by the complaining witnesses, made following full disclosure of all pertinent details and risk factors involved.  Attached to this memorandum as Exhibit "D" are documents disclosing these full risk factors and releases with respect to ProCinea. In other words, the individuals now accusing Mr. Cohen knowingly and intentionally acquired, for value, promissory notes convertible into an interest in ProCinea, which they actively sought. These individuals betrayed no dissatisfaction with Mr. Cohen until they became disappointed by the result of their investment, a risk that they readily and knowingly accepted when they acquired this interest.

For a long time the principal plaintiffs in the civil suits, through their lawyers, sought to enlist the prosecutorial powers of the government in their actions against Mr. Cohen.  Learning of these efforts through discovery provided in the civil case, Mr. Cohen's counsel repeatedly contacted federal authorities to learn whether any investigation was pending and to offer Mr. Cohen's cooperation.  These overtures by Mr. Cohen's counsel, initially Marshal Grossman, and later Tom Nolan of the Skadden firm, took place over a long period of time.  But the only prosecutorial and FBI contacts counsel were aware of from the civil litigation denied involvement and professed not to know whether an investigation was even pending.  The declaration filed by Mr. Nolan in the Los Angeles proceedings before the Magistrate is attached hereto Exhibit "E." Meanwhile Mr. Cohen continued his full cooperation with an SEC investigation of the same events that underlie the civil litigation and the present Indictment.  Between August 2009 and June 2010, Mr. Cohen made three voluntary productions of requested documents concerning these transactions and submitted to a full day of interrogation by the SEC staff. On August 3, 2010, Mr. Cohen's counsel was notified that the SEC case had been closed without any action taken against

him.  Exhibit "F" to this motion is the letter reflecting this closure.  In other words, the SEC, the government agency specifically charged with enforcing laws against the fraudulent sales of securities, fully investigated these claims, heard from Mr. Cohen, and closed the case.

On July 12, 2010, Mr. Cohen participated in a mediation of the civil cases in San Francisco.  At that time his counsel became aware that Agents were in and about the building where the mediation was occurring, with a view to possibly making an arrest.  Mr. Cohen, who participated in the mediation from his counsel's nearby offices, was made fully aware of the situation.  But no attempt was made to apprehend Mr. Cohen.  At the conclusion of the proceedings, he left the building and returned to his home in Los Angeles, without any effort having been made to arrest him.  He continued to reside in his home, attempting to be fully available and cooperative, for the next 24 days.  On August 5, 2010, however, Mr. Cohen was arrested in Los Angeles on the charges in this Indictment, which had been returned in this District on July 15, 2010.  He was arrested on a busy Los Angeles thoroughfare through "swat team" tactics, featuring approximately twenty federal agents and local police officers, who arrested the defendant at gun point as a helicopter hovered overhead.  In spite of his lawyer's communications to federal law enforcement and the US Attorney's Office, Mr. Cohen was never afforded an opportunity to self-surrender.  Instead, the government staged an unnecessary confrontational arrest of Mr. Cohen and then sought his detention as a flight risk.

On August 12, 2010, a detention proceeding was held before Magistrate Judge Nagle, in the Central District of California.  (The transcript of that proceeding is attached to this Motion as Exhibit "A;" the audio recording of the proceeding is also being filed with the Clerks Office for the Northern District of California).  At the conclusion of the hearing, Magistrate Nagle denied Mr. Cohen pretrial release, finding that he posed a risk of flight and an "economic danger" to the

*Samuel Cohen's Notice of Motion and Motion to Vacate the Detention Order, and Admit the Defendant to Bail on Reasonable Conditions; United States v. Cohen., Case No. 10-0547 SI*

community, and that no condition or combination of conditions of pretrial release could be fashioned which would insure Mr. Cohen's appearance as required.

We now seek this Court's review because the government failed to carry its burden under 18 USC § 3142 (the "Bail Reform Act"), the evidence relied upon by the government was unsubstantiated and unreliable, and the Magistrate's Court indulged in inferences were not supported, even by a preponderance of the evidence.  Mr. Cohen's family, friends, business and philanthropic associates are in full support of him, and he does not pose a risk of flight. Furthermore, the case against Mr. Cohen is neither as serious (in terms of the ultimate potential sentence involved) nor as strong (from an evidentiary perspective) as the government led the Magistrate to believe.  We propose conditions of release which are more than adequate to insure that Mr. Cohen will honor his obligation to appear in this Court to defend this case.  In fact, Samuel Cohen looks forward to his day in Court, when he will be able to vigorously defend the charges against him.

