United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>     v.<br><br>SAMUEL COHEN,<br><br>             Defendant.          / | No. C 10-00547 SI<br><br>**ORDER DENYING RENEWED MOTION TO VACATE DETENTION ORDER AND ADMIT THE DEFENDANT ON BAIL** |

Defendant's renewed motion to vacate the detention order and admit the defendant on bail came on for hearing before this Court on December 11, 2010. Defendant was represented by Gary S. Lincenberg and the United States was represented by Assistant United States Attorney Jeffrey R. Finigan.

The Court has considered defendant's renewed motion and all of the filings submitted in this case, including the filings made in connection with defendant's first motion and the record of the proceedings before Magistrate Judge Nagel in the Central District of California. The Court has also considered the Pretrial Service reports from the Central and Northern Districts of California. For the following reasons, the Court DENIES defendant's renewed motion for bail.

**BACKGROUND**

On August 5, 2010, defendant was arrested in Los Angeles pursuant to an indictment issued in the Northern District of California on July 15, 2010, alleging nineteen counts of wire fraud in violation of 18 U.S.C. section 1343 and thirteen counts of engaging in monetary transactions with criminally derived property in violation of 18 U.S.C. section 1957. The government contends that defendant

1 engaged in a scheme to defraud investors of $6,000,000 by selling them overpriced shares of a company
2 (Ecast) while lying to the investors that Ecast was about to be acquired by Microsoft. The government
3 also alleges that defendant fraudulently procured an additional $22,000,000 from the investors by
4 demanding the investors pay their share of fees associated with obtaining US and EU regulatory
5 approval of the purchase of Ecast by Microsoft.

**1.      Proceedings Before Magistrate Judge Nagel**

After his arrest, the government moved to have defendant detained in the Central District. The government made the following proffers to Magistrate Judge Nagel in support of detention: "(1) the defendant has sent more than $3,000,000 to Swiss bank accounts within the last 2 years; (2) the defendant has perpetrated this same scheme to defraud on other individuals (including his father-in-law from whom he stole more than $7,000,000 beginning in July 2003); (3) the defendant and his wife have lived an extravagant and luxurious lifestyle financed by the proceeds of the defendant's fraud; (4) the defendant is an Israeli and U.S. citizen; (5) the defendant was (prior to his incarceration) a frequent international traveler, often on private jets; (6) despite reaping millions from his schemes, the defendant has failed to pay taxes for years; (7) the defendant is 52 years old and his sentence exposure is decades by statute and more than 15 years by the guidelines and will include millions of dollars in restitution; (8) the defendant has no ties to the NDCA since moving away in 2009 to get away from the victims; and (9) in addition to the fraudulent scheme, the government has evidence that the defendant has walked away from numerous significant debts and simply has no conscience when it comes to taking people's money." United States' Opposition to Defendant's Motion to Vacate Detention Order and to Admit Defendant to Bail [Docket No. 25] at 3.

Defendant opposed the motion for detention, arguing that defendant presents no risk of flight; that he is an American citizen who has lived in California for more than a dozen years; he resides in Los Angeles with his wife and has two children in New York from a former marriage whom he continues to support; he runs a business in Los Angeles and has several employees who depend on him for their livelihoods; he has no criminal history; he voluntarily appeared for testimony before and cooperated with the Securities and Exchange Commission in its investigation of allegations similar to the ones in

2

the indictment; and has dutifully participated in civil proceedings directly related to the facts alleged in the indictment. *See* Opposition filed in Case No. 10-mj-01918 Central District California, Docket No. 5 at 1. Defendant also argued that "critically, Mr. Cohen has been aware of the government's investigation and its recent surveillance of him, but has not fled, has continued to reside in his home here in this district, and has even made several efforts through counsel to contact the government regarding self-surrender." *Id.* As a bail package, defendant offered a $250,000 bond from the defendant, a $25,000 cash bond from Mr. Bill Ballston, and $300,000 representing the equity in the home of Mr. McAulay, a business associate of defendant's. Exhibit A to Motion to Vacate Detention Order [Docket No. 18, Transcript of Detention Hearing] at 18-19. Defendant also offered to surrender his passports. *Id*. at 26.

