```
                                        Volume 7

                                        Pages 1278 - 1445

                  UNITED STATES DISTRICT COURT

                NORTHERN DISTRICT OF CALIFORNIA

             BEFORE THE HONORABLE CHARLES R. BREYER

UNITED STATES OF AMERICA,        )
                                 )
             Plaintiff,           )
                                 )
   vs.                           )  NO. CR 10-0547 CRB
                                 )
SAMUEL COHEN, a/k/a Mouli Cohen,  )
                                 )  San Francisco, California
             Defendant.           )  Wednesday
_____)  October 26, 2011
```

### TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

```
For Plaintiff:          MELINDA L. HAAG
                        United States Attorney
                        450 Golden Gate Avenue, 11th Floor
                        San Francisco, California  94102
                BY:  W. DOUGLAS SPRAGUE, AUSA
                     HALLIE MITCHELL, AUSA

For Defendant:          BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
                         DROOKS & LINCENBERG, P.C.
                        1875 Century Park East, 23rd Floor
                        Los Angeles, California  90067-2561
                BY:  GARY S. LINCENBERG, ESQUIRE
                     BENJAMIN D. LICHTMAN, ESQUIRE
```

```
Reported By:    Katherine Powell Sullivan, CSR #5812, RPR, CRR
                Official Reporter - U.S. District Court
```

```
 1                  P R O C E E D I N G S
 2    OCTOBER 26, 2011                           9:28 A.M.
 3             (The following proceedings were held in open court,
 4             outside the presence of the jury.)
 5             THE COURT:  Let the record reflect that the jury is
 6    not present.  The parties will be present shortly.
 7             We should probably address placement of marshals.
 8             MR. LINCENBERG:  Yes.  Well, first, can they be
 9    placed in the audience?
10             THE COURT:  Let me talk with the marshals.  Normally,
11    of course, when a defendant is in your custody you have to take
12    a position in the courtroom.  In this case I don't think that
13    there's a -- there's no danger, in the Court's view, of any
14    misconduct.
15             There is a question concerning flight, in the Court's
16    view.  So what I'd like the marshal to do is to position -- if
17    you need two people in the courtroom -- is that the protocol?
18             DEPUTY MARSHAL:  Yes.
19             THE COURT:  It's a protocol you have two?
20             DEPUTY MARSHAL:  Yes.
21             THE COURT:  Okay.  So I would like the two marshals
22    to sit in the body of the courtroom rather than on this side of
23    the well.  And I understand that's not the normal procedure,
24    but I'm taking that responsibility.  And then I think that will
25    not create any issues.
```

PROCEEDINGS

1             **MR. LINCENBERG:**  Appreciate that.

2             **DEPUTY MARSHAL:**  Is the front row okay?

3             **THE COURT:**  Well, on the other side of the well.  On

4    the other side of the barrier there.

5             So it would be not the very first row, but the second

6    row is fine.  And wherever you want to sit in the courtroom is

7    fine.

8             **MR. LINCENBERG:**  Your Honor --

9             **THE COURT:**  Yes, Mr. Lincenberg.

10            **MR. LINCENBERG:**  Then with regard to the bail issue,

11   I had conversation with Mr. Bercovici last night and he

12   e-mailed me this morning a proposal.  I'd like to bring that to

13   the attention of the Court.

14            The Court indicated that, if we're going to readdress

15   this, you wanted Mr. Bercovici to be present.  And I asked him

16   what his availability was during the day to get on the phone

17   telephonically and he said he's generally available.

18            Is there a time that I can tell him --

19            **THE COURT:**  First, I think I should look at the

20   proposal.

21            **MR. LINCENBERG:**  The proposal is --

22            **THE COURT:**  Well, I mean, I'm not going to do it

23   right now.

24            **MR. LINCENBERG:**  Right.  Just so the Court knows,

25   it's an e-mail with a revised cost estimate through

```
 1   November 19th.  And then I told him, beyond that, the Court is
 2   going to want to hear from you to make sure the Court is
 3   comfortable that you believe that the proper security can be
 4   provided and the Court can have its assurance --
 5           THE COURT:  Well, I'm concerned.  I want to find out
 6   a couple things.  Number one, I want to find out exactly what
 7   the security arrangements are, and -- because I'm of the
 8   opinion that at all times the defendant should be accompanied
 9   by two security individuals.
10           And I want to explore -- I want to have a discussion.
11   I don't know that it has to be Mr. Bercovici.  I'm not sure it
12   should be on the telephone.  That's my concern.  He's in L.A.
13           Well, I was going to address this.  I want to find
14   out where are we in terms of the government's case.
15           MR. SPRAGUE:  We still anticipate resting tomorrow
16   before lunch.
17           THE COURT:  So I could set a hearing for tomorrow
18   afternoon.  Mr. Bercovici could be present.  That's before --
19   that may be the last day that we meet anyway before the week
20   break.  But we can have some further discussions today.
21           I don't -- I don't feel comfortable, as I've
22   indicated, without Mr. Bercovici being present in court.  It's
23   almost always the practice that the surety, which I sort of
24   view him as in this case, be present in court, not
25   telephonically.
```

```
 1              I understand it's a different situation here, but I

 2    think Mr. Bercovici should be present, or someone who is a

 3    spokesperson on the company's behalf.

 4              MR. LINCENBERG:  As a follow-up to that, if the Court

 5    could let me know what time --

 6              THE COURT:  Well, we'll just set it for 2 o'clock

 7    tomorrow afternoon.

 8              MR. LINCENBERG:  Okay.  We may -- depending upon

 9    whether the Court wants us to launch straight into the defense

10    case --

11              THE COURT:  I don't think so.  I mean, I think

12    that -- we haven't talked about the defense case.  So let's

13    wait -- I think we have to -- in any event --

14              MR. LINCENBERG:  I was just --

15              THE COURT:  -- even if we -- I should let you talk.

16              MR. LINCENBERG:  I was just going to suggest that

17    with Mr. Bercovici, maybe it would be better to do it in the

18    morning.  We don't know how long things are going to go today

19    or tomorrow.

20              THE COURT:  Well, I don't care when it's done

21    tomorrow.

22              MR. LINCENBERG:  Okay.

23              THE COURT:  But I don't want to take a half an hour

24    or an hour or however long it's going to take out of the

25    presentation of the prosecutors' case.  I want to go ahead with
```

PROCEEDINGS

1    that.   That's the jury.  I don't need the jury after that.   I

2    may need it, obviously, after you start your case.   Maybe

3    you'll start your case.   I don't know.   But we can talk more

4    about that today.

5          MR. LINCENBERG:   Okay.   In the meantime, the Court

6    indicated that -- he sent me what he sort of called a revised

7    invoice.   Does the Court want to see that?   I can e-mail it to

8    the clerk and --

9          THE COURT:   Well, I think what you want to do is give

10   it to the government.   And then I'll make some decision after

11   that.   As I've indicated, I don't particularly want to get

12   involved in the dollars and cents of it all.

13          Bring in the jury.

14          MR. LICHTMAN:   Your Honor, if I might, there's one

15   issue with respect to the first witness today.

16          THE COURT:   Yes.

17          MR. LICHTMAN:   I understand from the government

18   counsel that the government plans to elicit from Mr. Zanolli

19   testimony having to do with --

20          THE COURT:   Mister who?

21          MR. LICHTMAN:   Zanolli.   He was the account manager

22   handler for Mr. Cohen's accounts at Wells Fargo when

23   Mr. Cohen -- there's an article in the paper, which I'm not

24   going to elicit, about the allegations of fraud in the spring

25   of '09 on the civil side.   I'm not going to elicit that.

1          But at that point Wells Fargo terminated their

2    relationship with Mr. Cohen.  And they gave him a couple of

3    months to get his affairs in order, where he was going to send

4    his money.

5          And some of the money, a large portion of the money

6    and stock, went to Switzerland in the spring of 2009, a couple

7    months after the December '08 meeting with the investors in

8    this case.  So, yes, I was going to elicit that at the end.

9          THE COURT:  Why isn't that relevant?

10         MR. LICHTMAN:  Well, Your Honor, first of all, those

11   are accounts that are not charged in money laundering.  It's

12   going to be incredibly prejudicial and confusing, frankly, for

13   the jury.  And when they hear the idea of Swiss accounts, it's

14   going to be incredibly inflammatory.

15         THE COURT:  Well, he sends his money offshore.  I

16   mean, yes, it's prejudicial.  But it's a way -- it's a way to

17   avoid detection.  You know, for 200 years it's been a way of

18   avoiding detection, is take what appears to be ill-gotten

19   gains, make them unavailable or put them in places which are

20   essentially secret places which can't be probed and --

21         MR. LICHTMAN:  Your Honor, there's no such allegation

22   in the indictment.  Those accounts are not part of any

23   charge --

24         THE COURT:  They don't have to be.  It's part and

25   parcel of the crime -- of the purported crime or alleged crime.

PROCEEDINGS

1    The concealment of the fruits of the crime are intertwined with

2    the crime itself.  So I think it's -- I think it's quite

3    probative.

4                **MR. LINCENBERG:**  Your Honor --

5                **THE COURT:**  Yes, sir.

6                **MR. LINCENBERG:**  -- briefly, let me bring to the

7    Court what I think is a nonissue, but just so the Court knows

8    where I'm coming from if I have a need to object on it.

9                **THE COURT:**  Sure.

10               **MR. LINCENBERG:**  I spoke with Ms. Mitchell.

11   Ms. Mitchell is going to be putting on another tax accountant.

12               **THE COURT:**  Mr. Washofsky.

13               **MR. LINCENBERG:**  Mr. Washofsky.

14               **THE COURT:**  Mr. Washofsky, yes.

15               **MR. LINCENBERG:**  And it sounds like we're both in

16   sync on what can come in and whatnot under the Court's rulings.

17               I'm paying attention to the bill of particulars,

18   which does not allege any improper deductions and so forth.

19   Counsel says that's not being elicited.  There's other issues.

20               If I raise an objection -- and I'll just frame it 403

21   or objection generally if I think something is going in that

22   direction.  I just want to alert the Court that's where I'm

23   going.  I don't think there's going to be an issue, but so the

24   Court knows --

25               **THE COURT:**  What am I supposed to do?

PROCEEDINGS

```
 1          MR. LINCENBERG:  Nothing right now.  Just so you know
 2   what my objection may pertain to so I don't have to be
 3   argumentative about it in front of the jury.
 4          THE COURT:  Okay.  Bring in the jury.
 5          (Jury enters at 9:37 a.m.)
 6          THE COURT:  Okay.  Let the record reflect all jurors
 7   are present.  Good morning.
 8          Parties are present.
 9          You may call your next witness.
10          MR. SPRAGUE:  United States calls Greg Zanolli.
11          THE CLERK:  Please come forward and take the witness
12   stand.  Please remain standing and raise your right hand.
13                      GREGORY ZANOLLI,
14   called as a witness for the Plaintiff herein, having been first
15   duly sworn, was examined and testified as follows:
16          THE WITNESS:  I do.
17          THE CLERK:  Please be seated.  Please state your full
18   name, spell your last name for the record.
19          THE WITNESS:  Gregory William Zanolli, Z-a-n-o-l-l-i.
20                    DIRECT EXAMINATION
21   BY MR. SPRAGUE:
22   Q.   Good morning, Mr. Zanolli.
23   A.   Good morning.
24   Q.   Where do you work?
25   A.   Wells Fargo Advisors.
```

1   Q.   And how long have you worked there?

2   A.   Fourteen years.

3   Q.   What is your role at Wells Fargo Advisors?

4   A.   I'm a senior financial advisor.

5   Q.   And can you briefly describe what you do as a senior

6   financial advisor?

7   A.   I assist our private clients with managing their assets,

8   wealth management.

9   Q.   And how long have you done that?

10  A.   Twenty-one years.

11  Q.   And what's your educational background?

12  A.   I have a B.A. in economics from UC Santa Barbara.

13  Q.   And after graduating from Santa Barbara, did you work for

14  Merrill Lynch for a while?

15  A.   I did.

16  Q.   What'd you do?

17  A.   In Menlo Park for five rears.

18  Q.   I'm sorry, what did you do at Merrill Lynch?

19  A.   Same role.

20  Q.   Okay.  And did you work at Citibank after that?

21  A.   Yes, I did.

22  Q.   Same or similar role?

23  A.   Same role.

24  Q.   You had the same or similar role at Citibank?

25  A.   Yes, I did.

1  Q.   For how long?

2  A.   Two years.

3  Q.   And then you've been at Wells Fargo for 14?

4  A.   That's correct.

5  Q.   Do you hold any professional licenses?

6  A.   I have Series 7, Series 63, and Series 65.

7  Q.   Generally speaking, what do those allow you to do?

8  A.   Give advice on asset management, do advisory business, and

9  allow clients to have managed assets on the outside.

10  Q.   Do you know Mouli Cohen?

11  A.   Yes, I do.

12  Q.   Approximately when did you meet Mr. Cohen?

13  A.   In 1999.

14  Q.   And what were the circumstances of your meeting Mr. Cohen?

15  A.   Our private banker introduced him to me.  In my role as an

16  investment advisor, we work in a partnership with our bankers,

17  and she introduced me to him.

18  Q.   And do you recognize anyone in the courtroom, sitting on

19  this side of the courtroom?

20  A.   Yes, Mr. Cohen is the last one on the left.

21        MR. SPRAGUE:  May the record reflect the witness

22  identified the defendant?

23        THE COURT:  So noted.

24  BY MR. SPRAGUE:

25  Q.   Did Mr. Cohen wish to open brokerage accounts or did he

```
 1  have them open at the time you met him in about 1999?

 2  A.    Yes, he did.

 3  Q.    And, I'm sorry, I sort of asked two questions.

 4        Did he have them open or did he wish to open them at

 5  that time?

 6  A.    I opened them at that time.

 7  Q.    Okay.  And did you meet with Mr. Cohen at that time to

 8  discuss his goals and strategies for these accounts he was

 9  opening?

10  A.    Yes, we did.

11  Q.    And what did he tell you about the objectives of these

12  accounts he was opening with you?

13  A.    The one account we opened at the time was designed for

14  long-term growth.

15  Q.    And what account was that?

16  A.    The name of it?

17  Q.    Yes.

18  A.    It was called the MYRD Millennium Trust.

19  Q.    Did you, over the course of your relationship with

20  Mr. Cohen, ask him how he had obtained his wealth?

21  A.    Yes, we did.

22  Q.    What did he tell you?

23  A.    The sale of a business to Teva Pharmaceuticals, as well as

24  other individual endeavors.

25  Q.    And did he tell you in these initial discussions that he
```

1    had other assets aside from the ones he was bringing into Wells

2    Fargo?

3    **A.**    Yes, he did.

4    **Q.**    What did he tell you about the nature and magnitude of

5    those other assets?

6    **A.**    The bulk of his assets were held in Credit Suisse in

7    Switzerland and they were primarily bonds.

8    **Q.**    And did he tell you where those bond assets came from, the

9    source of them?

10   **A.**    From the sale of his business.

11   **Q.**    Did he show you any documents regarding his purported

12   wealth?

13   **A.**    At the time it was primarily just a spreadsheet that

14   showed his assets at the other firm.

15   **Q.**    And Mr. Cohen provided the spreadsheet or he showed it to

16   you?

17   **A.**    Correct.

18   **Q.**    And about how much in assets did it reflect?

19   **A.**    Close to a hundred million dollars.

20   **Q.**    Were you able to keep that spreadsheet?

21   **A.**    No, we did not.

22   **Q.**    Did Mr. Cohen tell you how much of his assets he wanted to

23   have in the United States?

24   **A.**    No, he did not give us a number.

25   **Q.**    Did he give you a relative of so much in the United States

1   and so much keeping overseas?

2   **A.**    Just in relation to the account that I was affected, it

3   was a small portion of his total net worth.

4   **Q.**    Now, you mentioned that in about 1999 you opened the MYRD

5   Millennium account; is that right?

6   **A.**    Correct.

7   **Q.**    Did he subsequently open more accounts at Wells Fargo?

8   **A.**    Yes, he did.

9   **Q.**    What types of accounts?

10  **A.**    Same type of accounts, trading accounts.

11  **Q.**    And when, if you recall, did he open these additional

12  accounts after 1999?

13  **A.**    A couple years later.  It was switched to what's called

14  Matisse Investments, which was an LLC account.

15  **Q.**    Matisse Investments?

16  **A.**    Correct.

17  **Q.**    Was that changing over the MYRD Millennium account name or

18  was it new?

19  **A.**    It was a new account.

20  **Q.**    How long did the -- did the MYRD Millennium account or

21  MYRD continue on at Wells Fargo?  Does that account remain open

22  for some time?

23  **A.**    Not on my side.  On the investment side.

24  **Q.**    When Mr. Cohen opened the Matisse Investments, LLC

25  account, did he tell you what type of risk he was willing to

1  take in that account?

2  **A.**    The account was coded for long-term growth and

3  speculation.

4  **Q.**    Long-term growth and speculation?

5  **A.**    (Nods head.)

6  **Q.**    Where does that fall on the tiers of risk on accounts at

7  Wells Fargo?

8  **A.**    That's the highest level we give an account.

9  **Q.**    The highest level of risk?

10  **A.**    Correct.

11  **Q.**    The riskiest account determination at Wells Fargo?

12  **A.**    Correct.

13  **Q.**    And that was based on what Mr. Cohen told you in

14  connection with opening this account?

15  **A.**    Correct, and the previous activity we had done in the

16  other account.

17  **Q.**    In opening the Matisse Investments, LLC account, did he

18  move any money from the MYRD account into it, if you recall?

19  **A.**    I don't recall.  But I believe the account was

20  transferred, the balances were transferred to the new account.

21  **Q.**    Have you been to Mr. Cohen's residence in Belvedere?

22  **A.**    Yes, I have.

23  **Q.**    About how many times?

24  **A.**    Three times.

25  **Q.**    And could you describe that residence?

1  **A.**    A very nice home looking over the bay.  Four levels.  Very

2  nice home.

3  **Q.**    And what was the purpose of your going to his home those

4  approximately three times?

5  **A.**    To discuss his accounts and our strategy.

6  **Q.**    And did you discuss accounts and talk strategy with

7  Mr. Cohen in those one-on-one meetings?

8  **A.**    Yes, we did.

9  **Q.**    And, I'm sorry, were they one-on-one meetings?

10 **A.**    Yes, they were.

11 **Q.**    Did anyone else ever participate in the discussions

12 regarding the strategy and trading in his accounts?

13 **A.**    No, they did not.

14 **Q.**    Approximately how many accounts -- what's the time frame

15 of your relationship with Mr. Cohen?

16         It ended in early 2009; is that right?

17 **A.**    Correct.

18 **Q.**    In that time period, let's focus on 2003 to 2009, about

19 how many accounts did he have on your side at Wells Fargo?

20 **A.**    I believe there was only two.  Two or three.

21 **Q.**    And do you recall about how many he had on the banking

22 side at Wells Fargo?

23 **A.**    The same.

24 **Q.**    What's the relation -- are you familiar with an account

25 that ends in 007?

1   A.    Not by number.

2   Q.    The Matisse Investments account?

3   A.    Yes.

4   Q.    Was that a brokerage account?

5   A.    Yes, it was.

6   Q.    How was that related to Mr. Cohen's other accounts at

7   Wells Fargo?

8   A.    It was tied to an account on the bank side in the same

9   name.  It's the only relation.

10  Q.    And those accounts were linked?

11  A.    Correct.

12  Q.    What does that enable a Wells Fargo customer to do?

13  A.    Move money from the investment side to the bank side and

14  vice versa.

15  Q.    And did you speak with Mr. Cohen about moving money

16  between -- back and forth between those accounts over the

17  years?

18  A.    Frequently.

19  Q.    Did you ever speak to Yael or Yael Cohen?

20  A.    Only when we opened the original account.

21  Q.    In 1999?

22  A.    Correct.

23  Q.    Was that the only discussion you ever had with her?

24  A.    Correct.

25  Q.    About -- in the '03 to '05 period, as an example, how

1  often did you talk to Mr. Cohen?

2  **A.**    Pretty much daily.

3  **Q.**    And what was the nature of those conversations?

4  **A.**    Around different stock investments.

5  **Q.**    Did you ever -- after that communication with Yael Cohen

6  in about 1999, did you ever communicate with her again?

7          Meaning -- so I'm expanding from phone

8  conversations -- e-mail, mail correspondence, phone,

9  altogether?

10  **A.**    No.

11  **Q.**    Who controlled the Matisse Investments account?

12  **A.**    Mr. Cohen.

13  **Q.**    What would you need -- or Wells Fargo need before moving

14  money to or out of that account?  Any type of authorization?

15  **A.**    Depends on where it was going.

16  **Q.**    And explain that.

17  **A.**    If it was going to the bank account in the same name, we

18  just needed verbal.  If it was going outside to a third-party,

19  it would have to be in writing.

20  **Q.**    Okay.  And those were verbal authorizations from

21  Mr. Cohen?

22  **A.**    Correct.

23  **Q.**    And written authorizations from Mr. Cohen?

24  **A.**    Correct.

25  **Q.**    About how much time did you and your staff spend working

1  with Mr. Cohen handling his accounts during the 2003 to 2008

2  time period?

3  **A.**   A significant amount.

4  **Q.**   Can you expand on "significant amount"?

5  **A.**   An hour to two hours a day sometimes.  But probably five

6  hours a week, three to five hours a week, depending on the time

7  frame.

8  **Q.**   Over the course of from 2003 to 2008, how many phone

9  conversations did you and your staff have, if you can ballpark

10  it in hundreds or thousands?

11  **A.**   One a day, however many days there were over six years,

12  business days, on average.

13  **Q.**   And in that time period zero with Yael Cohen?

14  **A.**   Correct.

15  **Q.**   And about how many with Stacy Cohen?

16  **A.**   Very few.

17  **Q.**   Meaning?

18  **A.**   Less than ten.

19  **Q.**   Was the account -- Mr. Cohen's activity in the account

20  conservative or risky or somewhere in between?

21  **A.**   Risky.

22  **Q.**   How frequent were the wire transfers going out of the

23  Matisse Investments account?

24  **A.**   Pretty often.

25  **Q.**   What types of purchases were being made out of that

1   account from '03 to '08?

2   **A.**    A wide variety.  Everything from daily expenses for

3   running a household to -- we paid for his jets when he went on

4   vacation, paid for hotel rooms.  Whatever was asked of us, we

5   sent the wires.

6   **Q.**    Did you ever suggest -- and you mentioned earlier some

7   trading activity.  Explain some of the trading activity that

8   Mr. Cohen engaged in via this Matisse Investments, LLC account.

9   **A.**    Primarily, bought and sold stocks.

10  **Q.**    What was the magnitude of purchases and sales of stocks,

11  if you can estimate it, on a monthly or annual basis?

12  **A.**    In the millions.

13  **Q.**    And was that monthly or annually?

14  **A.**    Annual basis.

15  **Q.**    Okay.  Did you ever suggest to Mr. Cohen that perhaps he

16  should be more conservative or diversify his portfolio?

17  **A.**    Yes, I did.

18  **Q.**    And did he take your advice?

19  **A.**    Sometimes.

20  **Q.**    And was one of those -- did you recommend that he

21  diversify by investing in something called the Endowment Fund?

22  **A.**    Yes, I did.

23  **Q.**    What's the Endowment Fund?

24  **A.**    It's a fund-to-funds designed to have lower volatility,

25  lower risk than a traditional investment.

1  Q.   And did Mr. Cohen invest in this Endowment Fund based on

2  your advice?

3  A.   Yes, he did.

4  Q.   Do you recall approximately how much he invested in it?

5  A.   Somewhere between 500,000 and a million, I recall.  I'm

6  not sure of the exact amount.

7  Q.   How did that investment perform?

8  A.   It made money, but not as much as the traditional stocks

9  were making.

10  Q.   And do you recall about how long Mr. Cohen stayed in that

11  fund?

12  A.   About one year or less.

13  Q.   One year or less.  Did he -- at some point he sold out of

14  that fund, told you he wanted out of it?

15  A.   Correct.

16  Q.   Did he tell you why?

17  A.   It was too conservative.

18  Q.   Did Mr. Cohen have any accounts on the brokerage side at

19  Wells Fargo in his own name?

20  A.   No, he did not.

21  Q.   Why not?

22  A.   Don't know.

23  Q.   Did you ever discuss with him whether he wanted them in

24  his name?

