KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Marcus S. Topel (State Bar No. 54702)
mtopel@kasowitz.com
Daniel F. Cook (State Bar No. 70484)
dcook@kasowitz.com
Lyn R. Agre (State Bar No. 178218)
lagre@kasowitz.com
Jacob N. Foster (State Bar No. 250785)
jfoster@kasowitz.com
101 California Street, Suite 2300
San Francisco, CA 94111
Telephone:  (415) 421-6140
Facsimile:  (415) 398-5030

Counsel for Defendant
**SAMUEL COHEN**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| UNITED STATES OF AMERICA, | Case No:  CR-10-0547 CRB |
|---|---|
| Plaintiff, | **DEFENDANT SAMUEL COHEN'S SENTENCING MEMORANDUM** |
| vs. | Date:    April 30, 2012 |
| SAMUEL COHEN | Time:    10:00 a.m. |
| Defendant. | Place:   Courtroom 6 |
| | Honorable Charles R. Breyer |

**TABLE OF CONTENTS**

Page(s)

I.      INTRODUCTION……………………………………………………………1

II.     THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT……………4

    A.      Mr. Cohen's Early Life In Israel……………………………………………4

    B.      Mr. Cohen's Professional Achievements And Founding Of East……………5

    C.      Mr. Cohen's Founding Of Procinea………………………………………...7

    D.      Mr. Cohen's Founding Of Voltage Capital…………………………………9

    E.      Mr. Cohen's Personal And Family Life……………………………………12

    F.      Mr. Cohen's Outstanding Record Of Involvement And Financial Support
        For Charitable Organizations………………………………………………14

III.    SENTENCING GUIDELINES CALCULATION…………………………………..18

    A.      The Probation Department's Recommendation………………………………18

    B.      The Government Bears The Burden Of Proof………………………………..19

    C.      The Government Must Meet Its Burden With Evidence That Is Specific
        And Reliable…………………………………………………………………21

    D.      The Government Has Not Met Its Burden To Prove With Reliable And
        Specific Evidence That The Loss Exceeded $20 Million……………………22

        1.      The Loss Established At Trial Was $2,216,974………………………22

        2.      No Proof Whatsoever Has Been Presented By The Government
            Regarding Additional Loss From Relevant Conduct…………………24

        3.      The Government Cannot Prove Any Loss Based On The Original
            Investment Of $6.2 Million In Ecast Shares…………………………25

        4.      The Government Cannot Prove Any Additional Loss Based On
            Mr. Dillon's Interactions With The "Second-Tier" Investors………..28

        5.      Any Alleged Loss By The "First-Tier" Investors Does Not Prove
            Loss Over $20 Million………………………………………………...29

i

6.      There Is Insufficient Evidence To Determine Which Funds Were Lost Due To Mr. Dillon's Independent Scheme As Opposed To Mr. Cohen's…………………………………………………………………33

7.      The PRS Does Not Include Rely On Losses Resulting From Any Other Relevant Conduct And No Evidence Has Been Submitted Substantiating Such Loss……………………………………………36

E.      Number of Victims…………………………………………………..37

F.      Charitable Organization Enhancement…………………………………38

G.      Sophisticated Means Enhancement……………………………………41

H.      Adjustment For Role In The Offense……………………………………41

I.      Adjustment For Obstruction Of Justice…………………………………44

      1.      Allegedly Forged Documents……………………………………45

      2.      Alleged Cohen Perjury In SEC Deposition…………………………46

          a.      Stock Sales To Mr. Dillon………………………………48

          b.      Selling Shares After Leaving Ecast…………………………50

          c.      Misrepresentation Regarding Acquisition…………………..50

      3.      Mr. Ettinger………………………………………………51

J.      Tax Evasion Base Offense Level…………………………………………51

K.      Tax Evasion (Sophisticated Means Enhancement)……………………52

L.      The PSR Sentencing Recommendation………………………………..52

IV.      THE COURT SHOULD GRANT A SUBSTANTIAL DOWNWARD VARIANCE………………………………………………………………..53

A.      Legal Standards…………………………………………………………..53

B.      The Loss Guidelines For Fraud Are Fundamentally Flawed………………54

C.      Section 3553(a)(1): Nature And Circumstances Of The Offense And History And Characteristics of Mr. Cohen…………………………………57

D.      Section 3553(a)(2)(B) and (C): Deterrence………………………………60

ii

E.      Section 3553(a)(6):  The Need To Avoid Unwarranted Sentencing
        Disparities…………………………………………………………62

V.      CONCLUSION……………………………………………………………63

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

Cᴀsᴇs

4

*Bronston v. United States,*
   408 U.S. 352 (1973) ...................................................................................... 47, 49

5

6

*Carpenter v. United States,*
   484 U.S. 19 (1987) ............................................................................................. 22

7

8

*Gall v. United States,*
   552 U.S. 38 (2007) ............................................................................................. 54

9

10

*Kimbrough v. United States,*
   128 S.Ct. 558 (2007) .......................................................................................... 54

11

*Maxwell v. Roe,*
   628 F.3d 486 (9th Cir. 2010) .............................................................................. 28

12

*Rita v. United States,*
   127 S.Ct. 2456 (2007) ........................................................................................ 54

13

14

*Spears v. United States,*
   129 S.Ct. 840 (2009) ..................................................................................... 54, 57

15

16

*United States v. Adelson,*
   441 F.Supp. 2d 506 (S.D.N.Y. 2006) ...................................................... 54, 59, 62

17

18

*United States v. Arnaout,*
   431 F.3d 994 (7th Cir. 2005) .............................................................................. 37

19

*United States v. Ben-Shimon,*
   249 F.3d 98 (2d Cir. 2001) ................................................................................. 47

20

21

*United States v. Berger,*
   587 F.3d 1038 (9th Cir. 2009) ..................................................................... passim

22

*United States v. Bernardin,*
   73 F.3d 1038 (11th Cir. 1996) ............................................................................ 21

23

24

*United States v. Broderson,*
   67 F.3d 452 (2d. Cir. 1995) ................................................................................ 42

25

26

*United States v. Cavera,*
   550 F.3d 180 (2d Cir. 2008) ............................................................................... 56

27

*United States v. Contreras,*
   581 F.3d 1163 (9th Cir. 2009) ....................................................................... 42, 43

28

*United States v. Cronic*,
   900 F.2d 1511 (8th Cir. 1990).............................................................. 23

*United States v. Culps*,
   300 F. 3d. 1069 (9th Cir. 2001)............................................................ 22

*United States v. Di Girolamo*,
   808 F. Supp. 1445 (N.D. Cal. 1992) .................................................. 28

*United States v. Foley*,
   508 F.3d 627 (11th Cir. 2007)............................................................. 37

*United States v. Ghertler*,
   605 F.3d 1256 (11th Cir. 2010)........................................................... 42

*United States v. Gill*,
   99 F.3d 484 (1st Cir. 1996) ................................................................. 43

*United States v Guidry*,
   199 F3d 1150 (10th Cir 1999).............................................................. 42

*United States v. Halbert*,
   640 F.2d 1000 (9th Cir. 1980)..................................................... 22, 29

*United States v. Hanna*,
   49 F.3d 572 (9th Cir. 1995).................................................................. 21

*United States v. Hodges*,
   2009 WL 36231 (E.D.N.Y. Feb. 12, 2009) ........................................ 61

*United States v. Hopper*,
   177 F.3d 824 (9th Cir. 1999)......................................................... 19, 24

*United States v. Jordan*,
   256 F.3d 922 (9th Cir. 2001)..................................................... 20, 24, 25, 26

*United States v. Lawrence*,
   189 F.3d 838 (9th Cir. 1999)............................................................... 19

*United States v. Lew*,
   875 F.2d 219 (9th Cir. 1989)............................................................... 29

*United States v. Louderman*,
   576 F.2d 1383 (9th Cir. 1978)............................................................. 22

*United States v. Mezas de Jesus*,
   217 F.3d 638 (9th Cir. 2000)............................................................... 20

*United States v. Munoz*,
   233 F.3d 1117 (9th Cir. 2000)....................................................... 20, 24

v

*United States v. Parris*,
   573 F. Supp. 2d 744 (E.D.N.Y. 2008).........................................................54, 55

*United States v. Queen*,
   4 F.3d 925 (10th Cir. 1993)..............................................................................43

*United States v. Restrepo*,
   946 F.3d 654 (9th Cir. 1991) (*en banc*)......................................................19, 20

*United States v. Ruff*,
   535 F.3d 999 (9th Cir. 2008)............................................................................60

*United States v. Sanchez*,
   2007 WL 60517 (S.D.N.Y. Jan. 8, 2007)........................................................61

*United States v. Shoewalter*,
   569 F. 3d 1150 (9th Cir. 2009).............................................................22, 37, 38

*United States v. Technic Servs., Inc.*,
   314 F.3d 1031 (9th Cir. 2002), *overruled on other grounds by United States v.*
   *Contreras*, 593 F.3d 1135 (9th Cir. 2010) (en banc) (per curiam).................41, 42

*United States v. Tomko*,
   532 F.3d 558 (3d Cir. 2009).............................................................................58

*United States v. Treadwell*,
   593 F.3d 990 (9th Cir. 2010).................................................................22, 40, 41

*United States v. Whitehead*,
   532 F.3d 991 (9th Cir. 2008)............................................................................60

*United States v. Zagari*,
   111 F.3d 307 (2d Cir. 1997).......................................................................46, 47

**STATUTES**

18 U.S.C. §1343 ...................................................................................................22

18 U.S.C. §1957 ...................................................................................................20

18 U.S.C. § 3553(a)(6) .........................................................................................62

U.S.S.G. §2B1.1 .............................................................................................passim

U.S.S.G. §2F1.1 ...................................................................................................63

U.S.S.G. §2S1.1 .............................................................................................18, 63

1

**OTHER AUTHORITIES**

2

David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes* ................................................................................................. 56

3

4

Frank O. Bowman, III, *Pour encourager les autres? The Curious History and Distressing Implications of the Criminal Provisions of the Sarbanes-Oxley Act and the Sentencing Guidelines Amendments That Followed* .................................................................. 56

5

6

Debra Carfora, United States v. Newmark:  Semantics and Misrepresentation in Mail and Wire Fraud, Does It Really Matter Who Was Deceived?, 60 Cath. U. L. Rev. 779, 790- 97 (Spring, 2011) ........................................................................................... 29, 32

7

8

U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* at Ex. 9 (May 2004) .................................... 61

9

10

U.S. Sentencing Commission, *Recidivism and the "First Offender,"* at 13- 14 (May 2004)....... 61

11

Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007).............. 56

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.   INTRODUCTION

On November 9, 2011, a jury found Defendant Samuel Cohen guilty of twenty-nine counts of wire fraud, money laundering, and tax evasion and found him not guilty of six counts of wire fraud and money laundering.  In post-trial proceedings, the Court has made it clear that it believes the evidence at trial shows that Mr. Cohen is a stereotypical confidence man with no respect for other individuals or the community.  This Memorandum presents a different and, we submit, more accurate and balanced perspective of Mr. Cohen than that presented during the trial.  We hope that this will assist the Court in its heavy responsibility to fashion a sentence both "sufficient, but no greater than necessary."

Mr. Cohen was convicted of serious crimes.  But the scores of the letters from business colleagues, family members, and friends that are presented along with this Memorandum portray an individual who is radically different from the greedy sociopathic fraudster depicted by the government during and after the trial.  From individuals who knew him as a child in Israel, to business colleagues at companies he founded, to family members who have been shaped by his influence, to religious leaders and other charitable figures whose communities around the world benefited from Mr. Cohen's commitment to making a difference, all have come together to vouch for Mr. Cohen's character throughout every stage of his life, even despite their knowledge of Mr. Cohen's conviction in this case.  In letter after letter now before this Court, these business colleagues, friends, and family members present a consistent picture of a man with unique commitment to humanitarian projects, boundless energy and passion, and genuine caring for those around him who are less fortunate.

The record before the Court is now also clear that Mr. Cohen is not a stereotypical confidence artist – quite to the contrary, the record is replete with evidence of Mr. Cohen's entrepreneurial vision and resolute work ethic.  On the basis of Mr. Cohen's unique vision, he created legitimate businesses that were both ahead of their time and that introduced technology that has become the industry standard today.  The numerous letters from employees at companies that Mr. Cohen conceived of and founded make clear that these businesses were not some

elaborate cover-up for fraudulent activities, but rather were legitimate enterprises with numerous employees and investors who transformed Mr. Cohen's business foresight into reality.

With the sole exception of Mr. Cohen's sales of his founder's shares in Ecast and the associated events involving Procinea that were adduced at trial, Mr. Cohen has lived a life that is not only devoid of criminal activity, but is in fact exemplary in his commitment to making the world a better place. We hope the Court will not cast a jaundiced or dismissive eye towards Mr. Cohen's devotion to charitable organizations in light of crimes for which he was convicted, as it cannot be denied that he donated at least $2 million and countless energy to charitable causes both in the United States and around the world. The numerous letters from religious leaders and others who benefited from Mr. Cohen's generosity convey their authentic and sincere gratitude for Mr. Cohen's efforts, and the numerous lives that were enriched by Mr. Cohen are no less positively affected as a result of convictions now before this Court.

Mr. Cohen mentions these facts and supports the numerous letters of support not to minimize the serious nature of the crimes for which he was convicted, but to provide the Court with a broader and more nuanced context of the man who is to be sentenced. Mr. Cohen expects the Court to impose a sentence that is consistent with the purposes of the sentencing statute, including providing just punishment and affording adequate deterrence. But, as the Court is well aware, Mr. Cohen's punishment for his crimes has already begun. He has been deprived of his reputation and been publicly disgraced. He has come to the realization that he will likely never again be able to pursue his life's passion – conceiving and building startup technology and investment companies – in light of the indelible stain the convictions place on his reputation and perceived penchant for veracity. Mr. Cohen has lost the businesses that he spent time and energy creating. Most importantly, he has already lost his freedom.

Mr. Cohen neither expects nor requests this Court's sympathy. Instead, he merely expects objectivity and appropriate recognition that the state of the evidence has dramatically changed since the time of his conviction. Since that conviction, forensic handwriting experts have analyzed Mr. Dillon's signatures on the "central exhibits" in the entire case and determined that Mr. Dillon not only signed, but was presented with the entire document based on indentation evidence.

Although it was the government's overarching theory of the case that Mr. Cohen had constructed a fraudulent scheme based on false claims that Ecast would be acquired by Microsoft, it was in fact Mr. Dillon who made most if not all the false representations to investors and received all the wired funds that belong to nearly all of the victims upon which the government's loss calculation is based. Mr. Dillon's testimony that the false representations were originally made by Mr. Cohen is the lynchpin of the government's case for relevant conduct loss and the credibility of Mr. Dillon's testimony has now been thoroughly impeached by evidence of authenticity regarding the declarations and release agreement stating that Mr. Cohen made none of the false claims upon which the prosecution's case was based. Since Mr. Dillon's testimony can no longer rationally be considered "clear and convincing," and "specific and reliable," the government has not adequately proved either relevant conduct or the amount of loss, which of course is the entire basis for the 22-level sentencing enhancement and probation department's severe and disproportionate 30-year recommended sentence.

Even if the government is correct on loss, however, the probation department's recommendation reflects a sentence that is completely inappropriate to the nonviolent conduct presented here. In seeking fairness in the pursuit of justice, as opposed to punitive vengeance, Mr. Cohen requests that this Court impose a reasoned and proportionate sentence. Mr. Cohen is 53 years old and the 30-year sentence that the probation department recommends would add almost nothing to the deterrent effect that will result from these proceedings and Mr. Cohen's incarceration. Such a lengthy sentence is little different than a life sentence for Mr. Cohen based on his actuarial life expectancy, and its only purpose would be to increase the likelihood that Mr. Cohen dies in prison. Mr. Cohen requests that the Court provide him with a period of time to spend with his family and friends after his incarceration.

Significantly, the attached affidavit of Herbert Hoelter, co-founder and CEO of the National Center on Institutions and Alternatives ("NCIA"), conducted a comprehensive analysis of sentencing data for individuals in Mr. Cohen's loss category who did not receive a downward departure. Of the 169 defendants nationally in the loss category of $20-50 Million, four defendants received a probationary sentence and 165 defendants received a term of imprisonment

1  (average sentence imposed was 105.4 months).  Of the four defendants in the Northern District of

2  California within Mr. Cohen's loss category, the average sentence imposed was 69.3 months.  A

3  sentence within this range would further the goals of the sentencing statute and avoid an

4  unnecessary sentence that is disproportionately long.

5  **II.     THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT**

6      **A.     Mr. Cohen's Early Life In Israel**

7        Mr. Cohen is the child of Russian immigrants who arrived in Israel penniless after escaping

8  the post-1917 pograms, in which hundreds of thousands of civilian Jews were killed throughout the

9  Russian Empire.  D. Gliksman Letter.[1]  Mr. Cohen grew up in a tiny one bedroom apartment in

10  Jerusalem, where he slept in the dining room alongside his older brother.  Mr. Cohen's parents

11  worked multiple jobs to feed the family and earn a modest living.  *Id.*

12        At a young age, Mr. Cohen took after school jobs in order to support his parents.  In those

13  jobs, Mr. Cohen was "always hard working, caring and very generous."  *Id.*  Through these jobs,

14  Mr. Cohen was instilled with an appreciation for the value of hard work and a sense of

15  responsibility for helping others.  His older sister recalls that Mouli "gave everything he earned

16  after school to our mother, even against her wishes in hopes that she wouldn't have to work as hard

17  herself.  Although the money he earned and gave was meager in the eyes of our mother it was still

18  meaningful and taught him the early values of giving to others."  *Id.*  While as a child "he didn't

19  have much [] it was his ultimate goal that if he was to ever be in position to help others he would

20  make it his number one priority in life . . . He put others ahead of him at any chance he could get."

21  Y. Cohen Letter.

22        Mr. Cohen's high school classmates recall that "as a teenager we remember that even at an

23  early age, Mouli was one of the leaders among his friends.  His sense of humor, generosity, and

24  willingness to share whatever he has were always an inspiration for us."  U. Be'erie and M.B. Sira

25  Letter.  Following his high school graduation, Mouli enrolled in the Israeli army to serve his

26  country.  Although he was the only son of his parents, he did not hesitate to join an army battalion

27  _____

28  [1] The letters submitted in support of Mr. Cohen are attached as Exhibit 1.

