1  MELINDA HAAG (CABN 132612)
   United States Attorney
2
   MIRANDA KANE (CABN 150630)
3  Chief, Criminal Division

4  W. DOUGLAS SPRAGUE (CABN 202121)
   HALLIE MITCHELL (CABN 210020)
5  Assistant United States Attorneys

6     450 Golden Gate Avenue, Box 36055
      San Francisco, California 94102
7     Telephone:  (415) 436-7200
      Facsimile:  (415) 436-7234
8     E-mail: doug.sprague@usdoj.gov

9  Attorneys for Plaintiff

10              UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12                SAN FRANCISCO DIVISION

13  UNITED STATES OF AMERICA,          )    No. CR 10-0547 CRB
                                       )
14           Plaintiff,                )    **GOVERNMENT'S MEMORANDUM**
                                       )    **REGARDING SENTENCING**
15      v.                             )    **GUIDELINES CALCULATIONS**
                                       )
16  SAMUEL COHEN,                      )    DATE:      April 24, 2012
        a/k/a Mouli Cohen,             )    TIME:      10:00 a.m.
17                                     )
             Defendant.                )    Honorable Charles R. Breyer
18  _____)

19         The Probation Office issued the draft Presentence Investigation Report on December 28,

20  2011.  The Court ordered the parties to submit their respective objections to that draft by March

21  30, 2012, and to submit their respective responses to the other party's objections by April 6,

22  2012.  On March 30, 2012, each party submitted a letter to the Probation Office detailing any

23  objections to the draft PSR, and on April 6, 2012, each party submitted a letter to the Probation

24  Office responding to the March 30 submissions.  After considering those submissions, the

25  Probation Office timely issued the final Presentence Investigation Report (PSR) on April 13,

26  2012.

27         The Court ordered the parties to file any objections to the PSR by 3:00 p.m on April 20,

28  2012.  As set forth in the PSR, any objections the government had to the draft PSR have been

GOVT. MEMO. RE: SENT. GUIDELINES;
CR 10-0547 CRB

1    resolved; the government has no objections to the PSR.  Nonetheless, the government submits

2    the information below in anticipation of defendant's objections to the PSR as listed in the

3    Addendum to the PSR.  The government addresses each anticipated objection in the order it is set

4    forth in that Addendum.

**OBJECTION NO. 1: The Offense Conduct**

5

6         Defendant objects to "many of the factual statements" made in "The Offense Conduct"

7    section of the PSR.  There are 19 paragraphs in this section of the PSR (¶¶ 5—23).  Defendant

8    objected to many of them during the draft PSR process, but some of the objections have been

9    resolved.  The government will respond to any remaining objections after they are made.

**OBJECTION NO. 2: Grouping**

10

11        Defendant objects to treating the wire fraud, money laundering, and tax fraud convictions

12   as two separate groups pursuant to Chapter 3 of the Sentencing Guidelines.  The parties appear to

13   agree that the wire fraud and money laundering counts group, but defendant claims that the tax

14   counts should also group with those charges.

15        Counts involving substantially the same harm should be grouped.  U.S.S.G. § 3D1.2.

16   Counts involve substantially the same harm if they involve, for example, the same victim or the

17   same act or transaction.  Here, the wire fraud counts and the tax counts involve entirely different

18   victims and entirely different acts and transactions.  The victims of the wire fraud counts are the

19   scores of victims who paid money toward a non-existent deal and its purportedly required bonds

20   and fees.  The victim of the tax counts is the United States.  The wire fraud counts involved a

21   scheme to defraud individuals to "invest" in a non-existent deal, and defendant's acts in

22   furtherance of that scheme included multiple and layered false statements to various individuals

23   in person, over the phone, and by e-mail.  The tax counts involved failing to disclose income to

24   tax preparers and knowingly filing false tax returns with the United States.  The harm and the

25   victims are distinct, resulting in two different groups. *See United States v. Smith*, 424 F.3d 992,

26   1015 (9th Cir. 2005)(rejecting same argument defendant asserts here).

27   //

28   //

GOVT. MEMO. RE: SENT. GUIDELINES;
CR 10-0547 CRB                    2

**OBJECTION NO. 3: Loss Amount**

In his objections to the draft PSR, defendant claimed (1) there was zero loss, and (2) even if any loss occurred, it must be limited to, at most, the face amount of the specific 15 wire transfers supporting the "counts of conviction."

As the Ninth Circuit has held for at least 20 years, however, the Sentencing Guidelines make clear that loss amount is to be determined by all acts and omissions that were part of the same course of conduct or common scheme or plan as the offense(s) of conviction. *See e.g. United States v. Galliano*, 977 F.2d 1350, 1353–54 (9th Cir. 1992); U.S.S.G. § 1B1.3(a)(2). The Sentencing Guidelines note that a "common scheme or plan" is one in which multiple offenses are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*. U.S.S.G. § 1B1.3 (Relevant Conduct), App. Note 9. Even offenses that do not qualify as part of a "common scheme or plan" may qualify as part of the same "course of conduct" if they are sufficiently connected or related to support the conclusion that they are part of a single episode, spree, or ongoing series of offenses." *Id*.

