1  MELINDA HAAG (CABN 132612)
   United States Attorney
2
   MIRANDA KANE (CABN 150630)
3  Chief, Criminal Division

4  W. DOUGLAS SPRAGUE (CABN 202121)
   HALLIE MITCHELL (CABN 210020)
5  Assistant United States Attorneys

6     450 Golden Gate Avenue, Box 36055
      San Francisco, California 94102
7     Telephone:  (415) 436-7200
      Facsimile:  (415) 436-7234
8     E-mail: doug.sprague@usdoj.gov

9
   Attorneys for Plaintiff
10
                    UNITED STATES DISTRICT COURT
11
                 NORTHERN DISTRICT OF CALIFORNIA
12
                    SAN FRANCISCO DIVISION
13

14  UNITED STATES OF AMERICA,          )    No. CR 10-0547 CRB
                                       )
15        Plaintiff,                   )    **GOVERNMENT'S SENTENCING**
                                       )    **MEMORANDUM**
16     v.                              )
                                       )    DATE:        April 30, 2012
17  SAMUEL COHEN,                      )    TIME:        10:00 a.m.
       a/k/a Mouli Cohen,              )
18                                     )    Honorable Charles R. Breyer
          Defendant.                   )
19  _____  )

20

21

22

23

24

25

26

27

28

GOVT. SENT. MEMO.;
CR 10-0547 CRB

# TABLE OF CONTENTS

I.  The Nature and Circumstances of the Offenses. . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.  Defendant Creates False Impressions of Success and Wealth. . . . . . 2

    B.  The Initial Investments: Defendant Purports to Sell More
        Shares than He Owned for More Money than the Shares
        Were Ever Worth. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    C.  The "Bonds and Fees" Period. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II.  The History and Characteristics of the Defendant. . . . . . . . . . . . . . . . . . . . . 7

    A.  Defendant Defrauds His Father-in-Law. . . . . . . . . . . . . . . . . . . . . . . . 7

    B.  Defendant Defrauds the Parents of His Godson. . . . . . . . . . . . . . . 10

    C.  Defendant Defrauds Carl McLarand. . . . . . . . . . . . . . . . . . . . . . . . . . 12

    D.  Defendant's Use of His Victims' Money. . . . . . . . . . . . . . . . . . . . . . . 13

    E.  Defendant's Charitable Involvement. . . . . . . . . . . . . . . . . . . . . . . . . . 15

        1.  Defendant Caused the Collapse of Vanguard. . . . . . . . . . . . 15

        2.  Defendant's Involvement with Other Charities. . . . . . . . . . 15

            a.  Camp Okizu. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
            b.  The Seva Foundation. . . . . . . . . . . . . . . . . . . . . . . . . 17
            c.  UCSF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

III.  The Sentencing Guidelines. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

IV.  Other Considerations of 18 U.S.C. § 3553(a). . . . . . . . . . . . . . . . . . . . . . . . . 22

    A.  To Reflect the Seriousness of the Offense, to Promote Respect
        for the Law, and to Provide Just Punishment for the Offense. . . . . . . . . . 22

    B.  To Afford Adequate Deterrence and to Protect the Public
        From Further Crimes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    C.  The Kinds of Sentences Available. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    D.  The Need to Avoid Unwarranted Sentencing Disparities Among
        Defendants With Similar Records who Have Been Found Guilty
        of Similar Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

V.  Restitution and Forfeiture. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

VI.  Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

# TABLE OF AUTHORITIES

## CASES

*Gall v. United States,* 128 S.Ct. 586 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Iniguez,* 368 F.3d 1113 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Kentz,* 251 F.3d 835 ( 9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Littlesun,* 444 F.3d 1196 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Treadwell,* 593 F.3d 990 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Posely,* 2008 WL 467695 ( 9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . 22

## STATUTES

U.S.S.G. § 2B1.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

U.S.S.G. § 5G1.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

18 U.S.C. § 3553(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Over the course of at least a decade, defendant schemed to victimize a non-profit organization that had existed for three decades, his "friends", his family, and essentially anyone he could find who had money.  The Court has heard and seen substantial evidence of defendant's primary scheme, in which he purported to sell far more shares than he ever owned in a struggling company for far more money than they were ever worth, falsely claiming the company was about to be acquired by one of the most well known companies in the world.  While that conduct warrants the severe sentence called for by the Sentencing Guidelines and recommended by the Probation Office, an examination of the other factors under 18 U.S.C. § 3553(a) would justify an even greater sentence.  For the reasons set forth below, as well as those in the Government's Memorandum Regarding Sentencing Guidelines Calculations and in the Presentence Investigation Report, the government respectfully requests that the Court sentence defendant to 360 months imprisonment, three years of supervised release, restitution of $29,731,335.43, forfeiture of $31,422,403.06, a fine of $250,000, and the mandatory special assessment of $2,900.

## I.       The Nature and Circumstances of the Offenses

The nature and circumstances of defendant's offenses of conviction—multiple counts each of wire fraud, money laundering, and tax evasion—warrant an extremely severe sentence. Defendant set the stage for his fraud schemes by manufacturing an elaborate charade to depict himself as a successful businessman so his victims would be more likely to part with money.  He pretended to have the means and the genuine interest to help those less fortunate than he, and then he used a scheme he had practiced on other victims to attack a non-profit organization and its donors.  Instead of going to help those in need, these victims' tens of millions went to defendant, who proceeded to spend the millions on a lifestyle remarkable for its opulence.  When confronted by his victims, he first tried to keep up the charade, but then resorted to noting that the statute of limitations had expired.  When sued by those victims and investigated by the SEC, he created fraudulent documents and brazenly and repeatedly lied under oath, claiming, for example, that Mr. Dillon broached the idea of buying "millions" of dollars of Ecast shares despite defendant having never told anyone about any possible acquisition.  When arrested on

GOVT. SENT. MEMO.;
CR 10-0547 CRB

1  federal criminal charges, he lied to the federal magistrate reviewing his bail, and, later, to this
2  Court.  The duration and depravity of defendant's crimes and the financial and emotional
3  devastation they caused justify an extremely severe sentence.

4    A. <u>Defendant Creates False Impressions of Success and Wealth</u>

5    It was part of defendant's scheme to persuade his victims that defendant was very
6  successful and, as a result, immensely wealthy.  He told one of his bankers, Greg Zanolli, that he
7  sold one of his companies to Teva Pharmaceuticals.  He also showed Mr. Zanolli a document
8  purporting to reflect that defendant had $100 million in assets.  He told others, such as Mr.
9  Farrell and Mr. Dillon, that he had sold a company to Johnson & Johnson, and he told Mr. Ryles
10 that he had sold a fabric company to the Pritzker family.  He falsely told several witnesses, his
11 wife, and others noted below that he owned at least one private jet.  In August 2002, he hosted a
12 party at his rented residence in Belvedere under the false pretense that he had $60 million that he
13 wished to dole out to various charitable organizations.

14   He decorated the residence he falsely claimed to own with fake art that he instructed Mr.
15 Shaw was "to look authentic".  He carried this part of his deception so far that he had Mr. Shaw
16 create a gallery label for the back of a fake Jasper Johns and provide write-ups regarding the
17 history of various pieces in his "collection."  He offered to pay Mr. Shaw in Ecast stock.

