1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

        Plaintiff,

  v.

SAMUEL COHEN,

        Defendant.

_____/

No. CR 10-547 CRB

**ORDER DENYING MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE**

      Defendant Samuel Cohen ("Cohen"), convicted of defrauding would-be investors of tens of millions of dollars, has filed an amended memorandum in support of his motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.  See generally Am. Mot. (dkt. 535).  Cohen includes four sets of claims in his amended motion: six claims of ineffective assistance of counsel ("IAC") as to his trial counsel and two claims of IAC as to his appellate counsel; one claim of actual innocence; three claims of violations of due process; and a claim that the Court should vacate his money laundering and tax convictions.  See id.  To develop these claims, Cohen also seeks an evidentiary hearing.  See id.

      The government opposes Cohen's amended motion, and requests in the alternative that the Court waive the attorney-client and work-product privileges between Cohen and his trial counsel.  See generally Resp. to Am. Mot.  (dkt. 542).

      The Court DENIES Cohen's amended motion, as explained below.

**United States District Court**
For the Northern District of California

# I.     BACKGROUND

The Ninth Circuit Court of Appeals summarized the facts of the case as follows**:**

> Samuel Cohen posed as a wealthy philanthropist interested in donating sixty million dollars to charitable causes.  He arranged a meeting with the Vanguard Public Foundation, a charitable organization, on the pretext that he was considering making a donation. But instead of donating to Vanguard, Cohen extended an offer to the Vanguard Foundation's donors to sell them some of his shares in E-Cast, Inc., a company he co-founded. Cohen represented that E-Cast was about to be acquired by Microsoft and that the value of E-Cast shares would soon jump up to the Microsoft price of $30 per share.  Cohen offered to sell his E-Cast shares for $3.50 per share, ostensibly conditioning his offer on the donors' promise to give half their profits to charity.
>
> In fact, Cohen had been terminated from his position at E-Cast, he did not actually transfer any of his E-Cast shares to the purchasers, he never informed E-Cast that he sold any shares, and the evidence at his criminal trial showed that E-Cast was not in talks with Microsoft or any other buyer.

Op. of USCA (dkt. 434).

Following a 23-day jury trial, Cohen was convicted, on November 9, 2011, of 29 separate counts: 15 counts of wire fraud (counts 1–14, 18), 11 counts of money laundering (counts 20–29, 32), and three counts of tax evasion (counts 33–35).  See Indictment (dkt. 163); 11/9/2011 Min. Entry (dkt. 294).

On December 13, 2011, Cohen filed his first of three motions for a new trial and a motion for acquittal on all counts.  See Mot. for New Trial I (dkt. 303).  In his motion, Cohen argued that the evidence was insufficient to support a verdict because (1) it relied "entirely" on testimony from Hari Dillon ("Dillon"), and (2) the government failed to establish that Cohen made false statements to the investors that he allegedly defrauded in many of the wire fraud counts.  See id.  The Court denied Cohen relief after full briefing, see Resp. to Mot. I (dkt. 353) and Reply to Resp. I (dkt. 368), and a motion hearing, see 4/18/2012 Min. Entry (dkt. 371).

On March 1, 2012, Cohen filed a motion for release of exhibits, see Mot. Release of Exs. (dkt. 347), which he supported with a supplemental memorandum, see Suppl. Mem. Release (dkt. 352).  In the motion, Cohen claimed that he needed certain documents to provide to a handwriting expert to help him determine the authenticity of Dillon's signature. See id.  The Court denied Cohen's motion.  See Order Den. Release (dkt. 357).  Cohen then

United States District Court
For the Northern District of California

asked the Court for leave to file a motion for reconsideration of his motion for release of exhibits. See Recons. (dkt. 359). The government objected. Obj. to Recons. (dkt. 360). The Court denied Cohen leave to file his motion for reconsideration. See Order Den. Leave (dkt. 362).

On April 4, 2012, Cohen filed a second motion for new trial, based on IAC. See Mot. for New Trial II (dkt. 363). In his motion, Cohen claimed that his trial counsel was constitutionally ineffective by failing to retain a handwriting expert. See id. Cohen claimed that an expert could have examined documents used by the government that allegedly bore Dillon's signature. See id. The Court denied Cohen's motion after full briefing, see Resp. to Mot. II (dkt. 542) and Reply to Mot. II (dkt. 462), and a motion hearing, see 4/18/2012 Min. Entry (dkt. 371).

On April 30, 2012, the Court sentenced Cohen to 264 months of imprisonment; three years of supervised release; a $2,900 assessment fee; a $25,000 fine; restitution to be determined; forfeiture of a 2008 Jaguar Super V8; and a judgment in the amount of $31,422,403.05. See 4/30/2012 Min. Entry (dkt. 383); see Forfeiture Order (dkt. 381). At a subsequent hearing on September 26, 2012, the Court set Cohen's restitution at $29,731,335.43. See Am. J. (dkt. 421).

On May 7, 2012, Cohen filed a notice of appeal to the Ninth Circuit. See Notice of Appeal (dkt. 391). The Ninth Circuit affirmed Cohen's conviction and sentence, and dismissed his IAC claims without prejudice. See USCA Mem. (dkt. 433); United States v. Cohen, 539 F. App'x 743, 744 (9th Cir. 2013). On February 4, 2014, Cohen filed a petition for writ of certiorari with the Supreme Court. Pet. for Writ (dkt. 443). On May 5, 2015, the Supreme Court denied Cohen's petition for writ of certiorari. See Order of the Supreme Court (dkt. 444).

On November 7, 2014, Cohen filed a third motion for new trial based on newly discovered evidence. See Mot. for New Trial III (dkt. 446). Cohen claimed that newly discovered evidence revealed a scheme by Dillon and others to pay a second-tier investor, Barbara Rhine ("Rhine"), to conceal Dillon's central role in the fraud. See id. The Court

1  denied Cohen's motion after full briefing, see Resp. to Mot. III (dkt. 453) and Reply to Mot.

2  III (dkt. 462), and a motion hearing, see 5/20/2015 Min. Entry (dkt. 463).

3      On December 17, 2014, Cohen filed a motion for this Court to recuse itself.  See Mot.

4  for Recusal (dkt. 451).  Cohen claimed that this Court was not impartial with regard to

5  cooperating witness Dillon because this Court might have prosecuted Dillon approximately

6  40 years ago when serving as an assistant district attorney.  See id.  The Court denied

7  Cohen's motion after full briefing, see Resp. to Mot. for Recusal (dkt. 452) and Reply to

8  Mot. for Recusal (dkt. 461), and a motion hearing, see 5/20/2015 Min. Entry (dkt. 463).

9  After the May 20, 2015, hearing on Cohen's third motion for a new trial and his motion to

10  recuse, Cohen filed a notice of appeal to the Ninth Circuit regarding both motions.  See

11  Notice of Appeal II (dkt. 465).

12      On May 4, 2015, Cohen filed a motion to vacate, set aside, or correct his sentence

13  pursuant to § 2255.  See generally Mot. (dkt. 450).  The government filed a motion to stay

14  habeas briefing until the resolution of Cohen's pending appeal in the Ninth Circuit.  See Mot.

15  to Stay Habeas Briefing (dkt. 472).  On June 24, 2015, the Court denied the motion to stay

16  habeas briefing and ordered the government to respond to Cohen's § 2255 motion.  See

17  Order Den. Mot. to Stay Habeas Briefing (dkt. 476).  On August 24, 2015, the government

18  filed an opposition to Cohen's § 2255 motion.  See Resp. to Mot. to Vacate (dkt. 493).

19      On August 31, 2015, Cohen filed notice of substitution of counsel, see Mot. to

20  Substitute (dkt. 498), which the Court granted on September 1, 2015, see Order Granting

21  Mot. to Substitute (dkt. 499).  On September 17, 2015, Cohen filed an application for an

22  order continuing the date to file a reply to the government's response to Cohen's § 2255

23  motion until November 30, 2015.  See Mot. to Cont. (dkt. 501).  On September 24, 2015, the

24  Court granted Cohen's application.  See Order Granting Cont. (dkt. 503).  On December 3,

25  2015, Cohen filed a second application for an order continuing the date to file a reply to the

26  government's response to Cohen's § 2255 motion.  See Mot. to Cont. II (dkt. 511).  On

27  December 10, 2015, the Court granted Cohen's application and ordered that he file his

28  traverse by February 4, 2016.  See Order Granting Cont. II (dkt. 512).

On February 8, 2016, instead of filing a traverse, Cohen moved to stay his previously filed motion to vacate his conviction pursuant to his § 2255 proceedings based on, inter alia, (1) newly discovered evidence supporting his IAC claims for relief; (2) his pending appeal with the Ninth Circuit; and (3) his efforts to find counsel to assist with his § 2255 motion. See Mot. for Stay (dkt. 522). On February 10, 2016, the Court ordered Cohen to file the newly discovered evidence in the form of declarations within ten days. Order Directing Filing of Witness Decl. (dkt. 523). On February 22, 2016, the Court denied Cohen's motion to stay. See Order on Mot. for Misc. Relief (dkt. 525). On February 25, 2016, Cohen filed the declarations, see Notice of Decl. (dkt. 528), and on March 4, 2016, the Court vacated its order of February 22, 2016, and ordered Cohen to file an amended habeas petition, see Order (dkt. 530).