## III.    Mr. Cohen's Personal History and Character

Samuel ("Mouli") Cohen is a 52 year old man who was born and raised in Jerusalem, Israel.  Mr. Cohen immigrated to the United States in 1987, and became a naturalized citizen in 1996.  He met Stacy Cohen in 2000, and in 2003 they were married.  (A letter from Stacy Cohen is attached as Exhibit "G").  The couple was living in Los Angeles, California at the time of Mr. Cohen's arrest.  Mrs. Cohen has written to the Court describing her loving relationship with her husband and the pain exacted by his absence.  She also speaks movingly of the Cohens' charitable and philanthropic activities, which bring joy to their lives.  Samuel Cohen also has two children from a previous marriage, Roi (age 22), who recently graduated from college, and Danielle (age 19), who is still in school.   Roi and Danielle both live in New York with their mother, Yael. (Letters submitted by Roi, Danielle, and Yael in connection with the Los Angeles detention

hearing are resubmitted here, along with more recent letters written to this Court by Roi and Danielle, in Exhibit "H").

As these letters describe, Mr. Cohen is fortunate to have a tight-knit and warm family structure, in which his presence and support this past month has been sorely missed. Mrs. Cohen sincerely describes the pain and sadness that has resulted from Mouli's absence. As these letters also attest, throughout his children's lives, Samuel Cohen has been a caring and engaged parent to Roi and Danielle. Roi describes his father's strong positive influence, imbuing him with the need for honesty and respect for the law. He writes emotionally of his father's "compassion and generosity as well as concern for others less fortunate." Yael Cohen stresses the great heart of her former spouse. "Even as my ex-husband, I hold nothing but treasured memories of him and his kind and giving personality." She writes that as a child, Mr. Cohen "didn't have much, and it was his ultimate goal that if he was ever to be in a position to help others he would make it his number one priority in life." Danielle describes her father as "the most altruistic person I have known my entire life," who "always gave his love and care to his family and those who were in need." It is particularly sad and distressing that Mr. Cohen's mother, who lived in Israel, passed away in recent days. The elder Mrs. Cohen had experienced illness and was undergoing medical care, but her death at this time was tragic and unexpected. Mouli Cohen is incredibly distraught over the passing of his mother during his period of seeming helplessness and incarceration.

One of the foundations of Samuel Cohen's life is his faith. He and Stacy practice a kosher lifestyle, and are very involved in Jewish community events. Letters provided to the Court in support of Mr. Cohen's release on reasonable conditions by Rabbis Yosef Langer, Shmuel Naparstek, Danny Cohen and Asi Spiegel underscore Mr. Samuel Cohen's steadfast presence in his religious community and the respect that he has earned in that venue. (Letters of Rabbi Langer,

6

*Samuel Cohen's Notice of Motion and Motion to Vacate the Detention Order, and Admit the Defendant to Bail on Reasonable Conditions; United States v. Cohen., Case No. 10-0547 SI*

Rabbi Naparstek, Rabbi Cohen and Rabbi Asi Spiegel are attached to this motion as Exhibit "I").

As Rabbi Josef Langer eloquently expressed:

> "Even in the face of judgment against him, I personally can vouch that Mouli is a man of high character and integrity.  Mouli is an amazing man.  I have known him to be the most giving, responsible, honest and helping individual my wife, family and I have encountered in the past 20 years.  When he says something he will always do it, never going back on his word or a promise."

Rabbi Langer is in a good position to vouch for Mr. Cohen, because he knows him well, and is deeply involved in the Chabad community in San Francisco.  He recounts that he met Mr. Cohen years ago when he was living in San Francisco, and states: "When my family and I were in need of help he was always there for us, through thick and thin.  He is also a family man who loves his wife and kids and who is respected by those around him."  Rabbi Naperstek praises Mr. Cohen's "wisdom, charm and good nature" and is deeply impressed by the extent of Mr. Cohen's philanthropic activities.

Rabbi Danny Cohen of Hebron writes from afar to express his support for Mr. Cohen.  As director of the Chabad Organization in the city of Hebron, Israel, Rabbi Cohen writes: "to testify that Mr. Cohen has been a very important support or of our organization's work, supporting families in need and the learning of Jewish studies in different educational institutes."  Danny Cohen expresses his opinion that the defendant "is a man that will honor his word and not break the rules that will be set by the Court upon his release on bail."  (Exhibit "I").  These sentiments are echoed by Rabbi Spiegel.  Id.

As Mrs. Cohen stresses in her letter, and as numerous writers inside and outside the family have stressed, the Cohens' have devoted themselves to philanthropic activities, giving time and money to a broad range of worthy causes.  Nearly all of the letters written to this Court in support of Mr. Cohen discuss what Mr. Alex Sandel refers to as Mouli Cohen's "humanitarian instinct."  Among these endeavors, Mr. Cohen organized a fundraiser for stem cell research in the wake of

the death of Stacy Cohen's mother from early onset Alzheimer's Disease, and fostered a matching grant from Intel's Andy Grove for the benefit of the only GMP stem cell facility in the United States. Additionally, many of the organizations supported by the Cohens focus on improving the lives of children.  In this vain, Mr. Cohen has worked on an ongoing basis with Camp Okizu, a camp devoted to children with cancer and their families; has committed himself to the goal of reducing childhood blindness in third world countries through his support of the Childhood Vision Campaign; and supported Mount Sinai's adolescent health center, as well as a charity devoted to autistic children.  Mr. and Mrs. Cohen also supported the arts, through donations to the Asian Art Museum, the SF MOMA, and the LA County Museum, and through Jerry Brown's School for the arts, which brings the arts into the lives of under-privileged children.   These are causes which have imbued Mouli and Stacy Cohen's lives with meaning, and which further tie them to the community.  (See Letters of Support, Exhibits "G" through "I").