Judge Nagel found that defendant presented both a risk of flight and a danger to the community and therefore ordered him detained. In the detention hearing, Judge Nagel was primarily concerned with defendant's failure to explain what happened to the millions of dollars procured from the investors and defendant's access to money in overseas accounts, noting that "[w]hat the Court is really focused on is the access to money. The access to money typically brings with it the access to evade all of the constraints put upon someone that should limit their ability to flee." *Id*. at 39; *see also id.* at 14-15, 39-40. In issuing the order of detention, the Judge found that:

> [t]he history and characteristics of the defendant indicate a serious risk that he will flee, because there are inadequate bail resources to mitigate the risk of flight, given the defendant's ties outside the district, including his ties to Israel of which he remains a citizen, and his alleged access to substantial funds held in financial institutions outside the United States.

Finigan Declaration in Opposition [Docket No. 26], Ex. A at 3.

Judge Nagel also found that defendant "poses a risk to the safety of other persons or the community because the seriousness of the allegations in the indictment suggest that he presents an economic danger to the community." *Id*. The Judge also concurred with Pretrial Services in the Central District which recommended, initially and on reconsideration based upon a third-party's offer to use his family residence as a surety for defendant's release, that detention be ordered based on nonappearance and danger to the community.

3

**2.    Defendant's First Motion to Vacate Detention Order**

Defendant filed a motion to vacate Magistrate Judge Nagel's detention order with this Court on October 6, 2010. [Docket No. 17]. In support of that motion, defendant submitted letters from defendant's wife, ex-wife, adult children and letters of support from religious and business associates in support of Mr. Cohen's character and trustworthiness. *See* Declaration of William L. Osterhoudt, Exs. G - I. Defendant also argued that he had been conducting legitimate work as a partner in a venture capital fund, Threshold Capital, which has a net present value of $90 million and is supporting a number of initiatives which have genuine value. Motion to Vacate at 9-12, 15.

In opposition, the government argued that defendant was a flight risk based on his Israeli citizenship, his history of using private jets and international travel, and his numerous overseas connections. Opposition [Docket No. 25] at 12-13. In support, the government proffered translations of a series of jailhouse phone calls Mr. Cohen made to associates where Mr. Cohen sought to raise money to "get bail" through connections in Israel and Russia, including money from the "alternative market" in Russia. *Id*., at 5-7. In the calls, the defendant also repeatedly asserted that once he gets out "everything is over." *Id*. at 7.

The government continued to note that defendant, who lived a lavish lifestyle at the time of his arrest - including paying monthly rent of $50,000[1] and use of luxury cars, drivers, body guards, a cook and several other staff – still had not adequately explained where all of the money from the alleged fraud went, how Mr. Cohen financed his lavish lifestyle or why he suddenly did not have personal funds to put up for his own bail. *Id*. at 8. The government argued that defendant had not paid any income taxes and the government had no information that Mr. Cohen had earned any actual income by a legitimate means over the last decade. *Id*. With respect to the weight of the evidence underlying the charge, the government argued that Mr. Cohen made personal misrepresentations to various persons about the potential of the Microsoft acquisition of Ecast, sold his Ecast shares for $2.50 to $3.00 per share when their value was less than 10 cents and sold more Ecast shares than he possessed. Opposition at 1-2. The government also noted that multiple civil lawsuits had been filed against Mr. Cohen for the same

---

[1] The government and defendant subsequently clarified Mr. Cohen's rent was $45,000 a month.

4

conduct. Opposition at 2-3.

On October 18, 2010, the government submitted additional facts to support its motion, including proffers that defendant had in fact transferred more than $9,000,000 to Switzerland since 2003, far more than the $3,000,000 represented to Judge Nagel. Supplemental Opposition [Docket 29] at 2. The government also proffered additional evidence about in-custody phone calls where defendant offered to borrow money from "alternative markets" and at "higher interest rates than usual" and represented to people that he had plenty of assets to repay any loans once he gets out of custody. *Id*. at 2-3. Defendant's contacts indicated that the "alternative market" in Russia could be a source of "a lot of money." *Id*. at 3. The calls also indicated that defendant will have access to Swiss bank accounts with the help of a Swiss attorney, and that a contact in New York had raised "half a million for bail." *Id*. at 3-4. The government argues that these calls further demonstrate that defendant has vast connections around the world and the ability to raise significant amounts of money very quicky. *Id*. at 4.