25  A.   No.

1  Q.   Did he provide the names of the accounts that he wanted

2  opened?

3  A.   Yes, he did.

4  Q.   What is a 1099?

5  A.   It's a document we issue at the end of the year that shows

6  tax implications in an account.

7  Q.   And so if an account is in an individual's name and

8  interest or profits are earned in that year, is a 1099 issued

9  in that person's name?

10  A.   If the account is in his name, yes.

11  Q.   And where does that 1099 go?

12  A.   To the address of record in our system.

13  Q.   And is anything submitted to the IRS in connection with

14  that?

15  A.   Yes, copies go to the IRS.

16  Q.   There was, is it fair to say, a substantial amount of

17  money coming into Mr. Cohen's Wells Fargo account in the '03 to

18  '08 time frame?

19  A.   Yes.

20  Q.   Millions of dollars?

21  A.   Yes.

22  Q.   Did you ever ask him the source of all this money coming

23  in?

24  A.   Yes, we did.

25  Q.   And what did he tell you?

1   A.    They were from endeavors he had made other investments in,

2   and he was being paid back, as well as his previous wealth.

3   Q.    So he told you that this was money that he was being paid

4   back from other people, in part?

5   A.    Correct.

6   Q.    In one of your conversations -- I think you said it was

7   less than ten with Stacy Stripling, or Stacy Cohen -- did she

8   ever discuss a book with you?

9   A.    Yes.

10  Q.    And do you know the name of the book?

11  A.    I don't recall the name.

12  Q.    Do you know what type of book it was?

13  A.    It was a cooking book.

14          MR. LICHTMAN:  Objection, Your Honor, relevance.

15          THE COURT:  Sustained.

16  BY MR. SPRAGUE:

17  Q.    At some point the relationship between Mr. Cohen and Wells

18  Fargo was ended; is that true?

19  A.    That's correct.

20  Q.    And approximately when was that?

21  A.    2009, I believe.

22  Q.    And do you recall whether it was -- what part of 2009?

23  A.    I think it was near the end.

24  Q.    End of 2009?  And in part of that terminating the

25  relationship, did you ask Mr. Cohen where he wanted the

ZANOLLI - DIRECT / SPRAGUE                    1301

 1 | remaining funds sent?

 2 | **A.**   Yes.  We received written notice where to go.

 3 | **Q.**   I'm sorry?

 4 | **A.**   We received written notice on where to send the funds.

 5 | **Q.**   Okay.  And you received that notice from Mr. Cohen?

 6 | **A.**   Yes, we did.

 7 | **Q.**   And what made up the remaining funds?

 8 | **A.**   There was some cash and some holdings in one stock.

 9 | **Q.**   And do you recall about how much cash was left?

10 | **A.**   I believe it was less than a million, but I don't know

11 | exactly.

12 | **Q.**   And do you recall about how many shares of what stock?

13 | **A.**   I believe there was a hundred thousand shares of Mannkind.

14 | **Q.**   And where did Mr. Cohen direct you in writing to send that

15 | cash and that stock?

16 | **A.**   To his account in Credit Suisse, in Switzerland.

17 | **Q.**   In Switzerland?

18 | **A.**   Uh-huh.

19 |        **MR. SPRAGUE:**  Nothing further.

20 |        **THE COURT:**  Okay.  Cross.

21 |              **CROSS EXAMINATION**

22 | BY MR. LICHTMAN:

23 | **Q.**   Good morning, Mr. Zanolli.

24 | **A.**   Good morning.

25 | **Q.**   My name is Benjamin Lichtman, and I'm an attorney for

1    Mr. Cohen.

2           Mr. Zanolli, Mr. Cohen was a very active trader;

3    isn't that right?

4    A.   That's correct.

5    Q.   And you mentioned that he had an account that carried the

6    highest level of risk in Wells Fargo's universe of accounts;

7    isn't that right?

8    A.   That's correct.

9    Q.   Isn't it true that Mr. Cohen's account experienced losses

10   as a result of that active trading?

11   A.   At times.

12   Q.   And isn't it true that, in fact, Mr. Cohen's account --

13   brokerage account at Wells Fargo experienced losses of, for

14   example, between 1 to 2 million during the recession?

15   A.   I don't know the exact numbers.

16   Q.   Well, were you -- let me just ask:  Does the range of 1 to

17   2 million sound reasonable to you?

18   A.   Yes, it does.

19   Q.   Now, Mr. Cohen's wife, Ms. Stripling -- Mrs. Stripling

20   also had an account at Wells Fargo; isn't that right?

21   A.   That's correct.

22   Q.   And to your understanding, the money in that account came

23   from separate accounts that Ms. Stripling held in Texas; isn't

24   that right?

25   A.   That's correct.

```
 1              MR. LICHTMAN:  No further questions.

 2                    REDIRECT EXAMINATION

 3   BY MR. SPRAGUE:

 4   Q.   What was the basis of your understanding of where that

 5   other money came from, the so-called Texas money?

 6   A.   It was from her family.

 7   Q.   Who told you that?

 8   A.   She did.

 9              MR. SPRAGUE:  Nothing further.

10              THE COURT:  Thank you.  You're excused.

11              (Witness excused.)

12              THE COURT:  Call your next witness.

13              MS. MITCHELL:  Thank you, Your Honor.  The government

14   calls Martin Washofsky.

15              THE CLERK:  Will the witness please come forward.

16   Remain standing and raise your right hand.

17                    MARTIN WASHOFSKY

18   called as a witness for the Plaintiff herein, having been first

19   duly sworn, was examined and testified as follows:

20              THE WITNESS:  I do.

21              THE CLERK:  Please be seated.

22              THE WITNESS:  Thank you.

23              THE CLERK:  Please state your full name.  Spell your

24   last name for the record.

25              THE WITNESS:  Martin Washofsky.  W-a-s-h-o-f-s-k-y.
```

1304

## DIRECT EXAMINATION

BY MS. MITCHELL:

Q.   Mr. Washofsky, where do you live?

A.   I live in Plantation, Florida, which is about ten miles west of Fort Lauderdale.

Q.   And how are you employed?

A.   I am self-employed.

Q.   And in what capacity?

A.   I have a company called Washofsky & Associates.  It's tax representation firm.

Q.   And how long have you been doing tax representation?

A.   Over 15 years.

Q.   And what generally are your duties as a tax -- in tax representation?

A.   I usually handle what they call high-risk problems, people who failed to file tax returns in the past, people who have liens, people who have levies, people who are on installment plans or want to get on installment plans.  And I also do tax returns itself.

Q.   Were you introduced to Samuel Mouli Cohen in 2007, in furtherance of helping him with tax matters?

A.   Correct.

Q.   By whom were you introduced?

A.   I do some subcontract work with different CPA firms and some law firms.  And the CPA firm that introduced me to

1  Mr. Cohen was Morty Edgar.  He's a CPA in Miami, Florida.

2  **Q.**   Did you talk to Samuel Mouli Cohen about his assets?

3  **A.**   Yes.

4  **Q.**   And what did he tell you?  What did he tell you about the

5  income he received in 2007?

6  **A.**   In 2007?  A preliminary tax return was prepared by, I

7  believe, a firm in New York, and I went over it with him

8  regarding a couple items.  And I did request from the Internal

9  Revenue what they call a wage and income transcript, which

10 basically has any W-2's, 1099, any income item reported to the

11 individual taxpayer.

12        And I mentioned to Mr. Cohen that the only item that

13 we had was approximately a $13 item from -- I believe it was

14 National Financial Corporation as a dividend.  And there were

15 some other items on the previously prepared tax return that had

16 no documentation, so we -- I prepared the tax return with the

17 documentation that I had.

18 **Q.**   Okay.  And you mentioned that you spoke to him a few

19 times.

20 **A.**   Correct.

21 **Q.**   Okay.  Did you also e-mail with Mr. Cohen?

22 **A.**   Correct, yes.

23 **Q.**   If you would look at Government Exhibit 177.

24 **A.**   Pardon me?

25 **Q.**   In the books next to you, there's Exhibit 177.

1  A.   177?

2  Q.   Yes.   Thank you.

3       And, specifically, pages 14216 to 14224.

4  A.   Correct.  Okay.  Okay.  Right.  Okay.

5       I'm sorry, what was your question?

6  Q.   Do you recognize this?

7  A.   Yes.

8  Q.   And what is this?

9  A.   Well, it's an e-mail from Mouli Cohen to Pete Washofsky,

10 which is me, regarding Signet Ventures, LLC, regarding

11 information for a tax return that was the subject, and

12 basically had attachments for different companies.  Mostly

13 Signet Ventures, Signet Ventures, LLC, some balance sheets, and

14 trial balance, general ledger, and a balance sheet for Signet

15 Ventures, LLC.

16          MS. MITCHELL:  Your Honor, I would move in

17 Exhibit 177.

18          THE COURT:  Admitted.

19          (Trial Exhibit 177 received in evidence.)

20 BY MS. MITCHELL:

21 Q.   Wait for a minute for this to come up.

22 A.   Oh.

23 Q.   Did you request this information about Signet Ventures

24 from Mr. Cohen?

25 A.   Yes.

```
 1  Q.   And in your phone conversations did you ask him about all
 2  the companies he had -- or companies he had?
 3  A.   Yes.
 4  Q.   And what did he tell you about these companies?
 5  A.   Basically, he had -- there were no companies with no
 6  activity.
 7  Q.   Okay.  And so you asked for some verification?
 8  A.   Correct.
 9           (Document displayed.)
10  Q.   And this is the e-mail -- the front page of the e-mail
11  that we were just talking about?
12  A.   Yes.
13  Q.   Because the jurors are just seeing it now.
14           Okay.  So if you will turn to -- you see there's
15  little numbers on the bottom -- 14219.
16  A.   Okay.
17  Q.   Actually, let's back up one page.  Sorry.  14218, the page
18  with the title "Profit and Loss Standard"?
19  A.   Yes.
20  Q.   And what company is this about?
21  A.   Signet Ventures, LLC.
22  Q.   In what year?
23  A.   January -- well, it's a full calendar year, January
24  through December 2007.
25  Q.   And what net income does it show that Signet Ventures
```

 1  received in '07?

 2  **A.**    Showed a negative $370.

 3  **Q.**    And if you turn to the next page, which is entitled "Trial

 4  Balance for Signet Ventures as of December 31st, 2007," do you

 5  see that there's an accounting for notes receivable and

 6  promissory notes?

 7  **A.**    Correct.

 8  **Q.**    And the amount that the notes receivable is three-quarters

 9  of a million dollars; is that correct?

10  **A.**    Correct.

11  **Q.**    And then there's a general ledger, if that's correct, that

12  shows zero?

13  **A.**    Correct.

14  **Q.**    I'm trying to get to the last page.

15         And the last page of this is a balance sheet

16  standard?

17  **A.**    Yes.

18  **Q.**    For 2007?

19  **A.**    Correct.

20  **Q.**    For Signet Ventures?

21  **A.**    Correct.

22  **Q.**    And, again, it shows the promissory notes in the amount of

23  $750,000, right?

24  **A.**    That is correct.

25  **Q.**    And what are the total liabilities and equity of Signet

```
 1  Ventures in December 2007?

 2  A.   The total liabilities as shown on the balance sheet was

 3  $750,000.

 4  Q.   Now, did you talk to Mr. Cohen about where he lived?

 5  A.   Yes.

 6  Q.   And what did he tell you?

 7  A.   He lived in San Francisco with his wife, in her house.

 8  Q.   In his wife's house?

 9  A.   Correct.

10  Q.   So he did not own any property?

11  A.   Pardon me?

12  Q.   He did not own any property?

13  A.   Correct.

14  Q.   Did he tell you about other expenses, such as art or

15  jewelry or furniture?

16  A.   Other expenses or other assets?

17  Q.   Other assets.   Excuse me.

18  A.   Other assets.   Yes.   He advised me that he had a piece of

19  artwork, which was a tapestry that he owned for about 30 years

20  and there was value that he placed on it of approximately

21  $30,000.   But there was no appraisal, so it was his own

22  estimate.

23  Q.   Did he tell you anything about any cars he owned?

24  A.   Any car deals?

25  Q.   Cars he owned?
```

1  **A.**    No, no.  He said he did not own any.

2  **Q.**    He did not own any?  How did he get around?  Did he tell

3  you?

4  **A.**    His wife's car.

5  **Q.**    Did he talk to you about founding a company?

6  **A.**    I'm sorry?

7  **Q.**    Starting a company?

8  **A.**    Starting a company?  He -- I don't believe he indicated to

9  me that he started a company.  But we talked about some of the

10  companies that he was involved with at one time or another.

11  **Q.**    Did he tell you anything about selling shares in a

12  company?

13  **A.**    No.

14  **Q.**    Did he tell you anything about having personal loans?

15  **A.**    No.

16  **Q.**    Did he tell you anything about having any loans that any

17  of these companies he talked to you about had?

18  **A.**    No.

19  **Q.**    If you turn to 177A, do you recognize that?

20  **A.**    Yes, ma'am.

21  **Q.**    And what is that?

22  **A.**    Again, it's another e-mail from Mouli Cohen to Pete

23  Washofsky, which is me, regarding -- the subject was IRS Form

24  1040, tax year 2007.

25          **MS. MITCHELL:**  Your Honor, the government moves to

1311

1    admit 177.

2              **THE COURT:**  177?

3              **MS. MITCHELL:**  177A.  Excuse me.

4              **THE COURT:**  177A admitted.

5              (Trial Exhibit 177A received in evidence.)

6              (Document displayed.)

7    **BY MS. MITCHELL:**

8    **Q.**   And you -- you talked earlier about receiving a draft 1040

9    prepared by an accountant in New York?

10   **A.**   Correct.

11   **Q.**   Is that what you're referencing here?

12   **A.**   Yes.

13   **Q.**   Okay.  And you say, "I would recommend the least

14   complicated tax return."

15   **A.**   I'm sorry, you have to speak up a little.

16   **Q.**   Sorry.  You suggest recommending the least complicated tax

17   return?

18   **A.**   Yes.  As I indicated earlier, there was a 2007 draft tax

19   return that I received.  I believe it was through him or

20   through Morty Edgar.  And on it had certain lines that were not

21   consistent with prior years.

22              In other words, I also had a copy of the 2006 tax

23   return, which basically showed a loss for the year and no

24   income.  So the '7 didn't really -- was not really consistent

25   with the '6.

1       And then when I asked for documentation regarding the

2   '7, there was no documentation.  For example, there was a K-1,

3   which is like an income item, income or loss.  And when I asked

4   for it, nobody could provide me with it.  So I basically said,

5   if there's no documentation, I'm not going to do a tax return

6   unless I have the documentation.

7       And, again, I requested from the Internal Revenue

8   wage and income transcripts of any income either through a K-1

9   or interest income or dividends, and the only thing I did

10  receive was, again, the $13 for a dividend.

11  **Q.**   Okay.

12  **A.**   So that's what I meant by the least complicated rather

13  than put in items I could not document.

14  **Q.**   Sure.  So I believe you've already covered B and D.

15  **A.**   Correct.

16  **Q.**   But if we could go down just very briefly and walk through

17  some of the others.

18      You advised Mr. Cohen to take the standard deduction?

19  **A.**   Correct.

20  **Q.**   And why is that?  Why did you advise that?

21  **A.**   There was a -- I believe there was an item on his

22  Schedule A.  It had like a -- I believe it was called some sort

23  of an investment expense from a K-1.  Again, there was no

24  documentation provided, so I was not going to include that.

25  **Q.**   Okay.

1   **A.**   And it was approximately $6,000.  And taking the standard

2   deduction versus the Schedule A meant no difference in the

3   taxes anyway because he had a huge loss.

4   **Q.**   Got it.  You recommend taking off -- in the signature

5   line, to take off "executive" and leave it blank?

6   **A.**   Correct.

7   **Q.**   Why did you recommend that?

8   **A.**   He -- he indicated that he was not working and he was just

9   doing some charity work.

10  **Q.**   So you didn't think it was appropriate to put a title?

11  **A.**   Pardon me?

12  **Q.**   You didn't think it was appropriate for --

13  **A.**   Correct.

14  **Q.**   And did you prepare a draft tax return in accord with

15  everything you learned?

16  **A.**   Yes, I did.

17  **Q.**   If you turn to Exhibit 177B.  And do you recognize that?

18  **A.**   Yes.  That's my cover letter -- cover letter for tax

19  return 2007 and a California tax return 2007.

20              **THE COURT:**  Admitted.

21              (Trial Exhibit 177B received in evidence.)

22              (Document displayed.)

23  **BY MS. MITCHELL:**

24  **Q.**   And on the first page -- whose tax return is this, first

25  of all?

```
 1  A.    Samuel Cohen.

 2  Q.    And under "income," what is reported as Mr. Cohen

 3  receiving an income?

 4  A.    That stated income?  Again, the $13 from the National

 5  Financial Services.

 6  Q.    And there's a loss reported --

 7  A.    Correct.

 8  Q.    -- as an NOL carryover?

 9  A.    The NOL carry-forward loss was from a prior year, 2006.

10  Again, that was from the tax return.  And, also, I did receive

11  a 2006 Internal Revenue account transcript.

12          An account transcript is basically the tax return

13  that was submitted to the Internal Revenue.  It has each line

14  on it.  And that 99,861 also was the same number the Internal

15  Revenue had.  So that was identical.

16  Q.    And is this your signature on the second page?

17  A.    Yes, it is.

18  Q.    Now, Mr. Washofsky, did there come a time when you learned

19  more about Mr. Cohen's assets that he had in 2007?

20  A.    Correct.

21  Q.    And when was that?

22  A.    This was -- there was -- this was after a tax return was

23  prepared or shortly thereafter.  There were some other tax

24  issues that I was working on with Mr. Cohen and Mr. Edgar.

25  Q.    Did you learn about bank accounts that the defendant had?
```

 1  **A.**   Subsequently, yes.

 2  **Q.**   And did you investigate whether or not he actually had

 3  these bank accounts?

 4  **A.**   We -- we requested certain bank account statements from

 5  Mr. Cohen.

 6  **Q.**   And what did you find?

 7  **A.**   There were several bank accounts that I was unaware of.

 8  **Q.**   Did you confront Mr. Cohen with this?

 9  **A.**   Pardon me?

10  **Q.**   Did you confront Mr. Cohen about this?

11  **A.**   No, I didn't confront him.  We just requested it, that's

12  all.

13  **Q.**   Did you learn about other companies he had?

14  **A.**   There were -- there were several companies involved too,

15  yes.

16  **Q.**   And you found out about those companies?

17  **A.**   Correct.

18  **Q.**   Did you look into his assets by visiting his website?

19  **A.**   I went into the website and -- the website is a

20  self-embellishing website.  Basically, he patted himself on the

21  back --

22          **MR. LINCENBERG:**  Your Honor, I move to strike.  It's

23  nonresponsive.

24          **THE COURT:**  Sustained.

25

1   BY MS. MITCHELL:

2   Q.    Did you find out information from looking at his website

3   that caused you concern about the assets that Mr. Cohen had

4   told you he had for 2007?

5   A.    I believe the website indicated that he flew on his own

6   airplane.

7   Q.    And did you ask him about this?

8   A.    Correct.

9   Q.    What did he tell you?

10  A.    That he did not have an aircraft.

11  Q.    What did he tell you about the aircraft that he said he

12  was flying around in?

13  A.    If he did fly, they flew mid jet or commercial.

14        MS. MITCHELL:    Thank you.

15                     CROSS EXAMINATION

16  BY MR. LINCENBERG:

17  Q.    Good morning, Mr. Washofsky.

18  A.    Good morning.

19  Q.    My name is Gary Lincenberg.  I represent Mr. Cohen.  I'm

20  going to be brief in my questions for you.  I want to just go

21  backwards through a few points that you raised.

22        First, with regard to this discussion with Mr. Cohen

23  about the airplane he flew on, your testimony, I believe, was

24  that at some point he told you he owned an airplane?

25  A.    No.

1   **Q.**   Okay.

2   **A.**   He did not ever tell me he owned an airplane.  When I

3   visited his website, I believe it indicated in the website that

4   he had his own aircraft or flew on his own aircraft.

5   **Q.**   And is it possible that, from your reading of that, that

6   it may have been that there was an aircraft that he regularly

7   leased?

8   **A.**   I can't make that assumption.

9   **Q.**   Okay.  Now, you mentioned that you had told him to take

10  off the title "executive" because -- in connection with work

11  that he was doing.  And you had discussed with him his charity

12  work.  Is that right?

13  **A.**   Well, also he indicated that he was not working at the

14  time on any -- any business.

15  **Q.**   All right.  Did he -- did he tell you that he was working

16  but not for a salary?

17  **A.**   No.

18  **Q.**   Did you understand that he was a founder of companies and

19  that some of these companies might not have revenue in the year

20  that you were looking at, 2007?

21  **A.**   I'm sorry, could you repeat that?

22  **Q.**   Yes.  Did you understand that -- that he may have been

23  working without receiving a salary at that time?

24  **A.**   Oh, that's possible, sure.  But he never mentioned that to

25  me.

1    Q.   Okay.  And if he wasn't receiving a salary at that time,

2    then -- whether or not he was receiving a salary would have

3    been the pertinent question for you to determine whether there

4    was income to reflect on the tax return; is that right?

5    A.   Well, if he was not receiving any salary and there was no

6    salary indicated, then it was not a tax question for me.

7    Q.   Okay.

8    A.   In other words, if you're not receiving a salary --

9    Q.   Right.

10   A.   -- there's no tax event happening.

11   Q.   Okay.  And your discussions with him were primarily for

12   you to be able to prepare a proper tax return?

13   A.   Correct.

14   Q.   All right.  And then with regard to the Signet Ventures

15   trial balance that counsel showed you as part of Exhibit 177

16   that had listed $750,000 worth of promissory notes, do you

17   recall that?

18            It's this document here.  It's page 14219.

19            (Document displayed.)

20   Q.   Do you see that?

21   A.   Yes, I see that, yes.  Promissory note.

22   Q.   Now, did you get into a discussion with Mr. Cohen at all

23   about whether or not -- first of all, as to who prepared the

24   trial balance for Signet?

25   A.   I don't know.

1   Q.   All right.  And did you get into a discussion of whether

2   or not this was listing promissory notes for which there was no

3   recourse because there was a mandatory conversion --

4   A.   It's --

5   Q.   Let me just finish.

6   A.   It's not -- I'm sorry.

7   Q.   -- because there was a mandatory conversion into stock?

8   A.   No.

9           MR. LINCENBERG:  Thank you, sir.  I have nothing

10  further.

11          MS. MITCHELL:  Just a couple of quick questions.

12                  **REDIRECT EXAMINATION**

13  BY MS. MITCHELL:

14  Q.   In the income tax return that you prepared for 2007, how

15  much taxes did the defendant declare were owed in 2007?

16  A.   I'm sorry?

17  Q.   How much did Mr. Cohen said he owed in taxes in 2007?

18          MR. LINCENBERG:  Your Honor, this exceeds the scope

19  of redirect.

20          THE COURT:  I'll allow it.

21  BY MS. MITCHELL:

22  Q.   In the tax return, which I believe is 277B --

23  A.   Correct.

24  Q.   -- what is the ultimate tax liability that's determined by

25  that tax return?

1   A.    Zero.

2   Q.    And you were asked about receiving a salary.  And I

3   believe the defense counsel suggested that Mr. Cohen had no

4   salary in 2007?

5   A.    Correct.

6               MR. LINCENBERG:  Your Honor --

7               THE COURT:  I don't know that he suggested anything.

8   BY MS. MITCHELL:

9   Q.    Okay.  Well, in regards to -- did the defendant tell you

10  how he lived, how he paid for food, how he paid for other

11  expenses?

12  A.    He was living with --

13              MR. LINCENBERG:  Your Honor, this has been covered

14  and exceeds the scope of cross.

15              THE COURT:  Overruled.  Go ahead.

16              THE WITNESS:  He told me he was living with his wife,

17  who basically supported him.

18  BY MS. MITCHELL:

19  Q.    Did he tell you anything about an allowance he received?

20  A.    I believe at one time early -- early on he received

21  $200,000 a month or something to that effect.