1  and serve far away from his family in order to contribute to his country.  *Id.*  After serving in the

2  army, Mr. Cohen became a partner in a small commercial art company.  With his "remarkable

3  skills and endless efforts, he made this company very successful.  Mouli demonstrated that with

4  hard work, vision, and believing in yourself you can get very far."  *Id.*

5        **B.**      **Mr. Cohen's Professional Achievements And Founding Of Ecast**

6        Since his arrival to the United States in 1987, Mr. Cohen focused on high-tech and health

7  care industry start-up companies.  Mr. Cohen invested in and helped form several companies

8  including Lamia Enterprises, where he was Chairman and CEO.  Following Lamia, Mr. Cohen was

9  the founder Aristo of International.  Mr. Cohen was also the Chairman and CEO of Aristo

10  International.  Eventually Aristo became PlayNet, Inc. where he was the Chairman and CEO from

11  1994 to 1997.  PlayNet developed video games for specific use in bars and restaurants.

12        In 1998, Mr. Cohen co-founded Ecast, an interactive media company offering digital

13  music, games, entertainment, information and advertising through a network of electronic juke

14  boxes.  The product was Mr. Cohen's idea, based on work he had done at his previous business,

15  PlayNet, Inc.

16        Numerous letters describe Mr. Cohen's unique vision and innovative thinking that led to

17  the creation of Ecast.  Ecast's VP of Product Development writes that as "a seasoned software

18  executive with over 20 years' experience in the high technology industry" he was "impressed with

19  Mouli's entrepreneurial vision, his passion, and his drive."  M. Rodgers Letter.  The former VP of

20  Engineering and Operations at Ecast similarly describes how he joined the company after he saw

21  Mouli demonstrate a prototype of Ecast's Music-on-Demand jukebox because "he was inspired by

22  the technology and Mouli's vision for how it would change the amusement industry."  T. Pigoski

23  Letter.  Mr. Cohen's co-founder simply states that "the product was Mouli's idea . . . It was an

24  innovative and ground-breaking product.  No other downloading digital jukebox existed at the time

25  or for years to come and Mouli was subsequently granted a patent (US Patent #7,657,910)

26  covering the innovations embodied in the product."  R. McAulay Letter.

27        Mr. Cohen not only conceived of the Ecast product, but was "an inspirational leader

28  involved in almost every aspect of the company from Sales to Engineering to Operations –

including leading the development of key relationships for software development, hardware

manufacturing, industry partnerships, and major customers." T. Pigoski Letter. Mr. Cohen's rigor

and hard work were responsible for growing a company from its first employee to over 100

employees at its peak. *Id*. One employee in the marketing and product management department

describes Mouli's work ethic as follows:

> He was an exciting leader and boss and was well respected amongst the 70 or
> more employees that worked under him. Every day he worked just as hard as the
> hardest working employee often working late in to the evening. He had a desk
> out in the open (no office) right along side the rest of us for the majority of the
> time we worked together. We traveled to multiple trade show events together in
> Las Vegas, and Orlando in order to exhibit our product, generate buzz and sell
> units. He was down on the trade show floor wearing the Ecast (logo) button down
> just like all of us – working toward the common goal of getting our machines in
> as many establishments as we could.

E. Running Letter.

For over four years, Mouli was physically present in the office on a daily basis, in large

part managing the sales and marketing of Ecast's products. R. McAulay Letter. As a result of Mr.

Cohen's determined work ethic and vision, "[f]rom 1999 to 2002, at a time when the rest of the

dotcom start-ups were folding, we grew from nothing to an install base of several thousand

jukeboxes and video games used by hundreds of thousands of customers nationwide." T. Pigoski

Letter. During that time, Mr. Cohen raised approximately $45,000,000, primarily from venture

capital firms, but also from strategic investors and accredited individuals, that was necessary to

create, market, and sell the product. The investors recognized an "innovative company with

unique technology, a compelling business model and a strong management team . . . [and] voted

with wallets and invested in a promising opportunity." R. McAulay Letter.

Mr. Cohen's co-founder sums up the undeniable impact that Mr. Cohen had in growing

Ecast into a successful amusement technology company:

> Mouli's daily involvement in the developments of the company's innovative,
> patented product, the marketing and sales of that product, and with the company's
> investors is simply undeniable. Mouli's role and more importantly is actions at
> Ecast where those of a bona fide technology CEO running a bona fide technology
> company. Whatever occurred after Mouli left Ecast, there is no doubt that Ecast
> was founded with the same aspirations, dreams and confidence with which
> hundreds of technology businesses are founded every year, and that across 14
> years it employed hundreds of people and its products served millions of

6

customers.  The idea that Mouli conceived is now the industry standard, deployed in approximately 100,000 locations nation-wide.

R. McAulay Letter.

### C.      Mr. Cohen's Founding Of Procinea

At the end of 2003, Mr. Cohen formed Procinea.  Procinea's focus was the development of financial modeling software to forecast box office returns for motion pictures.  The main principals involved in Procinea, including Prof. Gordon Rausser, Mr. William Balson, and Mr. Craig Heimark, have provided compelling letters attesting to Mr. Cohen's intellectual brilliance and innovative thinking in founding a company "on a principle, that while reasonably common today was rather rare in 2004, namely that data mining and modeling constructs were more effective than human judgment in assembling a variety of financial instruments."  C. Heimark Letter; *see also* W. Balson Letter; G. Rausser Letter.  In the 2003-04 period prior the formation of Procinea, CRA International was paid approximately $1 million to develop methods and models to enable the "development of prudent financial engineered products that would facilitate the alignment of incentives among stakeholders and the demand for equity and debt capital from the domestic film industry."  G. Rausser Letter; W. Balson Letter.

Mr. Cohen was actively involved in translating Procinea into a viable business in 2004-08, and was particularly instrumental in hiring a highly qualified and nationally recognized team of experts to form the management and staff of Procinea.  G. Rausser Letter; W. Balson Letter; C. Heimark Letter.  These experts included former studio executives, "one of the most innovative financial engineers in the U.S.," and Prof. Rausser, the former Senior Economist of the President's Council on Economic Advisers.  G. Rausser Letter; W. Balson Letter.  In addition to perhaps a dozen employees, the staff of Procinea was supplemented by retained consultants.  W. Balson Letter.  Mr. Cohen was often involved with meetings that were undertaken by the principals and consultants with Walt Disney Studios, Universal Pictures, Lion's Gate, Warner Brothers, Sony Entertainment, Standard and Poor's, and numerous investment banks and prospective business partners such as Citigroup, Relativity, and the Salter Group.  *Id.*

Reputed principals in Procinea note that Mr. Cohen was "a diligent hard-working executive who attempted to commercialize new technologies and create companies to operate using the new technologies . . . he sought to employ people with the highest credentials and he sought expert advice on business development, finance and legal matters."  W. Balson Letter; *see also* C. Heimark Letter.  While "all entrepreneurs know the risks of startups are high . . . [and] Procinea ultimately succumbed to these market statistics, important work was executed along the way that pointed to a higher probability of success than normal startups."  C. Heimark Letter.  First, "Procinea was successful in proving the underlying thesis of its business model, i.e., that data collection, and data modeling building, brought considerable insight and competitive advantage to the financing of Hollywood movies."  *Id*.  Second, Procinea licensed data at substantial cost from film vendors and created a proprietary methodology that resulted in a "dataset [that] was as comprehensive as any I have discovered or seen described in the literature."  W. Balson Letter. The data and models are still in existence and, although their utilization was impeded by Mr. Cohen's criminal prosecution, remain "designed for an active and robust film investment advisory service with access to highly proprietary studio film data."  *Id*.

There is no dispute that "had it achieved its objective, Procinea could have been a major competitor in film finance."  *Id*.  There is also no dispute that Procinea failed to become a major film business not because of any misconduct or wrongdoing by Mr. Cohen; quite to the contrary, Mr. Cohen was known "to be smart, creative and willing to openly discuss the risk and opportunities involved in this venture."  C. Heimark Letter.  Instead, Procinea's troubles resulted from the financial crisis of 2007-08 and the failure to "source and secure the requisite financing." *Id*.

In a letter to the Court, Professor Rausser sums up Mr. Cohen's crucial leadership of the company:

> I am writing to verify that Procinea was a viable and innovative startup company that did its best to create employment and economic value in the global film industry.  Mr. Cohen provided the entrepreneurial leadership for this organization. This enterprise attracted some of the very best financial management talent available.  Mr. Cohen's tenacity and ability to secure this talent was remarkable….

But for the financial crisis that began to unfold in 2007, Procinea was well positioned to provide real value to the marketplace.

As with many innovative startup organizations, there was substantial risk but also the distinct possibility of significant returns.  Given the tumultuous economic conditions toward the latter period of Procinea's existence, there was much disagreement among investors and management.  Nevertheless, there can be no question that this company was guided by the diligence, support, and creativity of Mr. Cohen.

G. Rausser Letter.

### D.     Mr. Cohen's Founding Of Voltage Capital

In 2007, Mr. Cohen formed Voltage Capital, a private investment firm focusing on investment opportunities in the high technology, digital media and healthcare sectors.  Mr. Cohen's vision for Voltage was to create a philanthropic venture capital firm that focused on leveraging underutilized assets in existing businesses and directing venture capital in a manner that would benefit the public at large.

At Voltage, "Mouli exhibited the same energy and drive to succeed as he had at Ecast . . . [and] was fully engaged, on a daily basis, with the business, its portfolio companies and its future opportunities."  R. McAulay Letter.  Mr. Cohen conceived Voltage, explored numerous potential investment opportunities, and built a vibrant venture capital fund that launched two portfolio companies and had a robust pipeline of future opportunities at the time of Mr. Cohen's arrest.  *Id*. Voltage regularly employed approximately half a dozen individuals as employees or consultants and its portfolio companies employed many more.  *Id*.

Mr. Cohen built Voltage by displaying the same devotion to hard work that he showed throughout his life; involving himself in a "multitude (on what seemed to be a daily & weekly basis) of in-person and phone meetings."  E. Running Letter.  Even in regards to potential investment opportunities that Mr. Cohen elected not to pursue, he "spent significant time listening to [biomedical entrepreneurs'] ideas, finding technical support for evaluation, and connecting them with other interested parties."  Dr. Reilly Letter.

In 2009, Mr. Cohen, acting through Voltage, co-founded OnCirc Diagnostics.  On Circ is a medical device company that was focused on developing a system that would allow more precise and consistent monitoring and diagnostics of hospital patients in order to combat cancer.  Hoon

9

Letter; Reilly Letter.  The company's innovative cancer treatment products and services were based on technology and cancer biomarker inventions that were underutilized by the John Wayne Cancer Institute, a well-known medical research institution, from whom the technology was licensed by OnCirc.  *Id.*

Mr. Michael Reilly, CEO of OnCirc Diagnostics describes Mr. Cohen's hard work and sustained effort in getting this Biotech startup, devoted to developing breakthrough cancer diagnostics, off the ground.  Mr. Reilly explained:

> I worked with Mouli for over two years to develop new technologies for unmet medical needs. Finding and funding the right technologies is long difficult work and he supported my efforts throughout the time period unlike many private equity investors who are very short-term oriented. Throughout this time period, he was very careful with expenditures, focusing on support of the project with his energy, insight, and connections.

> His support ultimately resulted in the identification of new oncology diagnostic technologies that can identify hidden circulating cancer cells in order to better treat patients with metastatic cancer. The technology was previously undeveloped by the John Wayne Cancer Institute and patients had been missing the benefits of these breakthrough approaches. Thanks to his efforts, a company was formed, financing found, and the technology advanced.

> Please consider this socially productive and generous side of Mouli as you decide on his sentencing.

Dr. Reilly Letter.  Dr. Hoon echoes Dr. Reilly's comments in stating that "[t]he cancer field has been in trouble in the last several years . . . Mr. Cohen['s] generosity and enthusiasm provides an important to the field to help mankind when it needs it the most in these difficult times."  Dr. Hoon Letter.

When Mr. Cohen was arrested, Voltage was in ongoing discussions for a joint venture with Mannkind-Afreza to distribute a revolutionary new insulin inhaler for diabetics in Southeast Asia, India, and China.  Several countries in Asia as well as the Russian Federation have experienced dramatically rising rates of diabetes in their populations due to changes in the traditional diets of their populations and other factors.  At the same time, traditional methods of insulin treatment are often prohibitively expensive and/or impractical to administer.

The letter from Ornit Avidar attests to Mr. Cohen's devoted efforts (through Voltage) to create joint ventures with Western drug companies and local partners in the Asian countries to market alternative treatment methods, that would allow for oral (inhaled) administration of insulin. Mr. Avidar writes:

> Throughout my business encounters with Mr. Cohen I found him to be an honest and dedicated person who is committed to helping people to get the best treatment possible.  Through this endeavor, I met Mr. Cohen's colleagues, business partners and was also exposed to his philanthropic work and charities.   He always seemed like a very well liked person, whose partners and colleagues had great respect for, and he was always seen as a visionary with a true passion for doing good in the world, especially in the fields of medicine.

O. Avidar Letter.

Danny Petrosek, a medical doctor and PhD met Mr. Cohen in connection with his work on an ambitious project to help solve the problem of dehydration secondary to intestinal illness in the third world.  Dr. Petrosek Letter.  Dr. Petrosek, who is a visiting faculty associate in two departments at the California Institute of Technology, has written to the Court that he "was impressed at once with Mr. Cohen's enthusiasm, natural scientific intuition, and desire to support impactful projects that would promote welfare for those who are underserved."

These are just a few examples of the many legitimate and socially beneficial philanthropic venture capital opportunities that Mr. Cohen pursued through Voltage.  Although the government suggests that Mr. Cohen's passion and hard work on behalf of startup companies could not be legitimate because many were not successful, Mr. McAulay compellingly rebuts that contention:

> As any entrepreneur or private equity investor can attest, the success rate of technology start-up is not high.  Fewer than 1 in 5 grow into mature businesses. Ecast, with the product that Mouli conceived, beat those odds.  Nevertheless, one of the hallmarks of technology investing, and one of the constants, is risk. Investors in most technology businesses will lose 100% of their investment.   In order to mitigate that risk, investors have learned to look for certain characteristics in technology executives.  Those characteristics include intellect, drive and passion.  At both Ecast and Voltage, Mouli demonstrated all of those things, which is one of the reasons Ecast was successful under Mouli. Mouli has created many bona fide businesses over the course of his career. Whatever transactions took place around certain shares of Ecast or Procinea, there should be no doubt as to the legitimacy of those businesses themselves or as to the day-by-day and hour-by-hour effort that Mouli put into building them.

R. McAulay Letter.

**E.     Mr. Cohen's Personal And Family Life**

Mr. Cohen comes from a small family in Israel.  Mr. Cohen immigrated to the United States in 1987, and became a naturalized citizen in 1996.  He met Stacy Cohen in 2000, and they later married.  S. Stripling Letter.  Mrs. Cohen has written to the Court describing her loving relationship with her husband and the pain exacted by his absence.  *Id.*  She also speaks movingly of the Cohens' "many successful charity events at our home and other venues," which brought joy to their lives.  *Id.*  Mr. Cohen also has two children from a previous marriage, Roi and Danielle.

Mr. Cohen is fortunate to have a tight-knit and warm family structure.  Although Mr. Cohen immigrated to the United States, his sister's letter discusses at length the serious responsibility he undertook for caring for his elderly parents in Israel:

> And then there was our parents who he was always supporting.  And when I say supporting, I mean from the day he left the US until the day our parents passed away he was always their number one emotional, moral and financial supporter. All the surgeries and doctors our parents needed, because they did get very sick in their later years were all provided for by Mouli and this must have kept them alive by Gd's grace for some many years.  Our mother who was sick with dementia for the last six years needed special nursing care which could not have been provided by the state . . . Mouli supported her until his arrest when his financial assets were frozen.  At that point her nurses could not be afforded, they left . . . And the day they left her was the day she passed away.  She was brought into public care that day and died a few hours later from the shock. Mouli was her favorite child, always so kind and caring.  We have a tiny family here in Israel but we love him dearly and miss him so much !

D. Gliksman Letter.

Throughout his children's lives, Mr. Cohen has also been a caring and engaged parent to Roi and Danielle.  R. Cohen Letter; D. Cohen Letter.  Roi was strongly influenced by his father strong positive influence, imbuing him with the need for honesty, respect for the law, compassion, generosity and a passion for giving back to those less fortunate.  R. Cohen Letter.  Danielle similarly describes her father as the greatest inspiration in her life, the most altruistic person she has known, who always gave his love and care to his family and instilled in her the value of giving back to others.  D. Cohen Letter.  Mr. Cohen's children are devastated by the charges brought against him the result of the trial, and extremely fearful of spending the rest of their lives without him.  R. Cohen Letter; D. Cohen Letter.  Mr. Cohen's ex-wife, Yael, similarly holds "nothing but

12

1    treasured memories of [Mouli]" and is "very worried" that life without him "would be devastating

2    both emotionally and physically" for both his children.  Y. Cohen Letter.

3          In light of Roi and Danielle's compelling letters, there can be no doubt that Mr. Cohen

4    instilled in his children the sense of obligation to help the less fortunate.  In addition to providing

5    for his immediate family, Mr. Cohen also provided essential support for relatives in Israel.  For

6    example, when his 18 year old niece was burned badly in an apartment fire, Mr. Cohen was the

7    first to respond and financially supported "multiple surgeries to help ease the pain and scarring."

8    D. Gliksman Letter.  Mr. Cohen's sister writes that "to be honest without [Mouli's] help at that

9    very moment [in arranging the surgeries], we don't [know] how things would have turned out . . .

10   My daughter is married now with six children !  Everytime I think of that moment it brings me

11   quick to tears."  *Id.*

12         The government and the probation officer have tried to cast doubt on Mr. Cohen's

13   commitment to his family with the spurious contention that that "[a]ccording to the case agent, this

14   marriage [to Ms. Stripling] appears to have taken place in Italy at the time the defendant was

15   legally married to his first wife."  PSR ¶ 64.  This assertion is unsubstantiated hearsay and no

16   evidentiary support is provided.  Further, while the government has contended in prior motion

17   papers that defendant and Stacy Cohen were married in Europe in 2003 based on a holiday card

18   from her father, Robert Stripling's FBI interview actually confirms that the defendant and Mrs.