The Sentencing Guidelines and Ninth Circuit case law are also clear that the court may consider uncharged conduct as well as acquitted and dismissed counts in determining relevant conduct and loss amount. "Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range." *Id*., Background. "Thus, in an embezzlement case, for example, embezzled funds that may not be specified in any count of conviction are nonetheless included in determining the offense level if they were part of the same course of conduct or part of the same scheme or plan as the count of conviction." *Id*. In part, this is because "the distinctions that the law makes as to what constitutes separate counts or offenses often turn on technical elements that are not especially meaningful for purposes of sentencing." *Id*. Accordingly, "[r]elying on the entire range of conduct, regardless of the number of counts that are alleged or on which a conviction is obtained, appears to be the most reasonable approach to writing workable guidelines for these offenses." *Id*.

GOVT. MEMO. RE: SENT. GUIDELINES;
CR 10-0547 CRB                    3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Furthermore, this Court:

> ... need only make a reasonable estimate of loss.  The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence.  For this reason, the court's loss determination is entitled to appropriate deference.

*Id*. App. Note 3(C)(citing 18 U.S.C. §§ 3742(e) and (f).  If the Court is unable to determine actual or intended loss, the Court may rely upon the defendant's personal gain from the fraud as an alternate measure of loss.  *Id*., App. Note 3(B).

The Probation Office's correct application of the enhancement for losses exceeding $20 million is supported by overwhelming evidence.  First, Agent Saavedra's testimony established that victims lost approximately $6,204,000 to defendant  from late 2002 through mid-2003 (Tr. 1391—92), and then victims lost an additional $25,278,403.06 to defendant in subsequent payments victims thought were being used for "bonds and fees" to maintain their and Vanguard's stake in the acquisition (Tr. 1395.)  Adding those figures results in a loss amount of $31,482,403.06.

Second, Agent Oertl testified that defendant received $21,778,403 in income from Mr. Dillon, Mr. Glover, the Mills, and their related investment groups *just in 2005 through 2007*. (Tr. 1367—68.)  In light of evidence at trial and the verdicts, there is no dispute that this income resulted from purported bonds and fees purportedly connected to the acquisition of Ecast.  That testimony alone supports finding the applicable loss enhancement for losses exceeding $20,000,000.

Third, multiple witnesses testified about how much money they lost to defendant.  For example, Mr. Dillon, Mr. Mills, and Mrs. Mills all testified about check after check and wire after wire that they sent directly to defendant, whether for the initial investment or the "bonds and fees."  This testimony alone results in a loss amount of more than the $20 million threshold.

Fourth, the Sentencing Guidelines define "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense."  U.S.S.G. § 2B1.1, App. Note 3(A)(I). "Reasonably foreseeable pecuniary harm", in turn, is defined as "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential

result of the offense." *Id.*, App. Note 3(A)(iv).  There is no meaningful dispute that defendant received more than $31 million from the victims (the defense admitted this in their objections to the draft PSR: "It was undisputed at trial that Mr. Dillon himself received $43.5 million dollars from secondary investors ... of which he only transferred $31 million to Mr. Cohen.").  There is no dispute that defendant spent much of this money on expensive jewelry, luxury automobiles, extravagant residences staffed by cooks and drivers and assistants, and traveling via private jet to lavish vacation spots across the globe.  It was quite foreseeable that having spent all this money, defendant never would pay back any of the victims—which he plainly never intended to do.

Fifth, the testimony of Mike Farrell and William Meeker and the related exhibits established that defendant caused additional losses.  Mike Farrell and his friends lost more than $1.8 million after defendant duped them into "investing in Ecast" just before, claimed defendant, Ecast was going to be acquired by Qwest on a "one-to-one" share peg.  (Tr. 175—85; Exs. 183, 184.)  William Meeker testified that he lost $600,000 to defendant after defendant defrauded him in the same manner he defrauded the Vanguard-related victims.

## OBJECTION NO. 4: Number of Victims

Defendant objected to the enhancement for more than 50 victims because the draft PSR "does not provide proof of the name and amount of loss for each victim."  (Addendum, p. 1.)  As the Probation Office notes, however, "[t]he government provided the defendant with a detailed victim list which includes victim names and loss amounts.  This list reveals that there are more than 50 victims.  Specifically, there are 70 victims pertaining to the indicted scheme and a total of 94 victims, if victims relating to relevant conduct are considered."  (Addendum, pp. 1—2.)