18   Defendant perpetuated these false impressions throughout his scheme.  For example, he
19 circulated apparently self-authored articles such as "Mouli Cohen on Leadership: Every
20 Company Needs a Super Leader" and "Business Tycoon and Magnate Mouli Cohen Talks About
21 the Art of Making Tough Business Decisions" and "Business tycoon and philanthropist Mouli
22 Cohen—Reaching for the Moon is one secret of success."  (Exs. 204, 204B, 204C.)  He sent
23 these articles  to victims during the course of his fraudulent scheme.  These articles ended with
24 this bio "About Mouli Cohen":

25    In his career as an entrepreneur, Mouli has been one of the few to have success in
   biotechnology and high technology.  His start-ups have generated well over $1B
26    in shareholder value.  In recognition of his ability to generate mega investment in
   the U.S. economy and the creation of thousands of U.S. jobs, Mouli was awarded
27    the first-ever "Millionaire Residency" with full citizenship status by President
   George H. [sic] Bush.  For more information visit <u>www.moulicohen.com</u>

28

GOVT. SENT. MEMO.;
CR 10-0547 CRB     2

Visitors to www.moulicohen.com, even now, would see that $1 billion in shareholder value listed as $3 billion ("About" section), as well as many articles about defendant's purportedly successful businesses and philanthropic endeavors.

Related links defendant posted included another in which he listed his "Top 10" pieces of business advice "he has gained throughout his distinguished career" in which he has "collaborated with some of the worlds [sic] most powerful leaders and thinkers including heads of state and CEOs." One of his pieces of advice, titled "Ethics" reads as follows:

> **Always be ethical**. This rings especially true in this era of corporate scandals and greed. You have executives who have been sentenced to prison for up to 25 years. Doing the right thing is critical. We should treat one another with respect and dignity. My dad always taught me that doing the wrong thing is not worth the loss of one night's good sleep.

http://www.scribd.com/doc/17489113/What--Learned-by-Mouli-Cohen (emphasis in original).

B.   The Initial Investments: Defendant Purports to Sell More Shares than He Owned for More Money than the Shares Were Ever Worth

After meeting defendant at the party in August 2002 in Belvedere, Mr. Glover introduced defendant and Mr. Dillon. Defendant confirmed his purported desire to contribute to non-profit organizations and foundations. (Tr. 529.) The main topic of discussion at this initial meeting was the Vanguard Public Foundation (Tr. 530), which was a foundation dedicated to social justice that supported causes such as battered women's shelters, tutoring young children, reducing gang violence, and aiding victims of Hurricane Katrina. (Tr. 525—26.) After hearing about Vanguard's principles and goals, defendant expressed a desire to help "make a difference" and to "give back". (Tr. 531.)

Based on defendant's claims, Mr. Dillon wrote that defendant's "commitment to giving back is clearly deep and profound and reflective of the very core of who you are as a person," and Mr. Dillon compared defendant's articulation of his values to those of Dr. Martin Luther King, Jr. (Ex. 180.) A few days later, defendant e-mailed Mr. Dillon that defendant was "touched by [Mr. Dillon's] amazing letter, and to compare [defendant's] articulated values to those of the greatest ever, Dr. King. I'm confident we can develop a strategic relationship to benefit many people. We can make a significant impact together." (Ex. 181.)

The first wave of the significant impact defendant made included purporting to sell his "founder's shares" in Ecast to Vanguard donors.  In late 2002, he told Vanguard-related victims, such as Gina Warren, Hari Dillon, and Sam Mills, that Ecast was soon to be acquired.  Defendant was willing to provide a "win-win" by allowing these investors to purchase founder's shares, because defendant would get to achieve his stated philanthropic goals, and the investors could share profits with Vanguard.  As Mr. Dillon wrote in an e-mail dated November 3, 2002, "what you are doing for Vanguard in the present moment is huge.  It will enable us to have a financial solidity we've always needed, but never had.  You have created such a great opportunity."

After luring in his victims, defendant proceeded to "sell" his shares to the Vanguard victims for $2 to $3.50 per share over the next several months.  When he began these sales, Ecast's internal documents consistently valued its shares at less than 10 cents per share.  (Exs. 40, 41).  Yet he did not really ever "sell" the shares; he never provided any of these "purchasers" with a stock certificate, let alone an endorsed one.  Furthermore, he "sold" far more shares than he ever owned; the stock purchase agreements all reflect he owned 6,000,000 or 5,000,000 million shares, even though the agreements he provided Mr. Farrell and Mr. Merrill claimed the same share ownership totals.[1]  Indeed, as reflected in a document defendant introduced at trial, Ecast determined that from late 1998 through mid-2004 defendant had purported to sell more than 6 million shares of Ecast stock to individuals not including any of the Vanguard investors. In addition to those "sales", from October 2002 through approximately September 2003 defendant "sold" more than 2,000,000 shares of Ecast stock to the Vanguard investors for $6,204,000.  During the time defendant was purporting to sell the Vanguard victims all these shares, defendant knew of a 1,000—1 reverse stock split involving Ecast shares that would have reduced this $6,204,000 investment to about $70,000 even if he had sold the shares.  Defendant

---

[1]In February 2001, defendant told Mr. Farrell he was allowing him to purchase founder's shares in Ecast in advance of an imminent acquisition "for our friendship forever."  (Ex. 187.)  In September 2001, defendant charged Mr. Farrell $3.50 per share.  In October 2001, he charged Mr. Meeker $1.50 per share.  As he would later do to the Vanguard victims, defendant kept Mr. Farrell on the hook by blaming "his" Board of Directors and claiming that defendant would give Mr. Farrell stock in another company to protect his Ecast investment.

1   never mentioned this reverse stock split to any of his victims.

2        Also during the course of these purchases, and shortly after Susanna Moore and her

3   husband had executed a Stock Purchase Agreement for 29,000 shares for $101,500, defendant

4   told Mr. Dillon that defendant had dinner with Bill Gates and Steve Ballmer and the parties had

5   reached a "handshake deal."  Mr. Dillon noted this event in an e-mail, and defendant responded

6   the next morning by indicating that defendant would "love to talk this afternoon."  (Ex. 61.)

7   After they did talk that afternoon, that evening Mr. Dillon sent defendant a congratulatory e-mail.

8   (Ex. 62.)  Years later, defendant tried to impede investigations into his fraud by creating a

9   fraudulent purported e-mail response to Mr. Dillon's first e-mail about the Gates/Ballmer dinner.

10  One of these fraudulent e-mails, which defendant produced to the SEC, purported to be sent on

11  April 23, 2003, at 9:47 p.m.  (Ex. 60.)  The other version of this e-mail, which defendant

12  produced in civil litigation, was the same except that it bore a date/time stamp of April 23, 2009,

13  at 11:17 p.m. (Ex. 153.)  Both of these e-mails were plainly fraudulent.

14        C.    The "Bonds and Fees" Period

15        Defendant also employed fraudulent e-mails and other fraudulent documents in the next

16  phase of his scheme.  After the Microsoft/Ecast deal failed to occur, defendant spun a tale to

17  investors involving delays caused first by United States regulators, then by European Union

18  regulators.  Just as he did with Mr. Farrell, defendant told the Vanguard investors that their Ecast

19  investment would be protected by shares in another of defendant's companies, this time that

20  company was Procinea.  Defendant tricked some of the investors into signing signature pages for

21  documents relating to Procinea by telling them he was protecting them, and evidence at trial

22  showed that even the tricked investors did not see all the Procinea-related documents bearing

23  photocopied signature pages.  Defendant even sent a slide show about Procinea to Mr. Dillon.