On April 20, 2016, Cohen filed an amended memorandum in support of his § 2255 motion. See Am. Mot. On April 21, 2016, the Court ordered the government to respond to Cohen's amended motion by May 5, 2016. See Order Directing Filing of Resp. (dkt. 536). On May 4, 2016, the government filed its response to Cohen's amended motion. See Resp. to Am. Mot. (dkt. 542). On June 6, 2016, Cohen filed a reply in support of his amended memorandum. See generally Reply to Am. Mot. (dkt. 551).[1]

On September 23, 2016, Cohen filed a motion for leave to file a second amendment to his amended § 2255 motion. See Mot. to Amend Am. Mot. (dkt. 568). On October 7, 2016, the government filed its response, arguing that the motion was untimely and futile. See generally Resp. to Amend Am. Mot. (dkt. 572). Rather than addressing the government's

---

[1] On July 1, 2016, Cohen also filed a motion to dismiss all money laundering counts pursuant to Johnson v. United States, 135 S. Ct. 2551 (2015), and Federal Rules of Criminal Procedure 12(b)(2) and 12(b)(3). See generally Mot. to Dismiss (dkt. 557). Cohen claimed that Johnson's holding compels the conclusion that the Court lacked jurisdiction over the money laundering offenses. See id. On July 6, 2016, the Court denied Cohen's motion. See generally Order Denying Mot. to Dismiss (dkt. 558). On August 1, 2016, Cohen filed a motion for reconsideration regarding his motion to dismiss pursuant to Johnson. See generally Mot. for Reconsideration (dkt. 562). On August 9, 2016, the Court denied the motion for reconsideration. See generally Order Denying Mot. for Reconsideration (dkt. 563). On August 15, 2016, Cohen filed a motion for certificate of appealability from the Court's final order denying Cohen's motion to dismiss all money laundering accounts. See Mot. for Cert. of Appeal. (dkt. 565). On August 25, 2016, the Court denied Cohen's motion. See Order Denying Mot. for Cert. of Appeal (dkt. 566).

1    arguments about the procedural infirmities of the motion, the Court will address Cohen's

2    second proposed amendments on their merits herein.

3    **II.     LEGAL STANDARD**

4           Pursuant to 28 U.S.C. § 2255, a court may grant relief if: "the sentence was imposed

5    in violation of the Constitution or laws of the United States, or . . . the court was without

6    jurisdiction to impose such sentence, or . . . the sentence was in excess of the maximum

7    authorized by law, or is otherwise subject to collateral attack."  28 U.S.C. § 2255(a).

8           The remedy available under § 2255 is as broad and comprehensive as that provided by

9    a writ of habeas corpus.  See United States v. Addonizio, 442 U.S. 178, 184–85 (1979).  The

10   remedy, however, does not encompass all claimed errors in conviction and sentencing.  See

11   id. at 187.  Rather, it is limited to attack convictions and sentences entered by a court without

12   jurisdiction or in violation of the Constitution or laws of the United States.  See id. (citations

13   omitted).  A mere error of law therefore does not provide a basis for collateral attack unless

14   the claimed error constituted "a fundamental defect which inherently results in a complete

15   miscarriage of justice."  Id. (quoting Hill v. United States, 368 U.S. 424, 428 (1962)).  An

16   error that may justify reversal on direct appeal will not necessarily support a collateral attack

17   on a final judgment.  See Addonizio, 442 U.S. at 184.

18          A federal prisoner may not raise claims in a § 2255 motion that he failed to raise on

19   direct appeal.  See Bousley v. United States, 523 U.S. 614, 621 (1998); Reed v. Farley, 512

20   U.S. 339, 354 (1994).  That is, if he could have raised a claim of error on direct appeal but

21   failed to do so, the prisoner has procedurally defaulted the claim and may obtain collateral

22   review under § 2255 only if he can show either cause and actual prejudice or that he is

23   actually innocent.  See Bousley, 523 U.S. at 621 (prisoner who failed to challenge validity of

24   guilty plea on appeal procedurally defaulted claim); United States v. Skurdal, 341 F.3d 921,

25   925 (9th Cir. 2003) (prisoner who failed to bring claims of error on direct appeal

26   procedurally defaulted them); United States v. Mejia-Mesa, 153 F.3d 925, 928 (9th Cir.

27   1998) (same); see also United States v. Schlesinger, 49 F.3d 483, 485 (9th Cir. 1995)

28   (unconstitutional sentencing errors that were not raised on direct appeal considered waived

United States District Court
For the Northern District of California

6

and ineligible for review by way of a § 2255 motion). A claim rejected on direct appeal may not be litigated again in a § 2255 motion. See United States v. Scrivner, 189 F.3d 825, 828 (9th Cir. 1999) (appellate court decision rejecting claim was binding on court considering § 2255 motion).

Section 2255 requires that a court hold an evidentiary hearing unless the record reveals that the petitioner is not entitled to relief. See Mejia-Mesa, 153 F.3d at 929. The petitioner need not detail his evidence, but must only make special factual allegations which, if true, would entitle him to relief. See id. A district court may deny a § 2255 motion without an evidentiary hearing if the petitioner's allegations, viewed against the record, either do not state a claim for relief or are so palpably incredible or patently frivolous as to warrant summary dismissal. See Mejia-Mesa, 153 F.3d at 931 (district court properly denied evidentiary hearing on claims that failed to state a claim for relief under § 2255 as a matter of law).

## III.    DISCUSSION

In his amended motion, Cohen asserts (A) eight claims of IAC, (B) one claim of actual innocence, and (C) three claims of violations of due process. See Am. Mot. at 16–53. Cohen also asks (D) that the Court vacate his money laundering and tax convictions, and (E) that the Court conduct an evidentiary hearing. See id. at 53–54.

### A.    Ineffective Assistance of Counsel Claims

Cohen asserts six claims of IAC as to his trial counsel: (1) failure to retain a forensic document or handwriting expert; (2) failure to utilize newly discovered "Cabal Evidence" against the government; (3) failure to investigate possible defense witnesses; (4) failure to interview possible government witnesses and call the "Secondary Group" of lenders as witnesses; (5) failure to hire an expert to rebut the testimonies of Dillon and Samuel Mills ("Mills"); and (6) failure to introduce evidence of agreements related to Cohen's purported

United States District Court
For the Northern District of California

7

United States District Court
For the Northern District of California

company, Procinea.[2]  See id. at 16–38.

Cohen also asserts two claims of IAC as to his appellate counsel: (7) failure to argue that Cohen did not commit fraud by sophisticated means, and (8) failure to argue that Cohen did not exploit his alleged victims through charitable means.  The Court addresses each claim below.  See Mot. to Am. Mot. at 3–9.

A petitioner seeking to have his conviction overturned on the ground of ineffective assistance of counsel must establish both deficient representation by counsel and prejudice. Strickland v. Washington, 466 U.S. 668 (1984).

First, to establish deficient performance, a petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness.  Strickland, at 687–88. That is, counsel must have made errors "so serious" that he was not functioning as the counsel guaranteed by the Sixth Amendment.  Id. at 688.

The Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Strickland, 466 U.S. at 689.  The absence of evidence that counsel provided constitutionally inadequate advice cannot overcome the presumption that counsel's conduct fell within the range of reasonable professional advice. See Burt v. Titlow, 134 S. Ct. 10, 17 (2013).  The relevant inquiry is therefore not what defense counsel could have done, but whether the choices counsel made were reasonable. See Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

In evaluating the reasonableness of counsel's actions, a reviewing court must consider the circumstances at the time of counsel's conduct and cannot "second-guess" counsel's decisions or view them under the "fabled twenty-twenty vision of hindsight."  Edwards v. Lamarque, 475 F.3d 1121, 1127 (9th Cir. 2007) (en banc) (internal quotation and citations omitted).  A defense attorney has a general duty to make reasonable investigations or to make a reasonable decision that renders particular investigations unnecessary.  See Strickland, 466

---

[2] Although Cohen raised these issues on direct appeal to the Ninth Circuit, the Ninth Circuit determined that the record was not sufficiently developed for it to make an informed decision. See USCA Mem. (dkt. 433).  Cohen may thus bring the IAC claims in his amended motion.  See Vgeri, 51 F.3d at 876.

U.S. at 691; <u>Hinton v. Alabama</u>, 134 S. Ct. 1081, 1088 (2014) (<u>per curiam</u>);

<u>Cullen v. Pinholster</u>, 563 U.S. 170, 190 (2011).  Similarly, "a particular decision not to

investigate must be directly assessed for reasonableness in all the circumstances, applying a

heavy measure of deference to counsel's judgments."  <u>Silva v. Woodford</u>, 279 F.3d 825, 836

(9th Cir. 2002) (quoting <u>Strickland</u>, 466 U.S. at 691).  Counsel need not pursue an

investigation that would be fruitless or might be harmful to the defense.  <u>Richter</u>, 562 U.S. at

108.

     Second, the petitioner must demonstrate that the deficient representation resulted in

prejudice to him.  <u>See</u> <u>Strickland</u>, 466 U.S. at 668.  The petitioner must establish "reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would

have been different."  <u>Id.</u> at 694.  A reasonable probability is "a probability sufficient to

undermine confidence in the outcome."  <u>Id.</u>  The <u>Strickland</u> analysis is complete; there is no

review for harmless error.  <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993).

     Because Cohen can establish neither deficient performance nor prejudice under

<u>Strickland</u> for any of his eight claims, he is not entitled to relief based on IAC.