## IV.     Mouli Cohen's Professional Background

Samuel Cohen's professional background is like that of so many creative, energetic and motivated businessmen; it is the success story of a self-made man.  After high school, Mr. Cohen completed a three year commitment of compulsory military service in Israel.  He then began his professional career, developing his knowledge in the business world through trial and error in several small business ventures in Israel.  Following his arrival in the United States in 1987, Mr. Cohen focused his energies of the emerging high technology field, including successful healthcare and software startups.  Mr. Cohen invested in and helped form several startup companies.  These included Lamia Enterprises, Aristo International, which identified computer applications for consumer products, and Playnet, Inc., established to develop video games in bars and restaurants. In 1998, Samuel Cohen founded Ecast, an interactive media company offering digital music, games, entertainment, information and advertising through a network of electronic juke boxes,

*Samuel Cohen's Notice of Motion and Motion to Vacate the Detention Order, and Admit the Defendant to Bail on Reasonable Conditions; United States v. Cohen., Case No. 10-0547 SI*

found in more than 10,000 locations nationwide.  This company has raised more than $100 million dollars in venture financing.  Mr. Cohen served as Chairman and Chief Executive Officer of Ecast until January 2002, and as Executive Chairman until October 2002, when he left the company.

In late 2003 – early 2004, Mr. Cohen formed ProCinea, an ambitious venture which developed financial modeling software to forecast box office returns for motion pictures.  This venture utilized the services of respected academics and professionals and was highly regarded by those familiar with development in the motion picture industry.  It was ProCinea that attracted many investors, Complainants Dillon, Glover and the Mills (Samuel and Mary Mills) among them.  There was nothing fraudulent about it and it ultimately went into decline only because of developments in the motion picture industry.  The project has not been abandoned; through various transactions, the creditors of ProCinea now own the company's proprietary software, which has been maintained by Mr. Cohen and his staff until the day when hopefully the concept can be revived in a different financial atmosphere.

In 2007, Mr. Cohen formed Voltage Capital (now Threshold Capital), a private investment firm focusing on investment opportunities in the high technology, digital media and healthcare sectors.  Threshold Capital included portfolio companies with substantial net present values, which held great promise.  When Mr. Cohen was arrested, Threshold was in ongoing discussions for a joint venture with Mannkind-Afreza to distribute a revolutionary new insulin inhaler for diabetics in Southeast Asia, India, and China.  Several countries in Asia as well as the Russian Federation have experienced dramatically rising rates of Diabetes in their populations due to changes in the traditional diets of their populations and other factors.  At the same time, traditional methods of insulin treatment are often prohibitively expensive and/or impractical to administer.  Mr. Cohen's efforts (through Threshold), were to create joint ventures with Western drug companies and local

partners in the Asian countries to market alternative treatment methods, that would allow for oral (inhaled) administration of insulin.

Pear, Inc. envisioned collaboration with the world's largest diamond dealer, and intended to launch an online retail service focused on diamond and jewelry sales.  OnCirc Diagnostics is a company co-founded by Mr. Cohen, acting through Threshold Capital Group, in 2009.  On Circ is a medical device company developing a system that would allow more precise and consistent monitoring and diagnostics of hospital patients.  The company's planned products and services are based on technology exclusively licensed from the John Wayne Cancer Institute, a well-known medical research institution, where the technology was originally developed.  OnCirc's system is based on an intravenous catheter to be used on hospital patients while the patients are in intensive care or are otherwise receiving intravenous medication.  OnCirc's catheter, in conjunction with an automated screening system to which it is connected, monitors biologic agents in the patients blood stream on a consistent basis throughout their hospital stay.  While Mannkind and Pear were effectively blocked from advancement by Mr. Cohen's arrest, OnCirc continues to grow and to show great promise.

Mr. Michael Reilly, CEO of OnCirc Diagnostics describes Mr. Cohen's hard work and sustained effort in getting this Biotech startup, devoted to developing breakthrough cancer diagnostics, off the ground.  Mr. Reilly explained:

> "As you know, this period of time [the last two years] was marked by an economic recession that has made it very difficult for biotech startups to find funding. Finding and funding the right technologies is long difficult work and [Mr. Cohen] has supported my efforts throughout the time period unlike many private equity investors who are very short-term oriented.  Throughout this time period, he was very careful with expenditures in OnCirc, focusing on support of the project with his energy, insight, and connections."