In reply, defendant asserted that $22 million of the funds secured from the alleged victims was, with full disclosure, invested in Procinea, a company created by defendant. Reply in Support of Motion to Vacate [Docket No. 30] at 6-7. Defendant also disputed the negative implications of his Swiss bank accounts, admitting that he transferred between $1.5 to $2 million from the U.S. to his Credit Swiss accounts "until he was satisfied by the integrity of the banking system." Reply at 9. With respect to his in-custody phone calls, defendant argued that these only show that he is desperate to get out of jail and is trying to come up with borrowed funds to pay for bail and that his repeated efforts to secure such funds through various sources discredits the government's argument that he has "money put away overseas." Reply at 9. With respect to taxes, defendant argued he has filed tax returns, even if he hasn't paid taxes recently due, possibly, to deferral of the taxes given the nature of his investments. Reply at 10. Finally, defendant also challenged the charges made by the United States in the first bail hearing that defendant also defrauded his father-in-law and Javier Burillo of additional millions of dollars. Motion at 15. Defendant argues that the business dealings with Mr. Burillo were and remain amicable, although to date unprofitable (Motion at 15-16; Reply at 12-13) and that the majority of the funds from his father-in-law were funds for the benefit of defendant's wife in the form of a loan to "Signet Ventures" an LLC established by defendant and secured by promissory notes. Motion at 16-18; Reply

5

1  at 10-11.

2  Defendant also offered different and additional conditions from those presented to Judge Nagle
3  to support his bail package including: a third-party – who admitted he had known defendant for only
4  a short period of time – to act as custodian of Mr. Cohen and who would allow Mr. Cohen to reside with
5  him and ensure that defendant attends all court appearances and abides by all conditions of release;
6  defendant would submit to electronic monitoring or GPS surveillance; defendant would restrict his
7  travel to Northern and Central Districts of California; and the McAulay's will post an increased security
8  of $600,000 of equity in their family home.

9  The Court held a hearing on the motion on October 19, 2010. At the hearing, the government
10 proffered more information regarding the multiple Swiss bank accounts that the government had
11 discovered, only one of which was identified by defendant, and confirmed that at least $9 million dollars
12 had been credited to those accounts between 2003 and 2010, and that the Swiss authorities had indicated
13 that additional monies had been transferred. *Id*. at 25-26. The government also indicated that the IRS
14 had discovered more than 20 domestic bank accounts and that at least $20 million passed through those
15 accounts. *Id*. at 26. The government also emphasized that defendant sold more Ecast shares than he
16 owned and sold them for vastly inflated prices. *Id*. at 27-28. In response, defendant reiterated that the
17 money in his Credit Swiss accounts was put there for safe keeping and then transferred back or used to
18 pay defendant's expenses and disputed the claim that he sold more Ecast shares than he owned or sold
19 them at inflated prices. *Id*. at 38-40.

20 After considering all of the evidence proffered and arguments made, as well as the Pretrial
21 Services report from the Northern District of California which recommended that defendant be detained
22 as a risk of flight/non-appearance, the Court denied defendant's motion. The Court was very concerned
23 with the enormous amount of money that was being transferred about, and the millions that the
24 government proffered was unaccounted for. The Court did not believe that the bail conditions offered
25 were sufficient to ensure the defendant's presence at trial. *Id*. at 42.[2] The written Order issued by the

26

27  [2] Information provided by the government in a supplemental filing, referenced in the pretrial
28  service report from the Northern District, and discussed during the hearing concerned whether or not defendant's wife had represented to a Rolls Royce dealer that she had $19 million in a Swiss bank

6

1  Court stated that for the reasons expressed at the hearing, the "Court agrees with Judge Nagel and the
2  conclusions of Pretrial Services in the Central and Northern Districts and finds that the history and
3  characteristics of the defendant indicate a serious risk that he will flee; there are inadequate bail
4  resources to mitigate the risk of flight given the defendant's ties outside the District, including his ties
5  to Israel of which he remains a citizen, and his alleged access to substantial funds in overseas financial
6  institutions or through his network of contacts outside the United States." October 19, 2010 Order at
7  1-2.