22  Q.    From his wife?

23  A.    From his wife, correct.

24              MS. MITCHELL:  Thank you.  No further questions.

25              THE COURT:  Thank you.  You're excused.

```
 1              (Witness excused.)

 2         MR. SPRAGUE:  United States calls Steve Segvich.

 3         THE CLERK:  Good morning.

 4         THE WITNESS:  Good morning.

 5         THE CLERK:  Please remain standing and raise your

 6    right hand.

 7                      STEVEN SEGVICH,

 8    called as a witness for the Plaintiff herein, having been first

 9    duly sworn, was examined and testified as follows:

10         THE WITNESS:  I do.

11         THE CLERK:  Please be seated.  Please state your full

12    name.  Spell your last name for the record.

13         THE WITNESS:  My name is Steven J. Segvich.  My last

14    name is spelled S-e-g-v-i-c-h, Steven with a v.

15                    DIRECT EXAMINATION

16    BY MR. SPRAGUE:

17    Q.   Good morning, Mr. Segvich.

18    A.   Good morning.

19    Q.   Do you work for Prime Jet?

20    A.   Yes, I do.

21    Q.   And what is Prime Jet?

22    A.   Prime Jet was a private luxury charter aircraft service.

23    Q.   Is Prime-Jet -- what's the operational status of the

24    business of Prime Jet right now?

25    A.   Prime Jet ceased operations November 30th, 2010.
```

1   Q.   And then so what's been your role at Prime Jet post

2   November 30 of 2010?

3   A.   Wrapping up the business, following up on accounts

4   payable, accounts receivable, taxes and so forth.  Even though

5   the business has ceased operations, we still have invoices

6   coming in and payments that need to be taken care of.

7   Q.   And so in a little bit more layman's terms, Prime Jet is a

8   company that rents private aircraft to individuals and

9   corporations?

10  A.   That's correct.

11  Q.   What types of planes are in Prime Jet's fleet?

12  A.   Prime Jet had three identical G4SPs.

13  Q.   And can you describe a G4SP?

14  A.   G4SP is a heavy private jet.  "Heavy" meaning it's for

15  international services.  The aircraft has a range of about

16  4,000 miles, and fully capable of doing all international

17  travel.

18  Q.   How many people does it seat?

19  A.   Our aircraft are configured to seat 13 individuals.

20  Q.   And you worked there from 2008 until now; is that right?

21  A.   That is correct.

22  Q.   And were you the CFO during that entire time period?

23  A.   Yes, I was.

24  Q.   And as CFO, were you responsible for overseeing

25  Prime Jet's recordkeeping regarding all accounts receivable and

1   payable?

2   **A.**    That is correct, yes.

3   **Q.**    And as a part of accounts receivable, did that include

4   overseeing all the invoices and itineraries for Prime Jet

5   rentals?

6   **A.**    Yes, it was.

7   **Q.**    And were those records kept in the ordinary course of

8   Prime Jet's business?

9   **A.**    Yes, they were.

10  **Q.**    And were they made at or near the time of the trips

11  reflected in the records?

12  **A.**    Yes, they were.

13  **Q.**    And did they accurately reflect those trips, including the

14  passengers on the trips and the designations?

15  **A.**    Yes.

16  **Q.**    And how did Prime Jet keep its records?

17  **A.**    We kept actual hard copies of those records.  We had

18  electronic copies, but we -- all our recording keeping was also

19  as a hard copy.  We needed to maintain those not only for our

20  business purposes but for FAA purposes, too.

21  **Q.**    And how long do you need to maintain those for business

22  and FAA purposes?

23  **A.**    We had a standard; we just maintained everything.  The

24  business started operation in 2002, and we just maintained all

25  the records.  It's a safer course of business.

 1  Q.   Okay.  And Prime Jet received a subpoena in connection

 2  with this matter; is that correct?

 3  A.   Yes, we did.

 4  Q.   And were you the one in charge of gathering the documents

 5  responsive to the subpoena?

 6  A.   Yes, I was.

 7           (Trial Exhibit 239 marked for identification.)

 8  BY MR. SPRAGUE:

 9  Q.   I've handed you what's been marked Government Exhibit 239.

10  Do you recognize that?

11  A.   Yes, I do.

12  Q.   And what is Government Exhibit 239?

13  A.   It's -- it's all our records related to Boundless Skies

14  Travels, which our passenger was Mouli Cohen.

15  Q.   And what was the relationship between the name Boundless

16  Sky and Mr. Cohen?

17  A.   That was the company's name that we used for Mr. Cohen.

18           **MR. SPRAGUE:**  The government offers 239.

19           **MR. LICHTMAN:**  Objection, Your Honor.

20           **THE COURT:**  Overruled.  Admitted.

21           (Trial Exhibit 239 received in evidence.)

22           **THE COURT:**  Do you have an extra copy of that or not?

23  I don't seem to have one.

24           **MR. SPRAGUE:**  We're checking, Your Honor.

25

1    **BY MR. SPRAGUE:**

2    **Q.**   Mr. Segvich, you're familiar with Mouli Cohen; is that

3    right?

4    **A.**   Yes.

5    **Q.**   And he was a customer of Prime Jet; is that correct?

6    **A.**   Yes.

7    **Q.**   And you've spoken with Mr. Cohen many times on the phone;

8    is that right?

9    **A.**   I spoke to Mr. Cohen on the phone occasionally, yes.

10   **Q.**   Okay.  And did you also speak with his assistants

11   regarding scheduling and billing of his trips?

12   **A.**   I never spoke to his assistants in regards to billing or

13   scheduling of his trips.  But I spoke to Mr. Cohen in regards

14   to payment of his trips.

15   **Q.**   And did you speak to an accountant or some --

16   **A.**   I spoke to his accountant in regards to follow-up on

17   payment after speaking to Mr. Cohen.

18   **Q.**   Mr. Cohen flew many times on Prime Jet rented private

19   aircraft; is that right?

20   **A.**   That's correct, yes.

21   **Q.**   In connection with those trips, did he request that the

22   plane be personalized for him?

23   **A.**   Yes, he did.

24   **Q.**   How so?

25   **A.**   In regards to materials on the aircraft, including books,

1 private linens and so forth, and also for decals to be applied

2 to the exterior of the aircraft representing Mr. Cohen.

3 Q.   What was the decal that you just referred to?

4 A.   M and S for Mouli and Stacy.

5 Q.   And where was that decal or decals placed when Mr. Cohen

6 flew on the private plane?

7 A.   Some of the decals would be placed on the entrance to the

8 door to getting on the aircraft and also on the tail of the

9 aircraft.

10 Q.   Did Prime Jet provide that decal service for any of its

11 other customers?

12 A.   I'm only aware of one other customer we did it for, and

13 that was when we were providing a tour service for an

14 entertainer.

15 Q.   Who was that?

16 A.   Mary J. Blige.

17 Q.   I'm going to show you a few examples of the documents that

18 are in Exhibit 239.  This is marked a trip sheet.  What is

19 reflected?

20       MR. LICHTMAN:  Your Honor, could we at least have the

21 page that counsel is going to refer to, because we will have

22 objections to certain pages.

23       MR. SPRAGUE:  Of course.

24 BY MR. SPRAGUE:

25 Q.   13663, the first page of the exhibit in front of you, sir.

```
 1  A.   Yes.

 2         (Document displayed.)

 3  Q.   What type of page is this?

 4  A.   This reflects the trip, the invoice and the destination of

 5  the flight.  So you look at the first number, invoice 710, it's

 6  going from Kona, Hawaii, to Oakland.  KOA to OAK is Oakland.

 7  And the aircraft the service was provided on was 308 Alpha

 8  Bravo on the 2nd of January 2005.

 9  Q.   And another example of the page, the next page, ending in

10  64, what type of page is this?

11  A.   That's the statement of account for Mr. Cohen.

12  Q.   Okay.  And so Boundless Sky is the name of the entity that

13  he used?

14  A.   That is correct, yes.

15  Q.   And then what -- just briefly, these are the dates that

16  invoices were issued, and then a running account balance over

17  here on the right side?

18  A.   That is correct.

19  Q.   So in the amount due, when a number jumps up, say, from

20  here, 1,000 to 43,000, is that because there was a $42,000

21  invoice at that point?

22  A.   Yes.  Basically, that amount, like the invoice 728, 43,000

23  is the invoice.

24  Q.   All right.  And then here on the running balance it jumps

25  that amount of that invoice?
```

```
 1   A.   That is correct, yes.

 2   Q.   Okay.  So turning to 65, for example, I think you

 3   mentioned this one, to show an example of -- what type of page

 4   is this?

 5   A.   That's what we call the crew itinerary.  It's provided to

 6   the team on the aircraft, including the pilot, the copilot and

 7   the flight attendant, and indicates when they're leaving, where

 8   they're going from and to.

 9   Q.   And then past that, on the next page, are the details of

10   the trip?

11   A.   That is correct, yes.  That's additional instructions for

12   the crew.

13   Q.   And this one, for example, indicates the passengers are

14   Samuel Mouli Cohen and Stacy Stripling?

15   A.   Yes, that's correct.

16   Q.   And you often cater on your private aircraft or the

17   customer requests catering on the aircraft; is that right?

18   A.   That is correct.

19   Q.   And then so if there's catering down below, there will be

20   descriptions of the types of food or drinks, snacks that the

21   customer's requested?

22   A.   We ran a very strict operation so we made sure all the

23   trip details are included in the trip manifest for the crews so

24   they knew exactly what they needed to do.

25   Q.   And then moving to a page ending in 676, which I'll show
```

 1   you on the screen, sir --

 2              MR. LICHTMAN:  Objection, Your Honor.  403 as to that

 3   page.

 4              THE COURT:  Overruled.

 5              (Document displayed.)

 6   BY MR. SPRAGUE:

 7   Q.   These are the passengers listed on this trip; is that

 8   right?

 9   A.   Yes.

10   Q.   So occasionally Mr. Cohen would have other people travel

11   on a rented plane from Prime Jet, correct?

12   A.   Yes.

13   Q.   And on this one these are the catering -- what he asked

14   for to be catered to these passengers?

15   A.   That is correct.

16   Q.   And just showing one of the -- another of the billing

17   pages, for example, 690, the end.  Over on the right-hand side,

18   that indicates one invoice for approximately -- well, on the

19   left-hand side, it's a $191,000 invoice here?

20              (Document displayed.)

21   A.   That's correct.

22   Q.   In December of 2005?

23   A.   That's correct, yes.

24   Q.   And a few pages later, 696 to 700 -- I'm just going to go

25   through the locations here -- is this a trip, first leg,

```
 1   December 9 of '05, from Tel Aviv to Milan, Italy --

 2              (Document displayed.)

 3   A.   Yes.

 4   Q.   -- on December 9th?

 5              And then on December 16th, from Milan to Nice?

 6   A.   Yes.

 7   Q.   And then on January 3rd, 2006, from Nice to -- where is

 8   this?

 9   A.   Newfoundland, Gander.  It's a refueling stop.

10              (Document displayed.)

11   Q.   And let me just show you two more.

12              A page ending in 752 in the lower right-hand corner,

13   is this a trip from San Francisco to Monterey, California,

14   arriving at 12:05?

15   A.   Yes.

16   Q.   P.M.?

17   A.   Yes.

18   Q.   And on this trip the passengers are Mr. Cohen, Stacy

19   Stripling, Javier Burillo and Rose Burillo, correct?

20   A.   That's correct.

21   Q.   A reminder for the decals to be displayed there; is that

22   right?

23   A.   Yes.

24   Q.   And then leaving Monterey at 3 o'clock the same day; is

25   that right (indicating)?
```

1  A.    Yes.

2  Q.    March 31st, 2007?  And going to Las Vegas?

3  A.    That's correct.

4  Q.    And then on the next page, later that evening, 10:45 at

5  night, leaving Las Vegas and returning to San Francisco?

6  A.    Yes.

7  Q.    And 779 --

8              (Document displayed.)

9  Q.    -- December 13, 2007, the first leg from Oakland to West

10 Palm Beach?

11 A.    Yes.

12 Q.    And this is Mr. Cohen and Mrs. Stacy Stripling; is that

13 right?

14 A.    That's correct.

15 Q.    And then on the next page, on the next day, West

16 Palm Beach to St. Maarten?

17 A.    Yes.

18 Q.    Where is St. Maarten?

19 A.    We flew a lot of places.  I can't tell you exactly where

20 it is.

21 Q.    Do you know what it is?

22 A.    Yeah, it's a resort area.

23 Q.    So that's December 14, 2007, correct?

24 A.    Yes.

25 Q.    And then the next page, returning from St. Maarten on

1    January 3rd.  So about three weeks later; is that right?

2    **A.**    That's correct, yes.

3    **Q.**    And, again, it's Mr. Cohen and Stacy Stripling?

4    **A.**    Yes.

5    **Q.**    And then, finally, a page ending 822.

6              (Document displayed.)

7    **Q.**    This is going from Van Nuys to San Francisco, and again

8    it's Mr. and Mrs. Cohen, correct?

9    **A.**    That's correct.

10   **Q.**    On December 8, 2008?

11   **A.**    Yes.

12   **Q.**    And December 19th, 2008, Mr. Cohen and Stacy Stripling

13   going to Maui?

14   **A.**    Yes.

15   **Q.**    And returning January 2nd, 2009, from Maui to Van Nuys,

16   Mr. Cohen and Stacy Stripling?

17   **A.**    Yes.

18   **Q.**    In these records, sir, there are several trips in and out

19   of Teterboro, New Jersey?

20   **A.**    Yes.

21   **Q.**    What is the airfield at Teterboro, New Jersey?

22   **A.**    It's a private aviation field.  It's a very heavy use for

23   the East Coast, New York -- New York City that is.  It's

24   similar to the Van Nuys airport.  Van Nuys is the largest

25   private airport, large not in size but volume of air traffic

1  for private aircraft, private air travel.

2  **Q.**   And is Teterboro very close to Manhattan?

3  **A.**   Yes.

4  **Q.**   And Van Nuys very close to Los Angeles and Beverly Hills?

5  **A.**   That's correct, yes.

6  **Q.**   From 2003 to 2009, about how much money did Mouli Cohen

7  spend renting private jets from Prime Jet?

8  **A.**   Approximately $6 million.

9           **MR. SPRAGUE:**  Nothing further.

10          **THE COURT:**  Cross?

11          **MR. LICHTMAN:**  Not for this witness, Your Honor.

12          **THE COURT:**  Okay.  Thank you very much for coming.

13          Well, ladies and gentlemen, are you -- are you ready

14  for the next witness, or what do you want to do?

15          **MR. SPRAGUE:**  We're ready.  He's here, we're told,

16  and he's a short witness.

17          **THE COURT:**  Okay.  So we'll have the next witness.

18  Go ahead.

19          **MR. SPRAGUE:**  United States calls Mike Petras.

20          **THE CLERK:**  Will the witness please come forward and

21  take the witness stand.  Please remain standing and raise your

22  right hand.

23

24

25

1334

1                      **MICHAEL PETRAS**,

2    called as a witness for the Plaintiff herein, having been first

3    duly sworn, was examined and testified as follows:

4                **THE WITNESS:**  I do.

5                **THE CLERK:**  Please be seated.  Please state your full

6    name.  Spell your last name for the record.

7                **THE WITNESS:**  My name is Michael Petras, P-e-t-r-a-s.

8                      **DIRECT EXAMINATION**

9    **BY MR. SPRAGUE:**

10   **Q.**   Good morning, Mr. Petras.

11   **A.**   Good morning.

12   **Q.**   Where do you work?

13   **A.**   I work for a renewable energy company called Next Fields.

14   **Q.**   What do you do for them?

15   **A.**   I'm an executive.

16   **Q.**   What's your educational background?

17   **A.**   I studied at Stanford University, dropped out.

18   **Q.**   Where do you live?

19   **A.**   I live in Los Altos, California.

20   **Q.**   How long have you lived there?

21   **A.**   Six years.

22   **Q.**   Family?

23   **A.**   I have four children and a wife.

24   **Q.**   Were you an early investor in a company called Ecast?

25   **A.**   Yes, I was.

1   Q.   And when did you first invest in Ecast?

2   A.   I believe 2000.

3   Q.   And do you recall about how much money you initially

4   invested in Ecast?

5   A.   I believe it was a hundred to $150,000.

6   Q.   And what did you get in return, if anything, for your

7   investment in Ecast, meaning stock certificates or

8   documentation?

9   A.   Uhm, I received a Series A Investor Agreement from -- it

10  was sent to me by the lawyers Wilson Sonsini.

11  Q.   And did you get any stock certificates, if you recall?

12  A.   I do not believe I was issued the stock certificate.

13  Q.   Did you see a document called "Right of First Refusal"?

14  A.   Uhm, yes.  I do recall that.

15  Q.   Come back to that.

16          Who did you pay when you invested in Ecast in about

17  2000?

18  A.   Uhm, I believe I was e-mailed documents by Wilson Sonsini

19  directly, the lawyers.  And I handed the check to, I believe,

20  Roger McAulay.

21  Q.   Do you recall who the check was payable to?

22  A.   Ecast, Inc.

23  Q.   Have you met Mouli Cohen?

24  A.   Yes.

25  Q.   Approximately when did you meet him?

PETRAS - DIRECT / SPRAGUE

1336

```
1   A.    I believe -- well, I met him on numerous occasions, but

2   the first time I met him was in 1999.

3   Q.    Do you recognize Mr. Cohen in the courtroom?

4   A.    Yes, I do.

5   Q.    And can you generally say where he is?

6         MR. LINCENBERG:  So stipulated.

7   BY MR. SPRAGUE:

8   Q.    What was your relationship with Mouli Cohen from when you

9   met him in 1999 up until the fall of 2001?

10  A.    I would say we were friends.

11  Q.    Okay.  And why would you say that?

12        What did you do with him over that time period?

13  A.    I met him.  I was -- I discussed being employed by the

14  company, which I chose to not become an employee of Ecast and

15  instead invested.  My girlfriend, now wife, became an employee

16  of the company, so I attended many company events.  And I

17  invited him, I believe, to one Thanksgiving at my family's

18  house, or my in-law's house, in Palo Alto.

19  Q.    And did he attend that Thanksgiving at your house?

20  A.    And he did attend that Thanksgiving.

21  Q.    In approximately August of 2001, were you involved with an

22  entity called REmanage?

23  A.    Yes.

24  Q.    And what was REmanage?

25  A.    REmanage was a real estate software company.  And I was
```

1  one of the executives of the company.

2  **Q.**   And were you at that time, in the fall of 2001, looking to

3  raise money for REmanage?

4  **A.**   Yes, I was.

5  **Q.**   And what did you do over Labor Day weekend of 2001?

6  **A.**   Uhm, I went on a trip with Mr. Cohen and his wife to

7  Tahoe, Lake Tahoe.

8  **Q.**   And how did Mr. Cohen get to Lake Tahoe that weekend?

9  **A.**   Mr. Cohen flew there and I drove.

10 **Q.**   Did you have discussions with Mr. Cohen about REmanage

11 over this weekend?

12 **A.**   Yes.

13 **Q.**   Did he indicate he was interested in investing in

14 REmanage?

15 **A.**   Yes.

16 **Q.**   Did he indicate approximately how much he was interested

17 in investing in REmanage?

18 **A.**   Yes, 500,000.

19 **Q.**   After that weekend was 9/11; is that right?

20 **A.**   Yes.

21 **Q.**   And so was there some delay in your continued

22 communications with Mr. Cohen?

23 **A.**   Yes.

24 **Q.**   Did the subject of Mr. Cohen's investment in REmanage come

25 up again?

```
 1  A.    Yes.

 2  Q.    Who raised it?

 3  A.    I did.

 4  Q.    And what did you say?

 5  A.    I asked him if he was still interested in investing and he

 6  explained to me he was.

 7  Q.    And did he suggest any other piece of his investment in

 8  REmanage or connected to his investment in REmanage?

 9  A.    Yes.

10  Q.    What was that?

11  A.    He asked me to purchase some of his shares in Ecast or, I

12  believe, trust shares in Ecast prior to his purchase or

13  investment into REmanage.

14  Q.    So first you would buy Ecast shares from Mr. Cohen before

15  he would invest in REmanage?

16  A.    Yes.

17  Q.    Did he suggest how much you should pay him for Ecast

18  shares first?

19  A.    He asked me to invest or to buy 150,000 of his shares.

20  Q.    What did you think of this proposal?

21  A.    I thought it was a bit of a bait and switch.

22  Q.    And when -- I think I -- or you indicated there was

23  somewhat of a delay after 9/11.  When were these conversations

24  the bait and switch as you referred to it, when was this taking

25  place?
```

1  A.    This occurred in November of 2001, as I recall.

2  Q.    At some point did you ask Mr. Cohen if he was allowed to

3  sell these shares?

4  A.    I believe in an e-mail I -- I asked him that.

5  Q.    At some point did you ask him for written documentation

6  that he could do this type of deal?

7  A.    I believe I did so.

8  Q.    And up to this point how were you communicating with

9  Mr. Cohen?  Was it in person?  Via phone?  E-mail?  What?

10  A.    All of the above.

11  Q.    At some point did you ask him to put a response to you in

12  writing?

13  A.    Yes.

14  Q.    And what did he say to you when you asked him to put this

15  in writing?

16  A.    We're friends, you know, you can trust me, we don't need

17  to document that.  And he told me that in person and over the

18  phone.

19  Q.    At some point did you come to believe Mr. Cohen needed

20  permission from the board or to notify the board of this deal

21  he was proposing regarding Ecast?

22  A.    It is common -- it is common in some of the documents --

23  investment documents I've been involved with that this would be

24  a requirement.  In my Series A documents, it was also a

25  requirement that the company had -- that I was required to

PETRAS - DIRECT / SPRAGUE                                    1340

```
 1  notify them.  So I actually asked him as a consequence.
 2          (Trial Exhibit 175 marked for identification.)
 3  BY MR. SPRAGUE:
 4  Q.   And earlier you indicated perhaps an e-mail in this time
 5  period.  I'm going to hand you trial Exhibit 175.  Ask you to
 6  take a look at that to yourself and then tell me if you
 7  recognize it.
 8  A.   I recognize it.
 9  Q.   And is that an e-mail chain between you and Mr. Cohen
10  dated November 26, 2001?
11  A.   Yes.
12          MR. SPRAGUE:  The government offers 175.
13          THE COURT:  Admitted.
14          (Trial Exhibit 175 received in evidence.)
15  BY MR. SPRAGUE:
16  Q.   Now, before we look at this, was Mr. Cohen just offering
17  you these shares, was he pushing it at all?
18          What was the status of this offer from Mr. Cohen --
19  or request that you buy 150,000 Ecast shares?
20  A.   I'm sorry, I'm reading again, sir.
21  Q.   Sorry.
22  A.   Can you please repeat the question?
23  Q.   And it's different from the document, so I apologize.
24          Was Mr. Cohen pushing this deal about you buying
25  Ecast shares at all or was he just putting it out there?
```

1          What was the nature of those conversations?

2  **A.**   As I understood it and as I recall, he was pushing me.

3  And it was a predicate, a requirement.

4  **Q.**   To his subsequent investment in REmanage?

5  **A.**   Correct.

6  **Q.**   Did you have any reaction to him pushing this deal?

7  **A.**   Uhm, I -- I believe it was, you know, the e-mail

8  demonstrates I had a visceral reaction to it.

9  **Q.**   This is one of those that goes from bottom up, so on the

10 last page of Exhibit 175 -- this is from Mr. Cohen to you,

11 correct, where it says, "Hello, Mike, nothing happened on the

12 wire.  I need to talk to you today.  Regards, Mouli."

13 **A.**   Yes.

14 **Q.**   Do you recall what the reference was about the wire?

15 **A.**   He had instructed me to wire him $150,000 to initiate the

16 purchase of his Ecast shares.

17 **Q.**   Before you saw an agreement?

18 **A.**   Yes.

19 **Q.**   And just to complete that e-mail, that was below this

20 part, right, it was sent from Mr. Cohen?

21 **A.**   Yes.

22 **Q.**   From his Ecast address on November 26, right (indicating)?

23          And did you respond?  What's above here, your

24 response?

25 **A.**   I did respond.

1  Q.   Starting at the beginning, which is on the first page of

2  Exhibit 175, you told him that you read Ecast's documents and,

3  according to your read anyway, his shares were subject to a

4  co-sale agreement.  Is that right?