19   Cohen "were married in a Jewish ceremony in 2006 in Italy."  The 2003 event was strictly

20   ceremonial and, as the PSR properly acknowledges, "Stacy Jean Stripling and the defendant

21   married on February 22, 2008."  PSR ¶ 64.

22         The government's attempt to suggest that Mr. Cohen was not a faithful husband to Yael

23   Cohen is also compellingly rebutted in her letter, where she states that "[e]ven as my ex husband I

24   hold nothing but treasured memories of him and his kind and giving personality.  Mouli's dream

25   was to help people who were less fortunate.  He was never selfish, always lending his kind words

26   and time to others.  Mouli would always stress how important it is to be straightforward, never to

27   lie or cheat.  Mouli has always been an amazing father, the most loving husband and supportive

28   and attendant to his two children who love and need him dearly."  Y. Cohen Letter.

**F.     Mr. Cohen's Outstanding Record Of Involvement And Financial Support For Charitable Organizations**

Numerous letters from prominent religious figures and humanitarian leaders attest that Mr. Cohen was very involved and made significant contributions to charitable organizations located around the globe.  Even in the face of Mr. Cohen's conviction, these individuals found it "important . . . to speak up on his behalf and recount the significant role that Mouli had in our lives and work."  Rabbi Cohen Letter (no relation).  In particular, Mr. Cohen has been a leading donor to religious organizations in San Francisco and around the world.  The foundation of Mr. Cohen's life is his faith.  He practices a kosher lifestyle and is very involved in Jewish community events.  Mr. Cohen has steadfast presence in his religious community and has earned great respect in that venue.

As Rabbi Josef Langer eloquently expressed in a letter to this Court:

> The entire Chabad community of San Francisco joins me as I write this letter to be a character reference and express our concern for Mouli . . . .

> Mouli has also been a significant funder for our educational and religious, and social service programs, benefiting jewish community growth.  Mouli has been a still water for the Chabad, and an enthusiastic donor, giving approximately $225,000 over a 10-year period.  His enthusiasm to help shape, and strengthen the work of our Chabad, which has been established in 1972, has done wonderful things for the countless number of people which we have served.

> Even in the face of judgment against him, I personally can vouch that Mouli is a man of high character and integrity.  Mouli is an amazing man.  I have known him to be the most giving, responsible, honest and helping individual that my wife, family, and I have encountered in the past 20 years.

Rabbi Langer Lettter.

Rabbi Asi Spiegel similarly recounts at length Mr. Cohen's donations of approximately $300,000 to needed religious programs, including the establishment of a Jewish outreach center in Eugene, Oregon, and building of new synagogues at historic Jewish burial sites in Eastern Europe.  Rabbi Spiegel Letter.  Rabbi Spiegel states that, far from being the greedy person that the government describes, Mr. Cohen actively reached out in search of worthy causes that he could support:

14

Many times I would mention in passing about a project I heard about and Mr. Cohen would, on his own initiative, contact the charity and make a contribution to its cause.  In all these cases that I am aware of, he did so without knowing the benefactors at all.  The donations and contributions that he made over a several year span were always generous.

During the times of the Jewish holidays Mr. Cohen always inquired about needy persons and made numerous contributions to support families in need.  Again, these are people he did not know at all.  Neither did they know him.  In all these cases, I was genuinely impressed with Mr. Cohen's generosity and compassion for the community . . . He constantly talked about his strong belief in giving back to the community and did not need any pushing or convincing in this matter.  I am aware that Mr. Cohen was recently convicted by the court.  I can honestly say that what I have seen all these years was a giving and charitable man.

Rabbi Spiegel Letter.

Indeed, Mr. Cohen's devotion to Jewish communities is not limited to his local community in San Francisco, but extends across the world.  In particular, Mr. Cohen has shared a "special relationship" for a decade with the Chabad Center of Hebron and donated approximately $400,000 to various programs located in the world's most ancient Jewish site and the second holiest place for the Jewish people after the Temple Mount in Jerusalem.  Rabbi Cohen Letter.  Mr. Cohen was the primary sponsor the Menucha Rochel Kollel Advanced Learning Center and directly provided significant financial stipends to 15 scholars, enabling them to learn and teach Torah, and "add vibrancy and holiness to the entire community, and its many events touch the spirits of hundreds." *Id*.  Mr. Cohen's financial support was also the "bedrock and stabilizing force" for the Tomb of the Patriarchs Day School, serving local underprivileged children from low-income families, which "enable[ed] the school to grow and develop beyond their expectations."  *Id*.  Mr. Cohen also funded the building of a museum and library in the famed Beit Romano building, which is "considered among Chabad Chassidic Jews worldwide as an important historical compound of monumental significance."  *Id*.

There can be no greater testament to Mr. Cohen's essential involvement in Hebron than the words of Rabbi Cohen:

Mr. Cohen's generosity and involvement with our efforts has intimately impacted countless lives, restored hope, and fueled joy . . . Perhaps Mr. Cohen's greatest contribution, however, has been the consistent, reliable holiday support he's offered to the city's poor.  For the duration of our relationship, Mr. Cohen's

15

significant financial assistance before each of the major Jewish holidays has been a lifesaver for many families: food, clothes, stipends, and emergency funds.  His dependable help has been the answer to the prayers of many local families, keeping them afloat and smoothing their sails in the rough waters of life.  And in between the holidays, Mr. Cohen's additional support enabled us to hold large meals and provide on numerous occasions the thousands of pilgrims to the cave of the Patriarchs with food and drink on special days.  Mr. Cohen also assisted with the care packages to the on-duty IDF soldiers stationed in Hebron with food, holiday needs, and a sense of family and appreciation.

As such, I write to you not only as the center's Rabbi and director, but also as an emissary on behalf of Hebron's many residents, students, soldiers, children, and visitors who smile wider, believe stronger, and live more joyful do the care, beneficence, and support of Mr. Cohen.  We all turn to you, your honor, and ask your compassion in this matter.

Rabbi Cohen Letter.  In light of Mr. Cohen's generous spirit and deep devotion to religious organizations, small example of projects around the world that would not have been possible without his support also includes the Odessa Jewish Orphanage (serving 60 children from ages 6-18); the replacement Torah scrolls in Moscow, Russia; and gatherings of over 800 Jewish students from throughout Europe.  Rabbi Edelkopf Letter.

Mr. Cohen's devotion to charitable works is not limited to religious organizations.  A letter from World Economic Forum Technology Pioneer Isabel Maxwell notes that "[o]ne of Mouli's particular interests philanthropically was that of sick children and I realized that he was very genuinely interested to assist the children."  I. Maxwell Letter.  Mr. Cohen was on the Board of Directors of Camp Okizu, a free summer camp program that serves all members of families in Northern California dealing with childhood cancer.  J. Bell Letter.  Mr. Cohen provided $193,460 in direct donations, and raised an additional $38,400 that allowed Okizu to provided needed services for sick children.  Mr. Cohen also provided a "wonderful" $40,000 gift to fund the Clown's Program in the children's Oncology wards at the Soroka Medical Center in Israel.  I. Maxwell Letter.  As Ms. Maxwell attests, "[t]here were both Israeli and Arab sick children that Soroka cared for regardless of race or ethnicity, and the work of the clowns who came to cheer up the children and their parents, was wonderful and moving and hugely important to the morale and well-being of those children."  Id.

Mr. Cohen also provided substantial charitable support to other public health and medical related charities.  These contributions included $50,000 to the Seva Foundation which helped to

16

further the organization's mission to prevent blindness and restore vision for hundreds of thousands of children as well as help develop signature models around the world. Mr. Cohen contributed $50,000 to the University of California San Francisco ("UCSF") DC Stem Cell Suite Fund, to help launch an FDA-approved core research facility, a key component in translating the laboratory advancements made in stem cell research into therapeutic applications. He also contributed $50,000 to assist in the construction of the new Children's Hospital of LA hospital building, which promises a new era in pediatric healthcare upon its completion. Dr. Ornish's letter notes that "Mr. Cohen's generous support made a meaningful difference in our work" at the Preventative Medicine Research Institute of UCSF in proving, "for the first time, that comprehensive lifestyle changes may reverse the progression of coronary heart disease, stop or reverse the progression of early-stage prostate cancer, and even change gene expression – turning on disease-preventing genes, and turning off genes that promote heart disease, prostate cancer, and breast cancer." Dr. Ornish Letter.

Outside of the medical field, Mr. Cohen provided "important support" to the Russian Arts Foundation ("RAF"), which seeks to promote international understanding through the arts. R. Walker Letter. Mr. Cohen and his wife Stacy co-chaired and sponsored a fundraising event that raised approximately $3.5 million for "RAF's Magic of Music children's program, as well as for a consortium of three Sonoma County youth charities, and the scholarship fund of Sonoma Academy." M. Bredon Letter. Mr. Cohen also contributed $109,000 in the foundation's auction from 2003-05, contributed $125,000 to underwrite an admission-free concert for families and children in Santa Rosa, and contributed $100,000 to sponsor Carlo Ponti's first American CD release. M. Bredon Letter; R. Walker Letter. In the words of RAF's fundraiser, Mr. Cohen "promptly paid invoices for the [auction] lots of which he was the winning bidder . . . raised significant funds on behalf of programs serving youth in need and at risk, young people living right here to all the way across the globe in Moscow. Mr. Cohen's commitment [] was sincere, generous and very much appreciated by all of us involved in the event." M. Bredon Letter.

Mr. Cohen has devoted much of his life to charitable works, and the above is but a small selection of the organizations that he is impacted. Documentation to support all of his charitable

17

activities is provided in Exhibit B, and includes evidence of substantial additional donations to organizations such as the SFMOMA, Oakland School for the Arts, St. Helena Hospital's Martin O'Neil Cancer Center, the Alfred Mann Foundation, the Happy Hearts Fund, the San Francisco Film Society, the Glogau Teddy Bear Fund at the UCSF Medical Center, IMG Young Designers, Grace Cathedral, Beyond Hunger, The Center for Attitudinal Healing, Youth AIDS – PSI, San Francisco Ballet, University of California at Berkeley Performances, South Plains Suzuki Strings Foundation, GirlSource, The Leukemia & Lymphoma Society, Friends of Fai, CPMC Institute for Health and Healing, Free Arts for Abused Children NYC, United Cancer Research Society, Chabad in the Hills, Goodwill Industries and the Larry King Foundation.

The above summary and supporting letters describe to the Court that Mr. Cohen is sincere in his commitment in helping those in need. Mr. Cohen has devoted his time and effort, and at least $2 million, to assist those who are less fortunate. Mr. Cohen did not feign interest in charitable activities as part of a fraudulent scheme – his devotion to charitable causes is at the core of the person that he is and has been his entire life.

## III.    SENTENCING GUIDELINES CALCULATION

### A.    The Probation Department's Recommendation

The Probation Department's PSR sets forth their recommended guidelines calculation for this case:

**Group One** (Count Nos. 1-14, 18 and 20-29)

| | |
|---|---|
| Base offense level (§2S1.1) | 7 |
| Loss of $20-50 Million (§2B1.1(b)(1)(L) | +22 |
| 50 or more victims (§2B1.1(b)(2)(B) | +4 |
| Acting on behalf of a charity (§2B1.1(b)(9)(A) | +2 |
| Sophisticated means (§2B1.1(b)(10)(C)) | +2 |
| Specific offense characteristics (§2S1.1(b)(2)(A) | +1 |
| Role in the offense | +2 |
| Obstruction of justice | +2 |
| | |
| Adjusted offense level | 42 |

**Group Two** (Count Nos. 33-35)

| | |
|---|---|
| Base offense level (Loss over $7 million) (§2T4.1(K)) | 26 |

18

| | |
|---|---|
| Specific offense characteristics (§2T1.1(b)(1)) | +2 |
| Sophisticated means (§2T1.1(b)(2)) | +2 |
| | |
| Adjusted offense level | 30 |

The guidelines for Mr. Cohen in this case, as calculated by the PSR, are nearly in excess of the entire sentencing table. The sentencing table is designed to advise judges on sentencing in the full spectrum of crimes, including extremely violent crimes involving mass death, and it only reaches an offense level of 43. Mr. Cohen scores an offense level of 42, which is nearly off the chart.

An offense category 1 and an offense level of 42 yields a recommended sentence of 360 to life, of which the probation department has recommended the "low end" of 360 months. Since Mr. Cohen is not charged with any offense that could yield a sentence of 360 months, the probation department recommends that the Court sentence Mr. Cohen on "240 months on Counts One through Fourteen and Eighteen and 60 months on Counts Thirty-Three through Thirty-Five to be served concurrently; and 120 months on Counts Twenty through Twenty-Nine and Thirty-Two, to be served consecutively." As demonstrated by the guidelines calculation, the proposed sentence results almost entirely from the +22 level loss enhancement for Group One and the +26 base offense level based on the amount of loss for Group Two.

**B.     The Government Bears The Burden Of Proof**

The government has the burden of proving any enhancement that would raise the Guidelines offense level. *United States v. Berger*, 587 F.3d 1038, 1047-49 (9th Cir. 2009); *United States v. Lawrence*, 189 F.3d 838, 846 (9th Cir. 1999). Although that proof standard is usually preponderance of the evidence, *Berger*, 587 F.3d at 1047, where a sentencing factor has an "extremely disproportionate effect on the sentence relative to the offense of conviction," *id.*; *United States v. Restrepo*, 946 F.3d 654, 659-60 (9th Cir. 1991) (*en banc*), due process requires the government to prove loss or other sentencing enhancement by clear and convincing evidence. *Lawrence*, 189 F.3d at 846; *United States v. Hopper*, 177 F.3d 824, 833 (9th Cir. 1999) (holding clear and convincing evidence standard had to be applied to 7-level Guidelines increase under

*Restrepo* standard); *United States v. Mezas de Jesus*, 217 F.3d 638, 642-45 (9th Cir. 2000) (clear and convincing evidence standard had to be applied to 9-level sentencing enhancement); *United States v. Munoz*, 233 F.3d 1117, 1126-27 (9th Cir. 2000) (clear and convincing evidence standard had to be applied to 9-level sentencing enhancement); *United States v. Jordan*, 256 F.3d 922, 925-34 (9th Cir. 2001) (clear and convincing evidence standard had to be applied to 9-level sentencing enhancement).  The government proof must be convincing to the sentencing judge and not merely be an evaluation of the quantum of evidence.  *Mezas de Jesus*, 217 F.3d at 642-45.

In determining whether a sentencing enhancement has an extremely disproportionate effect, a six factor test is applied, with the last two factors being: (a) a sentencing enhancement of more than 4 levels; and (b) a more than doubling of the base offense level.  *Jordan*, 256 F.3d at 928-29.  A totality of the circumstances test is used.  *Id.* at 928.  A 9-level increase that more than doubles the base offense level has been found to require application of the clear and convincing test, even when the other four factors are not present.  *Id.* at 928-29.

Here the base offense level is 7 under SG §2S1.1(a)(1) (requiring application in this case of SG §2B1(a)(1)).  Under SG §2S1.1(b)(2)(B), an additional enhancement of one offense level is added for a conviction under 18 U.S.C. §1957, for a undisputed total offense level of 8.  Under the Sentencing Table, the SG range for a total offense level of 8 is, for a Category I criminal history, 0-6 months.  The PSR then calculates additional enhancements for specific offense characteristics, as follows:

- a 22-level enhancement for a loss of $20-50 million (¶ 38);
- a 4-level enhancement for more than 50 victims (¶ 38);
- a 2-level enhancement because the defendant misrepresented that he was acting on behalf of a charitable organization (¶ 38); and
- a 2-level enhancement because the offense involved sophisticated means (¶ 38).

Thus, the PSR calculates a 30-level enhancement for specific offense characteristics, to a total offense level of 37.  Under the Sentencing Table, an offense level of 37 has a sentencing range, for a Category I criminal history, of 210-262 months.  Just as in *Jordan* and *Munoz*, the loss sentencing enhancement calculated in the PSR is more than a 4-level enhancement and more than doubles the base offense level (with the lower range of 210 months being over 35 times the base

offense level top range of 6 months and the upper range of 260 months being over 43 times the base offense level top range of 6 months).

The PSR then calculates two additional upward adjustments as follows:

- a 2-level upward adjustment (1) for abuse of a position of public or private trust or (2) for use of a special skill in a manner that significantly facilitated the commission or concealment of the offense (¶ 41); and
- a 2-level upward adjustment for obstruction of justice (¶ 42).

Thus, the PSR calculates a total of upward enhancement or adjustment of 34 levels about the undisputed offense level of 8. According to the PSR, the total offense level is 42, with a sentencing range of 360 months to life. *See* PSR "Sentencing Recommendation."

Under these circumstances, there can be no question that the clear and convincing standard of proof must be applied to any uncharged or acquitted conduct adding more than four levels of enhancement from the base offense level of 0-6 months (to any level more than a level 10) that would also raise the top sentencing range above 12 months.[2]

### C.    The Government Must Meet Its Burden With Evidence That Is Specific And Reliable

The government's proof to meet its burden on any sentencing enhancement - whether by a preponderance or by a clear and convincing standard - must be based upon "reliable and specific evidence." *United States v. Bernardin,* 73 F.3d 1038, 1082-83 (11th Cir. 1996). Furthermore, due process protections apply at sentencing. *United States v. Hanna*, 49 F.3d 572, 577 (9th Cir. 1995). A sentencing court violates a defendant's due process rights by relying upon materially false or unreliable information at sentencing. *Id.* Such reliance on materially false or unreliable information constitutes an abuse of sentencing discretion as well. *Id.* In addition, the 2011 Guidelines require a sentencing court to consider only reliable information. SG § 6A1.3(a)

---

[2] The other Jordan factors weigh in favor of application of the clear and convincing proof standard – the PSR-proposed enhanced sentence (360 month) is longer than the maximum imprisonment on any one count of conviction (20 years for wire fraud); the massive proposed enhancement of offense levels negates the presumption of innocence and the government's burden of proof; and the PSR "facts' offered in support of the enhancement create new offenses requiring separate punishment. Jordan, 256 F.3d at 928. The final factor (the proposed increase is based upon the extent of the conspiracy) is not relevant here.