Attached hereto as Exhibit A to the Declaration of IRS Special Agent Juan Saavedra (attached as Exhibit 1) is 7-page document titled "Victim Losses Caused by Mouli Cohen" lists a total of 96 victims: 69 victims connected with Vanguard, having provided money to defendant directly or via Mr. Dillon, 24 victims who invested in the Ecast deal but were not connected to Vanguard or Mr. Dillon, and 3 victims who invested and lost an additional $8 million to defendant for similar investment fraud schemes.  Regarding the core 69 victims, as stated in his declaration, Agent Saavedra determined they were victims through several means.  First, he

identified potential victims by reviewing bank records that reflected payments from these individuals to defendant, Mr. Dillon, and The Dillon/Glover Groups during the initial investment period (2002—2003) and the "bonds and fees" period (2004—2008). Second, he identified victims by reviewing records provided by Certified Public Accountant Gail Webb, who had maintained records reflecting all purported purchases of Ecast shares by Vanguard-related investors as well as many "bonds and fees" payments by those individuals. Third, Agent Saavedra interviewed more than 15 of these investors, all of whom stated, among other things, that they had purchased shares or paid bonds and fees related to the Microsoft/Ecast acquisition. Fourth, Agent Saavedra interviewed Mr. Dillon on multiple occasions, and Mr. Dillon identified all of the individuals on this list as individuals/spouses who had invested in the Microsoft/Ecast deal at some point (save one, who Agent Saavedra then confirmed).

In addition, trial exhibits and testimony plainly established that there were more than 50 victims of defendant's fraud. Mr. Dillon, Mrs. Mills, and Ms. Moore, for example, testified about their own losses and how they unwittingly brought others, including family members, into this "opportunity"; those individuals quickly became additional victims. Trial exhibits such as Exhibit 216, 217, 218, and 220 were just a few examples of Mr. Dillon's communications to the scores of victims in this matter.

Finally, that there were so many victims was plainly foreseeable to defendant in light of the fraudulent scheme he devised and participated in for so many years. Mr. Dillon testified, and several trial exhibits confirmed, that he frequently told defendant about the necessity to reach out to other investors to cover the purportedly required bonds and fees payments. *See, e.g.,* Exs. 52, 64, 195, 101, 106, 107, 109, and 110.

### OBJECTION NO. 5: Charitable Organization Enhancement

Defendant objected to the enhancement for misrepresenting that he was acting on behalf of a charitable organization. The enhancement plainly applies.

Mr. Glover testified that he was invited to defendant's home in Belvedere by defendant's publicist, who claimed that defendant had $60 million he wanted to donate to charitable organizations. After speaking with defendant at this party, Mr. Glover introduced Mr.

1    Dillon to defendant.  The first time defendant met Mr. Dillon, defendant told Mr. Dillon about

2    defendant's purported desire to contribute to non-profit organizations and foundations.  (Tr. 529.)

3    The main topic of discussion at this initial meeting was the Vanguard Public Foundation (Tr.

4    530), which was a foundation dedicated to social justice that supported causes such as battered

5    women's shelters, tutoring young children, reducing gang violence, and aiding victims of

6    Hurricane Katrina.  (Tr. 525—526.)  At the initial meeting, after hearing about Vanguard's

7    principles and goals, defendant expressed a desire to help "make a difference" and to "give

8    back".  (Tr. 531.)

9         After that lunch, Mr. Dillon sent a letter (Exhibit 180) to defendant.  In that letter, Mr.

10   Dillon wrote that defendant's "commitment to giving back is clearly deep and profound and

11   reflective of the very core of who you are as a person," and Mr. Dillon compared defendant's

12   articulation of his values to those of Dr. Martin Luther King, Jr.  (Ex. 180.)  A few days later,

13   defendant e-mailed Mr. Dillon that defendant was "touched by [Mr. Dillon's] amazing letter, and

14   to compare [defendant's] articulated values to those of the greatest ever, Dr. King. I'm confident

15   we can develop a strategic relationship to benefit many people.  We can make a significant

16   impact together."  (Ex. 181.)

17        As Mr. Dillon and Mr. Mills testified, defendant repeated his purported desire to help

18   Vanguard at subsequent in-person meetings.  Mr. Dillon testified that at another lunch in 2002,

19   defendant offered to help Vanguard and its donors by selling them Ecast shares for about $3.50

20   per share.  This would help Vanguard and its donors, because Ecast was about to be acquired by

21   Qwest or, more likely, Microsoft, which was trading at approximately $30 per share.  (Tr.

22   536—37.)  Defendant sold Mr. Dillon on how impressed defendant was with Mr. Glover, Ms.

23   Warren, Mr. Dillon, and Vanguard at the same time defendant pitched the wonderful

24   "opportunity" he was providing to Vanguard by allowing them to purchase some of defendant's

25   founder's shares for such a great price.  (Tr. 547—49.)