24  As Mr. Ryles testified at trial, however, much of the information in the slide show defendant sent

25  was false.  In any event, not one witness testified that they ever had any intention to invest in

26  Procinea or to loan money to Signet Ventures, which did not even have a bank account until

27  months after defendant claimed in documents that the victims had been loaning money to it.

28  ///

GOVT. SENT. MEMO.;
CR 10-0547 CRB                    5

During the bonds and fees period of 2004—2008, defendant used several sub-schemes to lull Mr. Dillon and the Vanguard investors.  He claimed that his ex-wife was going to make a substantial donation.  He claimed that "Mr. E" and his syndicate of investors from overseas was going to wire millions to Vanguard.  He claimed another deal in New York would net Vanguard a $1.6 million profit after an initial $800,000 investment; Vanguard lost all of its $800,000, too.

Defendant also reassured victims about the Microsoft/Ecast deal during this period.  He reassured Mr. Dillon, Mr. Mills, and Mrs. Mills on a conference call on March 7, 2005.  In just the days after that call, the Mills alone sent defendant more than $500,000.  He reassued Mr. Dillon, Mrs. Mills, Mr. Mills, Ms. Segal, and Ms. Moore at a meeting at defendant's Belvedere residence on November 28, 2005 (then sent signature pages around the next morning).  In just the days after that meeting, Mary Mills and her brother sent defendant $500,000.  He even stuck to his fraudulent story during the confrontation in early December 2008.  Only when it was clear that the victims had exposed his fraud, defendant told them the statute of limitations had expired.  Then he and his wife rented a private jet to take them to Hawaii for two weeks, and he sent almost $2 million to Swiss accounts.

None of this $25 million defendant received (in addition to the initial $6.2 million), of course, was going to pay bonds or fees for the non-existent deal.  Instead, defendant was spending his victims' money as it came in.  After defendant claimed the U.S. finally had approved the deal in May 2005, Mary Mills sent him a check for $70,000; three days later defendant bought a Jaguar for just over $36,000.  A few months later, and just a few days after Sam Mills sent him a check for $200,000, defendant bought an Aston Martin for $207,000.  Similarly, while defendant told Mr. Dillon that defendant was going out of town to "do battle" on behalf of the Vanguard investors to move the deal forward, he, in fact, was going to Las Vegas with his wife on a rented private jet to spend $5,862 at the Bellagio in one night (November 2007) and to St. Maarten with his wife via private jet for three weeks (December 2007), spending more than $40,000 just on one credit card while there.

He took multiple affirmative steps to conceal his income and to mislead his tax preparers, including telling them that he did not work, did not own any cars, and that his wife supported

1    him by giving him a couple thousand dollars per month.  He paid no taxes on any of these tens of

2    millions he received from the Vanguard victims or the additional millions from other victims set

3    forth in this memorandum.

4        These facts alone warrant the sentence the government and the Probation Office

5    recommend.

6    **II.    The History and Characteristics of the Defendant**

7        Like the nature and seriousness of the offenses, the history and characteristics of the

8    defendant warrant a sentence at the high end of any applicable Guidelines range or an upward

9    variance.  18 U.S.C. § 3553(a)(1).  An examination of the history and characteristics of the

10   defendant reveals that he has defrauded many more victims than just those who the Court heard

11   testify at trial or even heard about at trial.

12       A.    Defendant Defrauds His Father-in-Law

13       "All I want for Christmas is for Mouli to replace my IRA's."

14           — Dr. Robert Stripling in his holiday note, circa 2007 (Attached as Exhibit 1.)

15       Defendant perpetrated the Microsoft/Ecast fraud on his own family, and he did so using

16   means so similar to what the Court heard at trial.  To be able to fleece his own father-in-law, Dr.

17   Robert Stripling, out of the retirement funds he worked so hard as a pediatrician to earn,

18   defendant first set the stage for his fraud.  He told Dr. Stripling that he had become wealthy by

19   inventing a painting restoration process that was subsequently sold to Johnson & Johnson.

20   (Declaration of FBI SA Michael Orndorff, ¶ 3 (Attached hereto as Exhibit 2).)  He said his

21   business success had allowed him to express his altruistic side by contributing to many charitable

22   organizations, including aiding blind children.  *Id.*  He boasted that he was the only person to

23   have received U.S. citizenship from the first President Bush.  *Id.*  He falsely told Dr. Stripling

24   that he owned not only the home in Belvedere, but two private jets, but that one of the jets was

25   frequently leased out to various Hollywood personalities.  *Id.*

26       Having set the stage with lies about his past, defendant went for the money.  He told Dr.

27   Stripling that Ecast was doing very well financially, that it was about to be acquired by

28   Microsoft, and that Dr. Stripling could invest in Ecast and make significant profits.  *Id.*  Dr.

1    Stripling took out a $400,000 loan and provided that money to defendant for an interest in Ecast.

2    *Id*.  Dr. Stripling planned to use the profits to fund the arts—including buying musical

3    instruments for underprivileged children and helping to fund the ballet—near Lubbock, Texas,

4    where he lived and had worked as a pediatrician.  *Id*.  Defendant told Dr. Stripling not to mention

5    the Microsoft/Ecast deal to anyone, because it was a secret.  *Id*.

6         The profits never came, and, in fact, what came were requests for more money—for

7    bonds and fees.  Defendant told Dr. Stripling that Microsoft's acquisition was delayed because of

8    problems obtaining approval from the European Union due to monopoly concerns.  *Id*.  He told

9    Dr. Stripling that he needed more of his money to help persuade EU commissioners to approve

10   the deal.  *Id*.  Dr. Stripling took out a second mortgage on his home and liquidated his IRA, and

11   he transferred these proceeds to defendant for what he thought was equity in Ecast.  *Id*.  While

12   taking millions from Dr. Stripling, defendant constantly called Dr. Stripling and called him

13   "Dad", but when the money ran out, defendant took "weeks" before returning calls.  *Id*.  Having

14   taken out loans and liquidated retirement savings to "invest" in the Microsoft/Ecast deal,

15   eventually Dr. Stripling and his wife did not even have money simply to make needed home

16   repairs.  When they asked defendant for money, he forced them to provide an itemized list of the

17   proposed expenses.  *Id*.  When Dr. Stripling could not repay the loans, defendant told him not to

18   pay the bank so defendant could "make the bank a deal"; defendant offered the bank $125,000 to

19   satisfy both loans, but only on the condition that Dr. Stripling amend his life insurance policies to

20   name defendant—not Dr. Stripling's children—the beneficiary.  *Id*.  After a life and career full of

21   helping his own children and so many others, Dr. Stripling was reduced to noting in a holiday

22   card that he had a pleasant year "[e]xcept for being poor" and that all he wanted "for Christmas is

23   for Mouli to replace my IRA's."  (Ex. 1.)  Even as he was lamenting his financial condition

24   caused by defendant, he was still supporting his daughter by congratulating her on getting her

25   books to print.  *Id*.  He likely had no idea that at least one of them, as discussed below, was

26   funded by money fleeced from victims like him.

27         Dr. Stripling's other child, Dr. Stephen Stripling, provides corroboration for what

28   defendant did to Dr. Robert Stripling.  In 2003 or 2004, Dr. Robert Stripling told his son about an

1  investment opportunity presented to him by defendant.  (Declaration of Dr. Stephen W. Stripling,

2  ¶ 2 (attached hereto as part of Group Exhibit 3).)  Dr. Robert Stripling told his son that he had

3  invested in a deal defendant presented in which a company called Ecast was going to be acquired

4  by Microsoft.  *Id*.  Dr. Robert Stripling told his son that defendant needed more money because

5  the European Union was stalling and defendant needed more money for attorneys' fees.  *Id*.  At

6  his father's request, Dr. Stephen Stripling provided $80,000 to his dad so his dad could bundle it

7  other money and send it to defendant to cover these fees.  *Id*.