### 1.     Failure to retain a forensic document or handwriting expert

     Cohen claims that counsel was constitutionally ineffective by failing to retain a

handwriting expert at trial.[3]  <u>See</u> Am. Mot. at 18.  Cohen argues that his trial counsel should

have consulted a handwriting expert to: "(1) decide on the defense to be presented; (2)

prepare how to counter Dillon's and Mills's denials of the authenticity of the documents; and

(3) effectively cross-examine and rebut Dillon and Mills's testimony utilizing the expert

witness information and testimony."  <u>Id.</u>

     The government opposes, contending that: (1) Cohen provides no reason for the Court

---

[3] Within this individual IAC claim, Cohen also makes a brief and unsupported assertion that "[trial counsel] failed to understand what Dillon actually said at trial and failed to predict what Dillon was likely to say.  Trial counsel's failure to order daily transcripts and his recollection of Dillon's testimony was error."  <u>See</u> Am. Mot. at 20.  Conclusory allegations such as this, unsupported by a statement of specific facts, do not warrant habeas relief.  <u>See</u> <u>James v. Borg</u>, 24 F.3d 20, 26 (9th Cir. 1994); <u>Jones v. Gomez</u>, 66 F.3d 199, 205 (9th Cir. 1995); <u>see also</u> Rule 2(c)(2) of the Rules Governing § 2255 Cases (requiring a habeas corpus petition to "state the facts supporting each ground [for relief]").

1  to reconsider its previous holding on the merits; (2) even if the Court reconsidered the issue,

2  trail counsel's decision not to retain a handwriting expert was strategic and reasonable; and

3  (3) any alleged deficiently did not prejudice Cohen.  See Resp. to Am. Motion at 13–20.

### a.    Deficient representation

5  Trial counsel's decision not to retain a handwriting expert did not constitute deficient

6  representation under Strickland.  See Strickland, 466 U.S. at 668.  Cohen's main argument

7  stems from his counsel's failure to hire a handwriting expert to examine potentially

8  exculpatory declarations that Dillon allegedly signed.  See Am. Mot. at 19.  The declarations,

9  according to Cohen, prove that Cohen did not misrepresent to Dillon that Dillon would

10  receive a guaranteed return in connection with E-Cast stock, or that the stock would make

11  him wealthy.  See Trial Transcript ("TT") at 876:18–878:2.  Cohen also claims that counsel

12  was unaware that Dillon would deny seeing the declarations prior to trial.  See Am. Mot. at

13  19 (quoting TT at 870:24–871:4).  Cohen reasons that by failing to retain a handwriting

14  expert to prove that Dillon actually and knowingly signed the documents, Cohen was

15  deprived of valuable impeachment material for use against Dillon.  See Am. Mot. at 19, 21.

16  Cohen's "criminal law expert,"[4] Doron Weinberg ("Weinberg"), found in his examination of

17  the record that no strategic decision was made to not consult an expert, and there was no

18  "affirmative reason not to do so."  See Am. Mot. at 20.  Cohen argues that this failure shows

19  that counsel was constitutionally ineffective.  See id.

20  Contrary to what Cohen claims, counsel was aware that Dillon would deny seeing the

21  declarations:

22  MR. LINCENBERG:      And I'm sure that Mr. Dillon will deny–
       THE COURT:                I don't know.
23  MR. LINCENBERG:      –that he ever– well, he will.  In his interviews
                                          he's denied ever seeing this [the declarations]
24                                         prior to the litigation.  So he will deny.

---

26  [4]According to Cohen's amended motion, Weinberg is a "leading criminal defense attorney and
    expert on the issues of professional responsibility."  Am. Mot. at 14–15.  Cohen hired Weinberg to
27  review the trial record, as well as to examine "handwriting expert" David Moore's ("D. Moore")
    declaration regarding Dillon's signatures on the potentially exculpatory declarations.  See id. at 13–15.
28  Based on the expert opinions of Weinberg and D. Moore, Cohen moved for new trial based on the IAC
    of trial counsel.  Id. at 13.

United States District Court
For the Northern District of California

TT at 870:24–871:4.  The government is correct in that Weinberg does not cite any evidence in the record proving that counsel found and ignored deficiencies related to handwriting experts in this case.  See Resp. to Am. Mot. at 15.  Instead, Weinberg assumes that counsel's failure to call a handwriting expert was "simply the result of mistake or oversight."  See Am. Mot. at 20.  In fact, counsel's awareness that Dillon would deny having seen the declarations weighs strongly against Weinberg's assertion that counsel overlooked the usefulness of the declarations.  See TT at 870:24–871:4.  The absence of evidence in the record that counsel gave deficient advice to Cohen does not overcome a presumption that Cohen's trial counsel gave reasonably professional advice.  See Titlow, 134 S. Ct. at 17.  Therefore, counsel's decision not to call a handwriting expert is not objectively unreasonable under Strickland.

Furthermore, Cohen's argument ignores facts in the record showing that a handwriting expert would not have provided useful evidence at trial.  See Am. Mot. at 18–20.  As the Court confirmed in reference to Cohen's motion for release of trial exhibits, Dillon had already acknowledged that the signatures on the documents were his.  See Order Den. Release.  The government has long maintained that "Dillon did not affix his signature to the document—not that the signature wasn't his."  See Resp. to Am. Mot. at 16.  A handwriting expert would likely confirm that the signature was in fact Dillon's, a point not disputed by the government.  See id.

Cohen also points to D. Moore's post-conviction "indentation analysis," which Cohen claims proves that Dillon signed the declarations in the form presented to him at trial.  See Am. Mot. at 20.  According to D. Moore, because the letter "n" from Dillon's signature was indented on the first page of one of the three declarations, Dillon signed the signature page with the first page behind it.  See id.  D. Moore thus reasons that Dillon signed the two pages as a packet.  See id.  Cohen argues that counsel should have known that an expert would have found the indentation, and further, that the indentation would have caused a different result at trial.  See id.  This is too great a leap.  Cohen's claim is entirely conclusory and not supported in the amended motion by fact or reason.  Nothing in the record proves that Dillon signed the signature page with the first page behind it or that Dillon signed the pages as a packet.  As

United States District Court
For the Northern District of California

such, Cohen's claim is without merit. See James, 24 F.3d at 26 ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief."). Counsel need not pursue an investigation that would be fruitless or might be harmful to the defense. See Richter, 562 U.S. at 108.

### b.    Prejudicial effect

Even if the Court found a constitutional deficiency, Cohen has failed to establish prejudice under Strickland. To meet the high standard set by Strickland, Cohen must demonstrate with reasonable probability that the outcome of his case would have been different had his counsel used a handwriting expert at trial. See Strickland, 466 U.S. at 694.

Cohen argues that expert testimony showing that Dillon's signature was inauthentic would "dramatically undermine, and in fact, destroy[][the government's] credibility." See Am. Mot. at 20. Cohen explains that his counsel's failure to refute the allegedly forged signatures bolstered Dillon's credibility while labeling Cohen a forger. See id. at 21. But Cohen does not sufficiently establish that the handwriting expert would have "destroy[ed]" Dillon's credibility, or restored Cohen's tarnished image. See Am. Mot. at 19–20. Cohen's discussion of prejudice due to this IAC claim merely recites conclusory statements without tying them to any specific facts in the record. See id. As such, the Court dismisses this claim. See Blackledge v. Allison, 431 U.S. 63, 74 (1977) ("The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible.").

Moreover, looking to the amended motion as a whole, Cohen's theory of prejudice appears to be that the government relied "exclusively" on Dillon to link Cohen to the misrepresentation that E-Cast would be acquired by Microsoft. See Am. Mot. at 2. This characterization of the case is not supported by the record and ignores evidence that reveals numerous fraudulent misrepresentations made by Cohen regarding the sale of E-Cast stock, as well as the acquisition of E-Cast by Microsoft. As the Court previously noted: "You could take Mr. Dillon's testimony and basically disbelieve any number of things that he said, if you choose, because there was a tremendous amount of evidence outside of Mr. Dillon's

testimony, which wasn't dependent on Mr. Dillon's testimony to establish the defendant's guilt." See Decl. in Support of Resp. to Mot. Ex. K at 17:17–21 (dkt. 543).

Cohen defrauded previous investors with a similar scheme.  For example, Cohen represented to Mike Farrell ("Farrell") that he would "build [Farrell] a rocket ship by offering [Farrell] these shares [of E-Cast]."  See Testimony of Mike Farrell TT at 160:10–11.  Cohen told Farrell that Farrell was the only one being offered shares of E-Cast stock and, due to concerns of the board of directors, he should keep the transaction secret.  See id. at 161:23–162:3.  Cohen also alluded to a future sale of E-Cast, with multiple bidders in the picture.  See id. at 162:8–14.  Cohen also defrauded William Meeker ("Meeker").  See Testimony of William Meeker TT at 1450:1–1466:9.  Cohen falsely represented to Meeker that money he invested would purchase large numbers of shares in E-Cast during two separate transactions.  See id.  Cohen also told Meeker, between October 2001 and February 2002, that he was having close negotiations with Microsoft and that Microsoft was interested in purchasing E-Cast.  See id. at 1463:23–1464:4.