Mr. Reilly states that Mouli Cohen's support "ultimately resulted in the identification of new oncology diagnostic technologies that can identify hidden circulating cancer cells in order to better

treat patients with metastatic cancer." Discussing Mr. Cohen's founding support of OnCirc, Mr. Reilly states that "thanks to his efforts, a company was formed, financing found, and this technology is now being discussed with a couple large pharmacuetical companies for commercialization and availability to the general public." He concludes that "Mr. Cohen's release would allow us to better continue this work and complete the studies necessary for FDA approval and patient benefit." (Letter of Michael Reilly attached hereto as Exhibit "I").

Danny Petrosak, a medical doctor and PhD met Mr. Cohen in connection with his work on an ambitious project to help solve the problem of dehydration secondary to intestinal illness in the third world. Dr. Petrosak, who is a visiting faculty associate in two departments at the California Institute of Technology, has written to the Court that "I was impressed at once with Mr. Cohen's enthusiasm, natural scientific intuition, and desire to support impactful projects that would promote welfare for those who are underserved." Dr. Petrosak writes:

> I have had ample opportunity to observe Mr. Cohen in multiple business meetings and conferences. He has always conducted himself with respect, kindness and integrity. I have also on occasion witnessed his interaction with family and friends. His devotion to his children, wife, family and friends takes precedent over any business or other matter.

(Dr. Petrosak's letter is attached hereto, as Exhibit "I").

In line with Mr. Cohen's ongoing interest in medical breakthroughs and technology, Collagen Detection, LLC, was formed by Mr. Cohen in 2009 to pursue development of a system for early detection and diagnosis of osteoporosis. Osteoporosis is notoriously difficult to detect at an early stage, and hence difficult to address by early preventative measures. Collagen Detection intends to address that problem with a system consisting of a device for measurement of skin collagen and a predictive computer monitoring system.

From this summary it should be apparent that the prosecution's bald statement during the Los Angeles bail/detention proceedings that Mr. Cohen has been involved in no lawful enterprises

in recent years is baseless.  Mr. Cohen, utilizing his skills in developing financial support for fledgling companies, and helping to administer a fund for this purpose, has involved himself in numerous enterprises of great benefit and potential benefit to society.

## V.   The Bail Reform Act Supports Mr. Cohen's Pretrial Release on Reasonable Conditions

The Bail Reform Act, 18 USC § 3142, *et. seq.*, supports Mr. Cohen's release on reasonable conditions.  Section 3142(b) states that a judicial officer shall order the pretrial release of a person on personal recognizance, or upon execution of an unsecured appearance bond, subject to specified conditions, "unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community."  Subsection (c) states that the judicial officer shall order pretrial release subject to "the least restrictive further condition, or combination of conditions," that such judicial officer determines will reasonably assure the appearance of the person and the safety of any other person and the community, followed by a nonexclusive list of potential conditions of release.

Section 3142(e) sets forth the bases for a rebuttable presumption against release, in cases dealing with a crime of violence or other specified offenses.  Finally, Section 3145(b), states that in the case of a detention order entered by a magistrate judge, or by a person other than a judge of a court having original jurisdiction over the offense, the person may file a motion with the Court having original jurisdiction over the offense, for revocation or amendment of that order; Section 3145(b) further states that the motion shall be determined promptly.

A.   The Government's Showing Before the Magistrate Was Deeply Flawed and Did Not Support Pretrial Detention

In the instant case, there is no presumption in favor of pretrial detention, and Mr. Cohen presents neither a risk of flight nor a danger to the community.  At the August 12, 2010 detention proceeding before Magistrate Nagle, the government asserted that such dangers exist, based on Mr.

*Samuel Cohen's Notice of Motion and Motion to Vacate the Detention Order, and Admit the Defendant to Bail on Reasonable Conditions; United States v. Cohen., Case No. 10-0547 SI*

Cohen's dual citizenship and history of international travel, his lack of assets in the United States, and the presumptive sentence that Mr. Cohen would face is convicted of the charges in the Indictment.  The Court was informed that Mr. Cohen had not conducted a lawful business in many years, and had, in substance devoted himself solely to fraudulent activities.  As we demonstrate herein, these claims and the proffers used to support them do not justify pretrial detention of Mr. Cohen.  But moving beyond the accusations in the Indictment or anything that had been previously alleged, government counsel told the court that Mr. Cohen had even defrauded his own father-in-law, Mr. Stripling, using the same Microsoft-Ecast scheme alleged in the Indictment, and, according to brand new information, had defrauded one Javier Burillo, a business associate.  These accusations, made for the first time at the bail hearing, surprising defense counsel and giving him no opportunity to prepare a response, were entirely false and scurrilous.  We will respond to these accusations in turn.