### 3.     Defendant's Renewed Motion to Vacate Detention Order

On November 30, 2010, defendant filed a motion to vacate the Court's October 19, 2010 detention order and to set bail. [Docket No. 41]. The motion is essentially a renewal of defendant's prior motion.[3] In support of his renewed motion, defendant challenges the government's assertion that defendant has access to hidden funds. In support of that argument, defendant provides account statements for four Swiss bank accounts. According to defendant, the statements demonstrate that defendant used the accounts in a legitimate manner, transferring money to and from the accounts and using the accounts to pay his personal and business expenses. Renewed Motion at 5-8. Those accounts, which may have been frozen by Swiss authorities, currently have small balances. That fact, defendant asserts, supports his position that he does not have access to substantial funds.

The defendant also argues that the government has mischaracterized defendant's in-custody calls. Based upon defendant's own translation and defense counsel's conversations with one of the participants, defendant asserts that the calls simply demonstrate that Mr. Cohen was desperately trying

---

account. Defendant asserted that, however the issue arose, there has been a "mistake," and neither Mr. nor Mrs. Cohen had access to a Swiss bank account with $19 million. Hearing Transcript at 36; 42-43. The Court did not find the issue dispositive on the issue of detention. *Id*., at 42-43. On the renewed motion, the defendant proffered evidence that the Swiss bank account at issue belonged to a third-party but did not otherwise explain how defendant's wife came into possession of the statement or whether she used it at the Rolls Royce dealer. In light of the new information, the government withdrew it's reliance on that proffer. *See* Opposition to Renewed Motion [Docket No. 43] at 7.

[3] As the government notes, the proper procedure should have been to either seek to "reopen" the bail hearing pursuant to 18 U.S.C. § 3142(f) based on newly available information or to have appealed the prior order pursuant to 18 U.S.C. § 3145(c). Nonetheless, the Court will proceed to review the renewed motion on its merits.

7

to raise money to fund his defense, that defendant did not have contacts or tried to raise money from Africa, and that references to things being "over" when defendant got out simply referred to defendant's belief that his financial situation would improve if he is able to secure bail. *Id*. at 10-13. Defendant then reargues that the evidence against him is weak and that there is no evidence that he presents a current danger of economic harm to anyone. *Id*. at 14-16.

On his renewed motion, defendant also proposes additional bail conditions. Specifically he offers to post his personal property, which a recent appraisal valued at $800,000; to post whatever balances are "available" from his bank accounts; agrees to waive extradition rights and agrees to "renounce" his Israeli citizenship. Renewed Motion at 17-18.[4]

The government opposes the renewed motion. In support, it proffers that IRS agents have analyzed the now over 30 domestic bank accounts used by defendant in the last 10 years and have failed to trace approximately $8 million in funds that transferred out of those accounts. Opposition to Renewed Motion [Docket No. 43] at 5-6. The government has also analyzed the four Swiss accounts for which defendant provided statements – as well as available information for two additional Swiss accounts controlled by Mr. Cohen that were *not* voluntarily disclosed by defendant – and asserts that it still has not accounted for $1.6 million of transfers out of those accounts. *Id*. at 4, 6. The government also noted that defendant had an ability to raise money, seeing as he has admittedly raised at least $250,000 since being in custody,[5] and reiterated that his international contacts and calls demonstrated he has the ability to raise more - all of which weighs in favor of continued detention. *Id*. at 8.

The government disputes the import of defendant's new translations of some portions of Mr. Cohen's in-custody calls, disputing defendant's contention that the context of the calls demonstrates a general aim to raise money so that Mr. Cohen can "fight" the case and pointing out that defendant has retained two sets of counsel "for bail only" and tried to retain the third in the same way, but was forced

---

[4] Defendant also offers a new third-party surety, Mr. Feldman, who offers a $25,000 interest in the equity of his home but Mr. Feldman's offer simply replaces the offer made by Mr. Ballston before Judge Nagel.

[5] The Court notes that one of defendant's Swiss accounts shows that $250,000 was in fact transferred into a Swiss account on August 10, 2010, a few days after Mr. Cohen was arrested. *See* Docket No. 41-4 at 23. The Court also notes that two days later, on August 12, 2010, the $250,000 appears to have been paid out of the account, and defendant offers no explanation of where it went. *Id.*

8

to have his counsel make a general appearance. These fact, the government argues, supports its position that defendant simply wants to get out on bail and remains a flight risk if he does. *Id*. at 10. Finally, the government counters that the new bail conditions are still insufficient to mitigate the risk and in particular argues that plaintiff's offer to post his personal property is insufficient as the property is overvalued and it is simply not feasible for the Court to ensure control over it.