5  A.   I was concerned that they were subject to it, yes.

6  Q.   And why did you tell him that this is contrary to his

7  verbal and written representations?

8  A.   I had asked him if -- if he was subject to repurchase

9  rights, and he stated to me that he did not think his shares

10  were subject to repurchase rights.

11  Q.   And then later in the e-mail you indicate that Mr. Cohen's

12  request of you to maintain confidentiality of this agreement

13  and the timing of your purchase significantly -- well, let's

14  break that down.

15           What was his request to you to maintain

16  confidentiality of this agreement?

17  A.   He asked me not to talk about it to anyone.

18  Q.   Did he say why?

19  A.   Just said it was a personal transaction, it wasn't anyone

20  else's business.

21  Q.   And then there's a reference to the timing of your

22  purchase significantly prior to Mr. Cohen's supposed investment

23  in REmanage, and that's what you discussed earlier; is that

24  fair to say?

25  A.   Correct.

PETRAS - DIRECT / SPRAGUE                1343

```
 1  Q.   And then you indicate that we should have no problem
 2  operating in the open?
 3  A.   Yes.
 4  Q.   And then later you indicate if you get a waiver of these
 5  rights, you'd be happy to buy Ecast shares and then hopefully
 6  he'd invest in REmanage; is that right?
 7  A.   Yes.
 8  Q.   And you ask him to respond in writing?
 9  A.   Yes.
10  Q.   And then, finally, Mr. Cohen responds, and he says he
11  doesn't think they're subject to co-sale.  He's shocked about
12  your confidentiality or confidentially characterization; is
13  that right?
14  A.   Yes.
15  Q.   And then he concludes by saying he's no longer interested
16  in pursuing an investment in REmanage?
17  A.   Yes.
18  Q.   And then you say thanks, good luck, I don't want to
19  purchase Ecast either?
20  A.   Yes.
21  Q.   And then you guys had been friends up until this point for
22  about two years?
23  A.   Yes.
24  Q.   You had him to dinner at your house for Thanksgiving?
25  A.   Yes.
```

1  Q.   And what was the nature of your friendship after this?

2  A.   I was -- in my opinion, we effectively ceased being

3  friends.   We were friendly, but we ceased being friends.

4          THE COURT:   Ladies and gentlemen, we're going to take

5  a recess now.   We will be in recess until 10 after 11:00.

6  Remember the admonition given to you.   Don't discuss the case,

7  allow anyone to discuss it with you, form or express an

8  opinion.

9          (Recess taken from 10:54 a.m. to 11:12 a.m.)

10         THE COURT:   Okay.   Let the record reflect all jurors

11 are present.

12         Mr. Petras, resume the stand.

13         Cross examine.

14                    **CROSS EXAMINATION**

15 BY MR. LINCENBERG:

16 Q.   Good morning, Mr. Petras.   My name's Gary Lincenberg.   I'm

17 the attorney for Mr. Cohen.

18 A.   Good morning.

19 Q.   Mr. Petras, you mentioned that you had invested in Ecast

20 in about 2000 -- in about the year 2000 and had invested, I

21 think you said, about a hundred, $150,000; is that right?

22 A.   Yes.

23 Q.   And you mentioned that you never received stock

24 certificates from Ecast in that regard?

25 A.   Yes.   They were held by Wilson Sonsini, the attorneys.

```
 1  Q.   Okay.  First, did you have to pay any money to Wilson
 2  Sonsini for holding those stock certificates for you?
 3            MR. SPRAGUE:  Objection.  Relevance.
 4            THE COURT:  I'll permit it.
 5            THE WITNESS:  I'm not aware I did.
 6  BY MR. LINCENBERG:
 7  Q.   Okay.  And did you ask Ecast for copies of the stock
 8  certificates?
 9  A.   I was issued a copy of the stock certificate.
10  Q.   Okay.
11  A.   But not the stock certificate.
12            THE COURT:  I'm sorry, what?
13            THE WITNESS:  But not the stock certificate.
14            MR. LINCENBERG:  He was issued a copy but not the
15  original.
16            THE COURT:  Thank you.
17  BY MR. LINCENBERG:
18  Q.   And you understood that Wilson Sonsini had been Ecast's
19  attorneys prior to around October of 2002?
20  A.   Yes.
21  Q.   Now, had you bought some stock from Mr. Cohen back in
22  about 1999, as well?
23  A.   I do not recall.
24  Q.   Do you recall buying about $50,000 worth of founder's
25  shares from Mr. Cohen?
```

1  **A.**   I do not recall.

2  **Q.**   Do you recall that you met Mr. Cohen in 1999 at Viant?

3  **A.**   I do recall meeting him in 1999 at Viant and other places.

4  **Q.**   Okay.  Was -- was Viant the first place you saw him or had

5  you met him before that?

6  **A.**   I recall I met him in Union Square the first time.

7  **Q.**   Okay.  And when you went to Viant, did you understand

8  Viant was an incubator which was helping to incubate and invest

9  in Ecast?

10  **A.**   Yes.

11  **Q.**   And did you meet Mr. Vann-Adibe, who was a part of Viant

12  at the time, do you recall?

13  **A.**   I do not recall.

14  **Q.**   And when you met with Mr. Cohen at Viant, was he

15  discussing the -- do you recall him discussing the Ecast

16  company with you?

17  **A.**   Yes.

18  **Q.**   And do you recall -- you don't recall buying shares from

19  him at a couple of dollars a share?

20  **A.**   I do not recall.

21  **Q.**   Okay.  Now, you knew of Ecast through -- you know a few

22  individuals from Ecast; is that right?

23  **A.**   I knew a number of employees at Ecast, yes.

24  **Q.**   Okay.  And was Mr. Cohen the only employee who, let's say,

25  pitched you with respect to Ecast?

1  **A.**   No.

2  **Q.**   Okay.  Who were some of the other employees who pitched

3  you?

4  **A.**   Well, one of my best friends, Roger McAulay, was early

5  executive.  He asked if I wanted to become an early employee.

6  I said no.

7  **Q.**   Okay.  Any others that you recall?

8  **A.**   Yes.  My wife was hired by Mr. McAulay.  She's an

9  electrical engineer.  She had a lot of fun working at Ecast.

10  **Q.**   Okay.  I would ask if she pitched you, but I don't want to

11  interfere with your marital communications so I won't.

12  **A.**   I would actually say I recommended the position to her.

13  **Q.**   Okay.  And were you excited about Ecast's prospects?

14  **A.**   Yes.

15  **Q.**   All right.  What was it about Ecast that you thought

16  looked like an exciting opportunity?

17  **A.**   I thought they had a very innovative business plan.  I

18  intuitively understood what they were trying to accomplish, and

19  understood the need for, effectively, digital jukeboxes in

20  bars.

21  **Q.**   All right.  And in the course of your conversations with

22  Mr. Cohen, with respect to Ecast -- and let's focus on your

23  conversations first in connection with your purchase of Ecast

24  shares from Ecast -- did you discuss potential exit strategies

25  with Mr. Cohen?

1  A.    I think it's -- well, I do not recall, but I -- it would

2  not be uncommon for entrepreneurs to discuss exit strategies as

3  part of an investment pitch.

4  Q.    All right.  You're an entrepreneur yourself; is that

5  right?

6  A.    Yes.

7  Q.    And you've run Silicon Valley companies?

8  A.    Yes.

9  Q.    And as -- when you pitch people to gauge their interest or

10 try to elicit their interest in your companies, you discuss

11 exit strategies?

12 A.    Commonly.

13 Q.    Okay.  And did Mr. Cohen's discussion of exit strategies

14 seem out of the ordinary to you?

15 A.    No.  It seemed quite within the normal range of

16 conversations.

17 Q.    Okay.  Did he ever tell you that, for example, there was

18 some guarantee that there was going to be an IPO or a takeover

19 of the company?

20 A.    No.  You know, I would -- I wold say he presented a very

21 broad picture of potential success, as any entrepreneur would.

22 Q.    Okay.  Now, when you and Mr. Cohen had your discussion in

23 2001 about -- I'm going to use the term "exchanging shares,"

24 investing in each other's companies maybe is a better way of

25 describing it, you had raised in your e-mail a question about a

1  co-sale agreement, correct?

2  **A.**    Yes.

3  **Q.**    And Mr. Cohen had responded by saying that the shares --

4  the preferred shares are not subject to a co-sale agreement.

5  Do you see that?

6  **A.**    Yes.

7  **Q.**    And did you ever determine whether or not that was correct

8  at that time?

9  **A.**    No, I did not determine it.

10  **Q.**    Now, in the same e-mail, you had mentioned that it was

11  important to get things in writing so that everybody's

12  respective positions was clear; is that right?

13  **A.**    Correct.

14  **Q.**    And is that because when people are discussing in your

15  industry buying and selling shares, there can be a lot of talk

16  back and forth but until you see what's in writing you really

17  don't know what the deal is?

18          **MR. SPRAGUE:**  Objection.

19          **THE COURT:**  Overruled.

20          **THE WITNESS:**  It is common in our industry to discuss

21  different terms and even draw on napkins.  But contracts are

22  contracts.

23  **BY MR. LINCENBERG:**

24  **Q.**    Right.  When you say "contracts are contracts," you

25  understand that if you're going to be investing a fair amount

1   of money, you want to make sure that it's in writing?

2   **A.**   Yes.

3   **Q.**   And here you were talking about you invested, for example,

4   a hundred thousand dollars or so and then you were talking

5   about putting more money in.  Investing that amount of money,

6   you would want to make sure that you reviewed the written

7   agreement as well, correct?

8   **A.**   Yes.

9           **MR. LINCENBERG:**  Thank you, Your Honor.  Nothing

10  further.

11          Thank you, Mr. Petras.

12          **THE COURT:**  Redirect?

13          **MR. SPRAGUE:**  No, Your Honor.

14          **THE COURT:**  Thank you.  You're excused.

15          (Witness excused.)

16          **THE COURT:**  Call your next witness.

17          **MS. MITCHELL:**  Thank you, Your Honor.  The government

18  calls James Oertel.

19                        **JAMES OERTEL**,

20  called as a witness for the Plaintiff herein, having been first

21  duly sworn, was examined and testified as follows:

22          **THE WITNESS:**  Yes.

23          **THE CLERK:**  Please, be seated.  Please state your

24  full name.  Spell your last name for the record.

25          **THE WITNESS:**  My name is James Oertel.  The last name

1  is spelled O-e-r-t-e-l.

2  **DIRECT EXAMINATION**

3  BY MS. MITCHELL:

4  Q.   Good morning, Mr. Oertel.

5  A.   Good morning.

6  Q.   Where do you work?

7  A.   I work for the Internal Revenue Service.

8  Q.   And how long have you worked there?

9  A.   Twenty-five years.

10  Q.   Have you received any CPA training?

11  A.   I have passed the CPA exam.

12  Q.   And have you received any other training in conjunction

13  with your work?

14  A.   Uhm, over the course of the years I've received probably

15  around a thousand hours of classroom training.

16  Q.   Before you joined the Internal Revenue Service, what was

17  your educational background?

18  A.   Uhm, I have a bachelor of science degree in business with

19  an emphasis in accounting.

20  Q.   And as a revenue agent, what are your job duties?

21  A.   I audit -- well, or examine income tax returns to

22  determine if they are accurate.

23        More specifically, I belong to a group called the

24  Special Enforcement Program, and we audit people who are either

25  been convicted of crimes or are suspected of crimes or tax

1   fraud.

2   **Q.**   And how long have you been involved in this group?

3   **A.**   Uhm, most of my career, about 22 years.

4   **Q.**   About how many tax returns have you reviewed as an IRS

5   agent?

6   **A.**   Uhm, my best estimate would have to be thousands.

7   **Q.**   And do you instruct others, other agents, on the review of

8   tax returns?

9   **A.**   Uhm, I have done that, yes.

10  **Q.**   Have you testified in both criminal and civil trials?

11  **A.**   Yes.

12  **Q.**   Approximately how many times?

13  **A.**   I believe this is my eighth time.

14          **MS. MITCHELL:**   Your Honor, the government to move to

15  qualify Agent Oertel as an expert in determining tax liability

16  for unreported income.

17          **THE COURT:**   You may proceed.

18  **BY MS. MITCHELL:**

19  **Q.**   Agent Oertel, what is the definition of income under the

20  tax code?

21  **A.**   The way that the tax code defines income is it's anything

22  you receive, anything at all of value, unless there is a

23  specific exception.

24  **Q.**   And what are the specific exceptions?

25  **A.**   The most usual ones are like gifts, inheritances or loans.

1  Q.   And what is an acceptable loan or a bona fide loan under

2  the tax code?

3  A.   Uhm --

4  Q.   What characteristics does the loan have?

5  A.   Well, I would say that the characteristics of a loan are

6  best described like whenever you buy a car.  After you buy a

7  car -- I mean, after you pick out the car, you talk to the

8  dealer, you get all the terms; the interest rate, the amount,

9  how long do you have to pay it.

10        They check your credit rating to see if you're the

11 kind of customer who would pay something back.  And then after

12 everything is agreed, then you put it all in writing.  You sign

13 it.  And it's not until after that's all done you can finally

14 get the keys to your car.

15        Or, you know, in the case of other kind of loans, you

16 can either get the money for a mortgage or a cash advance,

17 things like that.  That pretty much describes what you should

18 have in a loan.

19 Q.   We were talking -- in the loan discussions that you were

20 describing, you discussed an intent to repay is negotiated?

21 A.   That's absolutely right.

22 Q.   And that occurs before the money is received?

23 A.   That's right.  You have to -- there has to be an agreement

24 between the parties.  The lender has to understand that they're

25 loaning you the money, and the borrower has to have the

 1   understanding and the intent to repay that loan.

 2   **Q.**   Now, are loans always not taxable?

 3   **A.**   No, they're not.

 4   **Q.**   What would you a situation where they would be taxable?

 5   **A.**   Uhm, I can think of two instances.  A loan would be

 6   taxable upon receipt if you receive it under false pretenses or

 7   if you receive it and have no intention of repaying it.

 8              Under those two circumstances, whenever you receive

 9   that money, it becomes taxable to you.

10   **Q.**   Now, we're here today on the case of United States versus

11   Samuel Mouli Cohen.  Are you aware of this matter?

12   **A.**   Yes.

13   **Q.**   Have you been sitting through this trial?

14   **A.**   Yes.

15   **Q.**   Have you heard testimony of witnesses and seen the

16   documents presented?

17   **A.**   Yes.

18   **Q.**   Have you also reviewed the evidence that has been admitted

19   in this trial?

20   **A.**   Yes.

21   **Q.**   And have you reviewed all exhibits in this case --

22   **A.**   Yes.

23   **Q.**   -- including bank records?

24              Specifically, have you reviewed the defendant's tax

25   returns for the years 2004, 2005, 2006, and 2007?

```
 1   A.    I have.

 2             MS. MITCHELL:  Your Honor, at this time I would move

 3   in Exhibit 29, which I failed to do yesterday.  I moved in

 4   Exhibits 30, 31 and 32.

 5             THE COURT:  29.

 6             MS. MITCHELL:  Is the certified tax return from the

 7   year 2004.

 8             THE COURT:  29 admitted.

 9             (Trial Exhibit 29 received in evidence.)

10             MS. MITCHELL:  At this time the government would also

11   move in Exhibits 1 to 24.5.

12             THE COURT:  Wait.  What?

13             MS. MITCHELL:  1 to 24.5.

14             THE COURT:  Wait.  1 through 24.5?

15             MS. MITCHELL:  Yes, Your Honor.  They're all the bank

16   records.

17             THE COURT:  Bank records.  Okay.  Admitted.

18             (Trial Exhibits 1 through 24.5 received in evidence.)

19   BY MS. MITCHELL:

20   Q.    Agent Oertel, will you, in those binders next to you, look

21   at Exhibits 29, 30, 31 and 32.  That's what we're going to be

22   discussing.

23             And if you'd turn, first, to Exhibit 29.

24   A.    Okay.

25   Q.    And what is Exhibit 29?
```

1  **A.**   This is Mr. Cohen's 2004 federal income tax return.

2  **Q.**   And is it signed?

3  **A.**   Yes.

4  **Q.**   Who is it signed by?

5  **A.**   It appears to have Mr. Cohen's signature.

6  **Q.**   Okay.  So I'm going to then direct your attention to the

7  income.

8  **A.**   Okay.

9  **Q.**   Does Mr. Cohen report the receipt of any income?

10  **A.**   No, not as shown on this page.

11  **Q.**   Is there any loss reported?

12  **A.**   Uhm, there is a business loss from a Schedule C.

13  **Q.**   Is the Schedule C attached to this form?

14  **A.**   Yes, it is.

15  **Q.**   In what business is there a loss in 2004?

16  **A.**   The business name is Signet Ventures, LLC.

17  **Q.**   Okay.  And how much loss is claimed in 2004?

18  **A.**   Uhm, the net loss is 96,234.

19  **Q.**   And is that the amount that appears on the first page of

20  this return?

21  **A.**   Yes.

22  **Q.**   And does the defendant claim a standard deduction on this

23  form?

24  **A.**   Uhm, yes, he claims only the standard deduction.

25  **Q.**   And what is this 3100 that is claimed?

1  **A.**    That's your personal exemption.

2  **Q.**    Okay.  When do you receive a personal exemption?

3  **A.**    Uhm, everyone gets it.  You can get one for your kids or

4  dependents.  It's subject to limitations, but basically

5  everyone can get one.

6  **Q.**    Okay.  If you would turn to Exhibit now 30.

7  **A.**    Okay.

8  **Q.**    And what is Exhibit 30?

9  **A.**    This is Mr. Cohen's 2005 federal income tax return.

10 **Q.**    And is this signed?

11 **A.**    Yes, it appears to be signed by both Mr. Cohen and

12 Mr. Shulman.

13            (Document displayed.)

14 **Q.**    Directing your attention again to the area of income, is

15 any income reported by Mr. Cohen as having received in the tax

16 year 2005?

17 **A.**    Yes.  He reported $151 of interest.

18 **Q.**    And is there any business income or loss reported?

19 **A.**    There is another business loss.

20 **Q.**    And where does that business loss come from?

21 **A.**    Comes from the Schedule C.

22 **Q.**    Is this the Schedule C?

23 **A.**    Yes, ma'am.

24 **Q.**    And what is the business the loss comes from?

25 **A.**    Signet Ventures, LLC.

1  **Q.**   And what is the -- there is income received?

2  **A.**   Correct.  Gross receipts of 56,667.

3  **Q.**   And -- but there are expenses?

4  **A.**   Yes.  There are wages claimed of $60,294.  If you net the

5  two, it comes out with a net loss of 3627.

6  **Q.**   And is that the amount that's on the front page of the

7  return?

8  **A.**   Yes, ma'am.

9  **Q.**   Okay.  And in 2005, does Mr. Cohen claim any -- he claimed

10 a standard deduction?

11 **A.**   Yes.

12 **Q.**   And does he claim the personal exemption?

13 **A.**   Yes, he does.

14 **Q.**   Now, in 2005 -- well, before I go there, is there a

15 passive activity loss attached to the 2005 tax return?

16 **A.**   Yes.

17 **Q.**   And what is a passive activity loss?

18 **A.**   Well --

19 **Q.**   What is passive activity?

20 **A.**   Passive activity describes -- well, there are two kinds of

21 activity.  Whenever you take part in like a partnership, let's

22 say, you can either have passive activity or nonpassive.

23         What you have to do is you have to go through a

24 series of questions which ask you how much time do you actually

25 spend at the business?  And if you don't spend enough time

1   doing it, then it's considered passive.

2   **Q.**   And is there a passive activity loss claimed in

3   Mr. Cohen's 2005 tax return?

4   **A.**   Yes, ma'am.  It's from Procinea Management, LLC.

5   **Q.**   And how much loss is claimed?

6   **A.**   It's $1,427,064.

7   **Q.**   So how much did Mr. Cohen report as net income in the year

8   2005?

9   **A.**   Let's see.  Well, if you go to the first page, total

10  income is a negative of 99,710.

11  **Q.**   And how much does Mr. Cohen declare that he owes in income

12  tax in 2005?

13  **A.**   Nothing.

14  **Q.**   Okay.  If you'd turn to Exhibit 31.

15  **A.**   I have it.

16  **Q.**   Great.  And what is that?

17  **A.**   That is Mr. Cohen's 2006 federal income tax return.

18  **Q.**   And, again, does Mr. Cohen claim that he's received any

19  income in the year 2006?

20  **A.**   Zero income is reported.

21  **Q.**   Is any loss reported?

22  **A.**   Yes.  The net operating loss carryover from -- I think it

23  started in 2004.  It passed from 2004 to 2005.  And since it

24  wasn't used in 2005, it passes on to 2006.  And it's $99,861.

25  **Q.**   So what is the net income reported by Mr. Cohen?

```
 1   A.   It's that same amount, a negative $99,861.

 2   Q.   And in the year 2006, does Mr. Cohen claim a standard

 3   deduction or itemized deductions?

 4   A.   He elected the standard deduction.

 5   Q.   And does he take the personal exemption?

 6   A.   Yes.

 7   Q.   And, again, is this signed?

 8   A.   Yes, ma'am.

 9   Q.   Now, does this tax return have any Schedule B of dividend

10   interest?

11   A.   Uhm, no.

12   Q.   Okay.  Does this tax return have any Schedule C?

13   A.   No.

14   Q.   Regarding any companies' --

15   A.   No, ma'am.

16   Q.   -- profit or losses?

17           Does this tax return have any passive activity

18   reported?

19   A.   No, ma'am.

20   Q.   Okay.  If you would turn to Exhibit 32.  And what is this?

21   A.   That is Mr. Cohen's 2007 federal income tax return.

22   Q.   And is this signed?

23   A.   Yes, by Mr. Cohen and Mr. Shulman, his return preparer.

24   Q.   And returning to the first page, does Mr. Cohen claim that

25   he has received any income in the year of 2007?
```

1   A.   He reported interest of $13.

2   Q.   And is any loss reported?

3   A.   Yes, that same net operating loss carryover came into

4   2007, so it's there on line 21.

5   Q.   And in the year 2007, does Mr. Cohen claim the standard

6   deduction or itemized deductions?

7   A.   He elected the standard deduction.

8   Q.   And does he claim that -- the personal exemption?

9   A.   Yes.

10  Q.   Now, is there a Schedule B attached to the 2007 return?

11  A.   Yes, ma'am, there is.

12  Q.   And what is the Schedule B, again?

13  A.   A Schedule B is where you report the different payors of

14  your interest and dividends.  And then at the bottom it also

15  asks some questions about whether or not you have a foreign

16  account.

17  Q.   Okay.  And how does the defendant answer that?

18  A.   Uhm, well, there are two questions.  To both of them he

19  answers no.

20  Q.   And in the year 2007, how much income does -- net income,

21  does Mr. Cohen report?

22  A.   Uhm, the net is a negative 99,848.

23  Q.   And in the year 2007, how much does Mr. Cohen claim he

24  owes in income tax?

25  A.   Zero.

1  Q.   Now, after listening to all the testimony and reviewing

2  the documents in this case, have you made a determination of

3  how much income the defendant received in 2005, 2006, and 2007?

4  A.   Yes, ma'am, I have.

5  Q.   And how did you make this determination?

6  A.   I reviewed the payments that were received from Mr. Dillon

7  and -- well, also the Dillon Groups, Sam Mills, Mary Mills and

8  Danny Glover.

9  Q.   Now, you've seen and heard testimony about documents that

10 purport to be concerning a loan.  Did you consider this?

11 A.   I considered it.

12 Q.   And what did you determine?

13 A.   That they were not loans.

14 Q.   And how did you come to that decision?

15 A.   Because -- remember how I talked about the car loan?  You

16 first have to talk to the dealer, get an understanding about

17 all the terms and everything else, and then you sign it.  And

18 it's not until that understanding and signing that you can

19 finally get your keys.

20         And according to the witness testimony -- because all

21 I can do is just summarize the testimony.

22         MR. LICHTMAN:  Objection, Your Honor, this gets into

23 intent under 704(b).  This witness cannot testify to that.

24         THE COURT:  No, I think he can testify.  He can

25 testify as to his conclusions that these funds received by the

1363

1  defendant were not loans.  He can testify as to that.