1   (sentencing court may consider relevant information without regard to its admissibility under the

2   rules of evidence applicable at trial, provided that the information has sufficient indicia of

3   reliability to support its probable accuracy).

4         The Ninth Circuit has held that "[a]lthough the 'court may adopt the factual findings of the

5   presentence report ...it may not ...adopt conclusory statements unsupported by facts or the

6   Guidelines.'" *United States v. Culps*, 300 F. 3d. 1069 (9th Cir. 2001) (holding that district court's

7   finding could not be sustained where PSR included conclusory statement without evidence of

8   factual underpinning.  Additionally, "when a defendant raises objections to the PSR, the district

9   court is obligated to resolve the factual dispute, and the government bears the burden of proof . . . .

10  The court may not simply rely on the factual statements in the PSR." *United States v. Shoewalter*,

11  569 F. 3d 1150, 1159-61 (9th Cir. 2009).

12      **D.**    **The Government Has Not Met Its Burden To Prove With Reliable And Specific Evidence That The Loss Exceeded $20 Million**

13          **1.**    **The Loss Established At Trial Was $2,216,974**

14        If the sentencing factor increase is based upon facts for which the defendant was charged

15  and convicted, the burden of proof remains preponderance of the evidence.  *Berger*, 587 F.3d at

16  1048-49; *accord, United States v. Treadwell*, 593 F.3d 990 (9th Cir. 2010).  That is not the case

17  here.  The wire fraud charges and convictions were for false pretenses wire fraud only, not scheme

18  wire fraud, as is plainly evidence from the jury instructions given requiring a material

19  misrepresentation or omission as an element of the charged wire fraud counts.  Tr. (Vol. 11)

20  at 1813-16.  No instruction on a scheme liability prosecution theory was given.  Thus, the only

21  arguable losses attributable to conduct upon which the defendant was convicted are for the counts

22  of conviction on wire fraud (Counts 1-14, 18), with a total loss figure of $2,216,974 for those

23  counts of conviction.

24        Wire fraud under 18 U.S.C. §1343 consists of two possible theories of liability – scheme

25  liability for a fraudulent scheme reasonably calculated to deceive persons of ordinary intelligence

26  (where no misrepresentation or omission need be proved) and false pretenses liability for

27  fraudulent material misrepresentations or omissions.  *United States v. Halbert*, 640 F.2d 1000,

28

1007 (9th Cir. 1980). [3]   An examination of the jury instructions makes clear that Mr. Cohen was convicted on false pretenses liability and the jury was not instructed on scheme liability.  For example, the Court instructed the jury that the second element of wire fraud is that "the *statements made or facts omitted* as part of the scheme were material."  Tr. at 1813-14 (emphasis added).  Since statements or omissions are not an element of scheme liability, this instruction makes clear that the jury was instructed on false pretenses liability.

Similarly, the Court only referred to false pretenses liability and did not mention scheme liability in instructing the jury on criminal intent:

> In determining whether or not the government has proven beyond a reasonable doubt that the defendant acted with an intent to obtain money or property *by means of a false or fraudulent pretenses, representations, or promises*, or whether the defendant acted in good faith, the jury must consider all the evidence in this case on the defendant's state of mind.

Tr. at 17815-16 (emphasis added).

Finally, the Court did not give the jury an instruction on scheme liability or otherwise refer to the multiple theories of wire fraud.  Instead, it simply gave an instruction on false pretenses liability as the sole required theory supporting the wire fraud counts.  Thus, the government is incorrect to argue that the evidence supports conviction based on a scheme liability theory because the Court did not instruct the jury that Mr. Cohen's actions could constitute a scheme to defraud even if there are no specific false statements or omissions involved.  To the contrary; the Court instructed that the jury was *required* to find that there were "statements made or facts omitted."  Tr. at 1814.  Since the government never sought a jury instruction on scheme liability, it waived its right to rely on such a theory and the convictions were for specified false pretenses made to the enumerated investor/victims.  *See*, e.g., *United States v. Cronic*, 900 F.2d 1511, 1515 n. 3 (8th Cir. 1990).

---

[3] The mail fraud and wire fraud statutes share identical language regarding the scheme requirements, so the wire fraud statute is read in light of the case law on mail fraud.  *Carpenter v. United States*, 484 U.S. 19, 25 n.6 (1987); *United States v. Louderman*, 576 F.2d 1383, 1387 n.3 (9th Cir. 1978).

Thus, the amount of loss established by the enumerated counts of conviction is only $2,216,974. A loss figure of that amount would result in an upward enhancement for loss of only 16 levels under SG §2B1.1(b)(1)(I). A level 8 plus this 16-level upward adjustment for loss results in a level 24 under the Sentencing Table, with a range of 51-63 months. These are the only sentencing factors subject to a preponderance of the evidence standard. All other upward enhancement or upward adjustment calculations in the PSR (another 18-levels) are based upon facts for which the defendant was not charged or convicted, or was charged and acquitted. As such, government must meet the clear and convincing evidence standard of proof for any such additional upward enhancements or adjustments, as they increase the offense level another 18 levels and raise the sentencing range to 360 months to life instead of 51-63 months. Any such upward enhancements or adjustments, beyond the 16-level increase for a loss of $2,216,974, must be based upon reliable and specific evidence proving the predicate facts by clear and convincing evidence. *E.g., Hopper, supra; Meza de Jesus, supra; Jordan, supra; Munoz, supra.* All such additional upward enhancements or adjustments are combined for these burden of proof issues. *E.g., Jordan*, 256 F.3d at 928-29 (must combine all sentencing enhancements for Restrepo "extremely disproportionate effect" analysis purposes).

### 2. No Proof Whatsoever Has Been Presented By The Government Regarding Additional Loss From Relevant Conduct

The 22-level enhancement for loss of more than $20 million but less than $50 million is completely unsupported by any evidence in the PSR. As discussed above, the highest possible loss on the fraud counts of conviction is $2,216,974 (assuming that the money amounts in the wire fraud counts of conviction all count as loss). The PSR fails to specify whatsoever of what specific victims suffered what specific amount of loss, or any explanation of how it reached a determination that "there are 94 victims and the total loss is estimated to be more than $30,000,000. PSR ¶ 24. Instead, it simply states that "[t]he information regarding loss was obtained from the IRS case agent, the AUSA, and the victims." PSR Addendum at Objection No. 3.

The only documentation that the government has disclosed to the defense at the time of this sentencing memorandum is a 7 page document that simply lists 97 names with amounts next to them.  Nearly all of the people named on the list are unknown to the defense and were not the subject of testimony or evidence adduced at trial.  Although the PSR states that 12 Victim Impact Statements have been provided to the probation officer, no such information has been provided to the defense and it is unclear what if any monetary loss is substantiated based on each of those statements.

In sum, the "evidence" provided by the government to the defense, and also relied on in the PSR, is all inadmissible hearsay that is completely unsubstantiated.  Such documentation fails to prove any such loss by a preponderance of the evidence, let alone by the required clear and convincing evidence standard.  To simply repeat what the case agent and the AUSA "indicates" as the number of alleged victims and the amount of loss without specification of who the alleged victims are, what proof is there for each alleged victims' loss was, and how such evidence was specific and reliable is simply no proof of the number of victims or the amount of loss whatsoever under either standard of proof.

### 3. The Government Cannot Prove Any Loss Based On The Original Investment Of $6.2 Million In Ecast Shares

The government cannot prove by clear and convincing, and specific and reliable, evidence that any false pretenses were made by Mr. Cohen in regards to the "first tier" investors' original investment in Ecast.  Since Mr. Cohen was not convicted of any counts relating to the original share purchases, the government must prove the predicate facts by clear and convincing evidence.

The government cannot do so because Ms. Warren was the only witness who testified that Mr. Cohen made representations about an imminent Ecast/Microsoft transaction prior to the original purchase of shares, and Ms. Warren's testimony was contradicted by every other person who was present at her two interactions with Mr. Cohen.  Ms. Warren's claim that "Mouli, Stacy, myself, Danny, and Hari" had a "business discussion" is contradicted by the testimony of Mr. Glover and Mr. Dillon.  Mr. Glover testified that that he "*never discussed Microsoft with Mr. Cohen*" at the dinner or lunch, Tr. (Vol. 8) at 1479:13-1480:5, and even Mr. Dillon did not

corroborate Ms. Warren.  Tr. (Vol. 3) at 542, 545-46 (Dillon).  Ms. Warren "was mostly on her cell phone to the side" during discussions.  *Id*. at 552:18-553:2 (Dillon).

The government has also argued that Mr. Mills' testimony supports the inference that Mr. Cohen misrepresented that Microsoft was going to purchase Ecast, but Mr. Mills emphasized that he did not recall Mr. Cohen stating that an acquisition was imminent or that Ecast and Microsoft were in active negotiations.  Tr. (Vol. 2) at 316:22-24 (Mills) ("And I can't remember if they were in active negotiations or, I think, Microsoft was just beginning to -- to check it out.").  Instead, Mr. Mills testified that Mr. Cohen talked about various possible exit strategies for an investor, such as an IPO or a takeover by a company.  Tr. (Vol. 2) at 375:13-20 (Mills).  Mrs. Mills' testimony corroborates this point, as she testified that Mr. Mills did not discuss Microsoft with her and simply stated that "*whatever company* was acquiring [Ecast] would -- would give back shares one-on-one for the Ecast stock."  Tr. (Vol. 6) at 1116:15-20 (M. Mills) (*emphasis added*).  Thus, Mr. and Mrs. Cohen's testimony simply establishes that Mr. Cohen pitched the various exit strategies such as a potential acquisition, *see* Tr. (Vol. 2) at 375:13-20 (Mills), in a manner that is standard lawful business practice for technology entrepreneurs who are seeking to obtain investment in privately held companies.  Tr. (Vol. 8) at 1538-40 (McAulay).

The assertions that Ms. Warren and Mr. Mills' testimony constitutes clear and convincing evidence is not only contradicted by the testimony discussed above, but also is implausible in light of Mr. Dillon's testimony that he negotiated with a financial institution a loan agreement clause that allowed him not to pay principal or interest until after an IPO of Ecast occurred.  Tr. (Vol. 3) at 555:22-556:8 (Dillon).  Mr. Dillon testified that he negotiated this clause in the loan he used to purchase Ecast shares because Mr. Cohen would "often" speak of an IPO as a potential exit strategy for investors in Ecast.  *Id*.; *see also* Tr. (Vol. 4) at 791-92 (Dillon) (Mr. Cohen "made it clear that an IPO was a possibility.").  Mr. Dillon also testified that Mr. Cohen spoke of Qwest as well as Microsoft as potential acquisition partners for Ecast.  Tr. (Vol. 3) at 534-38 (Dillon).  Susana Moore similarly testified that Mr. Dillon "didn't mention Microsoft at the beginning" when the investors originally purchased their Ecast shares and her deposition testimony indicated that she considered the initial investment in Ecast to be no more or less risky than the previous

26

1   venture capital investments that the Dillon Group had made in other startup companies.  Tr. (Vol.

2   5) at 1048:2-9, 1092-94 (Moore).  Clearly – at the very minimum – Ms. Moore and Ms. Glover's

3   original investments cannot be counted as loss.

4         Statements by Mr. Cohen regarding potential exit strategies, such as an IPO or acquisition,

5   are unsurprising and not fraudulent because it is standard practice for technology entrepreneurs to

6   "typically pitch the IPO option as one exit, and then another likely exit was acquisition by a large

7   technology business."  Tr. (Vol. 8) at 1538-40 (McAulay).  Numerous witnesses at trial testified

8   that Mr. Cohen's pitches in this regard were no different than those normally used to pitch

9   privately held companies.  For example, Mr. Petras testified as follows:

10        Q. All right. And in the course of your conversations with Mr. Cohen, with respect
          to Ecast -- and let's focus on your conversations first in connection with your
11        purchase of Ecast shares from Ecast -- did you discuss potential exit strategies with
          Mr. Cohen?
12        A. I think it's -- well, I do not recall, but I -- it would not be uncommon for
          entrepreneurs to discuss exit strategies as part of an investment pitch.
13        Q. All right.  You're an entrepreneur yourself; is that right?
          A. Yes.
14        Q. And you've run Silicon Valley companies?
          A. Yes.
15        Q. And as -- when you pitch people to gauge their interest or try to elicit their
          interest in your companies, you discuss exit strategies?
16        A. Commonly.
          Q. Okay. And did Mr. Cohen's discussion of exit strategies seem out of the
17        ordinary to you?
          A. No.  It seemed quite within the normal range of conversations.
18        Q. Okay.  Did he ever tell you that, for example, there was some guarantee that
          there was going to be an IPO or a takeover of the company?
19        A. No.  You know, I would -- I would say he presented a very broad picture of
          potential success, as any entrepreneur would.
20   Tr. (Vol. 7) at 1347:21-1348:21 (Petras); *see also* Tr. (Vol. 8) at 1538-40 (McAulay).

21        There is nothing unlawful or improper about such an investment pitch, which likely

22   explains the reason that Mr. Cohen was not charged by the government or convicted of any counts

23   relating to these initial investments.

24        Most importantly, Ms. Warren and Mr. Mills' testimony cannot be considered reliable in

25   light of the post-trial revelations that Mr. Dillon in fact was presented with and signed declarations

26   and release agreements stating that Mr. Cohen never had made these exact representations prior to

27   the investment in Ecast.  Mr. Dillon was the leader of the investment group and states in his

28   declaration that "Cohen never represented that Ecast was about to be acquired or would be

27

acquired within any specific period of time or was imminently going to do an initial public offering." *See* Exs. 531A & 532A. It is now undisputed that forensic analysis establishes that Mr. Dillon signed these documents and stating that Mr. Cohen never made any of the core false representations upon which the government's case is based. *See* Declaration of David S. Moore ("Moore Decl."). In light of the post-trial emergence of this undisputed forensic evidence, the government cannot meet a burden to demonstrate by clear and convincing evidence that Mr. Cohen made false representations to the investors prior to their investment in Ecast.

### 4. The Government Cannot Prove Any Additional Loss Based On Mr. Dillon's Interactions With The "Second-Tier" Investors

The PSR states that Mr. Cohen was paid approximately $25-30 million (on top of the original investment) towards alleged fees and costs. PSR ¶ 15. Leaving aside a number of the initial investors who purportedly received direct representations by Mr. Cohen (e.g., Mr. Mills, Mrs. Mills, and Ms. Moore), who will be addressed in a subsequent section, the government has failed to meet its burden to substantiate that loss amount. This is particularly true in regards to loss suffered by second tier investors who never had any contact with Mr. Cohen and solely had contact with Mr. Dillon.

First, any evidence that is solely based on Mr. Dillon cannot be considered reliable for the purposes of determining sentencing loss. There is now no dispute that Mr. Dillon lied to the jury and swore the precise opposite of his testimony at trial on an earlier occasion where he had no motivation to lie. Moore Decl.; *Maxwell v. Roe,* 628 F.3d 486, 512 (9th Cir. 2010) ("the finders of fact were deprived of the fundamental inference that if the government informant lied about X, Y, and Z, it is quite likely that he lied about Q, R, and S."). Mr. Dillon's lies concern the precise representation about the Ecast/Microsoft transaction that the government would need to prove was authored by Mr. Cohen in order to prove loss in regards to the second tier investors. Since it is now undisputed that Mr. Dillon was presented with and signed documents warranting that Mr. Cohen did not author those representations, there is no evidence that Mr. Cohen was the source of Mr. Dillon's representations to the second tier investors.

Second, the government has failed to prove loss in regards to the second tier investors for the reasons discussed in Mr. Cohen's acquittal motion, which is currently pending before the Court.  Since Mr. Cohen did not specifically intend Mr. Dillon to make false pretenses to the investors, he cannot be held criminally responsible because "the Ninth Circuit has held that a necessary element of a valid conviction for mail fraud is the intent to obtain money or property *from one who is deceived*."  *United States v. Di Girolamo*, 808 F. Supp. 1445, 1450 (N.D. Cal. 1992) (emphasis in original); *see also United States v. Lew*, 875 F.2d 219, 221 (9th Cir. 1989) (reversing conviction because defendant's "intent must be to obtain money or property from the one who is deceived.").  Not only was there no testimony or documentary evidence (circumstantial or otherwise) that suggested that Mr. Cohen intended Mr. Dillon to deceive the second tier, but the evidence indicated that Mr. Cohen believed that the first tier was the "whole group."  Tr. (Vol. 4) at 682:7-684:14 (Dillon).

Third, the government cannot rely on proof of loss from the second tier investor absent evidence that each investor received a false pretense that was enumerated in the Indictment.  *Lew*, 875 F.2d at 221; *Halbert*, 640 F.2d at 1007; Debra Carfora, United States v. Newmark:  Semantics and Misrepresentation in Mail and Wire Fraud, Does It Really Matter Who Was Deceived?, 60 Cath. U. L. Rev. 779, 790-97 (Spring, 2011) ("The Ninth Circuit boldly went one step further than the Second Circuit and extended the limitations of McNally to require a direct misrepresentation to the intended victim of a scheme to defraud to sustain a conviction for mail fraud.").  No such evidence has been provided to the defense or discussed in the PSR because, as described *infra*, the only documentation that has been disclosed in a summary list of 97 names with amounts listed next to each name.  Such evidence does nothing to prove whether false representations were made to these individuals.

### 5. Any Alleged Loss By The "First-Tier" Investors Does Not Prove Loss Over $20 Million

Absent proof of loss to the second tier investors, the government has failed to adduce specific and reliable evidence that the losses suffered by the first tier investors exceeded $20 million.  The PSR does not even engage in a calculation that distinguishes between the amounts

contributed by the first tier investors and those contributed by the second tier investors – it instead simply asserts that "the original investors and secondary investors" paid approximately $25-30 million.