26        In light of these facts, the enhancement plainly applies.  In *United States v. Treadwell*,

27   593 F.3d 990 (9th Cir. 2010), the Ninth Circuit affirmed the application of this enhancement for a

28   defendant whose co-defendant had enticed investors by stating that "'some of the programs that

we're involved in, a certain percentage of the returns ... have to be returned into humanitarian needs'" and "'just being able to see the benefits, to be able to see people that are hungry and ... in various needs throughout the world ... that we are benefitting ...'". *Id.* at 1005. This enhancement applies "in any case in which the defendant represented that the defendant was acting to obtain a benefit on behalf of a charitable ... organization." *Id*. citing App. Note 7(B) to current U.S.S.G. § 2B1.1(b)(9)(A). The purpose of this enhancement is to punish defendants who take advantage of the generosity and charitable motives of victims—to enhance punishment for those who prey upon and exploit a person's tendency to be humanitarian. *Id*. Furthermore, the Ninth Circuit stated that it was irrelevant whether the victims were motivated by their own financial gains; the enhancement requires only that the offense "involve" a misrepresentation about charities, not that the investors be misled or otherwise motivated by the misrepresentation. *Id*. at 1008. Finally, the Ninth Circuit held that "acting on behalf of" does not require acting as a direct representative or agent of a charitable organization. Rather, for purposes of this enhancement, "acting on behalf of" can also mean "in the interest or for the benefit of". *Id*; s*ee also United States v. Romero*, 293 F.3d 1120 (9th Cir. 2002).

## **OBJECTION NO. 6: Sophisticated Means Enhancement**

Defendant objected to the 2-level enhancement for sophisticated means, asserting that defendant was convicted of merely "a simple and straightforward fraudulent scheme."

At a court appearance last month, this Court described defendant's fraud as one of the most sophisticated fraud schemes the Court had ever seen. There is overwhelming support for that comment and the application of this enhancement.

This enhancement targets "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1, App. Note 8(B). "Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." *Id*.

Defendant lured his victims by hosting a party under the false pretense that he had $60 million to donate to philanthropic causes. At this party, and at subsequent meetings at the rented

home he represented as his own, defendant had adorned the rented residence with fake art, all in an effort to falsely portray the trappings of success and wealth.  In meetings with victims, he pretended to care about issues such as battered women's shelters, tutoring young children, and reducing gang violence, all designed to pull his Vanguard-related victims into his scheme. Knowing he was being fired from Ecast, he nonetheless painted a picture that he was still in charge of that company and its ongoing negotiations involving an imminent acquisition by one of the best known companies in the world; indeed, knowing his severance from Ecast would be final in a just days, he took victims to the Ecast offices to further lure them into his charade.  He made up a ruse about being able to present this wonderful "opportunity" to Vanguard donors only through the "back door", thus demanding secrecy else the "venture capital firms" and other "investors in the deal" would be angry (because they paid more than the Vanguard donors) or the Vanguard donors might even be stripped of their shares.

To pacify his victims and to get them to part with even more money, defendant continued to complicate his elaborate scheme.  He created a ruse that "Mr. E" was a wealthy donor in Switzerland who was about to donate $2 million (and, later, much more than that) to Vanguard. He falsely promised imminent donations from his ex-wife, Yael.  He created another sub-scheme referred to as the "Bridge Over the River Kwai", through which Vanguard supposedly would receive a $1.6 million profit on an $800,000 investment—Vanguard made this investment, too, but defendant just spent that money, too.

Also to keep his victims at bay and to squeeze every penny out of them, he created elaborate tales about the need for approval from United States regulators, and, later European Union regulators.  He even weaved then-current news items—such as Microsoft's conflicts with the Department of Justice and the EU—into his explanation of why the purported acquisition was stalled.  He frequently told Mr. Dillon that he was flying out of town for acquisition negotiations when, in fact, he was jetting off on another extravagant vacation paid for by his victims.

Defendant continued to execute his scheme by creating fraudulent "convertible secured promissory notes" and related documents so he could later falsely claim that the victims were investing in Procinea or in one or more fictitious entities, such as Signet Ventures, MC18,

GOVT. MEMO. RE: SENT. GUIDELINES;
CR 10-0547 CRB                     9

MCJB, and so forth.  Defendant created those fraudulent documents so he could later claim—just as he did after he was confronted at a restaurant in Tiburon in 2008—that the millions he had fleeced from his victims were not related to the purported acquisition of Ecast or its attendant bonds and fees.  Victims testified, however, that often they saw only signature pages of these fraudulent documents, and evidence established that even some of those pages were fraudulent.  He also created at least one fake e-mail—the Gates/Ballmer dinner response—in an effort to thwart civil lawsuits and the SEC and to conceal his scheme.