8      In return, instead of receiving any of his money back, all Dr. Stephen Stripling received

9  were lawsuits initiated by his sister and defendant seeking even more money and visits from

10  private investigators *to his pediatric office telling his patients that he was subject to lawsuits*.

11  *Id*.; *see also* Letter from Dr. Stephen W. Stripling, MD, dated May 16, 2012,[2] attached as part of

12  Group Exhibit 3.  Dr. Stephen Stripling writes that as a result of defendant's fraud, the last 8

13  years of Dr. Robert Stripling's life "consisted of constant worry about money," including

14  difficulty and requiring several phone calls just to get defendant to part with a few thousand

15  dollars to fix a fence.  *Id*.  Dr. Robert Stripling had to take out a reverse mortgage and continue

16  working up to the day before he was diagnosed with terminal cancer; he died 6 months later,

17  having lost "the last decade [of his life] which was so consumed with anxiety and concern."  *Id*.

18  This type of harm and loss is not covered by the Sentencing Guidelines.[3]

19      Also corroborating the Striplings' information is the attached Declaration of IRS Special

20  Agent Juan Saavedra (attached hereto as Exhibit 4).  Agent Saavedra's review of financial

21  records revealed that from September 2003 through 2004, Dr. Robert Stripling wired $3,467,763

22  to defendant's brokerage account at Wells Fargo Investments (account number ending in -007) in

23  the name of Matisse Investments LLC.  (Ex. 4, ¶ 2(b).)  In return, from April 2005 through 2008,

[2]So dated in original.  Probably should be March.

[3]Defendant likely will claim this is hearsay.  It has long been the law in the Ninth Circuit, however, that hearsay is admissible and may be relied upon at sentencing provided "it is accompanied by some minimal indicia of reliability."  *United States v. Littlesun*, 444 F.3d 1196, 1200 (9th Cir. 2006).  There is far more than that here.

GOVT. SENT. MEMO.;
CR 10-0547 CRB                    9

1    there were 16 wire transfers and two checks from accounts associated with defendant to Dr.

2    Robert Stripling, totaling only $134,000.  *Id*.  The memo sections of the checks stated "2007

3    property tax statement" ($8,023.25) and "freezer, stove" ($2,800).  *Id*.

4            B.     <u>Defendant Defrauds the Parents of His Godson</u>

5            Defendant employed the same *modus operandi* in defrauding Javier Burillo, a man

6    defendant called his "brother" and who was the father of defendant's godson.  At a dinner at

7    defendant's rented home in Belvedere, defendant told his new friend Mr. Burillo that defendant

8    owned the home, that he was an art collector, and that some of his art was currently on display in

9    a museum in New York.  (Declaration of Javier Burillo, ¶ 3 (attached as Exhibit 5).)  Defendant

10   told Mr. Burillo that defendant had been a very successful businessman in New York, creating

11   and selling multiple companies, but that he had made a lot of money for many people through a

12   company he founded called Ecast.  *Id*.  Defendant used other familiar stage-setting themes with

13   Mr. Burillo, too, such as claiming to be an impressive philanthropist and claiming to have

14   received citizenship from the first President Bush in recognition of his business successes.  *Id*.

15   Echoing his false claims to Dr. Stripling and so many others, defendant told Mr. Burillo that he

16   owned more than one private jet, and that he often loaned one to *American Idol* creator Simon

17   Cowell.  *Id*.

18           Against this backdrop of wealth and unmitigated business success, defendant presented

19   Mr. Burillo with the opportunity to invest in defendant's next sure-fire "incredible investment

20   opportunity"—Procinea.  *Id*. at ¶ 4.  But Mr. Burillo had to "act fast" if he wanted to profit from

21   this "once in a lifetime" opportunity; indeed, it was "now or never."  *Id*.  Defendant told Mr.

22   Burillo that defendant had invested a substantial amount of his own money in Procinea.  In or

23   about May 2006, Mr. Burillo provided $1 million to defendant for an investment in Procinea.  *Id*.

24   Over the ensuing years, defendant pitched many investment ideas to Mr. Burillo.  Defendant

25   pitched an investment in The Fashion Channel, claiming he owned the rights to it in the United

26   States.  *Id*. at ¶ 5.  Defendant persuaded Mr. Burillo to invest approximately $2 million in another

27   business venture defendant claimed he could sell to Gatorade or Coca-Cola, and Mr. Burillo

28   wired his $2 million to Signet Ventures LLC.  *Id*. at ¶ 6.

Defendant also persuaded Mr. Burillo to invest in an entity defendant called Voltage.[4] Defendant told Mr. Burillo that defendant had invested $50 million of his own money in Voltage, which defendant described as some sort of holding company set up to invest in other companies. *Id.* at ¶ 7. As discussed below, defendant used some of the same false statements to persuade Mr. Burillo's friend, Carl McLarand, to invest in Voltage. Mr. Burillo and Mr. McLarand each sent defendant $1.1 million for an investment in Voltage. Finally, defendant convinced Mr. Burillo to invest in an opportunity related to Teva Pharmaceuticals. Defendant told Mr. Burillo that due to a Cohen family connection in Israel, defendant had learned that Teva was about to merge with another company.[5] As a result, investing in Teva would result in huge returns very quickly. *Id.* at ¶ 8. After refinancing his home to be able to do so, Mr. Burillo invested $2.5 million with defendant for this "opportunity." *Id.*

During their relationship, defendant had Mr. Burillo sign many documents that defendant said were related to these investments, often claiming what Mr. Burillo was signing was protecting his investments. *Id.* at ¶ 9. Defendant frequently told Mr. Burillo just to "sign here" because the document was "no big deal." *Id.*

The manner defendant employed to defraud Mr. Burillo is quite familiar. Defendant appeared to be treating Mr. Burillo very well while he was stealing his money, and he maintained his charade of wealth based on business acumen. He took Mr. and Mrs. Burillo by limousine to the airstrip to board "his" private jet to Las Vegas, where they enjoyed an expensive dinner before returning to San Francisco. *Id.* at ¶ 10. He hired a Grammy Award nominee to entertain the Burillos and the Cohens during a dinner at the Belvedere home. *Id.* at ¶ 10. He told Mr. Burillo that he loved him and called him "brother." He told Mr. Burillo his investments were

---

[4] Even today, defendant's glowing description of Voltage Capital can be viewed on his website, www.moulicohen.com, in the "About" section, "Voltage Capital" link.

[5] Even today, one can see the claim defendant makes on his website that "one of my first investments in Pharmaceuticals [sic] was with Teva, the largest generic drug company in the world. I acquired the shares in a direct transaction with Robert Maxwell." *(See* www.moulicohen.com, "About" section, "Teva" link.) Robert Maxwell died in 1991.

protected by other business entities, including one named by using defendant's and Mr. Burillo's initials, MCJB, and that if Procinea did not work out defendant would just pay him back from one of the other entities.  Also familiar is what happened at the end of their relationship; defendant rarely returned calls or e-mails and made excuses when he did.  *Id*.  Then he effectively disappeared.

Defendant took approximately $8 million from Mr. Burillo, only returning $40,000 in a "refund."  *Id*. at ¶ 15.  Agent Saavedra confirms these figures.  (Ex. 5, ¶ 2(b).)