After Cohen's involvement with Farrell and Meeker, he invited actor Danny Glover ("Glover") to his home under the pretense that Cohen had $60 million that he wished to donate to charity.  See Testimony of Danny Glover TT at 1514:4–7.  However, at the time Cohen made this statement to Glover, Cohen had approximately $95,000 in his bank account. See Testimony of Juan Saavedra TT at 1413:14–17.  On August 25, 2002, Glover introduced Dillon to Cohen.  See Testimony of Danny Glover TT at 1516:14–1517:12.  After this meeting, Cohen told Dillion that he wished to help Dillon's charitable organization, the Vanguard Public Foundation.  See Testimony of Hari Dillon TT at 531:10–13.  Another investor, Gina Warren ("Warren"), testified that during a dinner at Cohen's house in September of 2002, Cohen discussed the upcoming purchase of E-Cast by Microsoft.  See Testimony of Gina Warren TT at 44:11–45:21.  Cohen claimed that E-Cast's acquisition would be lucrative, that the acquisition was imminent, and that part of the acquisition proceeds would be invested in Vanguard's programs.  See id.  Within approximately a week of this dinner with Cohen, Warren and others attended a lunch with Cohen, where he again

United States District Court
For the Northern District of California

13

spoke about Microsoft's coming acquisition of E-Cast.  See id. at 47:7–24.  Cohen represented to the investors that E-Cast's acquisition by Microsoft was certain, and "just a matter of time."  See id.  Based on Cohen's misrepresentations regarding E-Cast's acquisition, Warren decided to invest money with Cohen.  See id. at 48:7–14.  In November 2002, Cohen met with Mills to discuss investment in E-Cast.  See Testimony of Sam Mills TT at 313:15–314:8.  At this meeting, Cohen told Mills about Microsoft's interest in acquiring E-Cast, and that the acquisition would not take long.  See id. at 316:22–317:3.  Cohen also told Mills that the purchase of shares in E-Cast would benefit Vanguard, as well as all of the investors personally.  See id. at 317:5–16.

As investors became nervous about how long the acquisition of E-Cast by Microsoft was taking, Cohen had a number of meetings with investors to calm their nerves.  In March 2005, Cohen participated in a conference call with Mills, Mills's wife Mary Mills, and Dillon.  See id. at 327:3–330:8.  During the course of the call, Cohen stated that the United States had given approval of the Microsoft acquisition of E-Cast.  See id. at 328:16–18.  Cohen's assurances of United States government approval of the deal assured Mills that the deal was nearing a close, and that everything was close to over.  See id. at 328:18–19.

Around November 2005, Dillon suggested to various investors that they meet with Cohen to discuss the status of the deal.  See Testimony of Susanna Moore TT at 1054:15–24.  A meeting was arranged in November 2005 between investors Mary Mills, Mills, Jane Segal ("Segal"), Susanna Moore ("Moore"), and Dillon.  See Testimony of Jane Segal TT at 1180:10–11.  Cohen assured investors at the meeting that E-Cast was still strong as a company and was growing as fast as Google.  See Testimony of Susanna Moore TT at 1056:20–22.  Furthermore, Cohen assured the investors that the Microsoft acquisition of E-Cast would be finished within three months.  See Testimony of Mary Mills TT at 1135:10–11.

In December 2008, investors Moore, Mills, and Dillon confronted Cohen at a meeting in Tiburon, California.  See Testimony of Sam Mills TT at 345:6–10.  Cohen was not aware that, before the meeting, the investors had contacted the real CEO of E-Cast, who informed

investors of Cohen's departure from the company.  See id. at 345:13–20.  Thus, at the meeting, investors knew that Cohen's representations regarding E-Cast were fraudulent.  See id. at 345:13–20.  In an effort to calm the investors, Cohen represented that Microsoft was still interested in acquiring E-Cast and that the deal was going to happen very soon.  See id. at 347:13–15.  Finally, after the investors informed Cohen that they knew about his fraud, Cohen claimed that E-Cast's current CEO was lying.  See Testimony of Susanna Moore TT at 1075:25–1076:4.  Cohen maintained that E-Cast's CEO lied to investors in an effort to protect the confidentiality of the deal.  Id.  Thus, even after investors had Cohen cornered, he still maintained his lies regarding E-Cast.  This is just some of the extensive evidence of Cohen's involvement in the E-Cast fraud.

As reflected in the record, Dillon's testimony was not the "exclusive" source of information linking Cohen to the illusory Microsoft acquisition of E-Cast.  To the contrary—Cohen systematically and intentionally lied to many individuals over the course of approximately eight years that Microsoft was in the process of acquiring E-Cast.  Regardless of Dillon's testimony, the government still had ample evidence, provided through the testimony of other E-Cast investors, of Cohen's misrepresentations regarding E-Cast.  This evidence makes it impossible for Cohen to demonstrate with reasonable probability that the outcome of his case would have been different had trial counsel retained a handwriting expert.  See Strickland, 466 U.S. at 694.  Thus, Cohen cannot establish prejudice in his case.

Cohen's IAC claim regarding his trial counsel's failure to hire a handwriting expert fails to meet the two-prong test of Strickland.  See Strickland, 466 U.S. at 668.  Cohen has failed to establish that his trial counsel was constitutionally deficient by failing to hire a handwriting expert to examine the potentially exculpatory declarations allegedly signed by Dillon.  Furthermore, even if Cohen could show that his counsel was constitutionally deficient, the record is sufficiently developed such that Cohen cannot prove actual prejudice in his case.

Accordingly, this IAC claim fails.

//

15

## 2.      Failure to utilize "Cabal Evidence" against the government

Cohen next claims that trial counsel was constitutionally ineffective by failing to utilize allegedly newly discovered "Cabal Evidence" at trial. <u>See</u> Am. Mot. at 21.  The "Cabal Evidence" consists of three emails produced by the government to Cohen.  <u>See</u> Mot. for New Trial III Ex. A, B, C.  Cohen argues that the emails prove that investor Rhine was paid to keep Dillon's central role in the fraud hidden.  <u>See</u> Am. Mot. at 23.  Cohen contends that there is "no objective reason the Cabal evidence was not utilized."  <u>See</u> Am. Mot. at 24. Cohen further contends that his counsel's failure to use this evidence shows that counsel was ineffective through either being unaware, or deliberately ignorant, of the existence of the emails.  <u>See</u> <u>id.</u>  The evidence, Cohen argues, dispels any notion that Dillon was an "unwitting dupe" of Cohen, and proves that Dillon was the central actor in the fraud.  <u>See</u> <u>id.</u> at 24.  Cohen claims that the evidence also proves that Mills, Mary Mills, and Moore worked together to fabricate all of the stories regarding Cohen's misrepresentations regarding the Microsoft acquisition of E-Cast.  <u>See</u> <u>id.</u>

The government responds that Cohen's amended motion "misstate[s]" what the "Cabal Evidence" actually shows and constitutes a "repackaged version" of the claim that Cohen offered in his motion for a new trial based on "newly discovered evidence."  <u>See</u> Resp. to Am. Mot. at 21.

### a.      Deficient representation

Trial counsel's decision not to utilize "Cabal Evidence" against the government did not constitute deficient representation under <u>Strickland</u>.  <u>See</u> <u>Strickland</u>, 466 U.S. at 668. Cohen's theory that Dillon was the central actor in the fraud is based on a misunderstanding of the "Cabal Evidence" produced by the government.  In Cohen's amended motion, he argues:

> Within the Cabal evidence, Dillon describes himself as "central to the stock pyramid affinity whatever the hell you want to call it scheme/fraud."  Dillon went so far as to say if "they proceed to go to outside lawyers, authorities, etc., while they probably at least 50% believe that they are saving themselves and taking us criminals down, in reality they're fucking themselves."

United States District Court
For the Northern District of California

Am. Mot. at 24 (quoting Mot. for New Trial III Ex. B).  Cohen thus bases his argument on truncated statements found in the July 1, 2007, email from Dillon to Stevie Kaplan and Willie Pettus, and reaches the conclusion that the email proves Dillon's central role in the fraud related to the sale of E-Cast shares to investors.

Cohen's reading of Dillon's July 1, 2007, email takes Dillon's statements out of context.  In fact, the Court understands Dillon's email to reference what he sees as potential insider trading issues, which could be investigated by the Securities and Exchange Commission ("SEC") if the advance purchase of E-Cast stocks were publicized.  See Mot. for New Trial III Ex. B at ¶ 2, ¶ 6.  Thus, the "scheme/fraud" that Dillon references is not related to Cohen's representation that Microsoft will acquire E-Cast.  See id.

Putting Dillon's statement into context, he expressly distances himself from the conduct that he believes the SEC would hypothetically investigate:

> I will say for the record, since coming from me it is probably relatively meaningless since I would have to be not only part of but central to the stock pyramid affinity whatever the hell you want to call it scheme/fraud, but at this point the only thing that can torpedo the buyout would be yourselves or Nancy or whomever contacting the SEC or some attorney functioning as your surrogate to begin investigating the so-called fraudulent stock scheme. . .if such calls or written inquires were to get to [Cohen], let alone Ecast, Wilson Sonsini, Microsoft, etc., there will definitely not be a buyout. . .but there definitely will be the financial disaster you fear for yourselves and all of us.

Id. at ¶ 2.  Here, Dillon is not discussing involvement in the representation that Microsoft would acquire E-Cast; he is highlighting a possible investigation by the SEC.  Dillon also distances himself from a central role in any such scheme.  Thus, Dillon's statements in the July 1, 2007, email are irrelevant to the IAC claim at hand.  As counsel is not under a duty to pursue an investigation that would be fruitless or might be harmful to the defense, failure to introduce this evidence at trial does not constitute deficient performance by counsel.  See Richter, 562 U.S. at 108.