First, as emphasized herein, Mr. Cohen has actually done nothing but legitimate work in recent years, operating his fund and working to improve the lot of persons throughout the community. The prosecutor who appeared at Mr. Cohen's initial bail proceeding in Los Angeles on August 6, 2010, told the court that Mr. Cohen had sent "tens of millions of dollars overseas," while the prosecutor who appeared at the August 12, 2010 continued hearing claimed that Mr. Cohen had exported three million dollars.  Neither of these widely disparate claims find any support in the evidence proffered by the government.  The record would show that during the banking crisis of 2009, Mr. Cohen transferred funds from his Wells Fargo accounts to his Credit Swiss account, from which he paid regular business and personal expenses until he was satisfied regarding the integrity of the banking system.  This is all a matter of record, and there was no surreptitious effort to hide funds anywhere.  There were no tens of millions of dollars or even three

million dollars exported by Mr. Cohen, and these unsupported claims of the government should not be credited.

While the prosecution made much of Mr. Cohen's dual citizenship, it was not explained how this factor creates a flight risk that cannot possibly be addressed by reasonable conditions of release. Both Mr. Cohen's Israeli passport and U.S. passport are in the possession of his counsel, who can either retain them, or turn them into the Clerk according to the Court's preference.  In neither case will they be available for his use.  Additionally, the Israeli Consulate can be instructed not to issue new travel documents to Mr. Cohen, even if he should request them, and to notify the Court or government of any such request on his part.  Mr. Cohen's wife, his former wife, and his children all reside in this country.  He has been a US citizen since 1996.  There is simply no reason to find Mr. Cohen to be an irremediable flight risk due to this factor.[1]  The fact that Mr. Cohen has traveled internationally should not count for anything in view of the proposed conditions of release, which would absolutely foreclose such travel.

The government complained earnestly before the Magistrate that Mr. Cohen had "no assets" in this country.  Presumably the government was referring to the fact that at the time of the defendant's arrest, the Cohen's were living in an expensive rental property and that they do not own residential or commercial real estate.  It is true that ever since he came to this country, Mr. Cohen has lived and worked in rented premises and has not purchased real estate.  That is his choice and it is a legitimate one.  But lack of real estate ownership simply does not mean that a person is devoid of substance and has no legitimate presence in the community.  Mr. Cohen's productive life has been involved with the development and acquisition of innovative and

---

[1]  While there s a mechanism by which a person can divest himself of Israeli citizenship, in view of all his strong ties to this country, Mr. Cohen should not be required to adopt this extreme remedy on pain of detention.

*Samuel Cohen's Notice of Motion and Motion to Vacate the Detention Order, and Admit the Defendant to Bail on Reasonable Conditions; United States v. Cohen., Case No. 10-0547 SI*

promising companies.   While in the normal course of business affairs some of these have failed, others have prospered and grown beyond even his expectations.   Ecast, already mentioned, is but one example.   As we have set forth above, at the time of Mr. Cohen's arrest on August 5, 2010, the Threshold Fund had a net present value, according to accounting principles, of nearly $90 million dollars.   Of course this does not mean that Mr. Cohen, as a principal of Threshold, had access to funds approaching this amount, or that the companies constituting this asset had present liquidity. Nevertheless, the Fund had genuine value based on realistic projections for these companies and, as Mr. Reilly and Dr. Petrosak attest, Mr. Cohen's energy and guidance was a major reason for this.   Thus, the suggestion that Mr. Cohen just travels a lot and rents a big house but has nothing going for him, is simply wrong.[2]

The charges made by the prosecutor, for the first time during the bail hearing, which seriously impugned the character of Mr. Cohen, are palpably false.   The accusation that Mr. Cohen somehow defrauded Mr. Javier Burillo came out of the blue and is completely bewildering.   At the August 12, 2010 hearing, the prosecutor stated that Mr. Burillo had "just called" the government, claiming to have been defrauded out of $10 million dollars by Mr. Cohen.   If Mr. Burillo indeed made such an accusation, it is completely and totally without merit.   Javier Burillo, a scion of one of wealthiest families in Mexico, first invested directly into ProCinea through his family trust in 2006.   He subsequently suggested that Mr. Cohen and he form an investment partnership, and in 2007 they jointly formed MCJB (Mouli Cohen-Javier Burillo), with each partner putting in

---

[2]  The government has made much of the very expensive rental property in Bel Air in which the Cohen's resided before his arrest.   We should point out, however, that these premises were extensively used by Mr. Cohen for business purposes, where his staff met, interviews were conducted, documents drafted, and present and prospective associates entertained.   A fair portion of the house was used in this way.   Mr. Cohen has always sought to present an image of success and achievement as an integral part of his business presentation.   We do not think this is unusual or wrong for a person in his position, and it is not a fact that justifies depriving Mr. Cohen of his liberty pending trial.

approximately $1.2 million dollars.  MCJB invested in some experimental projects that did not pan out and the partners lost money.  Because of this, Mr. Cohen invited Burillo to participate in the Voltage (now Threshold) Fund, which allowed him to participate in the development of companies evolving under Voltage's guidance. As a lender to ProCinea, MCJB remains part of the creditor's group formed to preserve and maintain the assets (principally software) developed for ProCinea. All this is well-documented; there was no fraud involved anywhere.