In a supplemental opposition filed the day before the argument, the government submitted evidence it claims establishes that Mr. Cohen provided false information in support of his prior motion for bail. The information proffered, the government argues, shows that at the time of his arrest Mr. Cohen's business venture, Threshold Capital, did not have ongoing negotiations with a firm for a joint-venture and that negotiations were terminated because defendant's company had made misrepresentations to the other parties. Docket No. 45. Defendant opposed the inferences from the government's new evidence, arguing that negotiations were ongoing at time of Mr. Cohen's arrest and questioned the government's source of the information.[6]

## LEGAL STANDARD

Under 18 U.S.C. section 3145(b), a criminal defendant is entitled to have a magistrate judge's detention order reviewed by "the court having original jurisdiction over the offense." 18 U.S.C. § 3145(b). This Court reviews Judge Nagle's detention order *de novo*. *United States v. Koenig*, 912 F.2d 1190, 1192-93 (9th Cir. 1990).

18 U.S.C. section 3142 governs pretrial detention of criminal defendants. Under the procedures set forth in the statute, criminal defendants are ordinarily entitled to go free before trial. *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985). In "rare circumstances," however, a court may order a defendant detained pending trial. *Id.* These circumstances are limited to those in which a judge finds

---

[6] The defendant asserts that the source of the supplemental evidence is an attorney involved in the civil litigation against Mr. Cohen who has an obvious bias. Defendant raised the same argument in opposition to a yet another supplemental piece of evidence offered by the government during the hearing on the renewed motion. The evidence, challenging Mr. Cohen's character, was offered by a former body guard of Mr. Cohen and current Navy SEAL, who states that he quit over his unease about Mr. Cohen's business dealings. The Court has taken notice of these last minute evidentiary proffers, but does not find them dispositive to the issue before the Court.

9

that "no condition or combination of conditions" will "reasonably assure" the appearance of the person at trial, and "reasonably assure" the safety of the community. 18 U.S.C. § 3142(e).

In determining whether there are conditions of release that will reasonable assure the appearance of a defendant and the safety of the community, the Court considers: (1) the nature and seriousness of the offense charged; (2) the weight of the evidence against the defendant; (3) the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug and alcohol abuse, and criminal history; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g); *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991). The government bears the burden of showing by a preponderance of the evidence that the defendant poses a flight risk, and by clear and convincing evidence that the defendant poses a danger to the community. *United States v. Gebro*, 948 F.2d at 1121.

### DISCUSSION

Based on review of all of the evidence proffered and arguments made, the Court continues to believe that Mr. Cohen presents a serious risk of flight and that no condition or combination of conditions will reasonable assure his appearance at trial or the safety of persons in the community.

**1.    Nature and Circumstances of the Offense**

With respect to the nature and seriousness of the offense, Mr. Cohen has been charged with nineteen counts of wire fraud and thirteen counts of engaging in monetary transactions with criminally derived money in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1957. The government asserts that defendant took at least $30 million from various victims and faces a sentence of at least 15 years by the guidelines and millions of dollars in restitution. Oppo. at 2-3. Defendant, through a sentencing expert, asserts that defendant faces a sentence of between four and nine years assuming there are few victims. Docket No. 30-2 at 3-4.[7] Even taking the defendant's range, however, the Court is persuaded that the nature of the sentence weighs in favor of denying bail. Years in prison, even if only a few, represents

---

[7] The Court also notes that Mr. Cohen is defending multiple civil lawsuits related to the alleged fraud in this case, and faces millions of dollars in damages in those cases as well.

10

1  a significant hardship for Mr. Cohen considering his former luxurious lifestyle. The sentence and the
2  fact that Mr. Cohen faces millions of dollars in restitution, increase the likelihood of Mr. Cohen's flight.
3       Moreover, the circumstances of the offenses – serious fraudulent conduct – weigh against bail
4  as well. As the government points out, as late as August 2010, Mr. Cohen was living a very luxurious
5  lifestyle, using private jets and paying $45,000 month rent plus expenses for a large personal staff. Yet,
6  Mr. Cohen has not paid any income tax in a decade. Mr. Cohen also cannot point to any substantial
7  bank accounts, except for his Swiss accounts which hold approximately $200,000, or sources of income
8  that show how he financed his former lifestyle. The lack of explanation as well as the lack of an
9  adequate explanation of where all of the $30 million dollars from the alleged victims went[8] – which was
10 recognized by Judge Nagel in defendant's initial bail hearing – give weight to the government's position
11 that Mr. Cohen will continue to engage in fraudulent conduct if he is allowed out on bail.[9]