2  **BY MS. MITCHELL:**

3  **Q.**   Please continue.

4  **A.**   Okay.  The witnesses who testified all stated repeatedly

5  that they never intended on loaning Mr. Cohen any money.  And

6  it's intent that is a major part of either making or receiving

7  a loan.

8          Regardless of what -- how it's documented, you must

9  first have that intent.  And because the witnesses stated they

10 had no intent, I believe that they are not loans.

11 **Q.**   I believe you also discussed earlier whether or not the

12 documentation exists before the money exchanges hands?

13 **A.**   That's correct.

14 **Q.**   And did you hear any testimony regarding that?

15 **A.**   Yeah, the -- uhm, the witnesses stated that they received

16 the money -- excuse me, they received the loan documents after

17 they gave the money.

18          And in a bona fide loan, that's not the sequence.

19 You first have to have -- well, in order for it to be a true

20 loan, you sign all the papers and get all that understanding

21 before you exchange money.

22 **Q.**   So after listening to this testimony and making the

23 determination that there was income, did you make a

24 determination whether or not all the monies sent to Mr. Cohen

25 were income?

OERTEL - DIRECT / MITCHELL                                    1364

```
 1  A.    Yes.

 2  Q.    And did you summarize this determination, these

 3  conclusions you arrived at on a chart?

 4  A.    Yes, ma'am.

 5  Q.    Would you look at Exhibit 35.

 6  A.    Okay.

 7  Q.    And is that chart a composite of all the conclusions that

 8  you've made?

 9  A.    Uhm, yes.

10        MS. MITCHELL:  Your Honor, at this time the

11  government would move in Exhibit 35.

12        MR. LICHTMAN:  Objection under 704(b) again, Your

13  Honor.

14        THE CLERK:  Exhibit 35?

15        MS. MITCHELL:  Exhibit 33.  Sorry.  I think I

16  misspoke.

17        THE COURT:  704(b) provides that no expert witness

18  testifying with respect to the mental state or condition of a

19  defendant in a criminal case may state an opinion or inference

20  as to whether the defendant did or did not have the mental

21  state.  Is that right?

22        MR. LICHTMAN:  Yes, Your Honor.

23        THE COURT:  Right.  This witness is testifying as to

24  the mental state of what he views as the intention of others,

25  not the defendant.  This witness is saying that -- as I
```

```
 1   understand it, he's saying that Mr. Dillon, Mills and so forth,
 2   did not intend the money to be a loan.  He is testifying as to
 3   their intent based upon --
 4            MR. LICHTMAN:  Your Honor.
 5            THE COURT:  I think I have to say a couple of things.
 6            Number one, ladies and gentlemen, an expert is
 7   entitled to give an opinion based upon his experience and based
 8   upon the information that is given to him.
 9            You are free to accept or reject the opinion based
10   upon your understanding of the facts as presented to you.
11            So, in other words, that the witness has testified
12   that the witnesses didn't intend for the money to be loans is
13   this witness's conclusion based upon the evidence that he
14   heard, and may be based upon a review of the records or based
15   upon other evidence in the case.  Okay.  That's his opinion.
16            You are free to accept it or reject it.  That is for
17   you to decide.  But a witness -- an expert witness is entitled
18   to give an opinion on that subject.
19            So he's not -- so your objection is overruled.
20            Okay.  Go ahead.
21            MS. MITCHELL:  Your Honor --
22            THE COURT:  And then, specifically, 705 of the
23   Evidence Code says the expert may testify in terms of opinions
24   or inferences and give reasons therefore.
25            MR. LINCENBERG:  It continues.
```

 1              THE COURT:  Okay.

 2              MR. LINCENBERG:  It says without --

 3              THE COURT:  Without first testifying as to the

 4    underlying facts or data.  But he doesn't have to testify.

 5              The question could have been asked, do you think

 6    these are loans?  And then the witness would have given his

 7    opinion.  And then counsel could have said, upon what facts do

 8    you base that conclusion on?

 9              But counsel chose to do it another way, to say, well,

10    you looked at the facts and based upon the facts, what were

11    those facts, what opinion do you have?

12              You can reverse it either way.  It's permissible.  So

13    under 705, it comes in.  And under the cautionary instruction

14    I've just given, it comes in.

15              Okay.  You may proceed.

16              MS. MITCHELL:  Thank you, Your Honor.

17              THE COURT:  And, what, it's -- 35 admitted.

18              MS. MITCHELL:  And I misspoke, 33 -- 33, 34, 35, we

19    do at all one time.

20              THE COURT:  Yes.

21    BY MS. MITCHELL:

22    Q.   Are these all charts that you prepared based on the

23    determinations you made?

24    A.   Yes, ma'am.

25              THE COURT:  33, 34, 35, all admitted.

```
 1              (Trial Exhibits 33, 34, and 35 received in evidence.)
 2   BY MS. MITCHELL:
 3   Q.   First turn to -- actually, you know what --
 4              MS. MITCHELL:  Can we pull up Exhibit 33?
 5              THE COURT:  Did you also seek or not seek 36?  There
 6   is a 36?
 7              MS. MITCHELL:  There's no 36.
 8              THE COURT:  Okay.  Thank you.
 9   BY MS. MITCHELL:
10   Q.   And what does this chart show?
11   A.   This chart shows the totals of the amounts received for
12   2005, 2006, and 2007, from Dillon, the Dillon Groups, Glover
13   and both Mills.
14   Q.   And how did you arrive at these figures?
15   A.   Uhm, I looked at the payments that were made both by check
16   or by wire from all of these people.
17   Q.   And what is the total amount of unreported income that
18   Mr. Cohen received in 2005?
19   A.   The total is 11,562,000.
20   Q.   And what about 2006?
21   A.   9,246,403.
22   Q.   And what about 2007?
23   A.   970,000.
24   Q.   Now, did you compare your determination of unreported
25   income to the amount of income that Mr. Cohen reported on his
```

1   tax returns for the years 2005, 2006, 2007?

2   **A.**    Yes.

3   **Q.**    And did you prepare a chart that summarized this?

4   **A.**    Yes.

5   **Q.**    And is that chart Exhibit 35?

6   **A.**    Yes, ma'am.

7            (Document displayed.)

8   **Q.**    And if you could walk us through this chart.

9   **A.**    Okay.  Well --

10  **Q.**    What are the adjustments to tax return?

11  **A.**    Uhm, the adjustments to tax return are the changes that I

12  found that should be made to Mr. Cohen's returns.

13  **Q.**    So in the first line, under "unreported income," are those

14  total amounts the amounts that we just saw in the prior chart?

15  **A.**    Yes, ma'am.

16  **Q.**    For 2005, 2006 and 2007?

17  **A.**    Yes.

18  **Q.**    And the next line says "disallowed net operating" cost.

19  What does that mean?  "Net operating loss."  Excuse me.

20  **A.**    Well, there was that amount that kept going from year to

21  year to year.  It originated in 2004.  And in reviewing the

22  documents, I found that there had been unreported income in

23  2004, which would wipe out that net operating loss.  And so it

24  can't be taken in any of these subsequent years: 2005, 2006,

25  and 2007.

OERTEL - DIRECT / MITCHELL

1  Q.   And it looks like you've disallowed the personal exemption

2  for each of these years: 2005, 2006, 2007?

3  A.   Well, not completely.

4  Q.   Okay.

5  A.   Because there is a limitation, we call it a phaseout,

6  where if your income hits a high enough level, then it starts

7  to become disallowed either in whole or in part.

8  Q.   And so the total adjustments, that is simply the addition

9  of everything, all the adjustments you made?

10 A.   Yes, ma'am.

11 Q.   2005, 2006 and 2007?

12 A.   Yes.

13 Q.   And those are the adjustments that you feel should be on

14 the tax return, the adjustments to the tax returns submitted in

15 each of those years?

16 A.   That's correct.

17 Q.   Okay.  And then you have "less reported taxable income."

18 A.   Well, we have to account for what was already put on the

19 returns, so I have these changes.  So first you have to look at

20 what was on the return, then you combine them with the changes

21 so that you can get that final line of corrected taxable

22 income.

23 Q.   And so the corrected taxable income is determined for each

24 of those years?

25 A.   Yes, ma'am.

1    Q.    And how much did you determine the corrected taxable

2    income is for the year 2005?

3    A.    11,553,524.

4    Q.    And how much for the year 2006?

5    A.    9,240,153.

6    Q.    And for 2007?

7    A.    963,530.

8    Q.    Okay.  And after you calculated what the corrected taxable

9    income was, did you determine what Mr. Cohen's tax liability

10   was for each of those years?

11   A.    Yes.

12   Q.    And when I use the phrase "tax liability," what does that

13   mean?

14   A.    That means how much he should have reported on his return,

15   you know, on that second page.  There is a total tax line --

16   well, actually, this is the corrected taxable income line we

17   see here.  That's one line.  And then further down you have the

18   line for how much tax would be on that.

19   Q.    Okay.  And did you prepare a chart summarizing how much

20   tax liability Mr. Cohen had in the years 2005, 2006, 2007?

21   A.    Yes.

22   Q.    And is that chart Exhibit 34?

23             (Document displayed.)

24   A.    Yes, it is.

25   Q.    Now, on the first line of this chart you have the filing

1  status reported.  And why do you have that?

2  A.   Well, the filing status, the marital status tells you

3  which tax rate schedule or which tax chart you should use in

4  determining your individual tax.

5  Q.   And then you have a line saying "corrected taxable

6  income."  And is that what we just went over in the previous

7  chart?

8  A.   Yeah, that's from the other chart.

9  Q.   Okay.  So the corrected taxable income is about

10 11.5 million in 2005.  In 2006, it's over 9 million.  In 2007,

11 it's just under a million?

12 A.   Yes.

13 Q.   And the corrected tax due, how do you compute that?

14 A.   Well, there are tax rates.  And so you just take those

15 rates, multiply them by whatever the taxable income is and you

16 get the tax due.

17 Q.   And so what is the corrected tax due for the year 2005?

18 A.   4,030,765.

19 Q.   And how much did Mr. Cohen report that was due on his

20 taxes for that year?

21 A.   Nothing.

22 Q.   And how about for the year 2006?

23 A.   The corrected tax was 3,220,679.

24 Q.   And how much did Mr. Cohen report was due?

25 A.   Again, that was zero.

1  Q.    And how about for the year 2007?

2  A.    Uhm, the tax should have been reported at 316,310.

3  Q.    And how much did the -- Mr. Cohen report that was due in

4  2007?

5  A.    Zero.

6  Q.    So the unreported tax liabilities, because the defendant

7  didn't report any taxes, are the amounts that you -- that

8  you've already stated?

9  A.    Yes.

10  Q.    So for the years 2005, 2006, and 2007, what is the total

11  unreported tax that is due and owing?

12  A.    7,567,754.

13  Q.    And returning to what you were talking about, the

14  characteristics of the loan earlier --

15  A.    Yes.

16  Q.    -- and you mentioned a couple things and what makes a

17  valid loan.  One thing we didn't talk about is the use of the

18  money.

19        Does there have to be a meeting of the minds of the

20  parties of how -- what's the purpose of the loan?

21  A.    It depends on the type of loan.  Some loans, like from

22  a -- if you get a credit card advance or a house refi, usually

23  the bank or credit card companies don't tell you what you can

24  do.

25        But then there are some loans, like a car loan or a

```
 1  mortgage, where if you loan somebody money to buy a house, then
 2  they're expected to buy a house.  If you take the money and,
 3  you know, just go somewhere and gamble it away or whatever,
 4  then that's not a true loan.  And I would contend that that
 5  money would be taxable.
 6  Q.   And do you evaluate what is income and what is not income
 7  through your work?
 8  A.   Yes, ma'am.
 9  Q.   Thank you, Agent Oertel.
10        MS. MITCHELL:  We have no further questions.
11        THE COURT:  Okay.  Well, ladies and gentlemen, it's
12  noon.  Why don't we take our noon recess.  We'll be in recess
13  until 1:00 o'clock.  And remember the admonition given to you,
14  don't discuss the case, allow anyone to discuss it with you,
15  form or express any opinion.
16        (Jury out at 11:57 a.m.)
17        THE COURT:  Okay.  Let the record reflect that the
18  jurors have left.
19        Mr. Lincenberg.
20        MR. LINCENBERG:  Two quick things.  First, Your
21  Honor, can we -- you asked us to reconvene at 1:00.  We would
22  like about 10 or 15 minutes to talk with Mr. Cohen --
23        THE COURT:  When do you want to reconvene?
24        MR. LINCENBERG:  We can reconvene at 1:00 or 1:15.
25  But if he could be brought in so we could meet him in the
```

 1  courtroom and sit here and talk to him for 10 or 15 minutes.

 2         **MR. SPRAGUE:**  1:15 would be great for the government.

 3         **THE COURT:**  Okay.  Would you have Mr. Cohen here by

 4  1:00, in the courtroom.

 5         **MR. LINCENBERG:**  Second quick point.

 6         **THE COURT:**  Yes.

 7         **MR. LINCENBERG:**  Your Honor, just to further our

 8  record on our 704(b) objection, 704(a) permits this witness to

 9  sort of be the government's conviction witness on certain

10  things; to get into, for example, certain opinions he can state

11  even if they are ultimate issues.

12         He can't get into opinions with regard to state of

13  mind.

14         **THE COURT:**  The state of mind of the defendant?

15         **MR. LINCENBERG:**  Of the defendant.

16         The Court looked at this, said he's getting into the

17  state of mind of these other witnesses, not the defendant;

18  therefore, I deny your objection.

19         I would suggest to the Court that he went beyond that

20  because he gave testimony in which he discussed how loan

21  agreements -- they are permissible loans depending upon the

22  state of mind of both individuals.  And then he concluded,

23  essentially, that these were not loans.

24         **THE COURT:**  I don't think that's correct.  I don't

25  think he did say anything about the defendant's state of mind.

 1          I think he said that if I loan you money and I

 2  don't -- or if I give you money and I do not intend that to be

 3  a loan, it is not a loan.  That's what he said.

 4          That may be wrong, by the way.  He may be wrong as a

 5  matter of law.  And it may be -- but I don't know whether he's

 6  right or wrong on that issue.

 7          But he's saying for income tax purposes, if the

 8  individual who is giving money to the taxpayer does not believe

 9  that to be a loan, it is, therefore, income.  That's his

10  opinion.  Right or wrong, that's his opinion.  That's all he

11  said, I suggest.

12          Okay.  Now, before you leave, I want to address a

13  question of bail because I assume we're going to have a hearing

14  at some point tomorrow on that subject.

15          Let me advise the parties of two things.  Number one,

16  as I said before, I want Mr. Bercovici -- I think that's his

17  name -- to be present in court.

18          Secondly, the government is entitled to cross-examine

19  Mr. Bercovici with respect to the security arrangements.

20          Third, the government is also entitled to call an

21  expert, if they wish, as to the adequacy or the inadequacy of

22  the security arrangements.

23          The government has objected to this process from day

24  one.  And, therefore, I'm going to make sure that the

25  government has a full hearing on this subject if they continue

1  to have an objection.  If they don't have an objection, that's

2  up to them.  But both sides get a hearing in this matter.

3          And it's a bail matter.  And, therefore, you know, it

4  may take the government some time to prepare if they wish.

5  It's up to them.  I want that to be understood.

6          I think you should also advise Mr. Bercovici that he

7  will be subject to cross-examination on these issues.

8          **MR. LINCENBERG:**  Okay.  I e-mailed him asking if he

9  could do late morning or early afternoon tomorrow.  I haven't

10 seen a response yet.

11         **THE COURT:**  Okay.

12         Now, let's talk a little bit about timing, because I

13 don't know how long you're going to be with this witness.

14         **MR. LINCENBERG:**  Not long.

15         **THE COURT:**  Not long.  Okay.  Then what?

16         **MR. SPRAGUE:**  Your Honor, we have Agent Saavedra,

17 who's our summary witness for bank account records.  One

18 somewhat complicating factor is if he finishes today, which I

19 fully anticipate it won't be real long, then Mr. Meeker is out

20 of town, scheduled to come.  He had other obligations --

21         **THE COURT:**  Okay.  Well, he'll be here first thing in

22 the morning?

23         **MR. SPRAGUE:**  First thing tomorrow morning.

24         **THE COURT:**  And is he your last witness?

25         **MR. SPRAGUE:**  And he will be the last witness.

```
 1          THE COURT:  Okay.  Well, then I think, before we
 2   adjourn today, we should have a discussion as to defense
 3   witnesses.  I think you should be prepared to tell me in some
 4   broad outline the number of witnesses you think you're going to
 5   have, how long these witnesses are going to be.
 6          MR. LINCENBERG:  I've advised the government that --
 7   some of this we're still considering, but I've advised the
 8   government of five people who we're intending to call.
 9          We learned last night that about 10 or 12 people from
10   the government's witness list are not being called.  And I
11   advised the government that there are two people on that list,
12   Glover and Ryles, who we would like to call, to make sure they
13   stay under subpoena.
14          I advised them that we want to call the agents for
15   some impeachment related to some of the testimony.
16          And I gave them a fifth name of somebody --
17          MR. SPRAGUE:  McAulay?
18          MR. LINCENBERG:  Probably McAulay.  And then there's
19   one or two people we'll be considering after tomorrow.
20          THE COURT:  So it's anticipated that, given who
21   you've described, though I don't know, Mr. Glover can be a
22   lengthy witness.
23          MR. LINCENBERG:  It will be lengthier than some, but
24   certainly not as lengthy as Sam Mills, for example.
25          THE COURT:  Okay.  Well, I think I can tell the jury
```

1   that it's anticipated that they will get the case then the week

2   following their return.  Is that fair?

3           **MR. LINCENBERG:**  I think so.

4           **THE COURT:**  I'm obviously not going to describe the

5   defendant's case.

6           **MR. LINCENBERG:**  There's obviously one important

7   witness that -- we need to discuss whether or not he would

8   testify when we get to the defense case.

9           **THE COURT:**  Well, okay.  That's something that

10  changes the dynamic.  But be that as it may, putting that

11  aside, I think I can tell the jury that it appears -- I may

12  wait on this until tomorrow anyway.  Though I don't know.  I

13  don't know.  I'll try to figure out.

14          Okay.  Anyway, you want to recess?

15          **MR. SPRAGUE:**  Will we start this tomorrow,

16  Mr. Glover, Mr. Ryles?

17          **THE COURT:**  Well, you don't have to call anybody

18  today.

19          **MR. LINCENBERG:**  No, but it sounds like --

20          **THE COURT:**  It sounds like you might start right

21  after Mr. Meeker.  Is that his name?

22          **MR. SPRAGUE:**  Yes.

23          **MR. LINCENBERG:**  So we would be prepared -- I would

24  suggest, if it's convenient with the Court and we may have this

25  bail hearing, we'd be prepared to go forward with Glover and

 1  Ryles and the two agents who will be brief.

 2          **THE COURT:**  I think you ought to be prepared to go

 3  ahead with everybody tomorrow because the jury is coming in.

 4  And I don't mean everybody.  I mean most of everybody.

 5          And then a couple things could happen.  Number one is

 6  we could have the hearing, the bail hearing, in the afternoon,

 7  at the end of the witnesses.  We could also have the bail

 8  hearing on Friday.  So I'm putting those options out for you

 9  people.

10          But when the jury is here, I very much want them to

11  hear testimony.  That's sort of my obligation for the jury.

12          **MR. LINCENBERG:**  Well, Your Honor, just in terms of

13  what we were reasonably anticipating, if the Court orders this,

14  we will make sure, for example, that Mr. McAulay is here.  I

15  don't think we'd be getting to him.

16          I hadn't anticipated that there were going to be a

17  good dozen witnesses not pulled off the list, which I'm happy

18  about, but I'm just saying I didn't anticipate that.

19          I prefer not to have Mr. McAulay here tomorrow when I

20  think there's going to be a lot of witness testimony and

21  bail-related issues to still deal with tomorrow.

22          **MR. SPRAGUE:**  But if Mr. Ryles, Mr. Glover --

23          **MR. LINCENBERG:**  And the two case agents.

24          **THE COURT:**  Well, the case agents --

25          **MR. LINCENBERG:**  They're going to be brief.

PROCEEDINGS                    2380

```
 1          THE COURT:  For impeachment purposes, it's going to

 2  be very short.

 3          MR. LINCENBERG:  Right.

 4          THE COURT:  I think you should have -- Mr. McAulay,

 5  is that his name?

 6          MR. LINCENBERG:  Yes.

 7          THE COURT:  I think you should have him on the stand

 8  by tomorrow afternoon.

 9          MR. LINCENBERG:  Okay.  He's out of town.

10          MR. SPRAGUE:  So is Mr. Glover, and so we're going to

11  have to make that call now, as far as I know.

12          THE COURT:  So are you.

13          (Recess taken from 12:06 p.m. to 1:16 p.m.)

14          (The following proceedings were held in open court,

15          outside the presence of the jury.)

16          MR. LINCENBERG:  Can we have ten seconds?

17          THE COURT:  Yes.

18          MR. LINCENBERG:  Your Honor, can the Court issue an

19  order that before court tomorrow Mr. Cohen be given an

20  opportunity to shower and shave?

21          THE COURT:  Where are the facilities?

22          DEPUTY MARSHAL:  He is at the county jail right now.

23          THE COURT:  Why don't we talk about it at the end of

24  the day.

25          (Jury enters at 1:19 p.m.)
```

 1           **THE COURT:**  Okay.  Let the record reflect all jurors

 2   are present, the parties are present.

 3           You may proceed.

 4                    <u>**CROSS EXAMINATION**</u>

 5   BY MR. LICHTMAN:

 6   **Q.**   Good afternoon, Mr. Oertel.

 7   **A.**   Hello.

 8   **Q.**   Just to clarify, the opinion that you offered today

 9   related only to purported income that was not reported by

10   Mr. Cohen, according to you; is that right?

11   **A.**   Well, I don't quite understand.

12   **Q.**   Well, to clarify, your opinion was not going to, for

13   example, deductions that Mr. Cohen may or may not have made?

14   **A.**   I don't think I discussed deductions.

15   **Q.**   Now, you gave testimony today on the topic of loans; is

16   that right?

17   **A.**   Correct.

18   **Q.**   And you offered your opinion that various individuals had

19   not intended to make loans to Mr. Cohen's company, Procinea; is

20   that right?

21   **A.**   What I did was restate what the witnesses had said.

22   **Q.**   Well, you also drew a conclusion based on your view of

23   those witnesses' testimony; is that right?

24   **A.**   Well, also on the documents themselves.

25   **Q.**   And in formulating your opinion, you were operating on the

1  assumption that the witnesses who testified for the government

2  in this case were testifying truthfully; isn't that right?

3  **A.**   Well, you have to remember there's two parts, that there

4  is the -- the testimony and then there are also the documents.

5  **Q.**   Right.  And I'm asking with respect to the witnesses'

6  testimony, you were operating and formulating your opinion on

7  the assumption that the witnesses were testifying truthfully;

8  isn't that right?

9  **A.**   I was taking it at face value.

10  **Q.**   Mr. Oertel, you're part of the prosecution team in this

11  case; isn't that right?

12  **A.**   Correct.

13  **Q.**   So, for example, you worked very closely with Special

14  Agent Saavedra; isn't that right?

15  **A.**   Yes.

16  **Q.**   And with the U.S. Attorney's Office?

17  **A.**   Yes.  That's part of my job.

18  **Q.**   And you spent hours working with that team in this case;

19  is that right?

20  **A.**   Hours?  Yes.

21  **Q.**   And, in fact, your role in this case is to summarize the

22  government's evidence with respect to tax and present it to the

23  jury; isn't that correct?

24  **A.**   It's to summarize evidence and -- into a tax calculation.

25          **MR. LICHTMAN:**   Thank you.  No further questions.

1          **MS. MITCHELL:**  No redirect, Your Honor.

2          **THE COURT:**  Okay.  Thank you, agent.

3          **THE WITNESS:**  You're welcome.

4          (Witness excused.)

5          **THE COURT:**  Call your next witness.

6          **MR. SPRAGUE:**  Thank you, Your Honor.

7          At this time the government would like to read two

8    stipulations and offer the actual document as Exhibit 249A.

9          **THE COURT:**  249A.  249A.