There is thus no clear and convincing, and specific and reliable, evidence that the first tier investors' contributions and the counts of conviction exceed $20 million.  In fact, the government argued in a recent brief that "[m]ost, if not all, of this money came from the 'second tier' investors to pay for the bonds and fees.  Govt. Resp. to Mot. for New Trial and Acquittal at 9.  Mr. Dillon similarly testified that the money was "primarily the second tier folks' money" that was going to Mr. Cohen for payment of bonds and fees."  Tr. (Vol. 4) at 692 (Dillon).

Nor has there ever been any proof of loss by the first tier investors that distinguishes (1) between funds used in the initial investments (which is not properly included in the loss calculation) and funds used for payment of "bonds and fees"; (2) between funds provided by investors to Mr. Cohen directly and those provided explicitly to Mr. Dillon as loans for his personal purposes; (3) and between funds that were purportedly provided for the payment of bonds and fees and those that Mr. Dillon sought to obtain and steal from the investors.  Mr. Dillon was not a co-schemer of Mr. Cohen's, but ran his own independent scheme where he stole money that he skimmed from investments that he represented would be deposited with Mr. Cohen.  Since the government maintains that there are two independent criminal activities, they must distinguish and trace each dollar of purported loss resulting from Mr. Cohen as opposed to Mr. Dillon.  Ms. Moore and Ms. Segal both made payments solely to Mr. Dillon and there has been a complete. But the government does not make any showing that the first tier victims lost is attributable to Mr. Cohen as opposed to the independent fraud of Mr. Dillon.  Absent such evidence, there is no specific and reliable proof of loss.

The PSR also does not discuss whether the alleged representations by Mr. Cohen were made after the payments were made and the crime completed by Mr. Dillon.  For example, Ms. Moore testified that no false representations were made prior to her initial investment in Ecast.  Tr. (Vol. 5) at 1048:2-9, 1092-94 (Moore).  Ms. Moore did not meet Mr. Cohen or have any contact with him until 2005, meaning that any payments or loans that she made to Mr. Dillon prior to that

30

1  date should not properly be considered loss.  Similarly, Ms. Moore testified that *she did not recall*

2  *Mr. Cohen even mentioning Microsoft at the meeting*.  Tr. (Vol. 5) at 1105:3-5 (Moore) (emphasis

3  added).  Ms. Moore further testified that she needed to meet with Mr. Cohen in 2008 because she

4  had never received any representations from him directly about the Ecast/Microsoft deal.  In her

5  words, the purpose of the December 2008 meeting was to get Mr. Cohen "to repeat what he'd said

6  [about the Ecast/Microsoft transaction] *only to Mr. Dillon* in the presence of other people."  Tr.

7  (Vol. 5) at 1109:5-13 (Moore) (*emphasis added*).  Indeed, after the investors discovered that there

8  was no Ecast/Microsoft deal in 2008, they met with a lawyer and "decided that we wanted to

9  approach Mr. Cohen and that we wanted to have *someone other than Hari present* as he discussed

10  the deal."  Tr. (Vol. 5) at 1063:7-14 (Moore) (*emphasis added*).  Obviously, Mr. Cohen cannot be

11  held responsible for loss prior to December 2008 in regards to Ms. Moore (and she suffered no

12  loss thereafter).

13       Further, in regards the other first tier investors such as Mr. Mills, Mrs. Mills, and Ms.

14  Segal, there would have been no need to make a record of Mr. Cohen's culpability in December

15  2008 if Mr. Cohen had previously made comments about the Ecast/Microsoft transaction to

16  investors other than Mr. Dillon prior to that date.

17       As discussed above, in their initial meeting, Mr. Mills testified that Mr. Cohen discussed

18  various possible exit strategies for an investor.  Tr. (Vol. 2) at 375:13-20.  In 2004, Mr. Cohen met

19  with Mr. Dillon, Mr. Mills, and two executives of Procinea in order to discuss the Procinea

20  company story and investment opportunity.  Tr. (Vol. 2) at 394:19-395:8 (Mills).  The

21  presentation and subsequent documentation provided to Mr. Mills explained Procinea's

22  proprietary software, which would provide investors in the film industry with a methodology for

23  ensuring steady returns and minimizing risk by combining projected blockbusters and higher risk

24  projects into a basket of investments.  Tr. (Vol. 2) at 396:24-399:11 (Mills).  Neither Mr. Dillon

25  nor Mr. Mills testified that Mr. Cohen mentioned the Ecast/Microsoft transaction or his

26  willingness to provide a gift of Procinea interest in exchange for payment of bonds and fees, as

27  would be expected if those representations originated with Mr. Cohen.  The evidence about the

28

Sentencing Memorandum
Case No. CR-10-0547 CRB

1   meeting consistently indicated that Mr. Cohen described Procinea as a legitimate business

2   enterprise.

3          Mr. Mills was "quite interested" in Procinea and had conversations with Mr. Dillon and

4   Mr. Glover about his desire to invest.  Tr. (Vol. 2) at 405:11-406:4 (Mills).  After the meeting with

5   Mr. Cohen, however, Mr. Dillon told Mr. Mills that Mr. Cohen would provide both Mr. Dillon and

6   Mr. Mills with an "in-kind" interest in Procinea if Mr. Mills was willing to pay for bonds and fees

7   associated with the Ecast/Microsoft transaction.  Tr. (Vol. 2) at 321:24-323:25 (Mills).  Although

8   Mr. Dillon maintained that Mr. Cohen was providing Procinea as a gift related to the

9   Ecast/Microsoft transaction, Mr. Dillon's correspondence to Mr. Cohen does not mention this

10  connection between Ecast and Procinea and simply states that "Sam and I and Danny would love

11  to be able to invest in Procinea toward the end of the first quarter [of 2005]."  Id.; Ex. 672.

12         Thus, Mr. Dillon's own testimony was that he told Mr. Mills about the bonds and fees and

13  that Mr. Cohen did not directly discuss the matter with Mr. Mills.  Tr. (Vol. 3) at 611:18- (Dillon).

14  Similarly, Mr. Mills testified that Mr. Dillon told him about the bonds and fees.  Tr. (Vol. 2) at

15  362:4-6 (Mills) ("Q. Mouli brought up bonds -- not Hari Dillon -- was the first one who brought it

16  up? A. No, I heard it from Hari Dillon.").  Mr. Cohen pitched him directly on an investment in

17  Procinea in 2004, but Mr. Dillon later told Mr. Mills that Procinea would be provided as an in-

18  kind payment for the payment of bonds and fees.  Tr. (Vol. 2) at 322:2-323:13 (Mills).  Mr. Mills

19  also testified that he first heard about Mr. Cohen from Mr. Dillon, see Tr. (Vol. 2) at 311 (Mills),

20  and that he never discussed his Ecast investment with Mr. Cohen.  Tr. (Vol. 2) at 441:8-17

21  (Mills).[4]  As a result, there is no clear and convincing, and specific and reliable evidence, to

22  support loss for Mr. Mills because Mr. Dillon's veracity is not credible in light of the expert

23  forensic report that Mr. Dillon signed the declarations and releases.  Mr. Mills credibility is also

24  _____

25  [4] Q. By the way, while these are being marked, let me ask you, did you ever receive any e-mails
    directly from Mr. Cohen; do you recall?
    A. I don't recall if I did or not.
26  Q. And did you ever, yourself, contact him directly to discuss any Ecast investment?
    A. Could you repeat that, please.
27  Q. Yes. My question is, did you yourself ever call up Mr. Cohen to discuss your Ecast investment?
    A. No, I never did.
28

32

undermined by the supplemental expert declaration from Mr. Moore establishing that he falsely

indicated that he did not sign Exhibit 643 when there is no doubt that he did sign that agreement,

which indicated that he was making an investment rather than a payment of bonds and fees related

to the nonexistent Ecast/Microsoft transaction.  See Further Moore Decl.

Similarly, Ms. Segal invested based on her relationship with Mr. Dillon.  Although she

attended the 2005 meeting with Mr. Cohen, she did not recall Mr. Cohen ever mentioning either

Microsoft, the European Union, or bonds and fees, and then gave ambiguous answers after

repeated attempts by the prosecution to "refresh her recollection."  Tr. (Vol. 6) at 1184-6 (Segal).

Mr. Dillon filed bankruptcy claiming $11 million in personal loans from Ms. Segal, but

maintained on the witness stand that he had been untruthful in the bankruptcy filing and the

correct number was $5-6 million.  Tr. (Vol. 4) at 778-80 (Dillon).  As a result, it is unlikely that a

significant amount of her loss is attributable to Mr. Cohen instead of Mr. Dillon.

The PSR, of course, discusses none of these objections, which were made by the defense to

the draft PSR, and provides no evidence to substantiate its loss calculation.

### 6. There Is Insufficient Evidence To Determine Which Funds Were Lost Due To Mr. Dillon's Independent Scheme As Opposed To Mr. Cohen's

As relevant here, under SG Section 1B1.1, relevant conduct includes (1) all acts or

omissions committed or willfully caused by the defendant that occurred during the commission of

the offense of conviction, or (2) to all acts or omissions described in (1) that were part of the same

course of conduct or common scheme or plan as the offense of conviction.  Thus, relevant conduct

here can only be for acts Mr. Cohen personally committed or willfully caused to be done because

the government concedes that Mr. Cohen was not part of any conspiracy or joint venture with Mr.

Dillon.   Relevant conduct must be based upon criminal conduct.   Haines, Bowman & Woll,

Federal Sentencing Guidelines Handbook 2011-12 Edition) at 176 & n. 10 (and cases cited

therein).  A defendant's own conduct that occurred during the commission of the offense of

conviction is relevant conduct.  *Id*. & n. 11. The "willfully caused" liability is limited to cases in

which the defendant willfully causes someone else to commit the offense of conviction.  Id. & n

18.  Likewise, relevant conduct can be other acts that are part of the same course of conduct or

common plan or scheme as the offense of conviction, provided that the defendant either personally committed the act or willfully caused it to be done (Section 1B1.3(a)(2)(incorporating element that acts must be personally committed by the defendant or willfully caused to be done by inclusion of language "described in (1)").   Thus, relevant conduct, for purposes of sentencing of Mr. Cohen, can lawfully only include acts Mr. Cohen personally committed or willfully caused to be done. There is no evidence that Mr. Cohen willfully caused Mr. Dillon to make any false representations to any investor, or willfully caused Mr. Dillon's personal theft of investor monies as part of Mr. Dillon's own, separate criminal conduct in committing the theft of investor monies.   The PSR and the government pay no heed to these distinct limitations on what relevant conduct can include in regard to Mr. Cohen's sentencing.  *US v. Sterling*, 210 F.3d 1020 (9th Cir. 2000) ("By the plain language of § 1B1.3, specific offense characteristics are determined by all acts and omissions committed . . . or willfully caused by the defendant. Willfully modifies caused, not committed. The guideline thus holds a defendant responsible for his own acts, and for the acts of others that he willfully causes them to commit.").

Proof of loss under Section 2B1.1 requires that actual loss be the "reasonably foreseeable pecuniary harm that resulted from the offense.  SG 2B1.1, Application Note 3(A)(1).  Application Note 3(b)(iv) states that reasonably forseeable pecuniary harm means "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known was a potential result of the offense."  (emphasis added).  A defendant's offense must have, at minimum, been a cause-in-fact of the economic harm at issue in the loss calculations.  Guidelines Handbook at 333.  A loss that resulted from a defendant's offense is one that would not have occurred but for the occurrence of the offense.  *Id.* at 334.  Proof of loss requires both cause-in-fact and legal causation – the proximate cause of the loss.  Id. & nn. 43-44 (and cases cited therein).  Thus, neither the PSR nor the government have offered any proof that any loss resulting from the independent theft crimes of investor money by Dillon were either caused-in-fact or proximately caused by Mr. Cohen.  As such, any Dillon-caused loss to investors is not loss for which Mr. Cohen is legally responsible under the Guidelines in computing loss.  *United States v. Berger*, 587 F.3d 1038, 1046

(9th Cir. 2009) (reversing loss calculations and remanding for determination of how much loss was "actually caused" by the defendant's fraud).

The government's position is that Mr. Dillon was an innocent dupe and that his independent criminal acts are not attributable to Mr. Cohen.  The evidence of loss is insufficient because the loss figures provided by the government do not distinguish between individuals that provided funds pursuant to Mr. Dillon's independent scheme to defraud and retained by Mr. Dillon for his own benefit, and funds that were allegedly secured and delivered to Mr. Cohen at his direction of Mr. Dillon.  Mr. Cohen can only be held criminally responsible under § 2(b) for loss that occurred as a result of his "purposeful direction," and cannot be held liable for any acts of fraud by Mr. Dillon because the government contends that Mr. Dillon was an "unwitting dupe" rather than a knowing participant in Mr. Cohen's fraudulent scheme.  *Berlin*, 472 F.2d at 15.  All funds that were given to Mr. Dillon, and especially those funds that were given for personal loans, cannot be attributed to loss caused by Mr. Cohen, but appear to be included on the government's summary of loss.[5]  In regards to other investors, there is insufficient evidence to make a determination that Mr. Cohen caused their loss because the government does not distinguish between loans that Mr. Dillon obtained for his own pecuniary purpose and those he obtained for Mr. Cohen.

This is no small matter because the government's post-trial disclosures indicate that there was $12 million that was obtained by Mr. Dillon and not passed on to Mr. Cohen.  In 2002, Mr. Dillon was nearly broke because of losses in the financial market.  *Id.*  Mr. Dillon had massive credit card debt, money due to the IRS and state franchise tax board, and was spending thousands of dollars on audiovisual equipment.  Tr. (Vol. 4) at 767-75 (Dillon).  Mr. Dillon also lived in a penthouse and retained a personal driver.  Tr. (Vol. 6) at 1088 (Moore).  Although he only drew a salary of $74,000 a year from his job at the Vanguard Foundation, he lived a lavish lifestyle and had significant family expenses, including private school tuition for numerous relatives.  Tr. (Vol. 4) at 767-75 (Dillon).  Mr. Dillon admitted needing millions of dollars that he obtained from

---

[5] Mr. Mills is the only investor that paid funds directly to Mr. Cohen besides Mr. Dillon.

donors in order to finance his lifestyle.  Tr. (Vol. 4) at 725, 778-80 (Dillon).  As a result, he needed to be able to convince wealthy donors, who were seeking to invest in Vanguard, to instead invest in venture capital projects.

The essence of Mr. Dillon's fraudulent scheme was assigning Ecast shares owned by the Dillon or Glover Groups to new investors at inflated prices.  Tr. (Vol. 4) at 724-26 (Dillon).  Mr. Dillon then "stole" their money and used it pay personal expenses, including American Express bills.  *Id*.  Part and parcel of Mr. Dillon's scheme was that he informed secondary investors that they were required to write checks to him personally, instead of to Mr. Cohen.  Tr. (Vol. 5) at 895-96 (Dillon).  Although Mr. Dillon conveniently claimed that Mr. Cohen only wanted funds to come from himself, Mr. Mills, or Mr. Glover, Mr. Dillon's explanation is implausible because he could have had checks made out to the Dillon Group or Glover Group and deposited in segregated accounts.  The effect of having checks made out to Mr. Dillon personally was that he was able to divert funds for his own personal gain.  *Id*.

Mr. Dillon's scheme, unlike Mr. Cohen's, was a Ponzi-scheme.  As former investors requested return of their investment capital, Mr. Dillon recruited new investors to pay out people who wanted their money back.  Tr. (Vol. 5) at 898-99 (Dillon).  Mr. Dillon also assigned more shares than he owned.  Tr. (Vol. 5) at 1011:14-17 (Dillon).  While Mr. Dillon estimated at trial that he stole approximately $2.5 million in investor funds, *see* Tr. (Vol. 4) at 724-26 (Dillon), the government made a post-trial disclosure to the defense on March 26, 2012, which clearly indicates that Mr. Dillon was responsible for approximately *$12.5 million* in losses.  Of course, there was no evidence that this conduct of Mr. Dillon's was known to Mr. Cohen, much less that it occurred at his direction.

While Mr. Dillon testified that the representations to the enumerated victims originated from Mr. Cohen, he did not testify as to nearly all of the victims listed by the government.  While the PSR does not identify any trial evidence that bears on Mr. Dillon's dealings with these uncharged victims, and the defense has found none, any evidence that is based on Mr. Dillon would lack credibility not only in light of his perjury regarding the declarations and release agreements, but also because of: (a) compelling need to avoid significant criminal sentence

through a cooperation agreement; (b) lack of documentary evidence; and (c) numerous independently made false representations regarding the Ecast/Microsoft deal that Mr. Dillon acknowledged were not attributable to Mr. Cohen.  For example, Mr. Dillon falsely told Mr. Mills that he had met with lawyers at Wilson Sonsini who confirmed the Ecast/Microsoft transaction. Tr. (Vol. 2) at 448:1-12 (Mills); Tr. (Vol. 3) at 476:16-477:2 (Mills).  Mr. Dillon also testified that he sent emails recounting personal meetings with attorneys from Fenwick and West, where Mr. Dillon "fired questions" at the lawyers about the Ecast/Microsoft deal.  Tr. (Vol. 4) at 800 (Dillon).  Such meetings were completely invented by Mr. Dillon and no evidence indicated that they were made at the direction of Mr. Cohen.  *Id.*

> **7.     The PSR Does Not Include Rely On Losses Resulting From Any Other Relevant Conduct And No Evidence Has Been Submitted Substantiating Such Loss**

The PSR only asserts loss resulting from the original and secondary investors who paid the original investment and alleged fees and costs associated with the transaction.  No other evidence is presented in the PSR seeking to predicate loss calculations based on any other alleged misconduct by Mr. Cohen.  Nor has any other evidence been presented by the government, outside a list of names on a document as described above.  As such, no enhancement for loss is warranted. There is a total failure of sufficient specific and reliable proof on this loss enhancement – under either proof standard.

### E.     Number of Victims

Mr. Cohen objected to the draft PSR's 4-level enhancement because it provided no evidentiary support for its conclusion that "the offense involved more than 50 victims."  While the draft PSR asserted that it relied on "information provided by the case agent," the final PSR states that "a detailed victim list . . . reveals that there are . . . 70 victims pertaining to the indicted scheme and a total of 94 victims, if victims relating to relevant conduct are considered."  PSR Addendum at ¶ 9.