Defendant's financial transactions further establish the sophisticated means he employed to execute and to conceal his scheme.  As Agent Saavedra testified, defendant used approximately 30 bank accounts during the period of his fraudulent scheme.  Many of these were in the name of even more fictitious entities, such as Matisse Investments.  As soon as money was deposited in any account bearing defendant's name, he immediately transferred it to accounts bearing names of fictitious entities or his wife's (maiden) name.  He still controlled all of that money, but he moved it around through multiple bank accounts (1) so he could claim he had no assets or income so did not have to pay taxes and (2) to try to make it difficult for civil litigants and law enforcement to find.  Finally, trial testimony and exhibits established that after the Vanguard victims confronted him in December 2008, he reacted by wiring millions of dollars of cash and stock to accounts in Switzerland.[1]

In sum, defendant's fraudulent conduct was far more complex and sophisticated than routine fraud schemes, it incorporated each of the examples set forth in the Guidelines (hiding assets and transactions, fictitious entities, corporate shells, offshore accounts), and it fully supports this Court's comment that defendant's fraud warrants application of this enhancement.

//

//

---

[1]In connection with requests for bail, defendant claimed that he sent millions of dollars to Switzerland in 2009 in response to a "banking crisis" until he was "satisfied regarding the integrity of the banking system" because he was "concerned about Wells Fargo" so he transferred money to Switzerland "to protect shareholders and his own family".  (Dkt. 17 at 13-14; Dkt. 30 at 9.)

GOVT. MEMO. RE: SENT. GUIDELINES;
CR 10-0547 CRB                    10

1

## OBJECTION NO. 7: Abuse of Trust Enhancement

2      Defendant objected to the 2-level enhancement for abuse of a position of trust, claiming

3 there is "no evidence" that defendant's claimed position at Ecast significantly facilitated his

4 crimes.  To the contrary, by falsely portraying himself as a high-level executive always in charge

5 of the negotiations with Microsoft (and U.S. regulators and EU regulators), defendant abused a

6 position of trust as defined in U.S.S.G. § 3B1.3.

7      This enhancement applies "[i]f the defendant abused a position of public or private trust,

8 or used a special skill, in a manner that significantly facilitated the commission or concealment

9 of the offense."  U.S.S.G. § 3B1.3.  Importantly for present purposes, whether a defendant

10 occupied a position of trust is assessed from the perspective of the victim.  The primary concern

11 of § 3B1.3 is to penalize defendants who take advantage of a *position* that provides them

12 freedom to commit or to conceal a difficult-to-detect wrong.  *United States v. Garrison*, 133 F.3d

13 831, 838 (11th Cir. 1998).  The court must distinguish between arms-length commercial

14 relationships where trust is created by defendant's personality or victims' credulity, and

15 relationships in which the victims' trust is based on defendant's *position in the transaction*.  *Id*.

16 Put another way, this enhancement applies to "imposters", as long as the defendant "provides

17 sufficient indicia to the victim that the defendant legitimately holds a position of private or public

18 trust when, in fact, the defendant does not."  *United States v. Brack*, 651 F.3d 388, 392—93 (4th

19 Cir. 2011); U.S.S.G. § 3B1.3, App. Note 3.  This is true because in making such a

20 misrepresentation, the defendant assumes a position of trust relative to the victim, thus providing

21 himself the same opportunity to commit a difficult-to-detect crime he would have had if he held

22 the position legitimately.  *Id*.  As the Sentencing Commission noted when it clarified that this

23 enhancement applied to those who pretend to hold a position of trust but actually do not:

24          The Commission has determined that, particularly from the perspective of the
            crime victim, an imposter who falsely assumes and takes advantage of a position
25          of trust is as culpable and deserving of increased punishment as is a defendant
            who abuses an actual position of trust.

26

27 U.S.S.G. § 3B1.3, Historical Notes, 1998 amend.

28      Throughout his dealings with the victims, defendant held a position of trust with the

GOVT. MEMO. RE: SENT. GUIDELINES;
CR 10-0547 CRB                     11

victims within the meaning of the Sentencing Guidelines. He undoubtedly provided "sufficient indicia" to the victims that he legitimately held a position of private or public trust when, in fact, he did not. U.S.S.G. § 3B1.3, App. Note 3. From the beginning of his scheme, defendant told victims—Mr. Dillon and Mr. Mills, for example—that defendant, as one of the founders of Ecast, was personally involved in acquisition discussions. In the Spring of 2003, he spun a false tale to Mr. Dillon about how he had dinner with Bill Gates and Steve Ballmer, and that the parties had reached a "handshake deal" on the pricing of Microsoft's acquisition of Ecast. He perpetuated the false pretense of being in charge of these acquisition negotiations, and thus holding the fate of Ecast in his hands, in frequent communications with Mr. Dillon, the November 2005 meeting with victims at his rented residence (at which defendant fabricated comments by what he called "his" board of directors), and all the way into the December 2008 confrontation in Tiburon. By this conduct, defendant did precisely what Application Note 3 describes as warranting this enhancement: he "assume[d] a position of trust, relative to the victim, that provide[d] the defendant with the same opportunity to commit a difficult-to-detect crime that the defendant would have had if the position were held legitimately."