C.   Defendant Defrauds Carl McLarand

Mr. Burillo's friend Carl McLarand also lost $2.1 million to defendant.  Defendant set the stage to victimize Mr. McLarand with a dinner at the Belvedere mansion complete with musical entertainment, stories of having made at least scores of millions of dollars from business dealings, and claims to huge amount of stock ownership in a very large company, perhaps Johnson & Johnson.  (Declaration of Carl McLarand, ¶ 2 (attached as Exhibit 6).)  Defendant pitched Mr. McLarand on a company called Procinea.  After attending a subsequent presentation about Procinea, Mr. McLarand declined.  Then defendant shifted the pitch, now selling an investment in MCJB.  *Id*. at ¶ 3.  Mr. McLarand invested $1 million in MCJB, believing from defendant that this money would be held for several months, during which time it would earn interest while Mr. McLarand could reconsider investing in Procinea.  *Id*.  Several months later, defendant sought Mr. McLarand's investment in Voltage, which he described as a venture capital firm set up to invest in start-up companies.  Defendant claimed to Mr. McLarand that he had invested $50 million of his own money in Voltage, and he showed Mr. McLarand documents purporting to reflect that investment.  *Id*. at ¶ 4.  Striking the familiar friendship chord defendant played with Mr. Farrell and others, after defendant received Mr. McLarand's additional $1.1 million he told Mr. McLarand how he was even more excited to have him "as a friend" and how he looked forward to "growing their friendship."  *Id*.

Defendant also struck familiar chords in attempting to persuade Mr. McLarand to invest in Teva Pharmaceuticals.  Defendant told Mr. McLarand that defendant had a close relationship with one of the principals of Teva, through which he had learned Teva was about to be acquired.

1  Defendant employed his previously successful tactics of telling his victim this was a time

2  sensitive opportunity; the window closed in just a few months.  *Id*. at ¶ 5.  Mr. McLarand wisely

3  chose not to invest in the Teva opportunity.

4          When Mr. McLarand asked defendant for his money back, defendant refused.  He cited

5  the promissory note Mr. McLarand had signed, which he claimed allowed defendant the right to

6  retain Mr. McLarand's money for 5 years, even though that was not what defendant had told Mr.

7  McLarand were the terms of their deal.  *Id*. at ¶ 6.  Despite calls, letters, and e-mails to defendant,

8  defendant never returned any of Mr. McLarand's $2.1 million.[6]  Instead, Mr. McLarand received

9  from defendant's attorneys accusations and reminders of "confidentiality obligations" and a

10  meeting with defendant and his bodyguard, who arrived together by limousine.  *Id*. at ¶¶ 8—9.

11          D.      Defendant's Use of His Victims' Money

12          The outrageously profligate lifestyle defendant funded with his victims' money also

13  warrants an upward variance.  The Court heard and saw evidence of many of the extravagant

14  luxuries defendant bestowed upon himself and his wife during the decade in which he was

15  defrauding Ecast "investors" as well as others such as Dr. Stripling, Mr. Burillo, and Mr.

16  McLarand.  Just a few examples were:

17      ●      $6 million in private jet rentals, mostly for himself and his wife, but also
                including flying pop stars Jennifer Lopez and Elton John (separately);

18

19      ●      $1.4 million on <u>one</u> ring (25 carat diamond ring);

20      ●      $1.4 million to rent the Belvedere mansion;

21      ●      more than $700,000 on additional jewelry;

22      ●      $373,000 on <u>one</u> car (Rolls Royce);

23      ●      $350,000 on a personal chef;

24      ●      $260,000 at the Four Seasons Hotels in *San Francisco*, New York,
                and Hawaii;

25      ●      $207,000 on <u>one</u> car (Aston Martin);

26      ●      $157,000 at the Peninsula Beverly in Beverly Hills;

27      ──────────────

28          [6]Agent Saavedra confirmed these figures, too.  (Ex. 5, ¶ 2(c).)

- $150,000 on a personal driver;

- hundreds of thousands of dollars on vacations;

- hundreds of thousands of dollars at luxury vendors in San Francisco, Beverly Hills, New York, and St. Bart's; and

- after being confronted, more than $1.75 million overseas to Swiss accounts.

One of the many examples of the luxury the victims unwittingly provided defendant that the Court did not see during trial was where defendant moved in 2009.  The Court heard details about the Belvedere mansion, where defendant and his wife lived from approximately 2002 to early 2009.  It was a 7,867 square foot home that is now worth approximately $5.7 million, off its market peak of approximately $10 million.  (PSR, ¶ 69.)  Defendant initially paid $15,000 per month to rent it; by the time he moved in early 2009 he was paying $35,000 per month.  *Id*.  In early 2009, he and his wife moved to palatial home in Lower Bel Air, California.  That home has 6 bedrooms and 10 bathrooms spread across its 9,289 square feet nestled into a 35,000 square foot lot overlooking the Bel Air Country Club golf course.  (PSR, ¶ 70.)  It is currently on the market for $15.9 million.  *Id*.  Photos of the home and its grounds are available on the real estate company's website, and some are attached hereto as Exhibit 7.

Defendant also poured at least scores of thousands of dollars into the publication of *The Kosher Billionaire's Secret Recipe* during this period.  This book not only represents a waste of victims' money, but it is perhaps the best illustration of the extravagant globetrotting lifestyle defendant enjoyed at his victims' expense.  A copy of the book is being submitted along with this filing as Exhibit 8.  In his declaration, Agent Saavedra lists just a few examples (totaling more than $160,000) of payments toward the production of this book.  (Ex. 5, ¶¶ 3—4.)  Those payments were made out of the "Stacy Cohen Lifestyle, Inc." account, which was funded by defendant's Wells Fargo accounts.  Those accounts were funded by victims.

The many examples of where the victims' money *did* go stands in stark contrast to where it could have—and at least much of it would have—gone: Vanguard and its causes, the Mills not having to sell their home, or Dr. Stripling not having to plead for some of his own money back to fix his fence, his freezer, or his stove.

E.     Defendant's Charitable Involvement

Donating other people's money is not a mitigating factor.

From his initial bail hearings through today, defendant has claimed that his efforts on behalf of charitable organizations have been remarkable.  A closer examination of those efforts, however, reveals that defendant's involvement with charitable organizations is not a mitigating factor, and, in fact, may be an aggravating one.

1.     Defendant Caused the Collapse of Vanguard

Vanguard had existed for three decades before defendant came along and pretended to want to help it and its causes.  (Tr. 525.)  Vanguard funded causes such as the first battered women's shelter in San Francisco, "Back on Track" which tutored young children, reduction of gang violence in minority communities, and victims of natural disasters.  (Tr. 526.)  It relied on individual donors to be able to make grants to these causes, and it had made approximately $30 million in grants to such causes over approximately a 25-year period.  (Tr. 527.)

As discussed above, defendant began his scheme by pretending to be a wealthy philanthropist who had the means and the desire to help Vanguard.  He was so persuasive in professing this desire that Mr. Dillon compared his values to those of Dr. Martin Luther King, Jr. Unfortunately for Vanguard, the truth was the precise opposite of what defendant represented: he had neither the means nor the desire to help fund Vanguard and it causes, and he wished to use Vanguard to help fund him and his causes.  After Vanguard, its directors, its staff, and its major and minor donors all unwittingly contributed tens of millions to defendant, the donors could no longer afford to fund Vanguard.