Cohen also claims that a July 5, 2007, memorandum from Shannon Gallagher ("Gallagher") to Dillon and two other investors proves that Rhine was paid to keep Dillon's central role in the fraud hidden.  See Am. Mot. at 23.  No evidence in the record supports this argument.  See Resp. Am. Mot. at 22.  Cohen's sole evidence for this claim is a single

United States District Court
For the Northern District of California

passage from the July 5, 2007 memorandum where Gallagher states: "Protect against Barbara [Rhine] calling [Cohen], the press, Wilson Sonsini, etc. and talking about the deal."  See id. at 24.  This passage is consistent with Cohen having advised investors to keep the deal private lest its exposure prevent it from going forward.  See, e.g., Decl. in Support of Resp. to Mot. Ex. C at 482:23–483:3, Ex. D at 803:3–14, Ex E. at 1060:19–1061:8.

Likewise, Cohen alleges that the May 1, 2007, email from Gallagher to Dillon proves that Gallagher and Dillon were conspiring to conceal Cohen's name from another investor by redacting documents.  See id. at 21.  Cohen's only evidence for this claim is a line from Gallagher's May 1, 2007, email, where she writes: "I fear turning over the Partnership Agreement given that [Cohen's] company name is included in the documentation.  We could turn over a redacted copy, removing the name of the company."  See See Resp. Am. Mot. at 21.  Again, this is consistent with Cohen's admonishments to investors to keep the deal secret.  See, e.g., Testimony of Mike Farrell TT at 161:23–162:3.  Since other support for Cohen's arguments regarding the emails does not appear in the record and the use of the memorandum would have been fruitless or harmful to Cohen's case, counsel is not required to use it during trial.  See Richter, 562 U.S. at 108.

### b.    Prejudicial effect

Even if the Court found counsel to be constitutionally deficient by failing to use the "Cabal Evidence," Cohen cannot satisfy part two of the Strickland standard, which requires a showing of prejudice.  Strickland, 466 U.S. at 694.  The overwhelming evidence produced at trial establishes Cohen's guilt independently of Dillon's testimony.  See supra Section III(A)(1).  This evidence makes it impossible for Cohen to demonstrate with reasonable probability that the outcome of his case would have been different if his counsel had used the "Cabal Evidence" at trial, as is necessitated by Strickland.  See Strickland, 466 U.S. at 694.  Thus, Cohen cannot establish prejudice in his case.

As a result, this IAC claim is unsuccessful.

### 3.    Failure to investigate possible defense witnesses

Cohen next claims that trial counsel was constitutionally ineffective by failing to

United States District Court
For the Northern District of California

investigate Dillon's activities during 1998 to 2002.  See Am. Mot. at 26.  Counsel, Cohen

contends, therefore denied him the opportunity to show that the government's theories were

"dead wrong."  Id. at 26.  Cohen reasons that had the government adequately investigated

Dillon, it would have found and called Michael Wilson ("Wilson") and Samuel Edelshtain

("Edelshtain") at trial.  See id. at 27.  Cohen claims that Wilson would have told investigators

that Wilson's daughter, Jennay Brown ("Brown"), solicited local businesses for money in

2001 with Dillon's purported "Microsoft Acquisition lure," and that Dillon promised Brown

"high returns" in exchange.  See id.; Supp. Providing Decl. Pursuant to Mot. for Stay Ex. B,

C (dkt. 528).  Edelshtain would have testified, according to Cohen, that Dillon offered him an

investment deal in 2002, which encompassed an "imminent" Microsoft buyout.  See Am.

Mot. at 27; Supp. Providing Decl. Pursuant to Mot. for Stay Ex. A.

The government argues that the record demonstrates that trial counsel extensively

investigated Dillon.  See Resp. to Am. Mot. at 23–24.  The government also argues that trial

counsel extensively impeached Dillon regarding matters that required extensive investigation

prior to trial.  See id.

### a.      Deficient representation

Trial counsel's decision to not investigate and identify theses possible defense

witnesses did not constitute constitutionally deficient representation.  See Strickland, 466

U.S. at 668.  Though Cohen claims that counsel was ineffective by failing to investigate all

possible witnesses connected to Dillon, the record establishes that counsel not only

investigated Dillon but also cross-examined and impeached him extensively during trial.  See

Decl. in Support of Resp. to Mot. Ex. D, E.  Dillon's cross-examination lasted for two days.

See id.  During his cross-examination, trial counsel impeached Dillon about numerous

matters that required investigation, such as where he obtained a loan of $1.5 million to

purchase a home for his son and his aunt, and a lawsuit filed by the lender, Janet Kranzberg

("Kranzberg").  See Decl. in Support of Resp. to Mot. Ex. D at 754:15–1011:21.  Counsel

highlighted that the lawsuit concerned fraud, see id. at 767:10–11, and counsel cross-

examined Dillon with questions such as: "You continued to take money from [] trusted

1   donors to finance your personal lifestyle, correct?" and "Well, you stole—I know you had a

2   hard time saying it when you were examined before, but you stole over $2 million from [the

3   donors], correct?" see id. at 777:1–7.

4          Likewise, Cohen's arguments regarding the potential testimony of Wilson and

5   Edelshtain are entirely conclusory.  Cohen fails to demonstrate how the additional testimony

6   would have contradicted Dillon's testimony or impeached Dillon in a different or new way.

7   Even still, Strickland provides that counsel is owned "a heavy measure of deference" in

8   constructing a defense.  Strickland, 466 U.S. at 691.  Such deference extends to counsel's

9   decisions concerning which witness to call on the defendant's behalf.  Silva, 279 F.3d at 836

10  (9th Cir. 2002) (quoting Strickland, 466 U.S. at 691).  Trial counsel was not obligated to

11  investigate all possible defense witnesses.  Cohen's lack of evidence to support this claim

12  and the deference extended to counsel therefore preclude a finding of deficient performance.

### b.      Prejudicial effect

14         Even if Cohen's IAC claim was supported by evidence from the record, Cohen still

15  cannot satisfy the second prong of Strickland, which requires prejudice to the petitioner.

16  Strickland, 466 U.S. at 694.  As previously noted, Dillon's testimony did not dictate the

17  result of trial.  See supra Section III(A)(1).  Even if there was evidence of Dillon using a

18  similar scheme, there was substantial evidence that Cohen strategically misrepresented to

19  several people over the course of approximately eight years that Microsoft was in the process

20  of acquiring E-Cast.  See id.  As such, any alleged deficient investigation into these

21  additional potential witnesses could not have prejudiced Cohen.

22         Cohen cannot meet Strickland's two-prong standard with this IAC claim regarding

23  the investigation of Dillon.  As such, the claim fails.

### 4.      Failure to interview government witnesses and call the "Secondary Group" of lenders as witnesses

25         In his amended motion, Cohen claims that because his trial counsel failed to appoint

26  an investigator to interview government witnesses, counsel was "left with no choice" but to

27  investigate them by cross-examination only.  See Am. Mot. at 29.  Cohen argues that had

28

Dillon been "faced with devastating impeachment," Dillon could not have testified to the "I was duped" claim, and further, the government would have abandoned its case.  Id.

Cohen also claims that because the government did not call many individuals from the "Secondary Group" of lenders, Cohen's convictions related to those investors were based on Dillon's claim that Cohen was the source of all the misrepresentations.[5]  See Am. Mot. at 31.  Thus, Cohen argues that his counsel's failure to call the "Secondary Group" of lenders as witnesses was constitutionally ineffective assistance.  See id.

The government again asserts that the record belies any failure to investigate Dillon.  See Resp. to Am. Mot. at 24.  The government argues that Cohen's conviction was not dependent on Dillon's testimony alone.  See id.  Moreover, the government maintains that Cohen's amended motion provides no evidence that the "Secondary Group" of lenders would have contradicted Dillon's testimony.  See id.

### a.    Deficient representation

Trial counsel's failure to interview government witnesses and call the "Secondary Group" of lenders as witnesses did not constitute deficient representation under Strickland.  See Strickland, 466 U.S. at 668.  First, Cohen argues that had trial counsel interviewed the "Secondary Group" of lenders and "discovered that they had invested on some basis other than the 'Microsoft Story,'" this evidence, if presented to the jury, would have acquitted Cohen on all wire fraud and money laundering charges.  Am. Mot. 30.  This argument not only ignores the record, which establishes that Cohen's conviction did not stem from Dillon's testimony alone, but is also misguided in that counsel is extended "a heavy measure of deference" in how he chooses to structure the defense at trail.  See Strickland, 466 U.S. at 691.  Choosing to not interview the "Secondary Group" of lenders did not rise to the level of constitutionally deficient representation.

Second, Cohen argues that because his counsel did not call most of the "Secondary Group" of lenders, Cohen's convictions as to these lenders were based "entirely on Dillon's

---

[5]Cohen uses the term "Secondary Group" to refer to the investors contacted by Glover, Dillon, and other individuals associated with Vanguard.

claim that Cohen was the source of Dillon's misrepresentations."  Am. Mot. at 31.  To

support his claim, Cohen offers that: "Glover testified and did not corroborate the suggestion

that Cohen was the source of any misrepresentations."  Id.  This statement is made without

reference to the record, and Cohen alleges no other facts to support his conclusion.  See id.

Namely, Cohen does not set forth evidence that these lenders would have challenged Dillon's

testimony.  Because there is no coherent statement of specific facts, habeas relief is not

warranted for this claim.  See James, 24 F.3d at 26 ("Conclusory allegations which are not

supported by a statement of specific facts do not warrant habeas relief.").  Cohen's lack of

evidence to support this claim therefore precludes a finding of deficient performance.  See

id.; Strickland, 466 U.S. at 694.

### b.      Prejudicial effect

Assuming Cohen's claims were supported by evidence from the record, Cohen still

cannot satisfy part two of the Strickland standard, which requires a showing of prejudice.