It was Mr. Burillo who first informed Mouli Cohen in 2009 that a civil suit had been filed against him by Mary and Samuel Mills growing out of the earlier Ecast investment they had made. Burillo has been consistently supportive of Mr. Cohen and they have remained friends throughout the course of the civil litigation.  Within days of Mr. Cohen's arrest, he had friendly discussions with Burillo, who has never suggested that he was defrauded in any way. All investments by Mr. Burillo are documented and well-supported.  There were no misrepresentations, and Mr. Burillo has never alleged that there were.  Therefore, we frankly do not know what the prosecutor was talking about when making the assertions he did before the Los Angeles Magistrate.

The prosecution's eleventh hour accusations regarding Mr. Cohen allegedly defrauding Robert Stripling, the father of his wife Stacy, are completely untrue, and in fact, scurrilous.  Some years ago, Mr. Stripling, a Texas surgeon, decided to make a distribution of funds to his children (Stacy and her brother) during his lifetime, rather than leaving the money to them upon his death. He was apparently also motivated to make this distribution in part by the relatively recent marriage of Stacy to Mouli Cohen.  His assets, however, were tied up in an IRA.  To avoid the penalties associated with early withdrawal, it was decided that the distribution would be by way of a loan out of the IRA to an entity, Signet Ventures, established by Mouli.  Signet, an LLC, received the funds in the form of a loan, and issued promissory notes for the loan amount.  Regardless of the form of this transaction, everyone associated with it regarded it as a way in which Mr. Stripling

could affect this payment to his daughter and her husband during his lifetime, without being penalized for early withdrawal from his IRA.  Merrill Lynch, which administers the Stripling IRA, continues to monitor the status of the notes through Signet.

The genesis of the prosecutor's accusation appears to be as follows.  Following the death of his wife (Stacy's mother) after along period of dementia, Robert Stripling remarried a much younger woman who became extremely angry that Mr. Stripling had provided for his children in this way.  Apparently this did not accord with her plans.  She began to shut off all communication with Stacy, even as Mr. Stripling himself became ill.  This person kept Stripling isolated, largely away from neighbors and others who had been friendly with the couple during Karen Stripling's lifetime.  She refused to let Stripling's children, particularly Stacy, speak with him.  Stacy became increasingly concerned as she learned from neighbors the extent of her father's illness, as melanoma spread to his liver and part of his brain.

At the same time, Stripling's new wife began claiming, to anyone who would listen, that Stacy and her husband had wrongly acquired from Robert money she thought was rightfully hers.  Within the last year, Stacy, concerned about her father's illness and rumors about her step-mother's control over him, tried to call but the step-mother made him hang up the phone.  When she tried to call again the line was disconnected.  When she flew to Texas to see her father, this woman slammed the door in her face.  Eventually, Mr. Stripling became aware of her presence and they were able to spend some time together.  She accompanied him to some chemotherapy treatments and renewed their bond as father and daughter.  Since that time, however, the step-mother has continued to prevent any telephone or other contact.

The information related by the prosecutor, obviously originating with this individual (Stripling's second wife) is therefore based on a lie.  The prosecutor said in court that, according to this source, Mr. Cohen had acquired money from his father-in-law using the same Microsoft-Ecast

17

scheme alleged in the Indictment.  These funds from Mr. Stripling were not an investment by him in anything, and no one who was aware of this event at the time regarded it as being any kind of investment, let alone something having to do with Ecast or Microsoft. This is simply a tragic family situation that has nothing to do with this case but was improperly exploited to cast Mr. Cohen in the worst possible light.  It should not have been presented to the Magistrate, and it is entitled to no weight in this Court.

When arguing before the Magistrate, the prosecutor kept on ratcheting up Mr. Cohen's supposed exposure under the federal sentencing guidelines, beginning with "$30 million dollars" as alleged in the Indictment, but not shown by the facts as they are presently known, blithely adding $10 million dollars based on the supposed last minute claims of Javier Burillo, and throwing into the mix several million dollars more, based on the false accusation about Mr. Stripling. The prosecutor told the Magistrate that Mr. Cohen faced "decades" in jail, or at least fifteen to twenty years.  These claims were wildly extravagant, and were calculated to convince the Magistrate that Mr. Cohen's exposure was so great that his incentive to flee was correspondingly great, regardless of conditions imposed on his release.  We do not read the sentencing guidelines the way the prosecutor does.  Even crediting the $30 million dollar claim made by the government (which we do not believe is supportable) it is difficult to envision a sentence of Mr. Cohen in a range theorized by the prosecutor.  At the age of 52 he has never been accused of crime before and he has, to say the least, strong defenses to the present prosecution.  He has little incentive to run from these charges, and every incentive to stay and fight them.