### 2. Weight of Evidence Against Defendant

14      The parties vigorously dispute the weight of the evidence in this case. Defendant's main
15 argument is that the government will not be able to prove that Mr. Cohen sold more Ecast shares than
16 he had or sold the Ecast shares at an inflated value. Defendant also denies that he made any promises
17 to any of the alleged victims that Microsoft was about to acquire Ecast, and that two of the government's
18 main witnesses – Mr. Dillon and Mr. Glover – have declared the same under oath. The government,
19 however, proffered the existence of documentary evidence regarding the number and overpriced value
20 of the stock sales and points to other witnesses who were told of the Microsoft deal by Mr. Cohen, as
21 well as emails where the Microsoft deal was raised and not refuted by Mr. Cohen. The merits of the
22 evidence will be decided at trial. However, for purposes of this motion, the Court finds that the
23 government has proffered substantial evidence against Mr. Cohen.

---

[8] Defendant asserts that $22 million of the money from the alleged victims went to buy interests in Procinea, a business founded in part by Mr. Cohen which is currently dormant.

[9] In the hearings, the government also proffered the fact that Mr. Cohen has repeatedly attempted to sell pieces of artwork at inflated prices in order to secure money, including money for bail.

11

### 3.     History and Characteristics of Defendant

Mr. Cohen has no criminal record or history of drug or alcohol abuse. Mr. Cohen, however, had dual U.S. and Israeli citizenship, and a history of frequent international travel, including by private jet. Mr. Cohen also lacks substantial ties to California. He owns no real property in the United States, and other than a "storage shed" in Southern California where defense counsel asserted Mr. Cohen's substantial personal property is stored, Mr. Cohen has little to tie him to California. Mr. Cohen's ex-wife and adult children live in New York. His current wife is living in Southern California, but in the home of an acquaintance who has known the Cohens for six months. While Mr. Cohen has submitted letters of support, they are from family members (who he supports financially), from leaders of religious organizations (who have also received financial assistance from Mr. Cohen or facilitated charitable contributions from Mr. Cohen to undisclosed recipients), and from two business associates who he has known for three years and two years respectively. *See* Declaration of William L. Osterhoudt, Exs. G, H and I.[10] Further, while Mr. Cohen has proffered that he has ongoing interests in various companies, though his Threshold Capital investment fund, he does not have the sort of employment that would tie him to California.

Moreover, the fact that Mr. Cohen was by all appearances a man of substantial wealth, but has not personally offered any substantial amount of money for his bond package – other than his unliquidated personal property – is troubling. Mr. Cohen was either living a lifestyle he could not afford or has substantial undisclosed funds at his disposal. Finally, even if the defendant does not have undisclosed funds, he has substantial connections overseas who are apparently ready and able to raise significant amounts of funds for him. As the in-custody calls proffered by the government demonstrate, defendant repeatedly called his connections in Israel and in Russia in efforts to secure funds, including funds from the "alternative market." These connections, and their apparent ability to secure substantial funds for Mr. Cohen, heightens the Court's concern over flight risk.

---

[10] The parties dispute whether there is substantial evidence of Mr. Cohen's charitable activities. The disputes center primarily on defendant's activities with Camp Okizu, with defendant asserting he contributed over $200,000 to the charity and the government countering that the money "donated" was spent solely on auction items – for which defendant received substantial value in return – and that it was like "pulling teeth" to get Mr. Cohen to pay for his auction items.

**4.      Nature and Seriousness of Danger to Community**

While Mr. Cohen was not arrested on a crime of violence and does not have a criminal record, for the reasons discussed above, the Court continues to agree with Judge Nagle that Mr. Cohen presents a risk to the community. Financial harm can constitute community danger, where there is a showing that defendant's fraudulent activity is ongoing or defendant has a propensity to continue fraudulent activity. *See, e.g.*, *United States v. Reynolds*, 956 F.2d 192, 192 (9th Cir. 1992) ("danger may, at least in some cases, encompass pecuniary or economic harm."); *United States v. Madoff*, 586 F. Supp. 2d 240, 252 (S.D.N.Y. 2009).