10         **MR. SPRAGUE:**  I'm sorry, Your Honor.  We may have to

11   delete one line.  But we'll read two stipulations in and submit

12   the document later.

13         **THE COURT:**  Okay.

14         **MR. SPRAGUE:**  It is hereby stipulated and agreed

15   between plaintiff and United States by its undersigned counsel

16   and Defendant Samuel Mouli Cohen by his undersigned counsel as

17   follows:

18         Trial Exhibit 236 consists of business records

19   pursuant to Federal Rule of Evidence 8036.

20         And Stipulation No. 7 is, Trial Exhibit 237, consists

21   of business records pursuant to Federal Rule of Evidence 8036.

22         **THE COURT:**  Okay.  That will be received in evidence.

23         (Trial Exhibit 249A received in evidence.)

24         **MR. SPRAGUE:**  Thank you, Your Honor.

25         We would also like to offer Exhibit 171, which are

```
 1   MAFCU bank records.

 2             THE COURT:  171.

 3             MR. SPRAGUE:  Then, Your Honor, the government

 4   calls -- 171.

 5             MR. LINCENBERG:  No objection to 171.

 6             THE COURT:  171 admitted.

 7             (Trial Exhibit 171 received in evidence.)

 8             MR. SPRAGUE:  And the government calls Juan Saavedra.

 9             THE CLERK:  Good afternoon.

10             THE WITNESS:  Good afternoon.

11             THE CLERK:  Stand and raise your right hand.

12                          JUAN SAAVEDRA,

13   called as a witness for the Plaintiff herein, having been first

14   duly sworn, was examined and testified as follows:

15             THE WITNESS:  I do.

16             THE CLERK:  Please, be seated.

17             Please state your full name.  Spell your last name

18   for the record.

19             THE WITNESS:  It's Juan Saavedra, S-a-a-v-e-d-r-a.

20                      DIRECT EXAMINATION

21   BY MR. SPRAGUE:

22   Q.   Good afternoon, Agent Saavedra.

23   A.   Good afternoon.

24   Q.   You are an IRS agent; is that correct?

25   A.   Yes, I am.
```

1    Q.   And how long have you been with the IRS?

2    A.   A little bit over 15 years.

3    Q.   And what do you do for the IRS?

4         What have you done for those 15 years?

5    A.   I am a special agent with the criminal division.

6    Q.   What's the difference between the criminal division and

7    other divisions of the IRS?

8    A.   The criminal division investigates criminal crimes of the

9    Internal Revenue Code, money laundering and the Bank Secrecy

10   Act.

11   Q.   And what's your educational background?

12   A.   I have a bachelor's of arts in business economics from the

13   University of California at Santa Barbara.

14   Q.   And what training have you received in your 15 years as an

15   IRS agent in the criminal investigation division?

16   A.   I received my basic training at -- in Georgia, which

17   lasted approximately seven months.  And after that I received

18   continued professional education training.

19   Q.   Have you received training with respect to asset

20   forfeiture?

21   A.   Yes, I have.  I'm currently the asset forfeiture

22   coordinator here in the Northern District of California.  In

23   that role, I've received specialized training in asset

24   forfeiture and money laundering.

25   Q.   And do you take biannual continuing education classes?

 1   A.    Yes, I do.

 2   Q.    And what are the general topics of those classes?

 3   A.    General topics, asset forfeiture being one of them,

 4   computer forensics, just bank account analysis.  Various items.

 5   Q.    About how many investigations have you been -- had

 6   substantial involvement in as an IRS agent in your 15 years?

 7   A.    Uhm, approximately 75 investigations.

 8   Q.    And do you also instruct new -- are you one of the

 9   instructors for new IRS agents in the criminal side of the IRS?

10   A.    Yes, I am.

11   Q.    Have you been involved in the investigation regarding the

12   defendant, Mr. Cohen?

13   A.    Yes, I have.

14   Q.    And approximately when did you become involved in that

15   investigation?

16              MR. LINCENBERG:  Objection.  Relevance.

17              THE COURT:  Well, I'll allow it in subject to a

18   motion to strike.

19              THE WITNESS:  I first became involved in

20   approximately summer of '09.

21   BY MR. SPRAGUE:

22   Q.    In connection with that investigation, have you

23   interviewed dozen of witnesses?

24   A.    Yes, I have.

25   Q.    Several of them more than once?

1   **A.**    Yes.

2   **Q.**    Did you analyze voluminous financial records?

3   **A.**    Yes, I have.

4   **Q.**    About how many bank and brokerage accounts have you

5   analyzed?

6   **A.**    I would say over 30 bank and brokerage accounts.

7   **Q.**    And of those more than 30 bank and brokerage accounts,

8   about how many were associated with Mr. Cohen?

9   **A.**    Those associated with Mr. Cohen, I would say -- the vast

10  majority I'd say between 25 and 30.

11  **Q.**    And did the remainder include bank accounts and records

12  from the Dillon Groups?

13  **A.**    Yes, it did.

14  **Q.**    And the Glover Group?

15  **A.**    Yes, it did.

16  **Q.**    Entity called MAFCU?

17  **A.**    Yes.

18  **Q.**    And have you reviewed credit card account records?

19  **A.**    Yes, I have.

20  **Q.**    In summary of those financial records, are they thousands

21  and thousands of pages of documents?

22  **A.**    Yes, they are.

23  **Q.**    And represented in part by those on those three shelves of

24  the wheeled cart in the back of the room?

25  **A.**    Yes, they are.

1  Q.   Now, you've also reviewed stock purchase agreements in

2  this case?

3  A.   Yes, I have.

4  Q.   Many e-mails?

5  A.   E-mails.

6  Q.   Records from individual investors?

7  A.   Yes, I have.

8  Q.   Tax returns?

9  A.   Yes.

10 Q.   Tax preparer records?

11 A.   Yes.

12 Q.   And you've listened to the testimony in the trial, right?

13 A.   Yes, I have.

14 Q.   Now, as a result of reviewing all those bank records, have

15 you analyzed them?

16 A.   Yes, I have.

17 Q.   And have you traced various movement of funds over time in

18 those accounts, in and out of those accounts?

19 A.   Yes, I have.

20 Q.   And have you prepared summaries of those bank account

21 records reflecting certain transactions and groups of

22 transactions?

23 A.   Yes, I have.

24 Q.   I'm going to hand you what's been marked Exhibit 36.  Ask

25 if you recognize that.

1  **A.**    Yes, I do.

2  **Q.**    Are these the summaries you've prepared as a result of the

3  analysis of voluminous records we just went through?

4  **A.**    Yes.

5          **MR. SPRAGUE:**  Your Honor, the government would offer

6  36.  There is an issue with a credit card account.

7          **THE COURT:**  Well, let me look at it.  I don't have

8  it.

9          **MR. SPRAGUE:**  Oh, sorry.

10          **THE COURT:**  Is there a particular page?

11          **MR. SPRAGUE:**  Well, at the payments section, Your

12  Honor, which is approximately halfway through, there's a

13  divider that says payments.  And then after that, on the third

14  page is the first time it comes up.

15          **MR. LINCENBERG:**  Your Honor, I think I can flag the

16  issue in a general sense or else we can go to sidebar.  But I

17  think if I flag it generally, the Court will understand the

18  basis of my objection.

19          **THE COURT:**  Well, I see it.

20          **MR. SPRAGUE:**  The top line there.  And then there are

21  some details of that top line in the --

22          **THE COURT:**  Well, I'm going to allow it in subject to

23  a motion to strike.

24          **MR. SPRAGUE:**  Thank you, Your Honor.

25

1   BY MR. SPRAGUE:

2   Q.   Did you begin your analysis -- or was one of the analyses

3   that you conducted regarding Ecast shares that were purchased

4   by Glover and Dillon Groups and those individuals?

5   A.   Yes, it was.

6           MR. SPRAGUE:   If we could look at the first --

7           (Document displayed.)

8           MR. SPRAGUE:   Next line.   Okay.

9   BY MR. SPRAGUE:

10  Q.   Sir, what does that first box there on Exhibit 36, the

11  Glover Group, $3.339 million indicate?

12  A.   That represents payments I traced from the Glover Group

13  2002-I in the amount of 3,339,000 that were made to Samuel

14  Mouli Cohen's Wells Fargo investment account.

15  Q.   And so did you review the underlying bank records actually

16  to identify those funds that were paid to Mr. Cohen based on

17  that stock purchase?

18  A.   Yes.

19  Q.   And what's the Dillon Group 2003-I box represent?

20  A.   That represents shares of Ecast that were purchased,

21  totaling $2,015,000, again payments from Dillon Group 2003-I to

22  Samuel Mouli Cohen at Wells Fargo investments.

23  Q.   And how about the Dillon Group 2003-II?

24  A.   Again, same thing, except for different amounts.   And this

25  one's from Dillon Group 2003-II, in the amount of 150,000.

1   Q.   And that's the same thing, but it's Dillon Group 2003-III

2   for $350,000?

3   A.   Correct.

4   Q.   And then, finally, Hari Dillon, purchase of 175,000 shares

5   for $2 each?

6   A.   Yes, it is.

7   Q.   And when was the time frame that these payments were made

8   to Mr. Cohen's Wells Fargo investment accounts?

9   A.   They started October 2002.  And the last one came in

10  September 2003.

11  Q.   And what is -- there's two accounts on the right side of

12  this page, account 7326 and 3007.  What are those two accounts?

13  A.   Those are accounts that Mr. Cohen had at Wells Fargo

14  investments.  The first one being account ending in 7326, which

15  was the MYRD Millennium Trust account, and the second one being

16  the Matisse Investments ending in 3007.

17  Q.   And the total of these payments was $6,204,000 is; is that

18  right?

19  A.   That is correct.

20  Q.   And were you able to trace how much money the Dillon Group

21  and Glover Group put in to those groups for these investments

22  and then how much went to Mr. Cohen?

23  A.   Yes, I did.

24  Q.   And what are those two numbers?

25  A.   Uhm, the Dillon Group -- or individuals put money into the

1    Dillon Groups and Glover Groups approximately just a little

2    over 6.2 million.

3    **Q.**    About how much --

4    **A.**    Approximately $2,000 over.

5    **Q.**    There's about a $2,000 difference between the figure at

6    the bottom of this page and what had gone in from the

7    investors?

8    **A.**    Yes.  And that was primarily to the Glover Group 2002-I.

9    **Q.**    And what did the $2,000 -- what was it ascribed to in the

10   records you reviewed?

11   **A.**    In the records I reviewed, they were ascribed to as fees.

12   **Q.**    Now, this on the right side indicates money goes to '326

13   account.  Did it hit the '326 account first or was it going

14   into both of these accounts?

15   **A.**    The 7326 account was opened first.  That one was open til

16   the end of 2003.  So payments -- I would say the first -- from

17   the Glover Group all the way down to the Dillon Group 2003-III,

18   all those payments went to the 7326 account, totaling

19   approximately 5.8 million.

20   **Q.**    Okay.  And then adding that last one for 350,000 brings

21   the total of 6.2?

22   **A.**    Yes.  The 350,000 went to the '007 account.

23   **Q.**    Okay.  And did you also review payments out of the '326

24   account in the time frame that it's represented here?

25   **A.**    Yes, I did.

1  Q.   And is that what is reflected on the next page of this

2  exhibit?

3  A.   Correct.

4  Q.   What is the top line of 1.4 million?  Where did that money

5  go?

6  A.   That money was transferred to the new account, which was

7  the Matisse Investments account at Wells Fargo for 1.4 million.

8  Q.   What's Blue Star Jets?

9  A.   Blue Star Jets is a jet company that a payment went to in

10 December 2002.

11 Q.   And then Global Jet, the same thing?

12 A.   Yes.

13 Q.   Now, this is in the initial investment period?

14 A.   Correct.

15 Q.   And did you also analyze where the fund -- where funds

16 went -- actually, before I get to that, when was the Matisse

17 Investments account opened?

18 A.   The first transaction on the statement is July 23rd, 2003.

19 Q.   And where -- how was that account funded in or about July

20 of 2003?

21 A.   On July 23rd, 2003, a transfer in the amount of

22 approximately 1.1 million was made from the 7326 account, which

23 is the MYRD account, to the '007 Matisse Investments account.

24 Q.   Do you recall about how much money was left in the MYRD

25 account after that 1.1 million went out?

1  **A.**    After that 1.1 million went out, approximately nothing was

2  in that account.

3  **Q.**    And that's as of late July of 2003?

4  **A.**    Yes.  But then more money came in on July 23rd, 2003,

5  after that transfer went out.  According to the bank record,

6  the 350,000 from Dillon Group 2003 came into the account, and

7  then four days later, approximately July 28, 2003, 344,000 was

8  transferred to the '007 account, basically wiping out the

9  account.

10 **Q.**    Was there another transfer out of either the '326 or the

11 '007 account at about this time?

12 **A.**    Yes.  On July 31st, 2003, $1,500,000 was transferred out

13 of the '007 Matisse Investment account.

14 **Q.**    And do you know where that went?

15 **A.**    No, I don't.

16 **Q.**    Why not?

17 **A.**    The bank records -- the bank was not able to provide the

18 actual records that show where the destination of funds went

19 to.

20 **Q.**    Now, you've listened to the testimony in the case; is that

21 right?

22 **A.**    Yes, I have.

23 **Q.**    Do you recall testimony from Susanna Moore about her stock

24 purchase agreement in about approximately mid-March 2003?

25 **A.**    Yes, I did.

1  Q.   Do you also recall seeing an e-mail from Mr. Dillon in

2  which he indicated that he's "crossed the Rubicon" and the wire

3  for $730,000 went out in mid to late 2003?

4  A.   Yes, I did.

5  Q.   And is there a purchase for jewelry of a hundred thousand

6  dollars in late March of 2003?

7  A.   Yes, there is.

8  Q.   And is that part of what makes up the fifth line on the

9  page that is on the screen now?

10 A.   Correct.  It's the $130,000.  So a hundred thousand plus

11 another wire later on for 30,000 that was also a jewelry

12 purchase.

13 Q.   Now, after what I referred to as the initial investor

14 period from, say, late '02 through summer or fall of '03, did

15 you also analyze records regarding -- bank records regarding

16 the later period, what we sometimes refer to as the bonds and

17 fees period or, anyway, the post initial investment period?

18 A.   Yes, I did.

19 Q.   Now, showing you on the next page of Exhibit 36, what does

20 that "first money movement" indicate?

21 A.   First money movement represents payments that Mr. Cohen

22 received from four sources:  Hari Dillon, the Dillon Group

23 2003-II, Danny Glover and then Sam and Mary Mills in the amount

24 of $25,278,403.06.

25 Q.   And then did you trace where that money went out of

1   Mr. Cohen's accounts?

2   **A.**    Yes, I did.

3   **Q.**    And what does the next -- the next slide indicates

4   24 million, almost $25 million to Mr. Cohen at some Wells Fargo

5   accounts?

6   **A.**    Yes.  The primary movement of money was Mr. Cohen would

7   receive or deposit the check in accounts ending in 1021 or 7860

8   at Wells Fargo Bank and then from there move them across a

9   couple of accounts and primarily ending up in the '007 Matisse

10  Investment account.

11  **Q.**    And did some money -- before it got moved into the Matisse

12  Investments '007 account, was some money sent to other places

13  first?

14  **A.**    Yes, it was.

15  **Q.**    How much first went to Procinea?

16  **A.**    Of that 25 million that I traced, $285,992 went directly

17  to Procinea.

18  **Q.**    How much went to Vanguard?

19  **A.**    There was a check written for $25,000, that went to

20  Vanguard directly from those funds.

21  **Q.**    And how much went to Signet?

22  **A.**    Again, direct tracing of that 25 million, zero went to

23  Signet.

24  **Q.**    Now, focusing on the red box in the upper right-hand

25  corner though, a lot of -- most of the money ended up there,

1   correct?

2   **A.**    Correct.

3   **Q.**    All right.  And then have you analyzed where it went once

4   it ended up in the accounts represented by that upper

5   right-hand corner?

6   **A.**    Yes, I have.

7   **Q.**    And before we get into that analysis, did you trace

8   particular checks and payments coming into Mr. Cohen's account

9   and then what he did with them immediately upon them hitting an

10  initial account?

11  **A.**    Yes, I did.

12  **Q.**    And some examples to go through quickly, was there a

13  $600,000 check from Mr. Dillon that was deposited on

14  September 14th of '05?

15  **A.**    Yes, it was.

16  **Q.**    And then the next day it gets transferred to the 2646

17  account?

18  **A.**    Yes, it is.

19  **Q.**    And then the same day it gets -- the money was moved into

20  the Matisse Investments account?

21  **A.**    Correct.

22  **Q.**    Okay.  And also, 10 days later, a $600,000 check from

23  Mr. Dillon that ends up within a couple days in the '007

24  account?

25  **A.**    Correct.

1   Q.   And then a check from Mr. Dillon and Mr. Mills totaling

2   1.2 million go to the 1021 account October 3rd?

3   A.   That's correct.

4   Q.   And then three-two-six-four-six-two, ends up in '007?

5   A.   Yes, it does.

6   Q.   Within two days?

7   A.   Yes.

8   Q.   And move through these --

9   A.   Same thing.

10  Q.   Yeah.

11          (Document displayed.)

12  Q.   And now this -- these are what happens to the checks that

13  Mary Mills and her -- I think it was her brother and

14  sister-in-law send to Mr. Cohen December 1st and 2nd, 2005,

15  correct?

16  A.   Correct, yes.

17  Q.   And so that ends up within four or five days in the

18  Matisse Investments account?

19  A.   Correct.

20  Q.   And then another example early December 2005?

21  A.   Yes, it is.

22          (Document displayed.)

23  Q.   And another one in January.

24          And these are -- to your understanding, the

25  particular slides running through here are the wire fraud

 1  charges in the indictment and the subsequent money laundering

 2  charges?

 3  A.    Correct.

 4          (Documents displayed.)

 5  Q.    Okay.  Did you analyze how much money of the -- we'll call

 6  it bonds and fees period, the money that came in in that

 7  period, 2004-2008, how much of that was transferred into

 8  Mr. Cohen's '007 Matisse Investments account?

 9  A.    It was -- approximately $24.6 million went into the '007

10  Matisse account per that account of the flow of funds there.

11  Q.    And did you also look at the underlying account records

12  for that Matisse Investments account?

13  A.    Yes, I did.

14  Q.    And what was the activity reflected in that account?

15  A.    The Matisse '007 at Wells Fargo investments is a brokerage

16  account.  And within that account, there was heavy stock

17  purchases, option purchases, and sales.

18  Q.    And by "heavy," what do you mean dollar figure-wise?

19  A.    I would say millions.  As more money was into the account,

20  I would say stock trading were in the millions per month.

21  Q.    Do you remember any of the particular stocks Mr. Cohen was

22  trading?

23  A.    I remember ebay, Google.

24  Q.    Were there also debit purchases out of the account?

25  A.    Yes.

SAAVEDRA - DIRECT / SPRAGUE    2400

1   **Q.**    Wire transfers out?

2   **A.**    Yes.

3   **Q.**    And did you -- other than looking at the activity in the

4   account, did you also analyze the movement out of the Matisse

5   Investments account?

6   **A.**    Yes, I did.

7   **Q.**    Showing you the slide, it says at the top this is a

8   five-year period from March of '04 to March of '09; is that

9   right?

10  **A.**    Yes, it is.

11  **Q.**    Were the accounts essentially closed in March or April,

12  spring of '09?

13  **A.**    Yes, it was.

14  **Q.**    And you have an asterisk up here at the top where you say

15  the funds from Ecast investors, 26.4 million.  What's the

16  asterisk six-point on the bottom?

17  **A.**    So through my tracing, I saw three sources of money that

18  went into the '007 account, one being the 1.4 million that was

19  transferred from the MYRD Millennium account ending in 7326,

20  $350,000 of cashier's checks that were for Hari Dillon's Ecast

21  purchases in September of '03, and then the 24.6 million of

22  funds that came from Hari Dillon, Sam Mills, Mary Mills, Danny

23  Glover and the Dillon Group 2003-II.

24  **Q.**    And what's the top line on this chart refer to?

25  **A.**    The top line refers to transfers from the '007 Matisse

1  account over to a Wells Fargo bank account ending in 2235, in

2  the name of Stacy Jean Stripling.

3  **Q.**   And then 2.9 million to Prime Jet?

4  **A.**   Yes.

5  **Q.**   And Prime Jet was paid out of other accounts as well; is

6  that right?

7  **A.**   Yes, it was.

8          **MR. SPRAGUE:**  Do we have a stipulation as to

9  foundation on 236?  Offer 236.

10          **MR. LINCENBERG:**  Stipulation of -- yes.

11          **THE COURT:**  236 admitted.

12          (Trial Exhibit 236 received in evidence.)

13  **BY MR. LINCENBERG:**

14  **Q.**   The next line, Agent Saavedra, is April 18, '08,

15  1.4 million.  Was that wired out to KLG Jewelry?

16  **A.**   Yes, it was, from the '007 account.

17          **THE COURT:**  Wired out to where?

18          **THE WITNESS:**  To KLG Jewelry, LLC.

19          **THE COURT:**  For how much?

20          **THE WITNESS:**  $1,400,000 on February -- on April 18,

21  2008.

22  **BY MR. LINCENBERG:**

23  **Q.**   I'm showing you what's just been admitted as Trial Exhibit

24  236.  You reviewed the underlying documents for that

25  transaction; is that right?

1    **A.**   Yes, I did.

2          (Document displayed.)

3    **Q.**   And was that for a purchase of a diamond ring,

4    cushion-shaped FVS2, weighing 23.4 carats?

5          **MR. LINCENBERG:**  Objection.  Calls for speculation.

6          **THE COURT:**  Well, I don't know.

7          **MR. LINCENBERG:**  Well, the document speaks for

8    itself, with regard to this witness's testimony.

9          **MR. SPRAGUE:**  I can ask it a different way.

10         **THE COURT:**  Well, I think he's -- what was your

11   question exactly?

12         **MR. SPRAGUE:**  My question -- I can ask it a different

13   way, Your Honor.

14         **THE COURT:**  Well, your question, does the 1.4 in his

15   chart appear to be the same number to KLG Jewelers as the same

16   item that is $1.4 million that's described on the invoice.  Is

17   that your question?

18         **MR. SPRAGUE:**  Yes.

19         **THE COURT:**  He can answer that.

20         **MR. LINCENBERG:**  That wasn't the question.

21         **THE COURT:**  What is the question?

22         **MR. LINCENBERG:**  The objection is to this witness's

23   knowledge of the underlying transactions.

24         **THE COURT:**  All he's saying is that -- he's saying, I

25   wrote down $1.4 million as a transfer out of a fund to a

1  jewelry concern.  And this is an invoice for jewelry, purchase

2  of jewelry, some jewelry.

3           MR. SPRAGUE:  Yes.

4           THE COURT:  I think he can say that.

5           MR. LINCENBERG:  I agree.

6  BY MR. SPRAGUE:

7  Q.   Agent Saavedra, you've seen this document I have on the

8  screen?

9  A.   Yes, I have.

10 Q.   All right.  Now, this is an invoice for $1.4 million; is

11 that right?

12 A.   That's correct.

13 Q.   For a purchase of the ring I just described?

14 A.   Yes, it is.

15 Q.   And it is dated January 17, 2008, correct?

16 A.   Correct.

17 Q.   And it's from Leviev, is the name of the entity?

18 A.   Yes, it is.

19 Q.   Now, and a subsequent page in this exhibit indicates

20 Leviev is the brand name and the dba is KLG Jewelry, their

21 corporate name, correct?

22 A.   Correct.

23 Q.   And then -- now, that was January, but your chart said

24 April 18, 2008, correct?

25 A.   Correct.

1 Q.   And that's when you saw the wire go out?

2 A.   Yes, it was.

3 Q.   And, now, a subsequent page of this exhibit, $1.4 million

4 paid April 18 of '08, correct?

5        MR. LINCENBERG:  Your Honor, I'm objecting.  The

6 witness is just being asked is this what the document says that

7 he has no foundation on.

8        MR. SPRAGUE:  A document that's in evidence.  He

9 reviewed the document in connection with his analysis of the

10 records.