The applicable guideline (SG § 2B1.1—defines victim as "any person who sustained any part of the actual loss determined under subsection (b)(1) . . . ."  "Actual loss" is defined as "the

1    reasonably foreseeable pecuniary harm that resulted from the offense."  *Id.* (application note

2    2(A)(i)).

3        The PSR is insufficient because it simply relies on a list provided by the government, but

4    does not conduct any analysis of whether and on what basis the relevant conduct should be

5    included.  Nor does the PSR detail how each alleged victim suffered "reasonably foreseeable

6    pecuniary harm that resulted from the offense," as is required by the guideline.  Thus, the

7    enhancement is inappropriate because there is *no evidence* supporting its application.  *Shoewalter*,

8    569 F. 3d at 1159-61; *United States v. Foley*, 508 F.3d 627, 633-34 (11th Cir. 2007) (reversing

9    district court decision that did not "did not attempt to connect the number of victims to the loss

10   calculation that it made, and it did not 'establish the factual basis for its Guidelines

11   calculations.'"); *United States v. Arnaout*, 431 F.3d 994, 999 (7th Cir. 2005) (reversing decision

12   below applying enhancement because district court failed to trace dollar loss to each specific

13   victim).

14       The Ninth Circuit's decision in *Shoewalter* is controlling as it was decided on nearly

15   identical facts to those presented here.  *Shoewalter*, 569 F. 3d at 1159-61.  In *Shoewalter*, the

16   probation officer relied on a list of names that was obtained from the bankruptcy trustee.  The

17   Ninth Circuit reversed the application of a four level enhancement for more than 50 victims

18   because "[i]t is impossible to determine from the record whether the probation office ever inquired

19   into the accuracy of the victim list or of the individual dollar amounts associated with the names

20   on the list.  Essentially, it appears that the probation office said there were 117 victims because the

21   bankruptcy trustee said so, without any explanation as to how the trustee came up with this

22   number. This does not justify a conclusion that the government met its burden of establishing that

23   there were 50 or more victims."  *Id.*

24       Similarly, here the probation officer has simply relied on the AUSA for a list of 94 names

25   of purported victims.  It is clear from the record that the probation office has made no efforts to

26   inquire into the accuracy of the victim list because the "Probation Officer's Response" to Mr.

27   Cohen's objection on this issue is that "[t]he government provided the defendant with a detailed

28   victim list which includes victims names and amounts."  PSR "Addendum" ¶ 9.  As in Shoewalter,

38

1    the probation officer's failure to ascertain the accuracy of the list indicates the insufficient nature

2    of the evidence.

3         While Mr. Cohen intends to dispute the number of victims, the PSR provides no

4    substantiation of why each individual is properly considered a victim.  Such lack of specificity in

5    the PSR of the date of each alleged amount of loss to each victim, and what specific evidence

6    supports the victim and loss determinations, means that no enhancement for the number of victims

7    is appropriate.  Thus, this entire discussion of the number of alleged victims and alleged loss, and

8    the 4-level enhancement for the number of alleged victims is not appropriate (or at least the

9    reference to 94 alleged victims and $30 million in loss statements).  Without such statements,

10   there is no basis for this enhancement.

11        **F.        Charitable Organization Enhancement**

12        Mr. Cohen objects to the "2-level enhancement, pursuant to 2B1.1(b)(9)9A), because the

13   Defendant misrepresented that he was acting on behalf of a charitable organization."  The PSR

14   provides no evidence, let alone specific and reliable evidence, to support application of this

15   enhancement, which is inapplicable given the factual circumstances presented here.  Mr. Cohen

16   was not a direct representative of a charitable organization, was not an agent of a charitable

17   organization, and did not represent that the money that he obtained from victims would directly

18   benefit charitable organizations.  The fact that the victims planned to use the proceeds of the

19   investment scheme to benefit a charitable organization does not support application of the

20   enhancement because Mr. Cohen was acting for private pecuniary gain.

21        SG § 2B1.1(b)(9)(A) states, in pertinent part:

22        If the offense involved . . . a misrepresentation that the defendant was acting on
          behalf of a charitable, educational, religious, or political organization, or a
23        government agency . . ., increase by 2 levels.

24        The Application Notes to SG § 2B1.1(b)(9)(A) clarify that:

25        Subsection (b)(9)(A) applies in any case in which the defendant represented that the
          defendant was acting to obtain a benefit on behalf of a charitable, educational,
26        religious, or political organization, or a government agency (regardless of whether
          the defendant actually was associated with the organization or government agency)
27        when, in fact the defendant intended to divert all or part of that benefit (e.g., for the
          defendant's personal gain).  Subsection (b)(9)(A) applies, for example, to the
28        following:

                                              39

(i) A defendant who solicited contributions for a non-existent famine relief organization.

(ii) A defendant who solicited donations from church members by falsely claiming to be a fundraiser for a religiously affiliated school.

(iii) A defendant, chief of a local fire department, who conducted a Public fundraiser representing that the purpose of th[e] fundraiser was to procure sufficient funds for a new fire engine when, in fact, the defendant intended to divert some of the funds for the defendant's personal benefit.

SG § 2B1.1, Application Note (2011).

The plain language of the guideline and the application note make clear that Mr. Cohen's conduct does not fall within the scope of SG § 2B1.1(b)(9)(A). First, the plain language of the guideline requires "a misrepresentation that the defendant was acting on behalf of a charitable . . . agency." Pursuant to a literal interpretation of the guideline, a defendant may be subject to enhanced punishment if he either falsely claims to be a representative of the organization, *i.e.,* falsely claims that he has the capacity to act as an agent or employee of the organization, or if he falsely claims to act in the interest of or for the benefit for the organization. Here, Mr. Cohen did neither. He did not falsely claim to be an agent or employee of a charitable organization. Nor did he represent that the funds that investors paid him would be used for the benefit of a charitable organization. Instead, according to some of the investors, Mr. Cohen represented that the funds would be used either for his private gain (in the case of the Ecast stock purchases) or for a variety of costs and expenses related to the Ecast/Microsoft transaction.

Second, Application Note 7 further indicates that Mr. Cohen's conduct does not fall within the parameters of the guideline. The commentary notes that the guideline applies where the "defendant represented that the defendant was acting to obtain a benefit on behalf of a charitable . . . organization, . . . when, in fact the defendant intended to divert all or part of that benefit (e.g., for the defendant's personal gain)." Similarly, the interpretive examples all involved defendants who diverted funds from a charitable organization after they "solicited contributions," "solicited donations," or held a "fundraiser" on behalf of a charitable organization. Here, in contrast, Mr. Cohen did not act on behalf of a charitable organization and did not divert any benefit that he represented would be obtained on behalf of a charitable organization. While the investors may

40

have hoped to use the gains from their investment to benefit the Vanguard Foundation, this does not bring Mr. Cohen's conduct within the scope of the guidelines.[6]

Finally, the Ninth Circuit's recent application of this guideline in *United States v. Treadwell*, 593 F.3d 990, (9th Cir. 2010) further clarifies that it does not apply here.  In *Treadwell*, the defendants "solicited loans while representing that the money would be invested, in part, in projects serving humanitarian aims." *Id*. at 1007.  The defendants further admitted that their "purpose in describing their companies' investments as 'humanitarian' was to entice investors to loan money on the basis of 'generosity and charitable motives' within the meaning of the Guidelines commentary." *Id*. at 1006.  The court noted that "[m]ost of the circuit court cases interpreting SG § 2B1.1(b)(8)(A) [the predecessor guideline to the current § 2B1.1(b)(9)(A)] involve defendants misrepresenting that they were acting as direct agents of specific charities," but held that it was sufficient that defendants "represented that loans to the investment companies would benefit humanitarian projects and therefore be 'in the interests of' those projects." *Id*. at 1008.  Notably here, unlike *Treadwell*, Mr. Cohen did not represent that the funds obtained from investors would benefit charitable organizations; instead, the funds were purportedly meant to compensate Mr. Cohen for the sales of Ecast shares or to pay for bonds and fees related to the Ecast/Microsoft transaction.

### G.      Sophisticated Means Enhancement

Mr. Cohen objects to the "2-level enhancement, pursuant to §2B1.1(b)(10)(C), because the offense involved sophisticated means."  The PSR does not provide any evidentiary basis, let alone one based upon specific reliable evidence, for its conclusion that Mr. Cohen's offense involved sophisticated means, and indeed there is no legitimate basis in the PSR for reaching such a conclusion.

---

[6] The vast majority of the investors were the secondary investors in Dillon's independent scheme that had no contact with Mr. Cohen and did not plan to donate any of their proceeds to the Vanguard Foundation.  Tr. (Vol. 5) at 895-96 (Dillon).  Those investors invested solely for private pecuniary gain.

**H.      Adjustment For Role In The Offense**

Mr. Cohen objects to the 2-level enhancement, which the PSR asserts is applicable under SG § 3B1.3, "as the defendant abused a position of public or private trust" by "claim[ing] he was the CEO of Ecast, but, in truth, he was forced out of Ecast (except as a figurehead title) by October 1, 2002, and forced out altogether by mid-2003." This enhancement is not applicable because Mr. Cohen was involved in an arms-length commercial transaction with the investors and did not abuse a fiduciary or discretionary relationship with them. *United States v. Technic Servs., Inc.*, 314 F.3d 1031, 1048 (9th Cir. 2002) ("To support the abuse of trust enhancement, a position of trust . . . must be established *from the perspective of the victim*"), *overruled on other grounds by United States v. Contreras*, 593 F.3d 1135, 1136, (9th Cir. 2010) (en banc) (per curiam) (citation omitted).

SG § 3B1.3 provides that the enhancement applies if the defendant "abused a position of public or private trust." Application of the enhancement requires a two-part test: "First, did the defendant hold a 'position of public or private trust' within the meaning of the Guidelines? Second, if so, did the position 'significantly facilitate' the commission of the crime?" *United States v. Contreras*, 581 F.3d 1163, 1165 (9th Cir. 2009).

In determining whether the defendant held a position of trust within the meaning of the guideline, there must be a showing that the defendant exercised a position of trust *with the victim* of the offense of conviction. *Technic Servs., Inc.*, 314 F.3d at 1048; *United States v Guidry*, 199 F3d 1150 (10th Cir 1999) ("Our case law clearly states the position of trust must be found in relation to the victim of the offense.") *United States v. Ghertler*, 605 F.3d 1256, 1264 (11th Cir. 2010) ("relationship of trust between the defendant and the victim is the *sine qua non* of the abuse-of-trust enhancement."). Since "there is a component of misplaced trust inherent in the concept of fraud . . . a sentencing court must be careful not to be overly broad in imposing the enhancement for abuse of a position of trust or the sentence of virtually every defendant who occupied any position of trust with anyone, victim or otherwise would receive a section 3B1.3 enhancement . . . for the abuse-of-trust adjustment to apply in the fraud context, there must be a showing that the victim placed a special trust in the defendant beyond ordinary reliance on the defendant's integrity

and honesty that underlies every fraud scenario."  *Ghertler*, 605 F.3d at 1264 (internal citations omitted).

Pursuant to these settled principles, the guideline is inapplicable because Mr. Cohen did not represent that he was in a position of trust *vis a vis* the alleged victims of his fraud.  That Mr. Cohen allegedly represented that he was the CEO of Ecast after he no longer held the position is immaterial because his role at CEO did not create duties of trust and confidence with the investors. *See*, e.g., *United States v. Broderson*, 67 F.3d 452, 455-56 (2d. Cir. 1995) (rejecting government's argument "that anyone with professional or managerial discretion -- which [defendant] had as a high executive at Grumman -- occupies a position of public or private trust," because "the discretion must be entrusted to the defendant by the victim.").

The PSR relies on Application Note 3, but it does not alter this conclusion.  SG § 3B1.3 Application Note 3 states:

> This adjustment also applies in a case in which the defendant provides sufficient indicia to the victim that the defendant legitimately holds a position of private or public trust when, in fact, the defendant does not. For example, the adjustment applies in the case of a defendant who (A) perpetrates a financial fraud by leading an investor to believe the defendant is a legitimate investment broker; or (B) perpetrates a fraud by representing falsely to a patient or employer that the defendant is a licensed physician. In making the misrepresentation, the defendant assumes a position of trust, relative to the victim, that provides the defendant with the same opportunity to commit a difficult-to-detect crime that the defendant would have had if the position were held legitimately.

Application Note 3 does not eliminate the requirement that there be a relationship of trust between the defendant and the victims.  The historical commentary makes clear that it is merely designed to resolve a circuit split and clarify that a defendant who entices a victim to grant the defendant discretionary authority based on misrepresentations is no less culpable than a defendant whose discretionary authority has been legitimately conferred.  SG §3 B1.3, Historical Notes, Amendment 580.  And Application Note 3 itself emphasizes that a relationship of trust "relative to the victim" is a prerequisite to application of the guideline.  Unlike the examples cited in Application Note 3, which are based on cases cited in the historical commentary, a CEO does not assume a direct relationship of trust with potential investors.  *See*, *e.g.,* SG § 3B1.3, Historical Notes, Amendment 580; *United States v. Gill*, 99 F.3d 484 (1st Cir. 1996) (defendant posing as

licensed psychologist subject to enhancement because "in real life terms, [the defendant] occupied

a position of trust relative to his counseling patients, and that [the defendant] took advantage of the

patients' reliance on his claimed status as a psychologist to further his fraud scheme"); *United*

*States v. Queen*, 4 F.3d 925, 929 (10th Cir. 1993) (holding that defendant posing as licensed

investment advisor/broker subject to enhancement because he was "entrusted with the

discretionary authority to manage the assets of his or her clients through the application of

specialized knowledge.").

In regards to the second prerequisite to application of the enhancement, the PSR fails to

provide evidence that Mr. Cohen's CEO position 'significantly facilitated' the commission of the

crime. *Contreras*, 581 F.3d at 1165. Application Note 1 reads as follows:

> For this adjustment to apply, the position of public or private trust must have
> contributed in some significant way to facilitating the commission or concealment
> of the offense (e.g., by making the detection of the offense or the defendant's
> responsibility for the offense more difficult). This adjustment, for example, applies
> in the case of an embezzlement of a client's funds by an attorney serving as a
> guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse
> of a patient by a physician under the guise of an examination.

Here, there is no evidence that the purported representation that Mr. Cohen was the CEO

of Ecast "significantly facilitated" the commission of the crime. First, there is no evidence in the

record that substantiates the assertion in the PSR that "[t]he defendant claimed he was the CEO of

Ecast." In fact, both Mr. Mills and Mr. Dillon testified that they were aware that Mr. Cohen was

not the CEO of Ecast. Tr. (Vol. 2) at 358:12-359:78, 360:18-20 (Mills) ("Q. So very early on in

your involvement in these investments you learned he was no longer the executive director of

Ecast? A. Yes."); Tr. (Vol. 4) 788:13-25 (Dillon).

Second, any belief by the investors that Mr. Cohen was the CEO of Ecast did not make

detection of the offense more difficult. As the investors acknowledged, there were many sources

of information available to them that easily would have allowed them to detect the fraud. For

example, Mr. Mills testified that the fraud was easily detectible by making a phone call to the

offices of Ecast.[7]  Similarly, Mr. Dillon testified that he was told by Mr. McKay that Mr. Cohen was no longer the CEO of Ecast.  And, after early-2003, Mr. Cohen's name no longer appeared on website of Ecast as an employee or board member.  Tr. (Vol. 4) at 1568-71 (McAulay), Ex. 725.

There is no evidence, let alone specific and reliable evidence, demonstrating that this adjustment for abuse of position of public or private trust is appropriate.

## I.        Adjustment For Obstruction Of Justice

Mr. Cohen objects to the 2-level enhancement under SG § 3C1.1, which is based on the theory that Mr. Cohen "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice" by (1) "provid[ing] false documents to the SEC and at trial" and (2) "l[ying], under oath, at his deposition before the SEC."  ¶ 42.  Notably, the government did not consider any of Mr. Cohen's actions important enough to charge criminally.

### 1.        Allegedly Forged Documents

The PSR asserts that Mr. Cohen "forged witness signatures on multiple documents he introduced at trial" and produced to the SEC.  ¶ 26-7.  This information is based upon unspecified information that is "according to the AUSA."  ¶ 26.  The PSR fails to specify what particular documents were forged, or any of the evidence supporting that assertion.  The PSR simply makes bald conclusions on these points.  The PSR fails to provide any evidence, let alone specific and reliable evidence, to support the conclusion that Mr. Cohen "created numerous fraudulent documents and "forged witness signatures."  ¶ 27.

The defendant is left to guess as to what specific documents the PSR is referencing. Assuming they are three documents introduced in trial, a defense handwriting expert has now

---

[7] *See* Tr. 361:5-16:  Q. And at any point in time between 2003 through 2008, is it true that you had the ability to pick up the phone and call somebody from Ecast and ask about this? Is that correct? A. That's correct.
Q. And is it your understanding now that if you had done so you would have learned that this scheme that you say he was perpetrating was not true?
A. Yes.
Q. So a part of this scheme that you're saying he employed was dependent upon neither you or any of the investors picking up and calling anybody at Ecast; is that fair?
A. That's fair.

concluded that the signatures on documents in question are Hari Dillon's.[8]  The exhibits with

disputed original signatures in the name of Mr. Dillon are Exhibit Nos. 531A (Declaration of Hari

Dillon re Dillon Group 2003), 532A (Declaration of Hari Dillon re Glover Group 2002), and 537A

(Release Agreement).  The government repeatedly argued that the signatures on these documents

were "forged signatures, copied signatures."  Tr. at 870:14-22; *see also* Tr. at 2019:11-2028:5.

Despite the government's arguments at trial, however, there is insufficient evidence to

support application of the enhancement here because the government did not introduce any

evidence regarding the authenticity of Mr. Dillon's signature.  After Mr. Cohen retained new

counsel for post-conviction proceedings, counsel consulted with David S. Moore, a forensic expert

and former director of the American Board of Forensic Document Examiners with over thirty

years of document and investigative experience.  Moore Decl., ¶¶ 2-5.  Mr. Moore's experience

includes assignments with the Crime Laboratories of the United States Army, the United States

Postal Inspection Service, the Las Vegas Metropolitan Police, and the California Department of

Justice.  *Id.*  Based on a forensic examination of the trial exhibits containing disputed signatures of

Mr. Dillon and comparison of those signatures to known and acknowledged signatures of Mr.