For those reasons and more, defendant's fabricated position significantly facilitated commission of the offense. Had defendant not been in a (or, as he claimed, "the") top decision-making position within Ecast from the beginning of his scheme through the time he received the last victim payments, no victim would have parted with any money. This is why defendant had to and did claim that *he* was the person in these negotiations with Microsoft, that *he* was the person meeting with lawyers in the Silicon Valley and in New York about the deal, and that *he* was the person getting phone calls from the head of the EU's Competition Committee and jetting off to Europe to negotiate with EU representatives. This fabricated position did not just "significantly facilitate" commission of the offense, it was vital to it. Had any of the victims learned the truth—that defendant had no meaningful role at Ecast after October 1, 2002, and *no role whatsoever at Ecast after mid-2003*—defendant would have received *not one penny from this fraudulent scheme*, especially the more than $25,000,000 in "bonds and fees" that did not start pouring in until long after defendant had no role whatsoever at Ecast. Instead, he received

1   every bit of the victims' $31,000,000+ in losses after he had no operational role at Ecast, and

2   more than $25,000,000 of that amount after he had no role at all.  During all of that time,

3   however, he falsely portrayed that he held the top decision-making position as Ecast's point

4   person on the acquisition.  As a result, the victims placed in defendant a much greater trust than

5   the ordinary reliance victims place in a defendant's integrity and honesty that underlies all fraud

6   scenarios.

7        As the Probation Office concluded, "this is exactly the type of conduct that warrants the

8   enhancement." (Addendum, p. 2.)

9                    **OBJECTION NO. 8: Obstruction of Justice Enhancement**

10       The bases for this enhancement are legion.  Defendant's conduct not only warrants the

11  enhancement for obstruction of justice, his pattern of obstruction is an aggravating factor that

12  should be considered in arriving at the ultimate sentence.

13                            **1. The Fraudulent Documents**

14       The first basis for this enhancement consists of the multiple fraudulent documents

15  defendant created and presented throughout his scheme, during civil and criminal pretrial

16  litigation, during trial, and during post-conviction proceedings.  Some examples follow.

17       Trial evidence and testimony established that defendant created a fraudulent e-mail and

18  produced it as purported evidence in civil litigation and to the SEC.  Specifically, on April 23,

19  2003, Mr. Dillon sent defendant an e-mail in which Mr. Dillon stated that he knew defendant was

20  "in the middle of dinner with [Bill] Gates and [Steve] Ballmer right now." (Ex. 61.)  The next

21  morning, defendant responded via e-mail that he would "love to talk this afternoon." (*Id.*)  This

22  e-mail exchange is powerful evidence of Mr. Dillon's state of mind based on false information

23  defendant provided to him and then did not correct at the time.  Recognizing that, defendant

24  subsequently created a fraudulent e-mail to produce to the SEC during its investigation.  That

25  fraudulent e-mail—which defendant stipulated he produced to the SEC—claimed to be in

26  response to Mr. Dillon's Gates/Ballmer e-mail, and in the fake e-mail defendant wrote that he

27  liked Mr. Dillon's sense of humor and that he had enjoyed dinner with his "lovely wife."

28       That this e-mail was fraudulent cannot be seriously disputed.  Even the claimed "strictly

GOVT. MEMO. RE: SENT. GUIDELINES;
CR 10-0547 CRB                        13

"ceremonial" wedding to Stacy Stripling did not occur until later in 2003, so defendant's only "wife" at that time was Yael. The unique printer source, the inconsistent date/time, the different subject line, and the contents of the e-mail all suggest fraud. And the only reason to produce it to the SEC was to attempt to obstruct or impede the administration of justice with respect to the investigation of defendant's conduct. *See* U.S.S.G. 3C1.1.

Additional examples of fraudulent trial exhibits defendant produced are the declarations (Exhibits 531A and 532A), the releases (Exs. 537 and 538), and Exhibit 643. As Mr. Dillon testified, Mr. Dillon did not see these complete declarations until the civil litigation. As Mr. Glover testified, he saw only the signature page of the proffered "release" (Exhibit 538). As demonstrated during Mr. Mills' testimony (Tr. 507—09), comparing the signature pages on Exhibit 643 plainly demonstrated phony signatures on that document—there was and is no explanation for why the multiple signatures appear differently. Defendant produced these documents in civil lawsuits and in the SEC investigation, and he introduced them at trial.

Defendant also attempted to obstruct justice by causing the submission of two fraudulent declarations from Joseph Ettinger. (The same "Mr. E" that defendant falsely told Vanguard victims was a wealthy philanthropist from Switzerland who was going to donate millions to Vanguard.) First, defendant produced to the SEC a declaration from Joseph Ettinger in which Ettinger claimed that Mike Farrell told Ettinger that Farrell understood his investment in Ecast was risky and that Farrell had enough money to make such a risky investment. (Attached as Exhibit 2.) Farrell's testimony at trial was squarely contrary to those false representations. Farrell was a struggling 27 year-old roofer when defendant lured him into the same Ecast fraud that he later perpetrated on Vanguard victims. In fact, Farrell told defendant that he did not have enough money to buy shares in Ecast, so he asked defendant if he could bring in friends to pool their money. Defendant welcomed the additional victims and money. Like he told the other victims, defendant told Farrell this investment was risk-free in light of the impending acquisition.