2.     Defendant's Involvement with Other Charities

Defendant's history with other charities also reveals that defendant is far less of a philanthropist than he claims.

a.     Camp Okizu

Although he cites it as a mitigating factor, defendant's selfish use of Camp Okizu, which serves to help children with cancer and their families, is one of many factors supporting an upward variance.

1    Camp Okizu provides peer support, mentoring, and recreational programs to help

2   children suffering from cancer and their families.  (Declaration of John Bell, ¶ 4 (attached as

3   Exhibit 9).)  It is funded by donations.  *Id*.  In 2002 or 2003, Mr. Bell, who founded Camp Okizu,

4   was introduced to defendant by Jamie Lee.[7]  Defendant flew, via private jet, to Camp Okizu,

5   though he did not interact with any children.  *Id*. at ¶ 5.  Defendant told Mr. Bell that he wanted

6   to help Camp Okizu by raising $5 million for it.  To the best of Mr. Bell's knowledge, defendant

7   never came back to the camp and defendant's wife never visited it.  *Id*.

8    After this visit, defendant invited Mr. Bell to the Ecast offices, where defendant reiterated

9   his desire to help.  *Id*. at ¶ 6.  As a condition of obtaining his help, however, defendant told Mr.

10  Bell that he wanted to become a member of Camp Okizu's Board of Directors.  *Id*. at ¶ 8.  That

11  request was granted, and defendant proceeded to attend one or zero of the board meetings that

12  took place four times per year for the several years he was on the board.  *Id*.

13   Mr. Bell confirms that defendant and his wife were the high bidders on several items at

14  various fundraiser auctions held to benefit Camp Okizu.  But defendant takes too much credit for

15  "philanthropy" here.  The philanthropist is not the one who buys material items or experiences

16  for himself at an auction; rather, the philanthropist is the one who donated those things to be sold

17  at auction.  Defendant claims some type of credit for purchasing, for example, a ladies pink gold

18  watch ($19,500), a Rolling Stones autographed guitar ($14,000), and a Barry Bonds autographed

19  baseball ($1,600).  *Id*. at ¶ 11.  Furthermore, even after he was the winning bidder, it was

20  "extremely difficult" for Mr. Bell and his staff to get defendant to pay for the items, and

21  sometimes it took months during which even contacting defendant was difficult.  *Id*. at ¶ 9.  And

22  defendant never fulfilled one pledge he made to fund one child's trip to Camp Okizu.  *Id*.

23   One pledge defendant did fulfill was to fund a day of sailing on Larry Ellison's yacht on

24  the San Francisco Bay.  Defendant and his wife enjoyed this sail, too.  *Id*. at 10.  Sometime

25  thereafter, defendant's wife asked for photos of the event, apparently not knowing that none had

26  been taken.  *Id*.  Defendant's wife described this event in her letter to this Court and in *The*

27  _____

28  [7]Mr. Lee also "purchased" Ecast shares and lost more than $400,000 to defendant.

1  *Kosher Billionaire's Secret Recipe* (pp. 155—56), claiming there were "thirty young campers"

2  on this sail; in fact, there were fewer than 10.  Bell Decl., Ex. 9, ¶ 10.

3        Despite these facts, defendant (and his wife in a letter to the Court) tout their work with

4  Camp Okizu as an example of a philanthropical cause near and dear to their hearts and which

5  they have supported over the years.  Defendant's website maintained, and still maintains, a

6  picture of defendant above a description of Camp Okizu and defendant's claimed involvement in

7  it.  *See* http://www.moulicohen.com/philanthropy/health-care/camp-okizu/.  That link directs the

8  viewer to another link if the viewer wishes to hear more about Camp Okizu or defendant's

9  thoughts on philanthropy.  That link, in turn, sends the reader to an apparently self-conducted

10  interview of defendant in which he shares his thoughts on philanthropy.  The link is available

11  through defendant's website or by searching "mouli cohen philanthropy" on www.youtube.com.

12  Either will reveal this video:  http://www.youtube.com/watch?v=wCWluZW6kiA

13        The government requests that the Court view this video "interview".  It begins with a

14  quote attributed to Bill Gates about helping others, immediately followed by one attributed to

15  defendant.  Mr. Bell, who has watched the video, opines that the video footage defendant inserted

16  in his self-directed interview appears to be footage shot by an ABC camerawoman working with

17  ABC newswoman Cheryl Jennings, who does an annual feature on Camp Okizu.[8]  *Id.* at 13.  And

18  some of the statements defendant makes about Camp Okizu are false.  *Id.*[9]

19                          b.   The Seva Foundation

20        Another reason the government asks the Court to view that video is because it also

21  includes false statements about another philanthropic cause for which defendant takes far too

22  much credit.  The Seva Foundation (Seva) was founded by Dr. Larry Brilliant and his wife more

23

24      [8]Indeed, the original footage defendant inserts in "Mouli Cohen on Philanthropy" was

25  posted in 2007 by ABC and is found here: http://www.youtube.com/watch?v=Wg2MhT8B_L0

26      [9]Included with this filing, as Exhibit 10, is a CD containing and preserving 4 videos of

27  apparently self-conducted interviews of defendant: (1) Mouli Cohen on Philanthropy, (2) Mouli
Cohen on the Importance of Art, (3) Mouli Cohen's "Secret Sauce" for Success, and (4) An
Interview with Mouli Cohen on His Connection to the Jewish Community.  All four videos were

28  posted in 2009, a few months after several lawsuits were filed against defendant alleging fraud.

than 30 years ago.  (Declaration of Dr. Lawrence ("Larry") Brilliant, ¶ 2 (attached as part of Group Exhibit 11).)  It is an international non-profit health foundation that delivers health services to some of the world's most vulnerable people in some of the world's most vulnerable areas, with a particular focus on reducing blindness in those areas.  *Id.*

        Defendant apparently promised money to Seva, but claimed on his website that he was a donor.  Seva staff repeatedly asked that defendant remove from his website all references to Seva, including photos defendant had uploaded without permission and false language in which defendant claimed to have "developed The Seva Child Vision Campaign to prevent blindness and restore sight in countries where nearly 500,000 children go blind every year."  (Group Ex. 11, e-mail chain received from Seva staff).  In response, defendant stated that his "website reference to our efforts ... speaks for it self [sic] but I am happy to remove any reference to Seva while under your direction."  *Id.*  Defendant continued, however, by noting that he was "disappointed, as I am sure my friends and other Seva donors would be, about your decisions on allocation of time, money and resources utilized for such frivolous claims.  Your response to the email is not needed.  Mouli".  *Id.*

        Prior to this exchange, at the request of Seva staff, Dr. Brilliant had contacted defendant and told him either to fulfill his promise to donate to Seva or to take all Seva references off his website.  *Id.* at ¶ 3.  Defendant responded by inviting Dr. Brilliant to the Belvedere home, where defendant offered to introduce Dr. Brilliant to the "business world."  *Id.* at ¶ 4.  Having been involved in the World Health Organization for decades, having served as Executive Director of Google's philanthropic arm, and having been named by *Time* magazine as one of the 100 most influential people in the world in 2008, and having come to Belvedere simply to get the promised donation, Dr. Brilliant was not interested in such introductions.  *Id.* at ¶¶ 1, 4.  Defendant asked if he could leave his Seva-related claims on his website if he donated $50,000, and he eventually promised a $50,000 check and promised to recruit "high-profile" support for Seva.  *Id.* at ¶ 4.  Just like Mr. Bell and the staff at Camp Okizu, Dr. Brilliant and the staff at Seva had to pursue defendant for months before finally receiving his promised donation.  *Id.* at ¶ 5.  The "high profile" (or any other) support never arrived.  *Id.*