Strickland, 466 U.S. at 694.  The extensive evidence produced at trial establishes Cohen's

guilt irrespective of any testimony from Dillon or the "Secondary Group" of witnesses.  See

supra Section III(A)(1).

As such, this IAC claim fails under Strickland.

### 5.      Failure to hire an expert to rebut the testimony of Dillon and Mills

Cohen next claims that his trial counsel was "utterly unprepared" to challenge the

signatures of Mills or Dillon on the Procinea documents[6] because counsel had not

investigated the authenticity of Mills's and Dillon's signatures.  See Am. Mot. at 33.

The government does not independently address this claim.  In its response to

Cohen's amended motion, the government argues that the claim is identical to Cohen's claim

that trial counsel impermissibly failed to retain a forensic document or handwriting expert.

See Resp. to Am. Mot. at 13.

---

[6] Cohen created "Convertible Secured Promissory Notes" and related documents to give to investors who had purportedly purchased an interest in Procinea.  See Decl. in Support of Resp. to Mot. Ex. J at 2019:12-2020:12.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

The Court also finds that Cohen's claim is a repackaged version of the argument made in Section IV(B)(2) of Cohen's amended motion.  See Am. Mot. at 16.  Cohen argues that although the government did not present Mills as a summary or expert witness, "[Mills] served the purpose of both."  Am. Mot. at 32.  Cohen further alleges that Dillon served as his own expert witness when the signatures were "a strong facsimile" and "questioned the credibility of his signature."  Id. at 33.  The Court disagrees that either Mills of Dillon served as de facto expert witnesses.  Cohen's trial counsel forcefully cross-examined both, and did not need an expert to rebut Mills's and Dillon's testimony that they never intended to buy stock in Procinea.  See Decl. in Support of Resp. to Mot. Ex. B at 414–447 (Mills), Ex. E at 978–1007 (Dillon).  Moreover, for the reasons stated in Section III(A)(1) of this Order, Cohen fails to establish under Strickland that trial counsel's failure to hire an expert to rebut the testimonies of Dillon and Mills constitutes constitutionally ineffective representation.  Dillon has not established with reasonable probability that but for trial counsel's alleged errors, the result of the trial would have been different.  See Strickland, 466 U.S. at 694.

This IAC claim resultantly fails.

### 6.   Failure to  introduce evidence of agreements related to Cohen's purported company, Procinea

Cohen next claims that his counsel was constitutionally ineffective by failing to introduce as evidence documents Cohen claims show that the "Secondary Group" of investors were deliberately and legitimately investing in Cohen's company, Procinea.  See Am. Mot. at 37.  Cohen reasons that adequate investigation of the documents "would have shown that the funds Cohen received from Dillon from the ["Secondary Group" of investors] were for an investment in Procinea—not the E-Cast/Microsoft transaction."  Id.

The government argues in response that Cohen failed to indicate with specificity which part of the agreements trial counsel failed to introduce, and further, that counsel did in fact utilize the Procinea agreements during trial.  See Resp. to Am. Mot. at 26.

### a.   Deficient representation

Trial counsel's decision not to introduce evidence of Procinea agreements did not

1  constitute deficient representation under Strickland.  See Strickland, 466 U.S. at 668.  Cohen,

2  again, makes his argument without reference to the record.  See id.  As the government

3  correctly states, Cohen's amended motion does not state which Procinea agreements trial

4  counsel failed to introduce.  See Resp. to Am. Mot. at 25.  On October 18, 2011, and October

5  24, 2011, trial counsel introduced several trial exhibits through witnesses Mills and Dillon,

6  questioned them about Procinea, and sought to show that they paid Cohen to purchase

7  Procinea stock.  See Decl. in Support of Resp. to Mot. Ex. B at 414–447 (Mills), Ex. E at

8  978–1007 (Dillon).  Cohen alleges no other facts to support his conclusion that trial counsel

9  provided inadequate representation.  See id.  Habeas relief is therefore not warranted.  See

10  James, 24 F.3d at 26 ("Conclusory allegations which are not supported by a statement of

11  specific facts do not warrant habeas relief.").

### b.      Prejudicial effect

13          Even if the Court assumes that the claim is supported by evidence from the record,

14  Cohen still cannot prove that he was prejudiced.  See Strickland, 466 U.S. at 694.  The

15  evidence produced at trial establishes Cohen's guilt regardless of the alleged agreements

16  showing investments in Procinea.  See supra Section III(A)(1).  As such, any alleged

17  deficient investigation regarding the Procinea agreements could not have prejudiced Cohen.

18          Accordingly, Cohen cannot meet Strickland's two-prong standard with this IAC claim

19  regarding the Procinea agreements.

### 7.      Failure to argue that Cohen did not commit fraud by sophisticated means

22          Cohen next claims that because his appellate counsel failed to argue that Cohen did

23  not commit fraud by sophisticated means, the Ninth Circuit affirmed this Court's having

24  sentenced Cohen to an "extra" 47 months of imprisonment.  Am. to Am. Mot. at 7.  Further,

25  according to Cohen, counsel allegedly failed to "contrast the simple garden variety alleged

26  fraudulent conduct of the [Microsoft] scheme with the sophisticated means by which Hari

27  Dillon solicited his victims."  Id.  Cohen reasons that his counsel's alleged deficient

28  representation resulted in the Court enhancing Cohen's sentence by two points.  See id.

United States District Court
For the Northern District of California

1    Claims of ineffective assistance of appellate counsel are reviewed according to the

2  standard set out in Strickland, 466 U.S. 668 (1984).  See Smith v. Robbins, 528 U.S. 259,

3  285 (2000); Moormann v. Ryan, 628 F.3d 1101, 1106 (9th Cir. 2010).  First, the petitioner

4  must show that counsel's performance was objectively unreasonable, which in the appellate

5  context requires the petitioner to demonstrate that counsel acted unreasonably in failing to

6  discover and brief a merit-worthy issue.  Smith, 528 U.S. at 285; Moormann, 628 F.3d at

7  1106.  Second, the petitioner must show prejudice, which in this context means that the

8  petitioner must demonstrate a reasonable probability that, but for appellate counsel's failure

9  to raise the issue, the petitioner would have prevailed in his appeal.  Smith, 528 U.S. at

10  285-86; Moormann, 628 F.3d at 1106.

11    Pursuant to United States Sentencing Guideline §2.B1.1(b)(10)(C): "sophisticated

12  means" include "especially complex of especially intricate offense conduct pertaining to the

13  execution or concealment of an offense."  The Guidelines further provide that conduct such

14  as "hiding assets or transactions, or both, through the use of fictitious entities, corporate

15  shells, or offshore financial accounts . . . ordinarily indicates a sophisticated means."

16  USSG § 2.B1.1(b)(10)(C).

### a.    Deficient representation

18    Appellate counsel's failure  to argue that Cohen did not commit fraud by

19  sophisticated means did not constitute deficient representation under Strickland.  See

20  Strickland, 466 U.S. at 668.  Cohen asserts that his appellate counsel "failed to argue that it

21  was Dillon who furnished his victim with complex paperwork, such as promissory notes,

22  complicated contracts and guarantees . . . not Cohen," and further, that it was Dillon who

23  claimed that people could trust him, not Cohen."  Am. to Am. Mot. at 4.  Such assertions

24  would have been entirely contrary to the record.  For example, in a sworn declaration to this

25  Court, Cohen's farther-in-law, Robert Stripling ("Stripling"), stated in describing Cohen's

26  fraud:

27    I have personally given $500,000 to [Cohen] from my estate to be directed to his
        company as an investment.  I have been instructed that this is in form of promissory
28    notes currently.  My original intent was to invest this money for my son . . . and once

United States District Court
For the Northern District of California

the investment matures, company is sold or gone public I plan to distribute this to him.

Gov. Sent. Memo. Ex. 3. (emphasis added).  Stripling told Federal Bureau of Investigation Special Agent Michael Orndorff that Cohen presented himself as a "successful business man," indicated that Microsoft was about to acquire E-Cast, and promised the Stripling would "make a very 'high rate of return,' which [Stripling] believed would be approximately 600% to 700%." Id. Ex. 2 at ¶ 3.  Cohen later told Stripling that Microsoft's acquisition of E-Cast "was delayed because of problems obtaining European Union approval due to monopoly concerns, and that more of [Stripling's] money was needed to help persuade the EU commissioners to approve the acquisition." Id.  Another investor, Javier Burillo ("Burillo"), submitted a declaration to the Court:

> Over the course of our relationship, Cohen had made me sign many documents that he said were related to these deals.  He often said the documents protected my investments.  He often just told me to "sign here" as the document was "no big deal."

Id. Ex. 5 at ¶ 9 (emphasis added).  From these statements, it is evident that regardless of Dillon's allegedly fraudulent behavior, Cohen did in fact "furnish his victims with complex paperwork, such as promissory notes, complicated contracts and guarantees."  Am. to Am. Mot. at 4.

Moreover, Cohen concealed his fraudulent activity by manipulating investors with lavish gestures and promises of high returns on their investments.  For example, Bruillo explained:

> While I was providing funds to Cohen for what I thought were investments, Cohen spent a lot of money entertaining me and my wife.  For example, he once took us by limousine to his private jet, which took us to Las Vegas, where he had a very expensive dinner before returning to San Francisco.  After I told him my wife enjoyed time in Carmel, Cohen flew us on what he said was his private jet to the Monterey Peninsula, took us to dinner at the Post Ranch Inn, and flew us back to San Francisco.  After I mentioned that I was a fan of Grammy Award nominee jazz trumpeter Chris Botti, Cohen invited my wife and I to dinner at his home in Belvedere where I was surprised to see Mr. Botti, who proceed to entertain us during the dinner, along with a a singer, a pianist, and a drummer.