B. <u>The Magistrate's Finding that Mouli Cohen Presents a  Risk of Flight and Danger to the Community, and that No Conditions of Reason Can Mitigate this Danger, Was Not Supported by Even a Preponderance of the Evidence</u>

The Magistrate's finding of flight risk was deeply flawed because the government proffered no legitimate evidence satisfying its burden of proof in this regard.  We have already

18

discussed the inadequacy of that proffer and of the arguments advanced by the government in support of detention.  The Magistrate appeared unduly cynical about the arguments raised by Defendant's counsel, mocking the suggestion that the government had "dithered" in arresting Mr. Cohen, after showing its hand during his mediation trip to San Francisco.  Defense counsel's point, however, was not that the government "dithered" but rather than Mr. Cohen, with full knowledge of the federal interest in him, and a clear warning that he may be arrested, took no step to flee the jurisdiction.  Engaging in pure and unsupported speculation, the Court opined that perhaps Mr. Cohen had not run because he was "in denial" regarding his jeopardy.  That suggestion is completely unjustified and untrue.

The court failed to credit Mr. Cohen's cooperation with the SEC and with the government in her bail determination.  The record is very strong in this regard.  The Magistrate Judge had before her abundant evidence of Mr. Cohen's voluntary cooperation with the SEC investigation of the very transactions involved in this Indictment.  He repeatedly produced documents requested by the Commission, and submitted to a lengthy, exhaustive interview.  Although the Court did not have before it the SEC's letter closing the inquiry without charges, we have attached it here as Exhibit "F."  Counsel's showing of Mr. Cohen's repeated efforts to contact federal prosecutors and the FBI in response to information that civil plaintiffs were trying to invoke their aid against Mr. Cohen, was particularly strong and is similarly placed before this Court.  (Exhibit "J").  Two separate lawyers for Mr. Cohen made repeated efforts in this regard, speaking to the agent and prosecutor whose names appeared through civil discovery proceedings as involved in the investigation.  All of these efforts were ignored by the FBI, and by the US Attorney's Office, both of which refused to even acknowledge the existence of an investigation.  When, during the San Francisco mediation trip, it appeared that Agents may be preparing to arrest Mr. Cohen, his counsel redoubled their efforts.  It was made known to prosecutors that Mr. Cohen was available,

*Samuel Cohen's Notice of Motion and Motion to Vacate the Detention Order, and Admit the Defendant to Bail on Reasonable Conditions; United States v. Cohen., Case No. 10-0547 SI*

that he was not going any place.  Following his arrest, Mr. Cohen was interviewed by Agents, to whom he readily revealed his banking information, which resulted in the prompt freezing of his accounts.  He did not conceal anything.

These were not the efforts of a person seeking to avoid arrest by running away.  Rather, they bespeak a desire to cooperate with authorities, as he did with the SEC, by answering their questions and providing the information they needed to evaluate the claims being made against him.  Those claims, after all, arose from people with a personal interest in seeing Mr. Cohen incapacitated and stripped of his resources by a federal prosecution, and were thus subject to legitimate scrutiny by federal law enforcement. The Magistrate gave no consideration to these cooperative efforts by the defense, before and after the arrest was made.

The Magistrate Judge too readily accepted the government's bald statements concerning vast sums of money sent to Swiss accounts and secreted over seas, without requiring any proffer of actual evidence that such was the case. The court placed undue emphasis on the defendant's dual citizenship without considering readily available conditions that would keep him from traveling, such as surrender of his travel documents.  The court indulged in unsupported and unjustified inferences against the defendant, such as the suggestion that he must have been "in denial' when he failed to run away and failed to consider available conditions of release, such as travel restrictions, electronic or GPS monitoring, reporting requirements, and the custodianship of another person to mitigate the risk of flight.  The Court erroneously considered "economic danger" to the community as a basis for detention when, as pointed out by defense counsel, that would not constitute an independent ground to detain the defendant.  For all of these reasons, the Magistrate's ruling was flawed and the order of detention should be vacated.

C.      <u>The Bail Reform Act Factors Favor the Defendant's Release</u>

The Bail Reform Act of 1984 speaks in terms not of absolute guarantees, but rather of reasonable assurances.  See *United States v. Tortora,* 922 F.2d 880, 884 (1st Cir. 1990).  Our Court of Appeals has made clear that "[d]oubt regarding the propriety of release should be resolved in favor of the defendant."  *United States v. Motamedei*, 767 F.2d 1403, 1404-1405 (9th Cir. 1985); *United States v. Townsend,* 897 F.2d 989, 994 (9th Cir. 1990).  Although we sometimes lose sight of the limited reach of the pretrial detention authorized by the Bail Reform Act, the cases make clear that a person arrested for a non-capital offense should ordinarily be permitted to bail, and only in rare circumstances should release be denied.  *Townsend, supra.,* 897 F.2d 994; *United States v. Gebro,* 948 F.2d 1118, 1121 (9th Cir. 1991).