In addition to these factors, the Court has also considered the incredibly large amounts of money that has passed though defendant's various bank accounts and the fact that the IRS has not been able to track $8 million from Mr. Cohen's domestic accounts and $1.6 million from Mr. Cohen's Swiss bank accounts. The fact that defendant used over 30 domestic and at least six Swiss accounts, as well as the fact that the government keeps discovering additional accounts which have not been voluntarily disclosed by Mr. Cohen, substantiate the Court's concern that defendant has access to undisclosed funds and is a flight risk.

Finally, the Court finds that only significant new condition of bail proposed on the renewed motion – posting of $800,000 in personal property including defendant's collection of art, watches, furniture, etc. – is insufficient, in combination with the other proposed conditions, to assure defendant's appearance at trial. The Court is not persuaded that the property's value would be the $800,000 defendant asserts it is at a forced sale, as opposed to at apprisal. Moreover, even personal property valued at $800,000 does not approach the size of the secured bonds that have persuaded other Courts to grant bail in similar circumstances. *See, e.g., United States v. Khashoggi*, 717 F. Supp 1048 (S.D.N.Y. 1989) (defendant posted $10 million dollar bail, secured by cash and real property); *United States v. Madoff*, 586 F.Supp. 2d 240 (S.D.N.Y. 2009) ($10 million bail secured by numerous properties).

The cases Mr. Cohen cites in support of his renewed motion for bail are not substantially similar to the facts of this case or the bail conditions offered. For example, in *United States v. Khashoggi*, 717 F. Supp. 1048 (S.D.N.Y. 1989), a wealthy Saudi Arabian business man was charged with mail fraud and

13

1 other violations stemming from his assistance in concealing property owned by a former Philippine
2 president and his wife. The Court granted bail as defendant had agreed to waive his right to appeal
3 extradition (when he voluntarily entered United States), put up $10 million in a personal bond (secured
4 by cash and personal property), had significant real property and family connections in the United
5 States, and had the Consulate General of Saudi Arabia guarantee his appearance at trial. No such
6 weighty financial or diplomatic guarantees have been provided here.[11] Not only were the conditions of
7 bail significantly different in *Khashoggi*, but the defendant also provided evidence that his business
8 affairs depend upon his ability to deal with high government and private business officials and that his
9 flight from the United States "would have a ruinous impact upon his ability to conduct business."
10 Defendant has not shown that his current business model - investing in and making deals for emerging
11 bio-technology companies – would suffer the same fate such that defendant is tied to the United States
12 and dissuaded from flight.

13     *United States v. Sabhnani*, 493 F.3d 63 (2d Cir. 2007), also relied on by defendant is equally
14 inapposite. While the defendants in that case had ample financial means to finance flight and could
15 operate their business from anywhere in world, the Court found that a $4.5 million secured bond, in
16 addition to home confinement with 24-hour monitors, and an agreement to have their assets reviewed
17 by an independent accountant and then be subjected to restraining orders was held to be sufficient to
18 assure their appearance at trial. Finally, the defendant in *United States v. Karni*, 298 F. Supp. 2d 129,
19 132 (D.D.C. 2004), who was charged with export violations, not only had to commit $100,000 of his
20 own funds for bail but also had to submit to home detention where he was monitored twenty-hour hours
21 a day.

24 ///

---

[11] Defendant's offers to turn in his passports, to "renounce" his Israeli citizenship, and have someone "instruct" the Israeli embassy to deny new documents or travel authorizations to defendant, as well as his offer to waive extradition – assuming he flees overseas at some point – do not sufficiently assure the Court that defendant is not still a flight risk. Defendant offers no authority about the real impact of these offers or whether they are enforceable in Israel if defendant were to flee there.

14

**CONCLUSION**

Based on the totality of the proffers offered to the Court, the Court finds that the government continues to demonstrate by a preponderance of the evidence that Mr. Cohen is a flight risk. The Court further finds that the government has also demonstrated by clear and convincing evidence that Mr. Cohen poses an economic danger to the community because of the seriousness of the allegations in the indictment and the lack of evidence showing that Mr. Cohen has legitimately earned substantial income over the past decade or has substantial prospects of immediate, legitimate business income in the future. Finally, the Court finds that the proposed bail package is still not sufficient to assure Mr. Cohen's appearance for trial in this matter.

**IT IS SO ORDERED.**

Dated: December 20, 2010

SUSAN ILLSTON
United States District Judge