11        THE COURT:  What I thought he was saying is he

12 conducted some analysis of these accounts and he took the

13 investors' money and he followed it through a number of

14 accounts, and that he also reviewed purchases; that is,

15 payments ultimately out of the account.  And he came to the

16 conclusion that the $1.4 million to KLG is this item because

17 the two match.

18        MR. LINCENBERG:  Well, his conclusions are not

19 pertinent.

20        THE COURT:  How would you be able to otherwise --

21 yes, it is.  It's entirely pertinent.  It's entirely pertinent

22 to the issue of how is money spent.  That's what counsel is

23 doing.  He's saying money went in and here's how the money was

24 spent.

25        MR. LINCENBERG:  Right.

 1          **THE COURT:**  And you need to have -- since money is

 2   fungible, a dollar is a dollar, you need to have somebody come

 3   in and say, if they can, I traced money, whether it's the same

 4   exact dollar, I traced money going in and I traced it going

 5   out.

 6          And this represents money going out.  That's all he's

 7   saying.

 8          **MR. LINCENBERG:**  Well, what Your Honor is summarizing

 9   is not objectionable.  The government can introduce a document

10   and he can talk about his money flow.  But he can't be talking

11   about -- he's just being asked to read documents that he has no

12   firsthand knowledge of.

13          **MR. SPRAGUE:**  I'm done with this one, Your Honor.

14          (Laughter)

15          **THE COURT:**  I think we're done with this subject.

16          **MR. SPRAGUE:**  Yes.

17          **THE COURT:**  Okay.

18          (Document displayed.)

19   BY MR. SPRAGUE:

20   **Q.**   Okay.  Going back to the list of money you traced out of

21   the Matisse Investments account, in February of '09, where did

22   the shares go out of the '007 account, anyway?

23   **A.**   Per this slide, two sets of shares went out.  180,000

24   shares of Mannkind were transferred to an account ending in

25   8583 at Wells Fargo investments.

1  Q.   And that was in the name of Stacy S. Cohen Trust?

2  A.   Yes.  And then on the same day, 10,500 shares of

3  Chesapeake Energy Corp. were transferred to the same account.

4  Q.   And to fast-forward a little bit, these go into the Stacy

5  S. Cohen Trust Account.  Did you trace where they went out of

6  that account?

7  A.   Yes.  After that, the Chesapeake Energy Corp. were sold

8  and funds were then wired out to Switzerland in Stacy

9  Stripling's name, to an account in Stacy Stripling's name.

10        The 180,000 shares of Mannkind were transferred out

11  to an account in Switzerland in Samuel Cohen's name.

12  Q.   And then on the next page, this is a continuation of the

13  prior slide; is that correct?

14  A.   Yes, it is.

15  Q.   So -- and this totals -- well, actually, what happened to

16  these Las Vegas Sands Corp. shares?

17  A.   Those were transferred, again, to the same account, 8583,

18  Stacy Cohen R Trust, on February 25th.  Those were sold

19  thereafter and the proceeds wired to Stacy Stripling's account

20  in Switzerland.

21  Q.   So in this five-year period, March of '04 to March of '09,

22  this slide aggregates $25.3 million worth of expenses out of

23  the '007 account; is that right?

24  A.   Yes, it does.

25  Q.   And were these all the expenses out of the account?

1  **A.**   No, it wasn't.

2  **Q.**   Why did you pick these particular ones?

3  **A.**   These were the larger ones.  There were smaller ones, but

4  these were the vast majority of the payments.

5  **Q.**   Now, at the beginning of that slide you showed $19 million

6  that went to an account ending in 2235 in the name of Stacy

7  Jean Stripling; is that right?

8  **A.**   Correct.

9  **Q.**   And did you then analyze the 2235 account to see where

10  those $19 million went?

11  **A.**   Yes, I did.

12  **Q.**   And is that represented on this page I've now showed you?

13  **A.**   Yes, it is.  This is a sample, again, of payments out of

14  that account to -- the amounts listed on there.

15  **Q.**   And the top one is 2.7 million to American Express?

16  **A.**   Yes.

17  **Q.**   And the next one is 2.4 million to Procinea?

18  **A.**   Correct.

19  **Q.**   From June of '05 until September of '06?

20  **A.**   Yes, there were payments to Procinea during that time.

21  **Q.**   And so this is in addition to the 285,000 earlier?

22  **A.**   Correct.

23  **Q.**   Who is Karen Drebes?

24  **A.**   Karen Drebes was the landlord for their home in Belvedere.

25  **Q.**   Okay.  And then $373,000 to Rolls Royce of Beverly Hills?

1   A.   Yes.  That was on June 22nd, 2006.

2   Q.   What -- have you reviewed many of the actual checks, seen

3   the actual checks written out of this account?

4   A.   Yes, I have.

5   Q.   And what do those checks say on them?

6   A.   The checks have the initials of M and S on the top of each

7   check.

8   Q.   And who signed those checks that you saw?

9   A.   The majority of those checks were signed by Samuel Cohen.

10  Q.   Now, did some money end up in an account that ends in 1179

11  and an account that ended in 1021?

12  A.   Yes, it did.

13  Q.   And did another 580,000 go to American Express?

14  A.   Yes, out of the 1179 account.

15  Q.   And then in June of '05, 36,000 to Jaguar of Marin?

16  A.   Yes, it did.

17  Q.   Were there also accounts ending in 1161 and 7860?

18  A.   Yes.   1161 had payments to Karen Drebes and Paychex.

19  Q.   And then in the 7860, there's another 122,000 to Procinea,

20  right?

21  A.   Correct.

22  Q.   And was there also an account that ended in the numbers

23  5223?

24  A.   Yes, there was.

25  Q.   And was this account opened from approximately July of '06

```
 1  till April of '09?
 2  A.   Yes, it was.
 3  Q.   And have you reviewed the signature page or account
 4  opening the documents for this account?
 5  A.   Yes, I have.
 6  Q.   What's on that page?
 7  A.   This is an account like -- this is an account in the name
 8  of Stacy Cohen Lifestyle, signed by Stacy Stripling as the
 9  authorized signer on the account.  On the signature card, which
10  is the application, basically, to open the account, it says to
11  the effect of Account for Lifestyle Book.
12  Q.   And were there also accounts ending in 9263 and 8583?
13  A.   Correct.
14  Q.   And in April -- and at the top here it says funds from
15  Wells Fargo investment account '007 and account 8583, a million
16  dollars.  What's that reference to?
17  A.   In late '08, 2008, a 500,000 transfer came from the '007
18  account, Matisse Investments, and then 500,000 came from an
19  account ending in 8583.
20  Q.   And then April of '09, $826,000 was wired to Switzerland?
21  A.   Yes, it was.
22  Q.   And the 8583 account, it says funds and stock from '007
23  and 8583, 757,000.  What do you mean by that?
24  A.   Basically, I traced transfers and stock transfers, the
25  price of the stock the day before the transfer, traced those
```

1  amounts over from the '007 Matisse Investment account and the

2  account ending in -- well, the '007 account.

3  **Q.**   And then does this top one, $509,000, reflect the amount

4  of shares in Mannkind times what it was worth that day that was

5  transferred -- or the day before, was transferred to a Swiss

6  account in Mr. Cohen's name?

7  **A.**   Yes.  I kept the same valuation of when it was transferred

8  first from the '007 Matisse Investment account, which was, I

9  believe, February 25th, 2009.

10 **Q.**   And then below that, there's a $100,000 wire to

11 Ms. Stripling's account -- or an account of Ms. Stripling's in

12 Switzerland?

13 **A.**   Yes.

14 **Q.**   And then, I think, finally, the 1875 account, what are

15 those two entries?

16 **A.**   Those two entries are wire transfers from this account to

17 Stacy Stripling's Swiss bank accounts on 4/23/09 and May 7th,

18 '09, for a total of 284,000.

19 **Q.**   Now, there were references earlier in this slide to

20 American Express?

21 **A.**   Yes.

22 **Q.**   And was that the largest credit card payment that you saw?

23 **A.**   Yes, it was.

24 **Q.**   There were also Citi cards and Wells Fargo cards; is that

25 right?

1   A.   Yes.

2   Q.   The American Express account, have you analyzed the actual

3   account statements for American Express?

4   A.   Yes, I have.

5   Q.   And is this page that I'm showing you now some of the

6   larger expenditures out of that account that was opened for

7   three or four years?

8   A.   Yes, it is.

9   Q.   Do you know what Eden Rock is, in the middle of this page

10  in St. Barthelemy?

11  A.   Eden Rock is a hotel in St. Barthelemy.

12  Q.   Is that also known as St. Bart's?

13  A.   Yes, it is.

14  Q.   And then this has an arrow at the bottom.  Is it continued

15  on the next page?

16  A.   Yes, it is.

17  Q.   And, again, was this all of the expenses or did you pick

18  the larger representative ones or what?

19  A.   This is the larger representative of purchases made out of

20  the American Express account.

21  Q.   I think the earlier number said maybe 2.7 million American

22  Express.  This reflects about 1.8 of that?

23  A.   Correct.

24  Q.   And then we've been through several of the accounts in

25  this slide presentation; is that right?

1   **A.**   That's correct.

2   **Q.**   And did you take -- showing some expenses that came out of

3   each?

4   **A.**   Yes, I did.

5   **Q.**   Did you also summarize certain types of expenses during

6   the time period of late 2002 until spring of 2009?

7   **A.**   Yes, I did.

8   **Q.**   And is that -- is this jewelry expenses, which I think we

9   spelled wrong, jewelry expenses during that time period?

10  **A.**   Yes, it is.

11  **Q.**   And that totals $2.1 million?

12  **A.**   Yes.

13  **Q.**   Cars?

14  **A.**   Cars for $704,000.

15  **Q.**   Credit card total?

16  **A.**   Credit cards for 4,400,000, approximately.

17  **Q.**   Travel?

18  **A.**   Travel, 5,566,000, approximately.

19  **Q.**   Representative personal expenses?

20  **A.**   Yes, for $2,800,000.

21  **Q.**   Transfers to Switzerland?

22  **A.**   Yes.  Out of these accounts that we analyzed -- that I

23  analyzed, five wire transfers, for a total of approximately

24  1.2 million, went to Stacy Stripling's account in Switzerland.

25  And the 180,000 shares of Mannkind, worth approximately

1   $500,000, went to Switzerland, to Samuel Cohen's account.

2   Q.   And were all of these made in about the same period of --

3   when?

4   A.   Early 2009.  Early to mid 2009.

5   Q.   Did you also analyze -- just two pages left -- taking all

6   the accounts at Wells Fargo that Mr. Cohen was associated with,

7   and did you do a monthly analysis of the account balance in all

8   those accounts?

9   A.   Yes.  For the accounts that are in evidence associated

10  with Mr. Cohen, I took the monthly balance of the account at

11  the end of the month and came up with a total.

12  Q.   And is that on the slide that's showing now?

13  A.   Yes, it is.

14  Q.   And so in September 30 -- the month ending September 30 of

15  2002, all of his accounts that you had and reviewed totaled

16  about $95,000?

17  A.   Yes, it does.

18  Q.   And at the end of the next month it's about $527,000?

19  A.   Yes, it is.

20  Q.   And that includes a $525,000 initial investment from the

21  Glover Group, I think it was?

22  A.   Glover Group 2002-I.

23  Q.   And then jumping to the end, in the spring of '09, summer

24  of '09, when Mr. Cohen terminated his -- the relationship

25  Mr. Cohen and Wells Fargo had was terminated, it's down to just

1  $20- or $30,000?

2  A.    Correct.

3  Q.    And did you take these numbers on this slide and create a

4  graph?

5  A.    Yes, I did.

6  Q.    And is this that graph?

7  A.    Yes, it is.

8  Q.    And this is all his Wells Fargo accounts adding together

9  all the money in them from April of -- is that 2002, at the

10  beginning?

11  A.    It should be September.

12  Q.    Well, I mean, at the very left?

13  A.    Oh, yes, that says April there.

14  Q.    Okay.  And then the end is about April or May of 2009,

15  correct?

16  A.    Correct.

17  Q.    And then there's a yellow flag.  Does it indicate

18  September of 2002?

19  A.    Yes, it does.

20  Q.    And this is about the time that the Ecast initial

21  investors, over the course of the next several months, buy

22  Mr. Cohen's founder's shares; is that right?

23  A.    That's correct.

24  Q.    And those payments come -- are all in by approximately

25  September 2003?

1  A.    Yes, it is.

2  Q.    Is the dip just before September 2003 represented by that

3  unexplained $1.5 million transfer out?

4  A.    Yes.

5  Q.    And then July of '04, is that approximately when the next

6  set of investments, what we've been referring to as bonds and

7  fees, start coming to Mr. Cohen's accounts?

8  A.    Yes, it is.

9  Q.    The first one comes from Mr. Dillon?

10  A.    Yes.

11  Q.    And you've heard testimony about a meeting in -- on or

12  about November 28, 2005; is that right?

13  A.    Yes, I have.

14  Q.    And after that, the balance increases over the next

15  several months or so, or a year, up to a peak of more than

16  $12 million; is that right?

17  A.    Yes, it is.

18  Q.    You've also heard testimony about a meeting in December of

19  2008 at a restaurant in Tiburon; is that right?

20  A.    Yes, I have.

21  Q.    At that time, does that mark on the chart indicate that

22  Mr. Cohen's assets combined at Wells Fargo were approximately

23  or just less than $2 million?

24  A.    Yes, it does.

25  Q.    And that's before the money and stock was shipped to

```
 1  Switzerland, correct?

 2  A.    That's correct.

 3  Q.    You also were involved in analyzing records relating to

 4  Mr. Dillon, correct?

 5  A.    That's correct.

 6  Q.    And start with the total money that came in from investors

 7  in the initial investment, the bonds and fees period.

 8          How much money came in to the Dillon Group, Glover

 9  Group, Mr. Dillon, total?

10  A.    Approximately 43 and a half million dollars.

11  Q.    And about -- you recall Ms. Segal's testimony about

12  loaning money to Mr. Dillon?

13  A.    Yes, I did.

14  Q.    And that was, I think she testified, approximately

15  3 million or maybe a little more?

16  A.    Correct.

17  Q.    And then you heard the Millses testify that they loaned

18  Mr. Dillon a million dollars or a little more?

19          MR. LINCENBERG:  Your Honor, can I have a continuing

20  objection to this just repeat of what other people testified

21  to?

22          THE COURT:  Well, the witness is a summary witness,

23  is he not?

24          MR. SPRAGUE:  Yes, he is, Your Honor.

25          THE COURT:  He's asking about certain testimony that
```

1  came in and how that affected, if it did, his conclusions.

2         MR. LINCENBERG:  I think that's improper just to

3  repeat the testimony.  He's summarizing money flow.

4         THE COURT:  Summarizing what?

5         MR. LINCENBERG:  The witness is summarizing where

6  monies went.  He can do that without repeating everybody else's

7  testimony.  That's improper.

8         MR. SPRAGUE:  This is in direct -- directly leading

9  to how much money went to Mr. Dillon versus Mr. Cohen according

10 to his analysis of tracing the money flow.

11        THE COURT:  I think it is absolutely proper.

12        MR. LINCENBERG:  All right.  The other thing, Your

13 Honor, for the record --

14        THE COURT:  Yes.

15        MR. LINCENBERG:  -- just so that -- can I have a

16 continuing objection on all grounds to the propriety of this

17 exhibit, and can we hear the argument on it later?

18        THE COURT:  Well, this exhibit was admitted subject

19 to a motion to strike.  And I will certainly hear you on that

20 subject before I rule.  Okay.

21        MR. LINCENBERG:  In fact, just so the record is

22 clear, it's on all grounds.

23        THE COURT:  All grounds stated.  Well, I don't know.

24 Some unknown grounds?  No.

25        MR. LINCENBERG:  Well, I just want to make sure the

```
 1  Court is aware of the full grounds.  I don't want to argue in
 2  front of the jury.  I don't think the Court wants me to do
 3  that.  But I want to make sure that that's covered.  If not, we
 4  can have a sidebar.
 5          THE COURT:  Anyway, I think it's covered.  And I will
 6  allow you to cover it further when we discuss it.
 7          MR. LINCENBERG:  Thank you.
 8          THE COURT:  Okay.
 9  BY MR. SPRAGUE:
10  Q.   Ms. Segal --
11          THE COURT:  And, ladies and gentlemen, let me just
12  emphasize a point, which is with any expert testifying in which
13  he has been asked, based upon the evidence that has come in as
14  he has listened to it, he has formed certain conclusions that
15  he is testifying to.
16          As with any expert, you are free to accept or reject
17  an expert's testimony based upon whether you believe the
18  evidence actually has shown what the witness has said that the
19  evidence is.
20          In other words, you're the people who really find the
21  evidence -- find the facts based upon the evidence.  No one
22  else does that.  And so the reasonableness -- I think maybe I
23  can say it better if I just read to you the instruction, which
24  is what I'm about to do, about expert testimony.
25          Opinion testimony -- which is what this witness is
```

 1   giving -- should be judged by any other testimony.  You may

 2   accept it or reject it and give it as much weight as you think

 3   it deserves considering the witness's education and experience,

 4   the reasons given for the opinion, and all the other evidence

 5   in the case.

 6           In other words, you're the people who weigh the

 7   evidence in the case and decide whether or not you believe, and

 8   to what extent you may or may not, the witness's testimony.

 9           Okay?  Okay.  Thank you.

10   BY MR. SPRAGUE:

11   Q.   So, Agent Saavedra, you had started at 43 and a half

12   million dollars, all money in.  A loan from Ms. Segal at

13   3 million or a little more.

14   A.   Yes.

15   Q.   And then I was asking you about the testimony from the

16   Millses.  Do you recall what that testimony was regarding how

17   much they loaned in personal loans to Mr. Dillon?

18   A.   According to their testimony, they loaned Mr. Dillon

19   approximately $1 million.

20   Q.   And have you reviewed -- in your review of all these bank

21   records, have you reviewed payments from Mr. Dillon back to

22   some investors over time, for example, buying them out of the

23   deal, paying them in whole or in part?

24   A.   Yes, I have.

25   Q.   And what do those payments total?

1  **A.**    Those payments, approximately $6 million.

2  **Q.**    So then we started with 43 and a half.  We've added up

3  10 million in those three figures, approximately, paying back

4  the Millses and the Segal loans.  So now we are at 32 -- I'm

5  sorry, 33.5 million, if my math is right.

6          How much of that $33.5 million went to Mr. Cohen?

7  **A.**    Approximately 31 and a half million dollars went to

8  Mr. Cohen.

9  **Q.**    Does that leave about two with Mr. Dillon, 2 million?

10  **A.**    Correct.

11  **Q.**    You have also reviewed one last account I want to talk to

12  you about.  Exhibit 24.5 is an account for Signet; is that

13  right?

14  **A.**    Correct.

15  **Q.**    And you've reviewed the account-opening documents and all

16  the documents within it?

17  **A.**    Yes, I have.

18  **Q.**    When was that account opened?

19  **A.**    Off the top of my head, it was somewhere June '05, I

20  believe.

21  **Q.**    Let me show you what's been admitted as Exhibit 24.5.  I'm

22  going to direct your attention to the account-opening

23  documents.  Do you see there a signature of Mr. Cohen?

24  **A.**    Yes, I do.

25  **Q.**    Is that, in fact, where you're looking at the

 1  account-opening document?

 2  **A.**    Yes, for an account ending in 7447 with Signet Ventures.

 3  **Q.**    And on what date does Mr. Cohen sign the document to open

 4  the account?

 5  **A.**    February 28, 2005.

 6  **Q.**    How much money is in the account, if you recall, as of --

 7  well, between February 28th, '05, and April 18th of '05, if you

 8  recall?

 9  **A.**    Approximately $200 comes in from that account associated

10  with Mr. Cohen.

11  **Q.**    And then between April 18th of '05 and October 27th of

12  '05, are there any deposits?

13  **A.**    No.

14  **Q.**    And on or about October 27th of '05, was there a deposit?

15  **A.**    Yes, there is.

16  **Q.**    For how much?

17  **A.**    A hundred dollars.

18  **Q.**    So what's the account balance in the end of October 2005?

19  **A.**    Ninety dollars.

20  **Q.**    And is there also -- is the next deposit in September of

21  2006?

22  **A.**    Yes, it is.

23  **Q.**    And how much is that deposit for?

24  **A.**    It's a deposit for $150 from the account ending in 2235.

25  **Q.**    2235 was in Stacy Jean Stripling's name?

1  A.    Yes.

2  Q.    So what's the balance as of September 2006?

3  A.    $130.

4  Q.    Now, between March and July of 2007, are there some

5  deposits from a Javier Burillo?

6  A.    Yes, there is.

7  Q.    Totaling how much, approximately?

8  A.    Approximately 1. -- 1.7 million, I believe.

9  Q.    And where does all that money go?

10 A.    Some of it goes to attorneys.  Some of the money goes to

11 the account ending in '007.

12 Q.    The Matisse Investments account?

13 A.    Yes, it is.

14 Q.    And how quickly does it go into the Signet account and

15 then from there to the '007 Matisse Investments account?

16 A.    Very soon after.  The day after.

17 Q.    Other than the money from Mr. Javier Burillo, what's the

18 approximate total amount of money that goes into the Signet

19 bank account from the time it's open, February of '05, until

20 it's closed in about May of '09?

21 A.    Approximately $8,000 from -- from transfers from bank

22 accounts associated with Mr. Cohen.

23         MR. SPRAGUE:  No further questions.

24         THE COURT:  Okay.  Cross.

25

**CROSS EXAMINATION**

BY MR. LINCENBERG:

Q.   Good afternoon, Special Agent Saavedra.

A.   Good afternoon.

Q.   Agent Saavedra, when did you prepare Exhibit 36?

A.   I've been preparing it for the last month and a half.

Q.   Do you know when it was turned over to the defense?

A.   No, I don't.

Q.   Do you have any reason to believe it was before the
beginning of your testimony today?

A.   It could have been.

Q.   Well, didn't you prepare, in anticipation of the notice of
your testimony, balance analyses of funds sent to Mr. Cohen,
for example?

A.   Yes, I did.

Q.   And isn't it true that -- and then you prepared flow of
funds analyses through Wells Fargo bank account; is that right?

A.   Yes, I did.

Q.   And the -- those were submitted as proposed summary
exhibits to the best of your knowledge; is that right?

A.   Yes, it was.

Q.   And those look very different from Exhibit 36, correct?

36, correct?

A.   Yes, they are.

Q.   Now, the Exhibit 36 which was provided to the defense a

1    few minutes ago has -- is color coded.  There's different

2    colors for different aspects of it, correct?

3    **A.**    Correct.

4    **Q.**    So, for example, was -- were you the one who determined

5    that the red should be the color in the exhibit associated with

6    Mr. Cohen?

7    **A.**    Yes, myself and other people.

8    **Q.**    Was that intended to maximize the impact of the exhibit?

9    **A.**    No, it wasn't.

10   **Q.**    And was it part of the analysis that you performed, was

11   there an underlying assumption at all that money is not

12   fungible?

13   **A.**    Can you explain the question?

14   **Q.**    Well, you, for example, traced payments from certain

15   accounts and you noted that money from those accounts was used

16   to pay for certain luxury items, for example, correct?

17   **A.**    Correct.

18   **Q.**    Is it part of your summary testimony that there was not

19   other money that could have been used for these purchases?

20   **A.**    I just analyzed the accounts and put -- indicated how much

21   money was transferred, for example, from the '007 account to

22   other accounts belonging to Mr. Cohen.

23   **Q.**    Okay.  And let's look at the summary exhibit that is

24   entitled, Payments to Mouli Cohen, 7/04 through January of '08.

25          Again, here, we have Mr. Cohen in red; is that right?

1   **A.**   Correct.

2   **Q.**   And this account indicates that Mr. Cohen gave $285,000

3   towards Procinea; is that right?

4   **A.**   That is correct.

5   **Q.**   And this is -- is this intended to suggest that the total

6   amount of money that was invested by Mr. Cohen in Procinea was

7   $285,000?

8   **A.**   No.  This slide here represents the direct tracing of

9   money that comes in from Hari Dillon, the Dillon Group 2003-II,

10   Danny Glover, Sam and Mary Mills --

11   **Q.**   Right.

12   **A.**   -- where it flows into Mr. Cohen's account and then where

13   it ends up after that.