Dillon, Mr. Moore concludes that Mr. Dillon wrote the questioned signatures on each exhibit.

Moore Decl., ¶¶ 7-8, Ex. 1.

Pursuant to the American Society of Testing Materials International standards, Mr.

Moore's identification of Mr. Dillon's signatures is "the highest degree of confidence expressed

by document examiners in handwriting comparisons."  *Id.*  Mr. Moore has "no reservations

whatever, and although prohibited [by professional standard guidelines] from using the word

'fact,' I am certain, based on evidence contained in the handwriting, that the Mr. Dillon actually

wrote the writing in question on Exhibit Nos. 531A, 532A, and 537A."  *Id.*  In reply to the

---

[8]  The Court's finding, in denying release of the questioned exhibits, that Dillon did not deny
signing the documents but instead admitted he did, is clearly erroneous.  If not clearly erroneous,
then that finding itself disproves that the defendant forged any documents or created fraudulent
documents.  As such, any reference to forged or fraudulent documents is flatly contradicted by this
Court's finding that Dillon admitted signing the documents.

1   government's response brief, which argued that Exhibit 643 also contained forged signatures, Mr.

2   Dillon submitted a further declaration establishing that the signatures of Mr. Dillon and Mr. Mills

3   on that document are not forged.  Further Declaration of David S. Moore, ¶¶ 10-14.

4       Thus, there is no evidence that supports an enhancement for obstruction of justice based on

5   Mr. Cohen's having "forged witness signatures" or "created numerous fraudulent documents."

6                   **2.      Alleged Cohen Perjury In SEC Deposition**

7       The PSR asserts that a 2-level adjustment is appropriate for the defendant's alleged perjury

8   in a SEC deposition.  ¶ 28.  Where the government seeks an enhancement under SG § 3C1.1 based

9   on alleged perjured testimony, it bears the burden of proving by a preponderance of the evidence

10  "that the defendant (1) willfully (2) materially (3) committed perjury, which is (a) the intentional

11  (b) giving of false testimony (c) as to a material matter."  *United States v. Zagari*, 111 F.3d 307,

12  329 (2d Cir. 1997).  The government must therefore prove all of the elements of the enhancement

13  plus all of the elements of perjury under the federal definition.  *See United States v. Ben-Shimon*,

14  249 F.3d 98, 102 (2d Cir. 2001) (*citing United States v. Dunnigan*, 507 U.S. 87, 95 (1993)).  In a

15  case like this, where the government alleges that the perjury was committed in a separate civil

16  proceeding, it must prove that the perjury was material both to the criminal case and to the civil

17  proceeding in which the testimony was given.  *See Zagari*, 111 F.3d at 329.  Moreover, the

18  government must prove that the defendant acted "'with the willful intent to provide false

19  testimony, rather than as a result of confusion, mistake, or faulty memory' – i.e., that the defendant

20  committed perjury rather than simply providing false testimony."  *Id.* (*quoting Dunnigan*, 507

21  U.S. at 94).  "[T]he court should be cognizant that inaccurate testimony or statements sometimes

22  may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or

23  statements necessarily reflect a willful attempt to obstruct justice." SG § 3C1.1, Application Note

24  2.

25      The government must also establish that the defendant's answers were literally false in

26  response to the questions asked; answers which are merely non-responsive, incomplete, or literally

27  true yet misleading, are insufficient to constitute perjury, and thus to trigger application of the

28  enhancement.  *See Bronston v. United States*, 408 U.S. 352, 358-59 (1973).  In such

47

circumstances, "it is the lawyer's responsibility to recognize the evasion and to bring the witness back to the mark, to flush out the whole truth with the tools of adversary examination." *Id*. In addition, a defendant's denial of guilt is insufficient to trigger the enhancement unless the denial itself constitutes perjury under oath. *See* SG § 3C1.1, Application Note 2.

As an initial matter, the PSR, *see* ¶ 28, does not cite to specific and reliable evidence – such as deposition record references outlining the specific question asked and the answers given. The PSR simply purports to summarize testimony, in totally conclusory fashion, without any evidence to support its bald characterizations. The statements in the PSR are without any evidentiary support, let alone sufficient specific and reliable evidence to support findings on each element of perjury for each allegedly perjurious statement under oath.

Further, none of the testimony mentioned in the PSR constitutes perjury. None of the testimony was false because a determination of falsity would be based entirely on the testimony of Mr. Dillon, which lacks any credibility in light of his perjury in regards to his signature on the disputed exhibits.

Finally, the probation department appeared to concede that Mr. Cohen's objection to this aspect of the PSR is correct. Although Mr. Cohen objected to the enhancement for obstruction of justice based on SEC perjury, the probation officer did not dispute those objections and just relied on Mr. Cohen's use of fraudulent documents to substantiate the enhancement. See PSR Addendum ¶¶ 16-17.

The government's brief cites a number of allegedly false statements by Mr. Cohen in his SEC deposition, none of which constitute perjury under oath

### a.      Stock Sales To Mr. Dillon

The government has identified the following testimony regarding stock sales to Mr. Dillon:

Q: Eventually you and Mr. Dillon had a discussion about purchasing eCast
shares, is that correct?
A: Correct.
Q: Okay. When did you have that discussion with Dillon?
A: Sometime in the fall of 2007 (sic).
Q: Did you offer to sell shares to Mr. Dillon?
A: I'd been asked by him.
Q: So he broached the subject, right?

48

A: Correct.

\*\*\*

Q: Had there been any discussion about – you know, did you say anything to him to indicate that you had a willingness to sell your stock before – sell stock before he spoke to you?

A: No.

\*\*\*

Q: The – did he talk to you about how much number [sic] of shares he was interested in purchasing?

A: He gave some indication.

Q: What did he say in that regard?

16

A: That he would like to buy a block of shares. He didn't indicate how big it was, but big enough that it would be meaningful to him.

Q: And did he tell you an approximate amount of money he wanted to spend?

A: It was in the millions of dollars.

\*\*\*

Q: Did you have any understanding that his investment was on behalf of Vanguard in any way?

A: No.

None of these statements constitute perjury. First, the only evidence that Mr. Cohen's statements are false is the testimony of Mr. Dillon. But Mr. Dillon's credibility is nonexistent because post-conviction handwriting analysis demonstrates that he signed declarations and releases confirming that Mr. Cohen made no false representations about an Ecast acquisition, which is the opposite of Mr. Dillon's trial testimony. *See* Moore Decl.

Second, Mr. Cohen's statements that Mr. Dillon reached out to him to buy the Ecast shares are not clearly contradicted by Mr. Dillon's testimony at trial. Mr. Dillon met Mr. Glover at an event held on behalf of the Camp Okizu charity at Mr. Dillon's home on August 25, 2002. Tr. (Vol. 3) at 528:21-529:7 (Dillon); Tr. (Vol. 8) at 1477:21-1478:8 (Glover). At that event, Mr. Cohen and Mr. Glover did not discuss any potential acquisition of Ecast. Tr. (Vol. 8) at 1477:21-1478:8 (Glover). On August 27, Mr. Cohen had lunch at the Omni hotel with Mr. Glover, Mr. Dillon, Ms. Warren, and Ms. Pucinelli. At the lunch, Mr. Glover and Mr. Dillon discussed Vanguard Foundation and Mr. Cohen discussed his general desire to contribute to philanthropic causes. Tr. (Vol. 3) at 529:8-531:18 (Dillon). At the lunch, Mr. Cohen did not discuss any potential acquisition of Ecast.

1    Mr. Dillon testified that at a subsequent lunch involving solely himself and Mr. Cohen, Mr.

2    Cohen for the first time discussed the possibility of offering the opportunity to purchase shares in

3    Ecast.  Tr. (Vol. 3) at 534-38 (Dillon).  According to Mr. Dillon, Mr. Cohen stated that Ecast "was

4    a strong startup that both Microsoft and Qwest, the company Qwest, were interested in."  Id.  Mr.

5    Dillon was very excited about the possibility of purchasing Ecast shares because he had previously

6    coordinated investments by a small circle of Vanguard donors and was interested in "leveraging

7    their assets by investing in some of the tech startups that were coming -- going public around that

8    time."  Tr. (Vol. 3) at 538-39 (Dillon).

9    Third, Mr. Cohen's statement that he did not have an understanding that the investment

10   was on behalf of Vanguard is taken out of context.  At numerous other points in the deposition,

11   Mr. Cohen indicated that the "opportunity would probably benefit them and benefit their own

12   foundation."  Depo. at 47.  Mr. Cohen also indicated that he understood Mr. Dillon to be talking

13   about the Ecast investment benefiting Vanguard, *id*. at 50, and understood that it could benefit the

14   foundation by "having the financial freedom and able to get an exit return that he expects, he can

15   help his own foundation."  *Id*. at 53.

16              **b.    Selling Shares After Leaving Ecast**

17   The government contends that Mr. Cohen committed perjury when he stated that he did not

18   sell Ecast shares after leaving Ecast:

19   Q: Did you sell [Ecast] shares after leaving eCast?
     A: No.
20   ***
     Q: I think you previously said – I think I asked you if you ever sold shares
21   after leaving eCast, and you said no. Is that correct?
22   A: Correct.
     Defendant's Attorney: Are you sure of that?
23   A: I'm sure.

24   Presumably, the government contends that Mr. Cohen's testimony was false because he

25   sold shares after leaving Ecast.  But Mr. Cohen was actively involved in actively raising funds for

26   Ecast throughout 2003.  Disputes over the amounts of the financing led to litigation and Ecast

27   eventually settled the lawsuit with Mr. Cohen and paid him several hundred thousand dollars.  Tr.

28   (Vol. 1) at 125:19-126:7 (Taylor).  However, as a result of this dispute over Ecast financing, Mr.

Cohen stepped away from active involvement with Ecast.  Tr. (Vol. 8) at 1554:22-1555:13 (McAulay).  Insofar as the government contends that Mr. Cohen sold Ecast shares in 2003, it was the duty of the examiner to clarify the vagueness of the phrase "leaving eCast."

To the extent the government believes that Mr. Cohen's answer was evasive, even if literally true, the answer cannot sustain a charge of perjury, since it was the examiner's responsibility "to flush out the whole truth with the tools of adversary examination."  Bronston, 408 at 358-59.  The examiner did not further clarify.

Statements about this subject also cannot constitute perjury because they are neither material to the civil nor criminal proceedings.

### c.  Misrepresentations Regarding Acquisition

The government contends that Mr. Dillon denied making false representations about the Ecast/Microsoft transaction.  None of Mr. Cohen's statements were false because their falsity depends on the credibility of Mr. Dillon, as discussed above.  Even assuming, *arguendo*, that Mr. Cohen's statements constituted perjury, his answers to these questions essentially amounts to nothing more than a general denial of wrongdoing.  It is the Department of Justice's policy not to prosecute in such circumstances because such denials do not meaningfully obstruct or impede the government's investigation.

### 3.  Mr. Ettinger

The government argued to the probation department that Mr. Cohen should receive an obstruction of justice enhancement for the independent activity of a third party, Mr. Ettinger.  For good reason, the probation department did not adopt the government's argument in the PSR.

In regards to the initial declaration that Mr. Ettinger submitted, there is no evidence that Mr. Ettinger's statements in that declaration were false, much less that he (1) willfully (2) materially (3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter.  While Mr. Ferrell's testimony at trial was that he did not understand the risks of the Ecast transactions, no evidence was introduced describing his interaction with Mr. Ettinger in great detail, or proving that Mr. Ettinger committed perjury when he claimed that Mr. Ferrell stated that he had enough money to make the Ecast investment.  Nor is there any evidence

51

supporting the government's bold assertion that Mr. Cohen knowingly caused the submission of any false information from Mr. Ettinger.

In regards to the declaration that Mr. Ettinger submitted in connection with post-bail proceedings, the declaration was drafted based on conversations that solely occurred between counsel and Mr. Ettinger.  *See* Declaration of Lyn R. Agre at ¶¶ 2-6.  Mr. Cohen was not informed about the contents of the declaration and was not involved in its preparation.  *Id.*  Thus, he cannot be held responsible for an obstruction of justice enhancement based on its contents.  *Id.*

### J.     Tax Evasion Base Offense Level

There is no specific or reliable evidence presented in the PSR to support the "more than $7 million" loss figure stated and the 26 base offense level.  *See* ¶ 45.  As the tax evasion loss calculation is dependent on the fraud loss calculation, the more than $7 million loss amount must be inaccurate if the Court finds Mr. Cohen's objections to the fraud loss calculation persuasive.

### K.     Tax Evasion (Sophisticated Means Enhancement)

Mr. Cohen objects to the "2-level enhancement, pursuant to §2B1.1(b)(10)(C), because the offense involved sophisticated means."  The PSR does not provide any evidentiary basis, let alone one based upon specific reliable evidence, for its conclusion that Mr. Cohen's offense involved sophisticated means, and indeed there is no legitimate basis in the PSR for reaching such a conclusion.

### L.     The PSR Sentencing Recommendation

The defense objects to the Guidelines range of 360 months to life found in the recommendations section, for all the reasons stated above.  The defense objects to the 360-month sentence recommendation, for all the reasons stated above.

The defense objects to the sentencing structure proposed on page 3 of the recommendations.  *First,* , the defendant notes that this proposed sentence is predicated upon a total offense level 42, with a sentencing range of 360 months to life and a 360-month total sentence actually being imposed.  That is an incorrect calculation of the Guidelines, both in terms of the total offense level and the sentencing range, for all the reasons stated above.  It presumes an total offense level with a sentencing range above the 20-year maximum sentence for wire fraud,

and the use of Guidelines Section 5G1.2(d) to impose this total punishment recommendation of 360 months by running 5-year sentences on each of the tax counts "consecutively."  Even assuming that a 360 month sentence were to be the final figure adopted by this Court, the proposed sentence structure is completely wrong in the recommendation.  As stated, 10-year consecutive sentences would be imposed on each of the money laundering counts, and all consecutive to the other fraud and tax counts.  Just on money laundering count sentencing alone, that would result in 11 consecutive sentences of 10 years each – a total of 132 years on just the money laundering counts, to be served consecutive to the 20-years concurrent sentences on the fraud and money laundering counts - for a total sentence of 152 years.  That is obviously not what was intended, but that is how the recommendation would be interpreted by the Bureau of Prisons.  The proposed sentence structure is wrong in how it structures any imposed consecutive sentences.

*Second,* it fails to acknowledge the appropriateness of *any* Section 3553(a) sentencing factors warranting a downward variance from whatever the correct total offense level and sentencing range is determined to be.  Indeed, the PSR does not even acknowledge and present to this Court the relevant factors and the information supporting those factors presented to the Probation Officer as objections to the proposed PSR.  It simply states that such factors may apply, but that the Probation Officer has not been given enough "verified" information to complete a Section 3553(a) analysis.  The Probation Officer was provided detailed analysis on Section 3553(a) sentencing factors and how they apply.  None of that is included in the PSR or recommendations.  Additionally, defense counsel does not understand the "verified" requirement.  No such concern was ever stated to defense counsel.  Indeed, the PSR accepts government information without question, without any apparent "verified" requirement.  Defense counsel should not be treated any differently, especially when the PSR accepts government calculations without the required specific and reliable evidence to support them, as discussed above.

*Third,* until the defense knows the total offense level and corresponding sentencing range, as determined by this Court at the conclusion of the hearing on April 24, 2012 to address and resolve those Guidelines application issues, the defense cannot further address this issue – either in terms of the total offense level, the appropriate corresponding sentencing range, or the propriety or

se

1   legality of imposing any consecutive sentences.  Once this Court makes the determination of total

2   offense level and the applicable sentencing range at the conclusion of the hearing on April 24th, the

3   defense may request to file a supplemental sentencing memorandum to address the issue of the

4   propriety or legality of any consecutive sentencing and the extend of downward variance

5   warranted by the applicable Section 3553 factors.  Without knowing the total offense level and

6   sentencing range that this Court will apply at the actual sentencing hearing, the defense cannot

7   further address these sentencing issues at this time.

8   **IV.    THE COURT SHOULD GRANT A SUBSTANTIAL DOWNWARD VARIANCE**

9       **A.    Legal Standards**

10         Following *United States v. Booker*, the Sentencing Guidelines are advisory only.  543 U.S.

11   220, 245 (2005).  Rather than relying on the guidelines, the Supreme Court has given judges the

12   power to impose sentences that are not greater than necessary to satisfy the statutory purposes of

13   sentencing, to consider *all* of the characteristics of the offender and circumstances of the offense,

14   to reject advisory guidelines that are not based on national sentencing data and empirical research,

15   and to serve their function in the constructive evolution of responsible guidelines.  *See Booker*,

16   543 U.S. 220; *Rita v. United States*, 127 S.Ct. 2456 (2007); *Gall v. United States*, 552 U.S. 38, 50

17   (2007); *Kimbrough v. United States*, 128 S.Ct. 558 (2007).  Although a district court "should

18   begin all sentencing proceedings by correctly calculating the applicable Guidelines range," the

19   court "may not presume that the Guidelines range is reasonable."  *Gall*, 552 U.S. at 50.

20         When the Commission fails to fulfill its institutional role, a district court can vary from the

21   guidelines "based on *policy* disagreement with them, and not simply based on an individualized

22   determination that they yield an excessive sentence in a particular case."  *Spears v. United States*,

23   129 S.Ct. 840, 843 (2009) (emphasis added).  The district court has the discretion to conclude that

24   the resulting advisory range "yields a sentence 'greater than necessary' to achieve §3553(a)'s

25   purposes, even in a mine-run case."  *Kimbrough*, 128 S.Ct. at 575 (2007).

26       **B.    The Loss Guidelines For Fraud Are Fundamentally Flawed**

27         As demonstrated by the probation department's guidelines calculation, the severity of the

28   sentence called for under the guidelines is almost entirely driven by the single enhancement for

loss.  The 22-level loss enhancement alone increases Mr. Cohen's base offense level sentence by a factor of approximately 20 — from 0-6 months to 97-121 months.  While some enhancement for loss is undeniably appropriate, the extreme enhancements contained in the loss table for §2B1.1 is unreasonable.  It is inconsistent with the guidelines as a whole and creates a sentence that is far greater than necessary to serve the policy needs of § 3553(a).