The second false Ettinger declaration was submitted as recently as during post-conviction proceedings in another effort to be released on bail. In this declaration, Ettinger declared that he has "never been a business partner of Mr. Cohen in any business or investment venture, including

but not limited to Ecast."  According to SEC filings, however, Ettinger and defendant were business partners in Playnet Technologies, Inc., until it declared bankruptcy with millions of dollars in outstanding liabilities.

### 2. The False Statements to the SEC

Defendant provided the following material false statements (which appear in bold typeface below) during his deposition before the SEC, which was investigating whether defendant had made false statements in connection with the purchase or sale of securities (Ecast stock).  Pages of the cited testimony are attached as Exhibit 3.

a.  Lies About the Genesis of the Stock Sales to Mr. Dillon/Vanguard

Q:    Eventually you and Mr. Dillon had a discussion about purchasing eCast shares, is that correct?
A:    Correct.
Q:    Okay.  When did you have that discussion with Dillon?
A:    Sometime in the fall of 2007 (sic).
Q:    Did you offer to sell shares to Mr. Dillon?
A:    **I'd been asked by him.**
Q:    So he broached the subject, right?
A:    **Correct.**
***
Q:    Had there been any discussion about – you know, did you say anything to him to indicate that you had a willingness to sell your stock before – sell stock before he spoke to you?
A:    **No.**
***
Q:    The – did he talk to you about how much number [sic] of shares he was interested in purchasing?
A:    He gave some indication.
Q:    What did he say in that regard?
A:    That he would like to buy a block of shares.  He didn't indicate how big it was, but big enough that it would be meaningful to him.
Q:    And did he tell you an approximate amount of money he wanted to spend?
A:    It was in the millions of dollars.
***
Q:    Did you have any understanding that his investment was on behalf of Vanguard in any way?
A:    **No.**

The notion that Mr. Dillon "broached the subject" of buying Ecast shares is squarely controverted by trial testimony and exhibits.  So, too, is the notion defendant did not have any understanding that Mr. Dillon was seeking to invest "on behalf of Vanguard in any way." Defendant's own e-mails belie that answer.

//

b. <u>Lies About Not Selling Shares after Leaving Ecast</u>

Q:      Did you sell [Ecast] shares after leaving eCast?
A:      **No.**
***
Q:      I think you previously said – I think I asked you if you ever sold shares
        after leaving eCast, and you said no.  Is that correct?
A:      **Correct.**
Defendant's Attorney:        Are you sure of that?
A:      **I'm sure.**

Even assuming defendant can claim he did not leave Ecast until being stripped of all

relationship with Ecast after Mr. Ashkenazi called claiming he owned much of Ecast in about

June 2003, bank records introduced at trial show that defendant sold shares to The Dillon Group

2003-II, The Dillon Group 2003-III, and Mr. Dillon on June 26, 2003 ($150,000), July 23, 2003

($350,000), September 3, 2003 ($260,000), and September 8, 2003 ($90,000).

c. <u>Lies About Misrepresentations Regarding Acquisition</u>

Q:      In the e-mail Mr. Dillons asks "When do you expect the call with
        Microsoft to be finished tomorrow?"  What call did you have with
        Microsoft in October 2008?
A:      No call.
Q:      Why does Mr. Dillon think that you're having a call with Microsoft?
        [objections by lawyer]
Q:      Did you have – you don't know?
A:      **I don't know.**
Q:      Did you have any discussions with Mr. Dillon at this time frame about
        conversations with Microsoft?
A:      **No.**
Q:      Did you ever tell anyone, Mr. Dillon or anybody in the Dillon Group, that
        eCast was being acquired by Microsoft?
A:      **No.**

These answers are obviously false.  Defendant consistently told Mr. Dillon about

conversations with and about Microsoft all the way into the December 2008 dinner in Tiburon.

And the assertion that he never told *anyone* that Ecast was being acquired by Microsoft was

exposed as false by overwhelming evidence at trial, including the testimony of Ms. Warren, Mr.

Dillon, Mr. Mills, Mrs. Mills, Ms. Moore, Ms. Segal, and more.

Q:      Okay.  With regards to the 10 to 15 people that you have sold eCast – your
        eCast shares to, have you ever made any representations to any of these
        investors that eCast was an acquisition target of a publicly-traded
        company?
A:      **No.**

GOVT. MEMO. RE: SENT. GUIDELINES;
CR 10-0547 CRB                              16

\*\*\*

Q:    Specifically with regard to the Farrells and the Merrills – we'll call it the
      Farrell group, the investors that are together, from Oregon – did you ever
      represent to them that eCast was an acquisition target – or in discussions to
      merge with another company?