Claims about Seva are still on defendant's website today.[10]

          c.    <u>UCSF</u>

Defendant also cites a $50,000 gift to UCSF as evidence of his philanthropy. But that is not the full story. According to UCSF records, that $50,000 was an "initial gift" as part of his pledge to make a "larger gift". (Ex. 12.) It appears defendant told UCSF that in addition to the $50,000 gift, he would "get some friends to match this amount", and he was ready to sign his pledge agreement for the larger gift as he had "made the commitment in his mind". He just needed 20 minutes to attend to this, and UCSF staff just needed to contact his new assistant to get this pledge "on top of his pile." *Id.* Defendant also told UCSF staff that Johnson & Johnson was "thinking of investing" in some orthopedic device company defendant was interested in, and that Johnson & Johnson had asked defendant to "come in". UCSF staff noted that "[a]s noted in his bio, Mouli had an earlier biotech company that was bought by J&J, so he has a lot of contacts there." *Id.* Defendant cites only this $50,000 donation in his papers, so it appears neither the "matching gift" nor the "larger gift" ever materialized.[11]

## III.    The Sentencing Guidelines

Based on just the conduct described at trial, the Probation Office issued the draft Presentence Investigation Report on December 28, 2011. The Court ordered the parties to submit their respective objections to that draft by March 30, 2012, and to submit their respective responses to the other party's objections by April 6, 2012. On March 30, 2012, each party submitted a letter to the Probation Office detailing any objections to the draft PSR, and on April 6, 2012, each party submitted a letter to the Probation Office responding to the March 30

---

[10]They can be found by copying and pasting this website address: http://www.moulicohen.com/philanthropy/health-care/childhood-vision-campaign/

[11]What did materialize, however, were headaches for UCSF. As reflected in e-mails between UCSF staff and one of defendant's assistants, defendant "kept calling the development office up to 6 times in one day demanding appt with Chatterjee or others when they are out of the country. I understand you ask forASAP appts in dermatologist, ENT, cardiology regularly. Also heard you cancelled at the last minute an appt with Chatterjee's associate that went out of his way to arrange to see you." *Id.* at p. 2.

1    submissions.  After considering those submissions, the Probation Office timely issued the final

2    Presentence Investigation Report (PSR) on April 13, 2012.

3        The Court ordered the parties to file any objections to the PSR on April 20, 2012, and the

4    Court held a hearing regarding application of the Sentencing Guidelines on April 24, 2012.  After

5    that approximately 2.5 hour hearing, the Court determined that the Total Offense Level was

6    either 38 or 39.  As stated at that hearing, the government submits that application of the

7    "grouping" rules results in a Total Offense Level of 39.  The resulting Guidelines range of

8    imprisonment is 262—327 months of imprisonment.

9        The Sentencing Guidelines recognize, however, that "[t]here may be cases in which the

10   offense level determined under this guideline [2B1.1] substantially understates the seriousness of

11   the offense.  In such cases, an upward departure may be warranted."  U.S.S.G. § 2B1.1, App.

12   Note 19(A).  One of the examples the Sentencing Commission provides is an offense which

13   "involved a substantial amount of interest of any kind, finance charges, late fees, penalties,

14   amounts based on an agreed-upon return or rate of return, or other similar costs, not included in

15   the determination of loss for purposes of subsection (b)(1)."  Here, as Mr. Dillon, Mr. Mills, and

16   Mrs. Mills testified, and as demonstrated by the declarations describing what defendant did to his

17   father-in-law and Mr. Burillo, several victims took out loans so they could make initial

18   investments or pay bonds and fees for the deal.  Mr. Dillon testified about e-mails he sent

19   defendant noting the installment payments and interest due on loans from MAFCU, and the Mills

20   testified about refinancing homes to pay the purported bonds and fees.  The interest these victims

21   had to pay on these loans were not included in the determination of loss, but represent a

22   substantial additional loss caused by defendant's fraudulent scheme.  Similarly, all the attorneys'

23   fees incurred by the victims in pursuit of civil suits are financial losses not taken into account in

24   the Sentencing Guidelines loss determinations.

25       Another remarkable aspect of defendant's tax free fraudulent scheme not covered in the

26   Guidelines and warranting an upward variance is that it was not a routine one in which at least

27   some victims received at least some of their money returned.  Defendant's scheme was such that

28   he was not expected to pay interest on investments, and he convinced his victims that all of their

money was tied up until the "central moving part" finally came to fruition.  The only money defendant paid back, $60,000, was part of his effort to conceal his crimes and obtain the fraudulent "releases" in July 2006.  A typical Ponzi schemer or investment fraudster who causes victims to part with between $20 million and $50 million would be saddled with the same loss amount as defendant here, even though they may have paid back millions of dollars in "interest" or allowed "investors" to withdraw their investments, thus causing far less actual loss than defendant did here.

The same is true with other enhancements.  The number of victims is far more than 50 who directly lost money, but the Guidelines do not take into account all the individuals victimized by Vanguard and its donors being financially decimated.  Even the charitable organization enhancement cannot be said to cover the extent of the damage defendant caused in that regard.  Although the Court found the specific enhancement not to apply, defendant plainly obstructed justice at least in a non-Guidelines manner.  The fraudulent documents and e-mails, the lies to the SEC, the fraudulent declarations of Mr. Ettinger, the lies to two federal judges—this conduct stands unaccounted for in the current Guidelines calculations yet plainly warrants an increased sentence.

Another issue that arose at the April 24 hearing was the issue of running terms imposed on multiple counts concurrently or consecutively ("stacking").  U.S.S.G. § 5G1.2(d) specifies the procedure for determining "the specific sentence to be formally imposed on each count in a multiple-count case."  U.S.S.G. § 5G1.2, Commentary, App. Note 1.  "The combined length of the sentences ('total punishment') is determined by the court after determining the adjusted combined offense level and the Criminal History Category."  *Id.*  Section 5G1.2(d) states as follows:

> If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produced a combined sentence equal to the total punishment.  In all other respects, sentences on all counts shall run concurrently, except to the extent otherwise required by law.

"If no count carries an adequate statutory maximum, consecutive sentences are to be imposed to

the extent necessary to achieve the total punishment."  U.S.S.G. § 5G1.2(d), Commentary, App.

Note 1.  Before and after *Booker*, the Ninth Circuit has approved of this method of "stacking"

sentences to achieve the desired sentence.  *See generally United States v. Posely*, 2008 WL

467695 (9th Cir. 2008)(unpublished)("Because no count of conviction provided for the total

amount of recommended punishment, the district court appropriately imposed certain sentences

consecutively to achieve that total.")(citations omitted); *United States v. Kentz*, 251 F.3d 835,

841—42 (9th Cir. 2001)(affirming 160-month sentence which required stacking because

defendant was convicted of 21 counts, each bearing a 60-month statutory maximum); *United

States v. Iniguez*, 368 F.3d 1113 (9th Cir. 2004).

In this case, "no count carries an adequate statutory maximum" because the statutory

maximum on each of the wire fraud counts is 240 months, 120 months on each of the money

laundering counts, and 60 months on each of the tax evasion counts.  Accordingly, the

government submits the Court should sentence defendant to 240 months on each of the wire

fraud counts (to run concurrently to each other), 120 months on each of the money laundering

counts (to run concurrently to each other and to the wire fraud counts), followed by 120 months

on each of the tax counts, to run concurrently to each other but to run <u>consecutively</u> to the

sentences imposed on the other counts, for a total punishment of 360 months in prison.