Id., at ¶ 9.  Victim investor Segal, who majored in art history, testified that she was "blown away" by Cohen's collection of counterfeit art that he displayed to would-be investors.  Decl. in Support of Resp. to Mot. Ex. F at 1181:17–1183:4.  In addition to falsely claiming that he

United States District Court
For the Northern District of California

owned the rented the home in Belvedere, rented with $1.4 million of the victims' money, Cohen claimed that he owned the private jets he used to lure investors such as Bruillo and Segal into his scheme.  See Ex. G at 1325.  These actions do not reflect what Cohen deems "garden variety fraud," see Am. to Am. Mot. at 3; they are "sophisticated means" of concealment under  §2.B1.1(b)(10)(C) of the Sentencing Guidelines.  Further, these actions represent the behavior of Cohen, not of Dillon.  As such, appellate counsel's failure to argue that Cohen's alleged fraudulent behavior was not sophisticated did not constitute deficient appellate representation under Strickland.  See Strickland, 466 U.S. at 668; Smith, 528 U.S. at 285.

### b.     Prejudicial effect

Even if Cohen could substantiate this IAC claim with evidence from the record, Cohen still cannot prove that he was prejudiced.  Strickland, 466 U.S. at 694.  Given the record in this case, Cohen has failed to demonstrate with any reasonable probability that, but for his appellate counsel's failure to argue that Cohen did not commit fraud by sophisticated means, Cohen would have prevailed in his appeal.  See Smith, 528 U.S. at 285.  As such, any alleged deficient representation of appellate counsel could not have prejudiced Cohen in this regard.

Therefore, this IAC claim fails under Strickland.

### 8.     Failure to argue that Cohen did not exploit his alleged victims through charitable means

Cohen next claims that appellate counsel failed to argue that Cohen did not overtly target and exploit the "charitable impulses" of his alleged victims. Am. to Am. Mot. at 8. Cohen further asserts that on direct appeal the Ninth Circuit incorrectly applied United States v. Treadwell, 693 F.3d 990 (9th Cir. 2010).  See id.

The Sentencing Guideline §2.B1.1(b)(8)(A) requires district courts to impose a two-level upward adjustment for frauds involving misrepresentation that the defendant acted on behalf of a charitable, education, religious or political organization.  The Section applies when the defendant represented that he acted to obtain a benefit on behalf of a charitable

organization.  USSG §2.B1.1 comment, application note 7(B).

Appellate counsel's failure to argue that Cohen did not exploit his alleged victims through charitable means did not constitute deficient representation under Strickland.  See Strickland, 466 U.S. at 668.  Under Treadwell, a court may impose a greater sentence pursuant to Sentencing Guideline §2.B1.1(b)(8)(A) if the defendant overtly represented to his victim(s) that a charity or humanitarian entity will likely benefit from his fraudulent scheme. Treadwell, 693 F.3d at 994.  As discussed in Section III(A)(1), Cohen did just this.  To provide a brief account: Cohen invited Glover to his home under the pretense that Cohen had $60 million that he wished to donate to charity.  See Testimony of Danny Glover TT at 1514:4–7.  Yet, at the time Cohen made this statement to Glover, Cohen had approximately $95,000 in his bank account.  See Testimony of Juan Saavedra TT at 1413:14–17.  On August 25, 2002, Glover introduced Dillon to Cohen.  See Testimony of Danny Glover TT at 1516:14–1517:12.  After this meeting, Cohen told Dillon that he sought to help Dillon's charitable organization, Vanguard.  See Testimony of Hari Dillon TT at 531:10–13.  A few days after this dinner, Dillon sent Cohen a letter, writing that Cohen's "commitment to giving back is clearly deep and profound and reflective of the very core of who [Cohen is] as a person.  Decl. in Support of Resp. to Mot. Ex. C at 532:11-17.  Dillon even compared Cohen's "values" to those of Dr. Martin Luther King, Jr.  Id.

Another Vanguard-related victim, Warren, testified that during a dinner at Cohen's house in September of 2002, Cohen discussed the upcoming purchase of E-Cast by Microsoft.  See Testimony of Gina Warren TT at 44:11–45:21.  Cohen claimed that E-Cast's acquisition would be lucrative, that the acquisition was imminent, and that part of the acquisition proceeds would be invested in Vanguard's programs.  See id.  John Bell ("Bell"), founder of Camp Okizu—a non-profit organization supporting children and families stricken by cancer—stated:

> In approximately 2002 or 2003, Jamie Lee introduced [Cohen] to me as a potential donor to camp Okizu. [Cohen] flew into the Oroville area on a private jet.  I gave him a tour of the camp. . . He told me he wanted to help Camp Okizu by raising $5 million for it. . . .[Cohen] and his wife Stacy were high bidders on several items at various fundraiser auctions held to benefit Camp Ozkizu.  After being the winning bidder, it

United States District Court
For the Northern District of California

was extremely difficult for me and my staff to get [Cohen] to pay. . . [yet] some of the money [Cohen] sent to Camp Okizu was to purchase items or experiences.  For example, according to Camp Okuzi records, Cohen purchased the following: ladies Diamant 18 kt. Pink gold watch ($19,500); Rolling Stone autographed guitar ($14,000); Barry Bonds' autographs baseball ($1,600); and others.

Gov. Sent. Memo. Ex. 9, at ¶ 1–11.  Cohen strategically misrepresented to several people who had charitable interests over the course of approximately eight years that Microsoft was in the process of acquiring E-Cast.  Cohen thus cannot establish with reasonable probability that, but for his appellate counsel's failure to argue that Cohen did not overtly target and exploit the "charitable impulses" of his alleged victims, Cohen would have prevailed in his appeal.  See Smith, 528 U.S. at 285; Am. to Am. Mot. at 8.  Any alleged deficient representation therefore would not have prejudiced Cohen in his appeal.

Accordingly, Cohen cannot meet Strickland's two-prong standard with this IAC claim.

### B.    Actual Innocence Claim

Cohen also claims that he is entitled to relief based on actual innocence.  See Am. Mot. at 38.  He claims that an affidavit provided by Gradie Cowens ("Cowens"), a federal prisoner, details Dillon's confession to the crimes for which Cohen was convicted.  See id.; Supp. Providing Decl. Pursuant to Mot. for Stay Ex. D.  Cohen further contends that three to four unnamed federal prisoners can corroborate Cowen's potential testimony.  See Am. Mot. at 38.  Cohen asks that the Court therefore vacate his conviction.  See id.

The government opposes this argument, asserting that Cowen's affidavit is cumulative of the material used at trial to cross-examine Dillon.  See Resp. to Am. Mot. at 26–28.  The government further argues that Cohen's claim is based on a witness of "dubious credibility," whose potential testimony, even if believed, "would not contradict the substantial evidence of [Cohen's] false statements."  Id. at 26.

A petitioner may raise procedurally barred claims by establishing his "actual innocence."  Bousley v. United States, 523 U.S. 614, 622 (1998).  The threshold for a freestanding actual innocence claim is "extraordinarily high."  See Herrera v. Collins, 506 U.S. 390, 417 (1993).  To successfully bring this claim for relief in the Ninth Circuit, a

29

habeas corpus petitioner is required to "go beyond demonstrating that doubt beyond his guilt"—that is, he must "affirmatively prove that he is probably innocent." <u>Carriger v. Stewart</u>, 132 F.3d 463, 476 (9th Cir. 1997) (en banc). The petitioner must present "evidence of innocence" such that "a court cannot have confidence in the outcome of the trial." <u>Id.</u> at 478 (quoting <u>Schlup v. Delo</u>, 513 U.S. 298, 316 (1995)).

Cohen has failed to establish that he is entitled to relief based on actual innocence. Cohen argues that Cowen's affidavit proves that Dillon orchestrated the fictitious acquisition of E-Cast by Microsoft, and further, that Dillon signed a declaration stating that Cohen never made any misrepresentations about the Microsoft E-Cast deal. <u>See</u> Am. Mot. at 41. Cohen also reasons that because Mills's testimony was "too flimsy" alone, Cohen's conviction rested almost exclusively on Dillon's testimony. <u>See</u> Am. Mot. at 39. However, as discussed already, there is overwhelming evidence in the record of Cohen's guilt, regardless of Dillon's or Mills's testimony about the Microsoft scheme. <u>See</u> <u>supra</u> Section III(A)(1).

Further, Cohen's trial counsel thoroughly cross-examined Dillon about the fictitious Microsoft scheme and the declaration that purportedly bore Dillon's signature. <u>See</u> Decl. in Support of Resp. to Mot. Exs. D, E. In fact, the Court previously stated that one could "disbelieve any number of things that [Dillon] said" and still conclude that Cohen is guilty because "there was a tremendous amount of evidence outside of Mr. Dillon's testimony, which wasn't dependent on Mr. Dillon's testimony to establish [Cohen's] guilt." <u>Id.</u> Ex. K 17:17–21.

As such, Cohen fails to meet the "extraordinary" standard set forth by the Ninth Circuit. <u>See</u> <u>Carriger</u>, 132 F.3d at 476. He has not affirmatively proved his innocence. <u>See</u> <u>id.</u> Cohen's assertion that he is innocent because Dillon purportedly "pressed upon [Cowen]" to "cleanse his soul of the shame he felt for inflicting such pain (22 years in prison) on Cohen" is unsupported by the record, <u>see</u> Am. Mot. at 40, and of questionable veracity in light of the overwhelming evidence of Cohen's deliberate fraud, based on lies he told and actions he took. <u>See</u> <u>supra</u> Section III(A)(1). Cohen has not presented "evidence of innocence" required to doubt the outcome at trial. <u>See</u> <u>Carriger</u>, 132 F.3d at 476.