Under these circumstances, at this stage of the proceedings, it cannot be said that the seriousness of the charges or the strength of the evidence preponderates against Mr. Cohen's release.  As the Court has recognized, these factors are in any event entitled to the least weight of any of the Section 3142(g) factors listed in the Bail Reform Act.  *United States v. Motamedei, supra,* 767 F.2d at 1408; *United States v. Honeyman,* 470 F.2d 473, 474 (9th Cir. 1972).  As the Court reminded us in *Motamedei,* "the statute neither requires nor permits a pretrial determination that the person is guilty" of the charges brought by the government.  *Motamedei, supra,* at 1408; *United States v. Chen,* 820 F. Supp. 1205, 1207 (N.D.Cal. 1992).  Here we have emphasized the weakness of the prosecution's case and the existence of strong, viable defenses.

When one passes to a consideration of the history and characteristics of the accused, including involvement in and ties to the community, we believe that the balance shifts heavily in favor of Mr. Cohen.  Mr. Cohen provides with this motion letters from persons attesting to his kindness, generosity, and deep involvement in the most positive philanthropic activities in the community.  Mr. Cohen's wife and children live in the United States.  The business activities

21

through which he has sustained himself for a quarter of a century are in the United States.  His "lifestyle" to which the government objects has not changed in recent years after he came into contact with the persons now falsely accusing him of fraudulent conduct.  He has consistently maintained a similar lifestyle for many years, obviously regarding it as beneficial to his business activities.  The big house emphasized by the government was extensively used for business purposes, contained an office and an office staff who regularly met and conducted their activities there.  Mr. Cohen chooses to rent rather than buy real estate because that is simply his choice, and it is both a reasonable and lawful choice.  The letters submitted herewith demonstrate the positive impact Mr. Cohen has had on the community and the strength of his commitment to the worthwhile projects being pursued by highly qualified individuals such as Dr. Petrosak and Mr. Reilly.

**VI.     Proposal for Release on Reasonable Conditions**

Mr. Cohen should be released on reasonable conditions.  We submit to the Court that the following assurances and conditions would be reasonable in this case. If Mr. Cohen is released pretrial, a man of substance and integrity has offered to allow Mr. Cohen and his wife, Stacy, to live in his family home. He will act as a third-party custodian of Mr. Cohen, insuring that he attends all court appearances, and abides by all conditions of release.  Stacy Cohen has already moved into the custodian's home.  He has written a thoughtful letter to the Court indicating a full awareness of his undertaking and explaining why he believes in Mr. Cohen and is willing to help him gain his release as he prepares for trial.

Mr. Cohen's passports can remain in the possession of undersigned counsel, or can be turned in to the Clerk of the Court if that is the preferred course, and thus will not be available to Mr. Cohen for travel purposes. We propose that as additional conditions of release, Mr. Cohen be required to report regularly to pretrial services, that he submit to electronic monitoring or GPS

surveillance, so that his whereabouts will be known;  that his travel be restricted to the Northern and Central Districts of California; that Mr. Cohen's custodian be sworn to inform the Court of violations of bail conditions; and that Mr. Cohen refrain from attempting to obtain any new travel documents without the Court's express permission.  Additionally, Roger and Judith McAulay have offered to post a substantial financial security, in the form of $600,000 of equity in their family home, for purposes of Mr. Cohen's bail. This home is the personal residence of the McAulay's and their children, and it is extremely important to them.  Their willingness to post it as bail security for Mr. Cohen bespeaks their faith in him and their firm belief that he will honor his commitments to the Court if released.

We believe that these additional conditions, which were not before the Magistrate in Los Angeles, are ample to reasonable assure Mr. Cohen's presence when required in Court.

**CONCLUSION**

For the reasons stated herein the defense respectfully requests that the Court authorize Mr. Cohen's release from jail confinement, on reasonable conditions.

Date:   October 6, 2010                                    Respectfully submitted,


                                                          /s/  William L. Osterhoudt
                                                         WILLIAM L. OSTERHOUDT,
                                                         Attorney for Samuel Cohen

*Samuel Cohen's Notice of Motion and Motion to Vacate the Detention Order, and Admit the Defendant to Bail on Reasonable Conditions; United States v. Cohen., Case No. 10-0547 SI*

**PROOF OF SERVICE**

I am employed in the City and County of San Francisco, State of California.  I am over the age of 18 and not a party to the within action; my business address is 135 Belvedere Street, San Francisco, California 94117.

On the date set forth below, I caused to be served the foregoing **DEFENDANT SAMUEL COHEN'S NOTICE OF MOTION AND MOTION TO VACATE DETENTION ORDER AND TO ADMIT THE DEFENDANT TO BAIL ON REASONABLE CONDITIONS; POINTS AND AUTHORITIES IN SUPPORT** on all interested parties in this action by causing same to be served electronically to the following:

AUSA **Jeffrey Finigan** at email address: Jeffrey.Finigan@usdoj.gov

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 6, 2010 in San Francisco, California.


/s/ Dolores T. Osterhoudt
Dolores T. Osterhoudt

*Samuel Cohen's Notice of Motion and Motion to Vacate the Detention Order, and Admit the Defendant to Bail on Reasonable Conditions; United States v. Cohen., Case No. 10-0547 SI*