14   **Q.**   Did you analyze the total amount of capital that was put

15   into Procinea to determine what percentage of that was provided

16   by Mr. Cohen?

17   **A.**   I analyzed the total payments that Mr. Cohen made to

18   Procinea from his bank accounts.

19   **Q.**   When you say "from his bank accounts," these are from the

20   Wells Fargo bank accounts?

21   **A.**   Correct.

22   **Q.**   Did that include monies contributed from the Credit Suisse

23   bank accounts?

24   **A.**   No, it did not.

25   **Q.**   Did you learn that Mr. Cohen had contributed about

1   $5 million towards Procinea?

2   **A.**   I traced payments totaling approximately $5 million from

3   the Wells Fargo accounts to Procinea.

4   **Q.**   And did you learn that that was far greater than any other

5   source of capital that went into Procinea?

6   **A.**   No, I did not.

7   **Q.**   Now, here you note that zero came from this source into

8   Signet.  From your investigation, sir, did you learn that

9   Signet was a single member LLC?

10  **A.**   Yes.

11  **Q.**   And by "single member LLC," do you understand that to mean

12  that it's essentially an LLC that is wholly owned by Mr. Cohen?

13  **A.**   Correct.

14  **Q.**   So that whether money went into an account in the name of

15  Signet or an account in the name Mouli Cohen, they were monies

16  going to Mr. Cohen?

17  **A.**   Correct.

18  **Q.**   And that that was a holding account from which money would

19  be used for other payments?

20  **A.**   Under my analysis I just indicated that out of these

21  payments 25 million that came in, zero went to the Signet bank

22  account.

23  **Q.**   Right.  And -- but in terms of whether the money went into

24  Procinea from this account or a different account, either way

25  would be money coming from Mr. Cohen, correct?

1  **A.**   Correct.

2  **Q.**   So, for example, the 3007 account was one such account,

3  another such account where money went to Procinea; is that

4  right?

5  **A.**   Correct.

6  **Q.**   You didn't prepare a summary chart of the monies that went

7  to Procinea, did you?

8  **A.**   No, I did not.

9  **Q.**   Did you prepare a summary chart of the total amounts of

10 Signet loan agreements which were signed by the witnesses who

11 testified here today, that were backed by convertible

12 securities in Procinea?

13 **A.**   No, I did not.

14        **MR. LINCENBERG:**  Nothing further.

15        **MR. SPRAGUE:**  No questions.

16        **THE COURT:**  Thank you.

17        Do you have any further witnesses today?

18        **MR. SPRAGUE:**  No, Your Honor.

19        **THE COURT:**  Okay.  Ladies and gentlemen, you are

20 going to be able to recess early today.  And let me give you

21 sort of a picture of where I think we are.

22        I believe that the government will conclude its case

23 tomorrow.  And I also believe that this case will be given to

24 you for decision the week that you return.  As you know, next

25 week is off.

```
 1              So, as you can see, it's ending closer to one end of

 2      the spectrum rather than the other end of the spectrum.  But

 3      that's fine.  That frequently happens in trials, it's been my

 4      experience.

 5              So we will have -- we could have a fairly full day

 6      tomorrow, but I can't promise that at this point.  I don't

 7      know.

 8              But after tomorrow, again, you'll have a week off or

 9      so, and then resume the following Monday, a week from Monday,

10      at 8:30.  And we'll see where we are.

11              I'm sure I can tell you on Monday, a week from -- and

12      I may even be able to tell you a bit more tomorrow, but a week

13      from, when you will be getting the case for decision.

14              So, of course, it's very important for you not to

15      form or express any opinion and to keep an open mind until the

16      case has been finally submitted to you and you've heard the

17      instructions of the Court and have been -- have had the

18      opportunity to discuss the views of your fellow jurors in

19      connection with this matter.

20              So, with that, I don't know what the temperature in

21      this court is.  To me, it seems a lots warmer than it was

22      earlier.

23              JUROR MR. FLORES:  It's warmer.

24              THE COURT:  You know, there are actually windows in

25      that wall, but for some reason the architect decided to cover
```

```
 1   them up.  As a matter of fact, you can't open up a window in

 2   this building.  You can't open up a window.

 3         So, as a result, we are at the mercy of whatever the

 4   thermostat -- and Barbara tries to regulate it, but it's nearly

 5   an impossible task to regulate.  So if you want to bring a fan

 6   in, that's perfectly all right.  I guess even bringing in a

 7   heater would not be too bad, but I think bring in some coats or

 8   something if you get too cold.

 9         JUROR MR. FLORES:  Could we get a couple more breaks

10   where we just stand up periodically?

11         THE COURT:  You sure can.  I'm sorry.  That's my

12   fault.  And I'm glad you suggested it.  I know it's difficult

13   on backs and so forth.

14         This is what we're going to do.  It's a little late

15   in the game, we can't go back, but I'll make sure that every

16   hour we have some stretch time.  Okay?

17         And thank you very much for mentioning that.  I

18   appreciate that.

19         Okay.  Ladies and gentlemen, I will see you tomorrow

20   morning at 9:30.  Remember the admonition given.

21         (Jury out at 2:34 p.m.)

22         THE COURT:  Okay.  Let the record reflect that the

23   jurors have left.

24         Mr. Lincenberg, you have a whole plethora of

25   objections, right?
```

```
 1              MR. LINCENBERG:  Thank you, Your Honor.

 2              THE COURT:  Every ground known to the Court and a few

 3   others.  But go ahead.

 4              MR. LINCENBERG:  Your Honor --

 5              THE COURT:  You've preserved all your objections.

 6   Don't worry about it.

 7              MR. LINCENBERG:  I appreciate it.  And with no

 8   disrespect to my colleagues, which I happen to believe behave

 9   with a high degree of integrity as a general matter, and have

10   enjoyed being their adversaries in this case, I'm compelled to

11   move for a mistrial based upon a discovery violation.

12              Exhibit 36, that had been presented to us in advance

13   of trial and had been marked as an exhibit for trial, if the

14   Court still has -- I don't know if the Court still has an

15   original --

16              THE COURT:  I have Exhibit 36.  It was just handed up

17   to me.

18              MR. LINCENBERG:  If I can hand the Court a copy of

19   what was prior Exhibit 36 so the Court can review that?

20              THE COURT:  Sure.

21              MR. LINCENBERG:  Thank you.

22              THE COURT:  Thank you.  So 36 is an exhibit

23   consisting of nine pages?

24              MR. LINCENBERG:  Yes.

25              THE COURT:  Well, maybe we should have it marked.  I
```

 1  think we should, for these purposes, have this document --

 2  Barbara is not here, but the previous 36 we'll call 36A.

 3          **MR. LINCENBERG:**  Great.

 4          **THE COURT:**  Okay.  So that will be 36A and part of

 5  the record.  Okay.  Go ahead.

 6          (Trial Exhibit 36A marked for identification.)

 7          (Trial Exhibit 36 received in evidence.)

 8          **MR. LINCENBERG:**  What I think that the Court -- the

 9  Court doesn't have to do it on the bench if the Court wants to

10  take it back, but I think the Court will see that there are

11  marked differences between 36 and 36A.

12          Now, we had objections that the Court denied on 403

13  grounds and other grounds with regard to 36A.  But what I'd

14  like to discuss now is that I believe that we were sandbagged

15  here, with no disrespect to counsel, but what we were just

16  handed, I just --

17          **THE COURT:**  Well, when were you handed this document?

18          **MR. LINCENBERG:**  I was handed it after the witness

19  took the stand.

20          **THE COURT:**  36?

21          **MR. LINCENBERG:**  Yes.

22          **THE COURT:**  Well, I'm sure there are differences

23  because there has to be some differences between a nine-page

24  document and a 50-page document.  But without getting into the

25  differences, what comes to me as a surprise is that, if handed

```
 1   the new document -- if, in fact -- and I don't know what's
 2   going on between the parties, but I would have assumed that you
 3   would have thought that if it was not only different from the
 4   36A document, which I think it is, but the differences were
 5   substantial, I would have thought that you would have -- that
 6   you would have asked for a continuance to review the document
 7   and proceed on that basis, especially with this witness who
 8   could be brought back tomorrow.  He's here every day.
 9            And, you know, this is the first time, at least, I've
10   become aware that there is this difference between the --
11   between the two exhibits.  And so just from the Court's point
12   of view, I'm surprised to learn not that there were
13   differences, because that can happen, but that if you feel you
14   were prejudiced, and indeed prejudiced such that you are moving
15   for a mistrial, which is the most drastic remedy that the Court
16   can grant, that you would have considered that, perhaps to some
17   extent, the prejudice that you've purportedly suffered would be
18   reduced or addressed by an overnight continuance.
19            MR. LINCENBERG:  Well --
20            THE COURT:  Anyway, that's my first observation.  I
21   don't know.
22            MR. LINCENBERG:  Let me respond.
23            THE COURT:  Yes, of course.
24            MR. LINCENBERG:  Your Honor, first of all, counsel
25   throughout the case on occasion have indicated we're replacing
```

1  one exhibit with another, and this is how it varies.  They've

2  been more than accommodating and professional.

3         We got an e-mail sometime late last night saying that

4  there's going to be a revised 35 or 36, and it had no greater

5  explanation, simply that it's going to be revised.  I assume

6  it's going to be along the same lines.

7         We then -- while the witness is on the stand, we're

8  put in a position -- we don't have time to review through it

9  all and match and compare to how it is -- compares to the old

10  36.  The Court is obviously looking to move forward with the

11  case.

12         I don't think that response is fair to say that the

13  fault is ours because, once handed this in the middle of an

14  examination, that we didn't ask for a continuance overnight.

15         **THE COURT:**  Well, I think in part it is.  But I think

16  I have another answer.  I have another answer, just to cut

17  through this, though I'll listen to the argument.

18         If you want to put the witness back on the stand

19  tomorrow for cross-examination, you're permitted to do so.  In

20  other words -- in other words, you -- I was a bit surprised by

21  your questioning because I don't permit, as a general rule, any

22  discovery issues to go before a jury because it seems to me

23  that all a discovery issue before a jury is addressed to is the

24  fairness of the proceedings.

25         You might be right.  It may be unfair.  But that's

PROCEEDINGS

```
 1  not for the jury to consider.  It's for the Court to consider.
 2  I didn't stop you.  I didn't -- there was no objection and I
 3  let you proceed in that way.  But -- and that's fine.  I'm not
 4  being critical.
 5           I'm just saying that to put the special agent on the
 6  stand tomorrow is perfectly explainable.  And, as a matter of
 7  fact, if you ask me to say something to the jury in that
 8  regard, I would say that you received this document at
 9  2 o'clock or whatever time it was today, or 1:00 o'clock in the
10  afternoon, and that the Court thought, in the interest of
11  fairness, that you be permitted to have further
12  cross-examination once you've had the opportunity -- it's now
13  quarter to 3:00 -- once you've had the opportunity to study the
14  document, discuss it with your client, and decide what you want
15  to do.
16           MR. LINCENBERG:  Your Honor, I would respond to that
17  in two ways.  First of all, Mr. Lichtman passed me a note I
18  should correct the record that the e-mail didn't even say that
19  36 was going to be revised.  It said that there would be
20  revisions to 33 through 35, just so that we're clarified.
21           THE COURT:  Be that as it may.
22           MR. LINCENBERG:  Yeah.  Second, logistically, that's
23  not a reasonable alternative right now.  We have -- we learned
24  last night -- and we've been preparing our examinations for an
25  additional 12 or so witnesses.  The government, within their
```

1   right, no objection, they advised us last night they are not

2   going to be calling a number of these witnesses.  We're now

3   expected -- the Court wants to move the case forward -- to call

4   our -- start the defense case tomorrow.

5           **THE COURT:**  I won't require you to do -- let me just

6   make things perfectly clear, as they say.

7           **MR. LINCENBERG:**  But --

8           **THE COURT:**  I said that the government is going to

9   rest tomorrow.  I didn't say the defense is going to commence

10  tomorrow, to the jury.

11          If you want to put the agent back on the stand,

12  either at the very beginning or after the next witness that the

13  government has, at your option, I will permit you to do it, and

14  I will permit you to have full cross-examination on this

15  document.

16          **MR. LINCENBERG:**  This is such a voluminous --

17          **THE COURT:**  You can get through it tonight.

18          **MR. LINCENBERG:**  -- with voluminous records

19  underneath it.  We're not going to be able -- I would

20  respectfully submit that's not a meaningful remedy, that there

21  should either be a mistrial or, at a minimum, alternatively,

22  the Court should strike the exhibit and testimony.

23          **THE COURT:**  Well, the motion for mistrial is denied.

24  I'm not striking the testimony.

25          And I'm permitting you as a -- whether you think it's

```
 1   adequate or not, I am giving you the opportunity of recalling
 2   the witness to the stand after an overnight recess, and you may
 3   ask him questions about this document.
 4           I think, though I haven't compared the two documents,
 5   there are obviously a number of similarities.  There may be
 6   compilations that are different from what appears in 36A.  That
 7   probably is the case.  But I also think that -- that's all I'm
 8   going to say on the subject.
 9           I'm going to permit you to recall him.  And you can
10   make that decision, Mr. Lincenberg.  You can make that decision
11   tomorrow morning.  So that addresses that, and the motions are
12   dealt with as I've indicated.
13           If the government wants to say something they can.
14   That's up to you.
15           MR. SPRAGUE:  Very briefly, Your Honor.  There was
16   another exhibit.  There was 35 and 36 or 36 and 37, I don't
17   remember, that were provided to the defense.  We told them last
18   night, in addition to Agent Oertel's that would have some
19   changes, Agent Saavedra's would have some changes.  And they
20   did.  We did that mostly last night.
21           As Agent Saavedra said, he was working on it for a
22   while, but putting these together mostly last night and today.
23   And they were on notice that these are summary documents and he
24   is testifying based on documents in the case and also testimony
25   in the case.  They were notified of that long ago.
```

1      We reserved our right to modify the charts prior to

2  his testimony.  And as the Court has handed out, they were --

3  they were modified.  They were handed to the defense and then

4  we get this motion now.  It's a summary from bank records

5  admitted in the case that they've had forever.

6      **THE COURT:**  Well, I would point out one other thing,

7  because I think that, in part, the defense has addressed the 36

8  document, which is that they have complained from early on that

9  it's unfair to disclose, to have into evidence particular

10  items, purchasing jewelry, purchasing cars, this and that.  And

11  they were willing to stipulate to amounts of money as distinct

12  from individual purchases and so forth.  That was their

13  position.

14      I rejected that position.  I rejected that position

15  for a number of reasons.  One of which is that it's important

16  for the jury to understand in light of the defense that was --

17  I think the defense on these particular charges -- well, let me

18  start at the beginning.

19      Number one, there's no question that Mr. Cohen

20  declared he had no income in particular years, or relatively

21  little income.  Okay.

22      Two, there's no question that Mr. Cohen received vast

23  sums of money in these particular years.

24      So those are facts that aren't in dispute, I don't

25  think.  The dispute is whether or not the money was given to

1   Mr. Cohen for particular purposes, and how to characterize that

2   money.

3           So what the government is doing is saying, in so many

4   words, let me show you how the money was spent.  And you be the

5   judge, to the jury, you draw the reasonable inferences as to

6   whether or not the argument that these -- that the funds given

7   to Mr. Cohen were loans.

8           You draw the inference as to whether or not these

9   individuals would have given him money, essentially, for

10  unfettered purposes.  That is, purposes such as buying jewelry

11  or consumption and so forth.  That's one aspect of it.

12          But there's a second aspect of it, which is that,

13  regardless of what restrictions were put on the use of the

14  money, if the defendant chose to use it for a particular

15  purpose, it might very well be characterized as income.  That's

16  what the agent said earlier.  I don't know whether he's correct

17  or not.  I'm just saying that was his position.

18          So if I give it to you for purpose A and you use it

19  for purpose B, whether that is income in connection with

20  purpose B.  And what they have shown is, purpose B was a

21  hundred and -- whatever the sums of money were.

22          There are vast sums of money for jewelry and cars and

23  travel and so forth in which most people would say are personal

24  expenditures.  I imagine some portion of it can be

25  appropriately characterized as business expenses.  But I don't

 1    know that $104,000 for a 23-carat diamond ring is a business

 2    purpose.  I don't know.  Doesn't seem to me it would be.

 3             And cars, Aston Martins, Rolls Royces, and so forth,

 4    to some extent they may be business and, therefore, appropriate

 5    not as income.  But the magnitude of them, the kind of them,

 6    belies that assertion.  And that's what the government is

 7    entitled to establish, if they can establish it.

 8             And, therefore, for a variety of reasons -- and those

 9    are just two -- the Court believed that it was appropriate to

10    allow the government, in light of other authority, to allow the

11    government to outline it with specifics.  Okay.

12             But you objected to it.  And you said it's cumulative

13    and prejudicial and not probative, and so forth.  And I

14    overruled those objections.  Those objections are preserved.

15             And it may even be maybe you have an *a fortiori*

16    objection in light of how it's been presented by way of 36.  I

17    understand that.  And that's why I let it in, in a sense,

18    subject to a motion to strike, because I thought that was what

19    the motion to strike was geared to.  And looking at it, I still

20    would not strike the exhibit or the testimony associated

21    therewith.

22             So I think you have preserved your record.  And I

23    think you preserved your point.  And the fact that -- you know,

24    the chronology of events is the chronology of events.  Whether

25    or not you -- when you say to me, we just couldn't have gotten

PROCEEDINGS                                        2440

1   up at that point and said, not so fast, we want a -- we've just

2   been handed this exhibit and we want a continuance, that's a

3   matter that, if an appellate court reviews, they can make that

4   determination.

5         I certainly would have -- I know it's a hindsight so

6   I'm not going to say anything self-serving such as I would have

7   granted a continuance.  But in any event, that's what I'm

8   indicating to you now.  I am granting the continuance with

9   respect to further cross-examination.

10        You didn't cross-examine him.  There was no

11  cross-exam, was there, of the last witness?  I don't think so,

12  other than when did we get the documents and isn't that

13  different?  Well, those are sort of discovery.  Those aren't

14  merits-related objections.

15        So you have not cross-examined the witness on the

16  subject matter of his testimony.  And I'm giving you that

17  opportunity.  I'm giving you the opportunity to think whether

18  you wish to or not.  And then if you do, you may be permitted

19  to do so.  And I'll make any explanation that's consistent with

20  the record.

21        Okay.  So what else are we dealing with here?

22        **MR. SPRAGUE:**  Mr. Bercovici.

23        **MR. LINCENBERG:**  I've been e-mailing back and

24  forth -- I don't know that we need to get into it.

25        **THE COURT:**  We'll assume he's coming and he either is

```
 1  or isn't tomorrow or he either is or isn't on Friday.  If he

 2  wants to keep come on Friday, that's fine with me as well.

 3            MR. LINCENBERG:  There was a housekeeping matter --

 4            THE COURT:  Yes.

 5            MR. LINCENBERG:  -- with regard to Mr. Cohen's

 6  conditions.

 7            THE COURT:  Well, I have to talk to the marshal.  Do

 8  we have the U.S. marshal here?

 9            We have a representative.  Great.  Okay.  Come on up.

10            Where is the defendant housed now?

11            DEPUTY MARSHAL:  San Francisco County.

12            THE COURT:  Okay.  And is it possible for him to have

13  the availability of a shower?

14            DEPUTY MARSHAL:  Yes.

15            THE COURT:  Okay.  That's fine.  Do you need an order

16  from me?

17            DEPUTY MARSHAL:  It would help.

18            MR. LINCENBERG:  Could he have a shower and a shave,

19  a meal, a shower, a shave?

20            THE COURT:  As soon as I get off the bench, I'll

21  prepare an order.

22            MR. LINCENBERG:  I think there were some problems

23  coming in today.  He wasn't given the opportunity to shave or

24  shower.

25            THE COURT:  No, I think he should have that.  Okay.
```

```
 1            MR. LINCENBERG:  I'm not sure if the marshal is able
 2   to address phone access for Mr. Cohen.
 3            THE COURT:  Well, I don't know about phone access.
 4   I'm not getting into phone access right now.
 5            MR. LINCENBERG:  Okay.
 6            MR. SPRAGUE:  What defense witnesses does the defense
 7   wants us to have here?
 8            MR. LINCENBERG:  The ones that I mentioned.
 9            MR. SPRAGUE:  Okay.
10            THE COURT:  Okay.  Who are they?
11            MR. LINCENBERG:  Glover.
12            THE COURT:  Glover.
13            MR. LINCENBERG:  Ryles, R-y-l-e-s.
14            THE COURT:  R-y-l-e-s.
15            MR. LINCENBERG:  And the agents.
16            MR. SPRAGUE:  And the agents.
17            THE COURT:  Pardon me?
18            MR. LINCENBERG:  And the agents.
19            And I called Mr. McAulay at the lunch hour.  I said
20   the judge is expecting you to be here tomorrow, if you can come
21   up tonight.
22            THE COURT:  Where is he?
23            MR. LINCENBERG:  He's in, I think, San Diego area.
24            THE COURT:  Is he the person who put up the bail in
25   this case?
```

PROCEEDINGS                                2443

```
 1              MR. SPRAGUE:  Yes.

 2              MR. LINCENBERG:  Yes.

 3              THE COURT:  Well, I think he should come up.  Would

 4   it be helpful for the government to make the call?

 5              MR. LINCENBERG:  No -- well, I called him.  I don't

 6   think the government needs to make a call.

 7              THE COURT:  All right.  Anything else?

 8              MR. LINCENBERG:  No, Your Honor.

 9              MR. SPRAGUE:  No, Your Honor.

10              THE COURT:  Okay.  I'll write an order.

11              (At 2:54 p.m. the proceedings were adjourned until

12              Thursday, October 27, 2011, at 9:30 a.m.)

13                          -  -  -  -

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2   PLAINTIFF'S WITNESSES                    PAGE   VOL.

 3   ZANOLLI, GREGORY
     (SWORN)                                  1286    7
 4   Direct Examination by Mr. Sprague        1286    7
     Cross Examination by Mr. Lichtman        1301    7
 5   Redirect Examination by Mr. Sprague      1303    7

 6   WASHOFSKY, MARTIN
     (SWORN)                                  1303    7
 7   Direct Examination by Ms. Mitchell       1304    7
     Cross Examination by Mr. Lincenberg      1316    7
 8   Redirect Examination by Ms. Mitchell     1319    7

 9   SEGVICH, STEVEN
     (SWORN)                                  1321    7
10   Direct Examination by Mr. Sprague        1321    7

11   PETRAS, MICHAEL
     (SWORN)                                  1334    7
12   Direct Examination by Mr. Sprague        1334    7
     Cross Examination by Mr. Lincenberg      1344    7
13
     OERTEL, JAMES MICHAEL
14   (SWORN)                                  1350    7
     Direct Examination by Ms. Mitchell       1351    7
15   Cross Examination by Mr. Lichtman        1381    7

16   SAAVEDRA, JUAN
     (SWORN)                                  1384    7
17   Direct Examination by Mr. Sprague        1384    7
     Cross Examination by Mr. Lincenberg      1423    7

18

19                      - - - - -

20

21   (Exhibits continued on next page.)

22

23

24

25
```

```
                        E X H I B I T S

TRIAL EXHIBITS                  IDEN   VOL.    EVID   VOL.

1 through 24.5                                 1355    7
29                                            1355    7
33 through 35                                 1367    7
36A                            1431    7
36                                            1431    7
171                                           1384    7
175                            1340    7       1340    7
177                                           1306    7
177A                                          1311    7
177B                                          1313    7
236                                           1401    7
239                            1324    7       1324    7
249A                                          1383    7


                     -  -  -  -  -
```

1

2                    **CERTIFICATE OF REPORTER**

3          I, KATHERINE POWELL SULLIVAN, Official Reporter for

4    the United States Court, Northern District of California,

5    hereby certify that the foregoing proceedings in CR 10-0547

6    CRB, United States of America vs. Samuel Cohen, were reported

7    by me, a certified shorthand reporter, and were thereafter

8    transcribed under my direction into typewriting; that the

9    foregoing is a full, complete and true record of said

10   proceedings at the time of filing.

11

12                    s/b Katherine Powell Sullivan

13        _____

14        Katherine Powell Sullivan, CSR #5812, RPR, CRR

15                 Monday, February 6, 2012

16

17

18

19

20

21

22

23

24

25