In *United States v. Adelson*, 441 F.Supp. 2d 506 (S.D.N.Y. 2006), the district court rejected the "utter travesty of justice that sometimes results from the Guidelines' fetish with abstract arithmetic" and granted the defendant a downward departure from a life sentence based on large actual losses, to 42 months imprisonment.  Similarly, in *United States v. Parris*, 573 F. Supp. 2d 744, 751 (E.D.N.Y. 2008), the district court noted that the Guidelines are appropriately criticized for "piling on points."  After reviewing sentences major fraud cases such as Enron, WorldCom, and Computer Associates where the amount of loss was over $1 billion, the court concluded that that the defendants' conduct was "simply not in the same league," and imposed sentences of 60 months "in the face of an advisory Guidelines range of 360 to life."  *Id*. at 753-54 (listing table of sentences in recent fraud prosecutions).

A survey of the enhancements in Sections 2A ("Offenses Against the Person") and 2B ("Basic Economic Offenses") of the Guidelines – excluding the loss chart at Section 2B1.1(b)(1) – demonstrates that there is no other enhancement in Section 2B of the Sentencing Guidelines that even approaches the 22 levels added for the alleged loss between $20-50 million.  Nor is there any enhancement under Section 2A that approaches a 22-level enhancement, and Section 2A deals with violent crime.  Indeed, there is no double-digit enhancement at all in Sections 2A or 2B.  The largest enhancements *anywhere* in the Guidelines appear to be:

| Enhancement | Points Added |
|---|---|
| Obstruction of justice related to terrorism (2J1.2(b)(1)(C)) | 12 |
| Felony involving or intending to promote terrorism (3A1.3(a)) | 12 |

| | |
|---|---|
| Willfully boarding an aircraft with a dangerous weapon or material without regard for the safety of human life (2K1.5(b)(1)) | 15 |
| Trafficking, receiving or possessing a portable rocket, missile, or launcher (2K2.1(b)(3)(A)) | 15 |
| Unlawfully entering or remaining in the United States after being convicted of certain major felonies (2L1.2(b)(1)(A)) | 16 |
| Bid-rigging or price-fixing, if the volume of commerce exceeds $1,500,000,000 (2R1.1 (b)(2)(H)) | 16 |

There is no reasoned analysis that supports application of a substantially greater enhancement for Mr. Cohen than for an arms trafficker, a felon intending to promote terrorism, or a bid rigger with a volume of commerce over *$1.5 billion*.  Instead, it is undeniable that the Sentencing Commission has dramatically increased sentences for fraud as a result of political pressure over the past 20 years.  These steady increases have been adopted without empirical support, without adequate consideration of the cumulative effect of overlapping enhancements, and despite research showing that shorter sentences provide adequate deterrence for white collar fraud offenders.  In fact, studies have shown no difference in deterrence for white collar defendants.  *See* Frank O. Bowman, III, *Pour encourager les autres?  The Curious History and Distressing Implications of the Criminal Provisions of the Sarbanes-Oxley Act and the Sentencing Guidelines Amendments That Followed*, 1 Ohio St. J.Crim. Law 373, 419 (2003-2004) ("A general increase in federal economic crime sentences might have been justifiable on deterrence grounds if there were evidence that existing penalties were failing to deter potential offenders.  One indicator of insufficiently stringent penalties for a class of crimes would be an increase in the general incidence of such crimes.  However, the available statistics show exactly the opposite trend for economic offenses."); David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995); Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8

56

Cardozo J. Conflict Resol. 421, 448-49 (2007) ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").

In light of the available evidence, there can be no reasonable dispute that the loss enhancement under § 2B1.1(b)(1) is not based on any empirical evidence showing that such severe an enhancement is warranted or, indeed, necessary. *See United States v. Cavera*, 550 F.3d 180, 192 n.9 (2d Cir. 2008) (*citing Kimbrough v. United States*, 552 U.S. 85 (2007)). The Guidelines have been increased substantially for twenty years for no given reason, and as such, should be given minimal weight in the § 3553(a) analysis. *See Spears*, 129 S.Ct. at 843.

Here, the loss calculation alone increases Mr. Cohen's base offense level sentence by a factor of approximately 20 — from 0-6 months to 97-121 months. The guidelines sentence suggested in the PSR incorporating the loss calculation and the other SOCs is at minimum a factor increase by 60 times, and up to an infinite increase at the top end, in Mr. Cohen's base offense level sentence — from 0-6 months to 360 months to life. As the loss enhancement is not supported by any empirical evidence, the Court should move directly to the § 3553 analysis to craft a sentence in this case.

### C. Section 3553(a)(1): Nature And Circumstances Of The Offense And History And Characteristics of Mr. Cohen

The PSR's recommendation of a 30 year sentence is excessive for a 53-year old first-time offender, who has a long history of selfless acts and entrepreneurial innovation. Mr. Cohen's strong moral character and leadership skills are attested to by numerous letters from friends and colleagues who have elected to vouch for his integrity to this Court. Such a lengthy sentence is unwarranted for an offense that caused no physical harm. It is unwarranted for a man who has already suffered greatly due to his prosecution and conviction and will be deprived as a result of his conviction of being ever again pursue his passion in venture capital and technology companies.

Numerous aspects of the nature and circumstances of the offense and the history and characteristics of Mr. Cohen should compel a substantial downward variance here. First, it is important to keep in mind circumstances that do not exist. Mr. Cohen emphatically is not a classic

conman.  He did not falsify Ecast, Procinea, or Voltage, companies with numerous employees, innovative products, and substantial successes in their own right.  Nor was Mr. Cohen completely lacking in good reason to be optimistic about and encouraged by the companies and their prospects.  No matter the Court's view of the transactions that occurred between Mr. Cohen and the investors who testified at trial, numerous letters from well respected experts in medicine, economics, and venture capital attest to Mr. Cohen's indisputably legitimate business talents.

Second, Mr. Cohen's documented devotion to philanthropic activities, giving time and money to a broad range of worthy causes, demonstrate his true character and show that his interest in charitable causes is genuine.  Although the government will likely highlight the unfortunate demise of the Vanguard Foundation as a result of the events of this case, Mr. Cohen's sustained and generous commitment to religious and charitable organizations around the globe are utterly inconsistent with the actions of someone who was trying to perniciously deceive potential investors into believing something that was not objectively true.  Numerous letters on behalf of the communities that have benefited from Mr. Cohen's efforts urge that the Court take that aspect of his character into account when delivering a just sentence.

Mr. Cohen's significant charitable works both before and after indictment are properly considered by the sentencing Court as a basis for downward variance under § 3553(a).  In *United States v. Tomko*, 532 F.3d 558, 560 (3d Cir. 2009), the appellate court upheld the district court's grant of a significant downward departure from 12 to 18 months imprisonment to one year of home confinement.  In so doing, the Third Circuit recounted Tomko's charitable acts, and stated the district court's reliance on this information as a basis for downward departure was "logical and consistent with the factors set forth in § 3553(a)."  *Id.* at 571-72.

Third, in considering the nature and circumstances of the offense, the Court may reasonable distinguish between Mr. Cohen's offense conduct here from the conduct of Mr. Dillon. Under the government's theory of the case, Mr. Cohen intended to deceive Mr. Dillon and other wealthy qualified investors in the first tier based on representations that they needed to pay bonds and fees to protect their initial investment in Ecast.  Mr. Dillon, however, independently embarked on a Ponzi scheme where he assigned Ecast shares owned by the Dillon Group and Glover Group

58

1   to new second tier investors at highly inflated prices and used the proceeds to buy out former

2   investors, fund his own luxury lifestyle, and make payments to Mr. Cohen.  Tr. (Vol. 4) at 724-26

3   (Dillon).  The government never presented evidence that Mr. Cohen intentionally directed Mr.

4   Dillon to embark on his own scheme, or that he was even aware of Mr. Dillon's activities.  And it

5   is now without dispute that the evidence presented by the government at trial was misleading

6   (although it did not, in the Court's view, rise to the level of *Strickland* prejudice) because Mr.

7   Dillon lied to the jury about signing the central exhibits in the case and the government seized on

8   Mr. Dillon's lies to inaccurately argue to the jury that Mr. Dillon had never seen and never signed

9   declarations attesting that Mr. Cohen never made the representations for which he was convicted.

10  Even assuming, *arguendo*, that the Court may yet determine that Mr. Cohen is legally responsible

11  for Mr. Dillon's actions, it should still nonetheless consider that nearly all of the victims

12  (excluding a mere handful) were directly defrauded by Mr. Dillon.

13       Fourth, Mr. Cohen is obviously distinct from the Enron and WorldCom defendants

14  because those defendants betrayed their own shareholders, employees, and resulted in crippling

15  damages to their companies with economic affects that ripple throughout the U.S. economy as a

16  whole.  There has been no credible allegation in this case that Mr. Cohen undermined the viability

17  of the companies he founded; to the contrary, Mr. Cohen's business colleagues attest in their

18  letters that these charges are utterly inconsistent with their dealings with a man who, in the words

19  of Professor Rausser, "left no question that this company [Procinea] was guided by the diligence,

20  support, and creativity of Mr. Cohen."  G. Rausser Letter.

21       Indeed, the Guidelines suggested sentence of 360 months to life is so severe that it

22  undercuts the policy goal of retribution and rehabilitation.  Thus the suggested guidelines sentence

23  is effectively a life sentence for a financial crime—a sentence "normally only seen in cases

24  involving major international narcotics traffickers, Mafia dons, and the like."  *Adelson*, 441

25  F.Supp. 2d at 509.

26       Fifth, Mr. Cohen understands that he has been convicted of serious crimes.  But the

27  evidence that emerged at trial was a one sided and selective portrayal of his life and his character.

28  The evidence established at sentencing casts substantial doubt on the government's portrayal of

him as a mastermind confidence man.  Rather the evidence establishes that Ecast, Procinea, and Voltage were well designed and well run businesses.  Unlike infamous fraudsters that have captured the national attention, Mr. Cohen did not conduct a Ponzi-scheme; instead, he is alleged to have made false representations in regards to securities investments in legitimate companies. No matter Mr. Cohen's loss amount, although undeniably substantial, it will pale in comparison to the fraudulent schemes in the hundreds of millions or even billions of dollars involving Enron, Worldcom, and others.  This analysis obviously does nothing to impeach the jury's verdict, but does provide greater context for the Court in reaching its sentencing decision in a case where the government and probation department is requesting a sentence that greatly exceeds those imposed on defendants with substantially greater loss amounts.

Finally, Mr. Cohen has led a good and productive life, and should be allowed the prospect of spending some time with his family and friends as an old man before his time on this earth expires.  As discussed herein, Mr. Cohen was born to a penniless family of immigrants in Israel, was able to immigrate to the United States through hard work, and establish a family in this country while remaining the primary supporter of his parents and extended family back in Israel. Mr. Cohen has stayed true to his heritage and provided compelling support for religious organizations that support thousands of Jews around the globe.  He has performed significant volunteer work while contributing substantially to a litany of religious, scientific, medical, and cultural foundations.  He has been a fantastic father, spouse, colleague, and friend.  Mr. Cohen's life has accomplished great things not only for his own family, but for numerous others as well. The Court should appropriately consider Mr. Cohen's children, who have provided letters detailing their adoration for their father, and not deprive them of the opportunity to spend meaningful time together post-incarceration.

The Ninth Circuit has endorsed the consideration of the foregoing mitigating factors as meriting leniency.  *See United States v. Ruff*, 535 F.3d 999, 1001 (9th Cir. 2008) (family support and business history are mitigating factors); *United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008) (court may properly consider defendant's attempt to lead a productive life and interests of defendant's children).

**D.      Section 3553(a)(2)(B) and (C):  Deterrence**

The sentence proposed by the probation department is not necessary to satisfy the relevant considerations of specific and general deterrence.  In regards to specific deterrence, there is no need for a lengthy sentence because Mr. Cohen is no longer in a position to commit a similar crime.  He has lost his reputation and, with it, the ability to raise funds for innovative startup companies.

While the government has contended at various points in the post-trial proceedings that there is $12.5 million in unaccounted for assets that, it presumes, Mr. Cohen has hidden away in offshore bank accounts, a preliminary analysis of the government's calculations shows that no such money exists.  *See* Ex. C.  In fact, the government overlooked expenses that were contained in its own wires database and did not account for significant legal fees, charitable contributions, and investment losses that were incurred by Mr. Cohen.  *Id.*  The preliminary analysis shows that there is well under $1 million unaccounted for – not the $12.5 million in funds that the government alleges.  *Id.*  This is true despite the fact that the preliminary analysis conducted by the defense does not include Mr. Cohen's living expenses, any checking information, or significant legal expenses that he paid to attorneys at Skadden Arps, LLP.  Based on this preliminary analysis, Mr. Cohen now has no financial ability that might allow him to return to a life of crime.

Further, Mr. Cohen is a 53-year old first time offender.  Both the age of an offender and his first offender status are powerful predictors of the likelihood of recidivism.  Indeed, the Sentencing Commission has itself recognized that (1) recidivism rates decline dramatically with age, and (2) first-time offenders are even less likely to reoffend than defendants with a limited criminal history who also fall within Criminal History Category I.  *See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* at Ex. 9 (May 2004) [hereinafter *Measuring Recidivism Report*], *available at* http://www.ussc.gov/research.htm; U.S. Sentencing Commission, *Recidivism and the "First Offender,"* at 13- 14 (May 2004) [hereinafter *First Offender Report*], *available at* http://www.ussc.gov/research.htm; *see also United States v. Hodges*, 2009 WL 36231, at *8

1    (E.D.N.Y. Feb. 12, 2009) ("post-*Booker*, courts have observed that recidivism is markedly lower

2    for older defendants" and collecting cases); *United States v. Sanchez*, 2007 WL 60517, at *4

3    (S.D.N.Y. Jan. 8, 2007) ("With regard to the necessity to protect society from future crimes of the

4    defendant, this Court and others have previously declined to impose lengthy Guidelines sentences

5    on older defendants in light of the Sentencing Commission's conclusion that '[r]ecidivism rates

6    decline relatively consistently as age increases.").

7         Mr. Cohen has no prior criminal history.  In fact, Mr. Cohen has dedicated his life to

8    charitable good works and serving his community.  Mr. Cohen's age and accomplishments make

9    recidivism extremely unlikely.

10        In this case, general deterrence will be satisfied by any sentence the Court imposes – a

11   significant or lengthy sentence is not necessary to further general deterrence principles.  As

12   discussed, *supra*, there is no evidence that the loss enhancement has any academic or evidentiary

13   support in further general deterrence.  To the contrary, "there is considerable evidence that even

14   relatively short sentences can have a strong deterrent effect on prospective 'white collar'

15   offenders."  *Adelson*, 441 F.2d at 514 (citing United States Sentencing Commission, *Fifteen Years*

16   *of Guidelines Sentencing* 56 (2004), for the proposition "that the Sentencing Guidelines were

17   written, in part, to 'ensure a <u>short but definite</u> period of confinement for a larger proportion of

18   these 'white collar' cases, both to ensure proportionate punishment and to achieve deterrence")

19   (emphasis in original); *see also* Peter J. Henning, White Collar Crime Sentences After Booker:

20   Was the Sentencing of Bernie Ebbers Too Harsh?, 37 McGeorge L. Rev. 757, 781 (2006) ("One

21   significant goal of the Sentencing Guidelines was to create a system in which white collar

22   offenders received 'short but definite periods of confinement' and moving away from sentences

23   that did not include at least some term of imprisonment.  They were largely successful in that

24   regard…") (*quoting* Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key*

25   *Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 22 (1988) (Justice Breyer noted that

26   "the Commission believed that a short but definite period of confinement might deter future [white

27   collar] crime more effectively than sentences with no confinement condition.").

28

**E.     Section 3553(a)(6):  The Need To Avoid Unwarranted Sentencing Disparities**

Section 3553 provides that the sentencing court shall consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  The attached affidavit of Herbert Hoelter, co-founder and CEO of the National Center on Institutions and Alternatives ("NCIA"), compellingly demonstrates that the probation department's recommendation in this case would create unwarranted sentencing disparities.

In order to avoid unwarranted sentencing disparities, the NCIA prepared a disparity analysis to determine how defendants similar to Mr. Cohen were sentenced in federal courts across the country, using a data collection maintained by the United States Sentencing Commission (USSC).  According to the instructions of the Guidelines Manual, Mr. Cohen is scored according to U.S.S.G. §2S1.1.  However, Mr. Cohen's offense conduct can best be described as a fraud offense.  Thus, NCIA research staff analyzed those cases in the USSC's dataset where the defendant was scored according to the Fraud guideline (U.S.S.G. §2B1.1, formerly U.S.S.G. §2F1.1).  The NCIA then conducted a comprehensive analysis of sentencing data for individuals in Mr. Cohen's loss category who did not receive a downward departure.

Of the 169 defendants nationally in Mr. Cohen's loss category of $20-50 Million, four defendants received a probationary sentence and 165 defendants received a term of imprisonment (average sentence imposed was 105.4 months).  In the Ninth Circuit, 35 defendants were in Mr. Cohen's loss category of $20-$50 Million.  Of these 35 defendants, 2 defendants (5.7%) were sentenced to a period of probation and the remaining 33 defendants (94.3%) were sentenced to a term of imprisonment (average sentence imposed was 104.8 months).  Of the four defendants in the Northern District of California within Mr. Cohen's loss category, the average sentence imposed was 69.3 months.

In light of this comprehensive statistical data, there is no dispute that a 360 month sentence would create significant sentencing disparities.  A sentence within the range of 69-105 months would further the goals of the sentencing statute and avoid an unnecessary sentence that is disproportionately long.

1    **V.     Conclusion**

2          We appreciate the Court's consideration of the points raised in this Memorandum and

3    respectfully request a fair, just, and proportionate sentence.

4    DATED:  April 20, 2012              KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

5                                        By:    /s/ Marcus S. Topel_____
                                                Marcus S. Topel
6                                               Counsel for Defendant
                                                SAMUEL COHEN

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28