A:    **No.**

The testimony of Mike Farrell, William Meeker, Gina Warren, Hari Dillon, Sam Mills, Mary Mills, Susanna Moore, Jane Segal, and others established the falsity of these answers.

The obstruction of justice enhancement applies to a wide range of conduct. Some of the examples listed in the Commentary to U.S.S.G. § 3C1.1 are as follows:

- committing, suborning, or attempting to suborn perjury, including during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction;

- producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding;

- providing materially false information to a judge; and

- other conduct prohibited by obstruction of justice provisions under Title 18, United States Code (e.g., 18 U.S.C. §§ 1510, 1511).

Defendant did all of these, and did all of them repeatedly. The Probation Office correctly concluded that this enhancement applies.

## OBJECTION NO. 9: Timing of Marriage to Stacy Stripling

The defendant objects to the statement that he married his current wife, the former Stacy J. Stripling, while he was still married to his first wife. The statement is true, but it does not need to be resolved unless the Court believes it will affect sentencing. *See* F.R.Cr.P. 32(i)(3)(B). The government submits it should not affect sentencing so a ruling is unnecessary, but nonetheless sets forth the facts here.

First, there is no dispute that defendant was married to his first wife, Yael, until early 2005.

Second, defendant married Stacy J. Stripling in 2003. In her book *The Kosher Billionaire's Secret Recipe*, Stacy Cohen describes her 2004 honeymoon, which she and defendant spent aboard a private yacht once owned by "shipping magnate Aristotle Onassis." Memorializing the event, Mrs. Cohen wrote:

GOVT. MEMO. RE: SENT. GUIDELINES;
CR 10-0547 CRB                    17

> As we steamed along the Mediterranean with the benevolent ghosts of Ari and Jackie as our guides, onward in the magnificent vessel, toward the breathtaking white cliffs and whitewashed chapels of Santorini, we were accompanied by a pod of dolphins—some of the most spiritually attuned creatures on earth—who seemed to recognize that *their onlookers were celebrating the most important time of their lives as newlyweds*!  As if to exclaim "congratulations," the leader of the pod raced the bow of the boat before doing a flip and swimming away.

*The Kosher Billionaire's Secret Recipe*, pp. 133—34 (emphasis added).  In addition, a holiday card from Ms. Stripling's parents (both now deceased) sent at the end of 2003 notes their "big news of the year" was that Stacy

> eloped for a most romantic marriage to Rome with her husband Mouli Cohen. She began her trip in Paris where designer John Galliano of Christian Dior designed her wedding dress.  After a beautiful stay in Paris, the loving couple flew to Rome where they were married in the Italian Villa de Coppola on October 21st. They plan a wedding reception in San Francisco early next year to celebrate their new life together.

As the Probation Office notes, during his bail interview, even *the defendant* stated that he married Ms. Stripling in 2003.  (PSR, ¶ 65.)

Finally, in an e-mail to her brother and sister-in-law dated October 27, 2003, bearing a subject line of "Wedding Bells", Mrs. Cohen confirmed that she and defendant had eloped in Rome.  (Attached as Exhibit 4.)

## OBJECTION NO. 10: Rental Properties

Defendant objected to the information about the properties he rented.  This information is set forth in paragraphs 69 and 70 of the PSR.  Defendant did not state why he objected to these paragraphs.  The information in these paragraphs is accurate and was recently confirmed by the Probation Office.

## OBJECTION NO. 11: Employment Record

Defendant objected to the information about his employment record now set forth in paragraphs 83—86. As the Probation Office notes, however, the Probation Office did the best it could with the information it could verify in the absence of defendant being interviewed about it or otherwise providing any verfication.  Furthermore, defendant appears to object not because what is set forth is incorrect, but because of what is not set forth.  In the absence of verifiable information, however, nothing more should be added.  Finally, it should not affect sentencing, so

no resolution is necessary.  *See* F.R.Cr.P. 32.

## OTHER OBJECTIONS

In addition to forthcoming objections to the "Offense Conduct" section (as noted above in the response to Objection No. 1), defendant also objected to various 3553(a) factors not being included in the PSR, claimed that the guidelines for fraud are "disproportionate" and constitute "double-counting", and claimed the guidelines range of imprisonment of 360 months to life "undercuts the policy goal of retribution and rehabilitation."  The government will address these issues and any other objections, to the extent they are pertinent, in its sentencing memorandum.

//

DATED: April 20, 2012                              Respectfully submitted,

                                                   MELINDA HAAG
                                                   United States Attorney

                                                      /s/
                                                   _____
                                                   W. DOUGLAS SPRAGUE
                                                   HALLIE MITCHELL
                                                   Assistant United States Attorneys