## IV.    Other Considerations of 18 U.S.C. § 3553(a)

Although the discussion of defendant's offense conduct and history and characteristics

largely covers the following factors, a few additional comments are warranted.

A.    To Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to
      <u>Provide Just Punishment for the Offense</u>

Defendant operated a devastating fraud scheme during which he preyed upon "friends"

and family for approximately a *decade*.  He did not stop, or even slow down, when he was sued

in 2003 or 2004 by the Farrell group.  To the contrary, his response was to manufacture

fraudulent documents in an effort to conceal his fraud better than he had done with the Farrell

group.  His response to the Dillon/Mills lawsuits filed in early 2009 and the SEC investigation

was even more telling.  He created more fraudulent documents—such as the Gates/Ballmer

dinner response—and he brazenly and repeatedly lied under oath to the SEC examiners.  At the same time, he wired at least approximately $2 million in assets to Swiss accounts.  Then, in the summer of 2009, he appears to have engaged in some type of attempted PR maneuver by posting videos of himself on the internet for all the world to see in which he falsely portrayed himself as a successful businessman who wanted to "give back" his "fortune."

The outrageously opulent lifestyle defendant chose to live on the backs of his victims, who otherwise would have been donating money to an organization that helped underprivileged children, battered women, and victims of natural disasters, warrants a severe sentence of imprisonment.  The losses defendant caused to his in-laws, his "friends", his other victims, and the unknown hundreds or thousands of people in the community and beyond who would have been aided but for defendant cannot be measured in the Sentencing Guidelines.

Even after he was arrested, he continued to demonstrate his disrespect—disdain—for the law by having the audacity to claim to a federal judge that he wired money to Switzerland to protect *investors* in response to what he claimed was a financial crisis causing him to be concerned about the viability of Wells Fargo.  He later lied to another federal judge about his effort to bribe one of the guards the judge ordered to watch over defendant to make sure he did not flee.  This defendant has demonstrated that he will lie to anyone, at any time, without any qualms, if he thinks it will advance his financial objectives.

B.     To Afford Adequate Deterrence and to Protect the Public From Further Crimes

These factors also weigh heavily in favor of a substantial prison term.  As the Ninth Circuit noted in *United States v. Treadwell*, 593 F.3d 990 (9th Cir. 2010), in denying the defendant a shorter sentence, the district court "had to consider, for example, that if not incarcerated, Treadwell might resume fraudulent activities sooner, and might harm new victims sooner.  The severity and scope of Treadwell's fraud, taking more than $40 million from investors, justified giving significant weight to specific deterrence and to protection of the public." 593 F.3d at 1012—13.  Notably, in *Treadwell*, the district court noted other factors present here: it was a fraud that "went on for many years" and that defendant "clearly hadn't accepted responsibility." *Id*. at 1013.  "The vast nature of Treadwell's scheme alone suggests

GOVT. SENT. MEMO.;
CR 10-0547 CRB                          23

1    that Treadwell poses a substantial danger to the public." *Id.* at 1014.

2        C.    <u>The Kinds of Sentences Available</u>

3        The only meaningful component of any sentence this Court will impose upon this

4    defendant is the prison component.  In light of his unbroken history of deceit and refusal to

5    communicate with people unless he is getting something out of it, there is little chance this

6    remorseless defendant will cooperate with a Probation Officer upon release or otherwise comply

7    with any terms of supervision the Court may impose.  The government submits there is no

8    chance this defendant will attempt to make any restitution or voluntarily satisfy any portion of the

9    forfeiture order.  This factor weighs in favor of an upward variance.

10       D.    The Need to Avoid Unwarranted Sentencing Disparities Among Defendants With

11       <u>Similar Records who Have Been Found Guilty of Similar Conduct</u>

12       Citing defendants involved in frauds at Enron, WorldCom, and Adelphia, as well as

13   obviously inapplicable statistics, defendant cites unwarranted sentencing disparities as a reason

14   that a greater sentence is too harsh.  Many circuits, including the Ninth Circuit, have rejected

15   these arguments, and the Court should do so here.

16       In *Treadwell*, defendant argued that his 300-month sentence created an unwarranted

17   sentencing disparity because it was similar to the sentences received by Ebbers, Skilling, and

18   Rigas.  In rejecting this argument, the Ninth Circuit reasoned that avoiding sentencing disparities

19   "on the basis of easily quantifiable values like amount of loss is a factor that the Guidelines are

20   uniquely well-suited to accomplish." *Id.* at 1011 (citations omitted).  The Sentencing

21   Commission examined tens of thousands of sentences, and it clearly considered the goal of

22   avoiding sentencing disparity.  *Id.*  In this case, because the Court calculated and carefully

23   reviewed the Guidelines range, "he necessarily gave significant weight and consideration to the

24   need to avoid unwarranted disparities." *Id.*, citing *Gall v. United States*, 128 S.Ct. 586 (2007).

25   The Sentencing Commission expressly concluded that in fraud cases, loss serves as a measure of

26   the severity of the offense and the defendant's relative culpability, and it is a principal factor in

27   determining the offense level.  *Id.*

28   ///

GOVT. SENT. MEMO.;
CR 10-0547 CRB        24

The Ninth Circuit also stated that it did not "matter for the purposes of § 3553(a) that [defendant] can point to a specific criminal defendant, like Rigas, who may have received a lighter sentence for a different fraud." *Id*. Courts tailor sentences to the specific characteristics of the offense and the defendant, and sentencing disparity is only one factor among many in that analysis. *Id*. at 1011—12. "Too many factors dictate the exercise of sound discretion in a particular case to make the inquiry [defendant] urges helpful or even feasible." *Id*. at 1012. Quoting the Supreme Court, the Ninth Circuit agreed that "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Id*. (citation omitted).

The duration of this defendant's fraud, the nature of the victims, how defendant spent their money, his disdain for the law and other human beings all magnify his crimes and the punishment necessary to address them.

## V.    Restitution and Forfeiture

The government requests that the Court order restitution of $29,731,335.43.  That figure represents defendant's gain from the offenses of conviction, less "bonds and fees" payments the government could not definitively track to a particular victim to be reimbursed and less the $60,000 he sent back to Vanguard in July 2006.  The precise breakdown of restitution payable to each victim is attached hereto as Exhibit 14.  The government will provide the addresses for restitution payments to the Probation Officer within one day of sentencing.  Forfeiture is also mandatory, and should be ordered in the amount the government proved at trial that defendant gained from his offenses of conviction (less $60,000): $31,422,403.06.

///

///

///

///

///

///

GOVT. SENT. MEMO.;
CR 10-0547 CRB                                     25

VI.     **Conclusion**

For these reasons and those set forth in the Government's Memorandum Regarding Sentencing Guidelines (filed April 20, 2012) as well as those in the PSR, the government respectfully requests that the Court sentence defendant to 360 months imprisonment, three years of supervised release, restitution of $29,731,335.43, forfeiture of $31,422,403.06, a fine of $250,000, and the mandatory special assessment of $2,900.

DATED: April 25, 2012                    Respectfully submitted,

                                         MELINDA HAAG
                                         United States Attorney


                                         _/s/_____
                                         W. DOUGLAS SPRAGUE
                                         HALLIE MITCHELL
                                         Assistant United States Attorneys

GOVT. SENT. MEMO.;
CR 10-0547 CRB                    26