United States District Court
For the Northern District of California

1  Accordingly, Cohen is not entitled to relief based on actual innocence.

2  **C.      Due Process Violation Claims**

3  Cohen makes three claims[7] that his conviction violated his due process rights under

4  the Fifth Amendment.  Federal prisoners may challenge their convictions under § 2255 on the

5  grounds that there was a fundamental defect that made the trial inherently unfair, resulting in

6  a conviction obtained in violation of the prisoner's Fifth Amendment due process rights.  See

7  Addonizio, 442 U.S. at 184–85.

8  Cohen argues: (1) that he was denied due process because the Court improperly

9  interfered with defense counsel's cross-examination; (2) that he was denied due process

10 because the Court allowed the government to introduce improper lifestyle evidence to be

11 introduced; and (3) that he was denied due process because the government withheld material

12 in violation of Brady v. Maryland, 373 U.S. 83 (1963).  See Am. Mot. 42.  Two of the three

13 arguments were previously litigated on direct appeal to the Ninth Circuit, and thus cannot be

14 litigated again.  See Cohen, 539 F. App'x at 745–46.  The third claim is procedurally barred

15 for a different reason.

16 **1.      Denial of due process because the Court improperly interfered with defense counsel's cross-examination**

17

18 Cohen argues that the Court improperly interrupted defense counsel's cross-

19 examination of Dillon.  See Am. Mot. at 42.  Cohen claims that this limitation amounted to a

20 due process violation.  See id.  Cohen made this same claim on direct appeal except that he

21 claimed that the Court violated his rights under the Confrontation Clause.  See Cohen, 539 F.

22 App'x at 745.  The Ninth Circuit held:

23       Cohen raises a Confrontation Clause challenge to the district court's
         limits on Cohen's cross-examination of Hari Dillon.  We review de novo
24       a challenge based on the exclusion of an area of inquiry, but we review
         the district court's restrictions of the scope or manner of
25       cross-examination for abuse of discretion.  United States v. Larson, 495
         F.3d 1094, 1101 (9th Cir. 2007) (en banc).  The district court's limitation

26

27 _____

   [7]Cohen's amended motion contains a short paragraph outlining the § 2255 fundamental fairness
28 standard for due process violations under Reed v. Farley, 512 U.S. 339, 335 (1994); Am. Mot. at 38.
   Cohen does not apply the facts or make a request for relief.  As such, the Court does not address this
   paragraph in its Order.

**United States District Court**
For the Northern District of California

1   on questions regarding Dillon's understanding of legal terms contained
2   within his plea agreement represented a minor limitation intended to
    avoid confusing the jury; it was not an exclusion of an area of inquiry.
3   See id. at 1102 (limitation on scope of cross-examination regarding
    Government's cooperating witnesses' biases and motivations to lie was
4   not exclusion of area of inquiry).  The jury heard evidence that Dillon
    had entered into a plea agreement and that he was motivated to cooperate
5   with the government.  The district court did not abuse its discretion by
    determining that a letter containing several layers of hearsay was
6   substantially more prejudicial than probative.  See United States v.
    Spencer, 1 F.3d 742, 744 (9th Cir.1993) (district courts receive " 'wide
7   latitude' " when balancing prejudicial effect of proffered evidence against
    its probative value (citation omitted)).

8   Id.  Because this argument was presented and rejected on direct appeal to the Ninth Circuit, it

9   may not be litigated again in a § 2255 motion.  See Scrivner, 189 F.3d at 828 (9th Cir. 1999)

10  (appellate court decision rejecting claim was binding on court considering § 2255 motion).

11  Even if such a claim were proper, the Court would reject it as meritless.

12          This due process claim is accordingly denied.

13          **2.      Denial of due process because the Court allowed improper lifestyle
                      evidence to be introduced**
14

15          Next, Cohen alleges that evidence of his lifestyle used at trial improperly prejudiced

16  him, in violation of his due process rights.  See Mot. at 44–46.  Cohen made this same claim

17  on direct appeal except that he argued that this Court abused its discretion under federal

18  evidence law by admitting prejudicial lifestyle evidence.  See Cohen, 539 F. App'x at 745.

19  However, the Ninth Circuit determined that:

20          The district court did not abuse its discretion by admitting evidence about
            Cohen's lavish lifestyle because a description of his lifestyle was
21          probative of the manner in which Cohen conducted his scheme and
            relevant to whether the money he received was an investment, a loan, or
22          funds he spent rather than funds he intended to repay.  Because Cohen's
            wealth was not admitted to establish motive, the authorities that Cohen
23          cites, United States v. Romero–Avila, 210 F.3d 1017, 1022–23 (9th Cir.
            2000); United States v. Mitchell, 172 F.3d 1104, 1108–09 (9th Cir.
24          1999), are inapposite.

25  Cohen, 539 F. App'x at 745.  As this argument was presented and rejected on direct appeal to

26  the Ninth Circuit, it may not be litigated again in a § 2255 motion.  See Scrivner, 189 F.3d at

27  828 (9th Cir. 1999) (appellate court decision rejecting claim was binding on court

28  considering § 2255 motion).  Even if such a claim were proper, the Court would reject it as

1    meritless.

2           Therefore, this due process claim is also denied.

3           **3.      Denial of due process because the government withheld material in violation of <u>Brady</u>**

4           Cohen's final due process claim is that the government failed to provide favorable

5    evidence to the defense, in violation of its duties under <u>Brady v. Maryland</u>, 373 U.S. 83

6    (1963).  <u>See</u> Am. Mot. at 52.  Cohen contends that "[t]he government's manner of presenting

7    its evidence related to the disputed signatures [on the Dillon releases] . . .  can only

8    reasonably be explained by the likelihood that the government's own experts would have . . .

9    testified that the signatures were authentic."  <u>Id.</u>  Cohen further argues that because

10   government presented the signature evidence with solely lay opinion, one can conclude that

11   the government had experts who agreed that the signature was authentic.  <u>See id.</u>

12          This argument is procedurally barred.  As Cohen could have raised a claim of error on

13   direct appeal but failed to do so, he has procedurally defaulted the claim and may obtain

14   collateral review of it under § 2255 only if he can show either: (1) cause and actual prejudice;

15   or (2) that he is actually innocent.  <u>See</u> <u>Bousley</u>, 523 U.S. at 621 (prisoner who failed to

16   challenge validity of guilty plea on appeal procedurally defaulted claim).  Even if Cohen

17   could show cause, he could not show actual prejudice due to the voluminous evidence in the

18   record of his guilt.  <u>See</u> <u>supra</u> Section III(A)(1).  His claim that the government likely had an

19   expert who "would have" testified differently is based entirely on assumption, rather than on

20   fact.  Cohen also cannot demonstrate actual innocence.  <u>See id.</u>

21          Therefore, Cohen's claim is procedurally defaulted and is denied.  <u>See</u> <u>Bousley</u>, 523

22   U.S. at 621.

23          **D.      Claims for Vacation of Money Laundering and Tax Evasion Convictions**

24          Cohen argues that any tax evasion or money laundering counts should be vacated if

25   they are tied to wire fraud convictions vacated as result of his § 2255 amended motion.  <u>See</u>

26   Am. Mot. at 52.  For the previously stated reasons, the Court is not vacating any of Cohen's

27   wire fraud counts.  Therefore, the money laundering and tax evasion counts tied to the

28

United States District Court
For the Northern District of California

1    individual wire fraud convictions stand.

2    **E.    Request for an Evidentiary Hearing**

3    Cohen argues that an evidentiary hearing is warranted to develop his claims for relief.

4    See Am. Mot. at 53–54.  Cohen is not entitled to an evidentiary hearing.

5    First, Cohen's claims of IAC all fail because his trial and appellate counsel were not

6    deficient.  See supra Section III(A).  Furthermore, even if his counsel were deficient, Cohen

7    cannot establish actual prejudice due to the overwhelming weight of evidence against him.

8    See supra Section III(A)(1)(b).  Second, the record establishes that Cohen is not entitled to

9    relief on the grounds of actual innocence.  See supra Section III(B).  Third, Cohen's three

10   due process claims are all barred for procedural reasons.  See supra Section III(C).  Fourth,

11   Cohen's arguments that various aspects of his sentence should be vacated are procedurally

12   barred.  See supra Section III(D).  Even if Cohen were to gather evidence at a hearing in

13   support of each claim he advances in his amended motion, his claims would still be either

14   without merit or procedurally barred.

15   The Court denies Cohen's § 2255 motion without an evidentiary hearing because his

16   allegations, viewed against the record, do not state a valid claim for relief and are so palpably

17   incredible as to warrant summary dismissal.  See Mejia-Mesa, 153 F.3d at 931 (district court

18   properly denied evidentiary hearing on claims that failed to state a claim for relief under

19   § 2255 as a matter of law).

20   **IV.    CONCLUSION**

21   For the foregoing reasons, Defendant's amended motion to vacate, set aside, or

22   correct his sentence pursuant to 28 U.S.C. § 2255 is hereby DENIED.

23

24   **IT IS SO ORDERED.**

25   Dated: October 28, 2016

26                                                    _____
                                                      CHARLES  R.  BREYER
27                                                    UNITED STATES DISTRICT JUDGE

28